# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

|  |  |
|---|---|
| DAMONIE EARL, LINDA RUGG, ALESA BECK, TIMOTHY BLAKEY, JR., STEPHANIE BLAKEY, MARISA THOMPSON, MUHAMMAD MUDDASIR KHAN, ELIZABETH COOPER, JOHN ROGERS, VALERIE MORTZ-ROGERS, and LAKESHA GOGGINS, each individually and on behalf of all others similarly situated, | Civil Action No. ___19-cv-00507___ |
| *Plaintiffs*. | |
| v. | |
| THE BOEING COMPANY, SOUTHWEST AIRLINES CO., | **CLASS ACTION COMPLAINT** **AND DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Brian J. Dunne (CA 275689)
*bdunne@piercebainbridge.com*
Pierce Bainbridge Beck Price & Hecht LLP
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Tel: (213) 262-9333

**Yavar Bathaee (NY 4703443) (Lead Counsel)**
*yavar@piercebainbridge.com*
David L. Hecht (NY 4695961)
*dhecht@piercebainbridge.com*
Andrew J. Lorin (NY 2368249)
*alorin@piercebainbridge.com*
Michael M. Pomerantz (NY 2920932)
*mpomerantz@piercebainbridge.com*
Barron M. Flood (NY 5585765)
*bflood@piercebainbridge.com*
Pierce Bainbridge Beck Price & Hecht LLP
277 Park Avenue, 45th Floor
New York, New York 10172
Tel: (212) 484-9866

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

PARTIES ........................................................................................................................... 14

I.      Defendants ........................................................................................................... 14

II.     Plaintiffs .............................................................................................................. 15

JURISDICTION AND VENUE ........................................................................................ 17

FACTS ............................................................................................................................... 18

I.      The Southwest and Boeing Relationship:  No "Relationship Like It
        in the History of the Airline Industry" ............................................................... 18

II.     The Development of the 737 MAX 8 and Its Fatal Design ................................. 24

        A.  Boeing's Rapid Response to Airbus ........................................................... 25

        B.  The Maneuvering Characteristics Augmentation System ........................... 26

        C.  The MCAS's Defective Design .................................................................. 27

        D.  Boeing's Misrepresentations to Regulators and
            the MAX 8 Approval Process ..................................................................... 37

        E.  Southwest's Involvement with the Development,
            Specification, and Testing of the MAX 8 .................................................. 39

III.    The Crash of Lion Air Flight 610 ........................................................................ 43

        A.  The Crew Struggles for Eleven Minutes
            with the MCAS Before All Aboard Perish ................................................ 43

        B.  Boeing's Response to Lion Air Crash ........................................................ 44

        C.  Southwest Makes False Statements Nearly Identical
            to Boeing's and Quietly Installs AoA Indicators,
            Pretending They Were Always There .......................................................... 48

        D.  Pilots Demand Answers ............................................................................. 52

IV.     Disaster Strikes Again:  The Crash of Ethiopian Airlines Flight 302 ................. 53

        A.  The Accident .............................................................................................. 53

        B.  The Immediate Aftermath and Southwest's False Assurances of Safety .... 54

        C.  The FAA Finally Grounds the 737 MAX 8 ............................................... 62

V.      Southwest Admits that Boeing Had Failed to Install
        AoA Indicator Features Prior to the Lion Air Crash ........................................... 63

VI.     Boeing Admits that the Cost of Fixing the MCAS Was "Immaterial" ............... 65

VII.    Investigations into the Causes of the Tragedies ................................................. 67

# TABLE OF CONTENTS
*(continued)*

VIII.   Boeing Admits that Its Handling of the Situation
Surrounding the AoA Disagree Indicator Was a "Mistake" ............................................. 70

INJURY TO AMERICAN AIRLINES TICKETHOLDERS ....................................................... 72

CLASS ACTION ALLEGATIONS ............................................................................................ 73

REALLEGATION AND INCORPORATION BY REFERENCE ............................................. 84

CLAIMS FOR RELIEF ............................................................................................................ 85

I.   Nationwide Claims ............................................................................................................ 85

    A.  Federal Claims ............................................................................................................ 85

    B.  Common Law and State Law Claims ....................................................................... 91

II.   State Subclass Claims ....................................................................................................... 99

    A.  Claims Brought on Behalf of the California Subclass ............................................. 99

    B.  Claims Brought on Behalf of the Florida Subclass ................................................ 103

    C.  Claims Brought on Behalf of the New York Subclass ........................................... 106

    D.  Claims Brought on Behalf of the Arizona Subclass .............................................. 110

    E.  Claims Brought on Behalf of the Indiana Subclass ............................................... 112

    F.  Claims Brought on Behalf of the Georgia Subclass .............................................. 115

PRAYER FOR RELIEF ......................................................................................................... 120

JURY DEMAND .................................................................................................................... 121

Plaintiffs, based on personal knowledge, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION[1]

1.      On February 7, 2018, defendant Southwest Airlines Co. ("Southwest") filed its annual Form 10-K with the United States Securities and Exchange Commission ("SEC").  In its filing, it boasted, "For the 45th consecutive year, the Company was profitable, earning $3.5 billion in net income"—forty-five consecutive years of profits, in what Southwest itself described as "an extremely volatile industry subject to numerous challenges."  Southwest had for another year maintained a multidecade streak that was simply unheard of in an industry fraught with razor-thin margins, massive bankruptcies, and fluctuating costs.

2.      This case is about how Southwest obtained those profits through a collusive relationship with codefendant The Boeing Company ("Boeing"), Southwest's sole airplane supplier.  It is also about how Southwest worked with Boeing to protect that relationship—and its streak of profits—when faced with a fatal design defect in Boeing's 737 MAX 8 aircraft, by lying to and defrauding, customers, regulators, and its own pilots and employees, risking thousands of lives in the process.

3.      For decades, Southwest has propped up Boeing in seemingly economically irrational ways, including by sending signals to the market with strategically timed orders for new 737 airplanes; locking itself to a single aircraft manufacturer and type of aircraft; spending millions of dollars to *avoid* flying non-737 airplanes acquired in a merger; creating a trust designed to hide delays and cancelations of aircraft orders; and releasing airplanes it had ordered to *its own competitors* in order to allow Boeing to meet demand for new airplanes.

---

[1]  Terms not defined in this Introduction are defined in the body of the Complaint.

4.     Boeing and Southwest, however, had an unwritten but strictly-adhered-to agreement: in exchange for its otherwise economically irrational backstopping of Boeing, Southwest would get early access to new 737 models, input into Boeing's design process, and the lowest price on all 737 aircraft—or a check from Boeing for the difference in price, no questions asked.  This agreement allowed Southwest to streamline its operations with only one type of aircraft, and to operate without fear of price increases by Boeing, thereby reducing Southwest's costs—and increasing its profits—dramatically.  No other airline has such a deal.

5.     In the past few years, a series of reckless design and manufacturing decisions have made this unprecedented relationship even more critical for both companies.  Boeing rushed a terribly defective new 737 model—the 737 MAX 8—to market, and people died.  Southwest worked with Boeing to cover up the defect in this model, and to assure the public that the 737 MAX 8 was safe (it was not), and later that it was fixed (it was not).  More people died.  But Southwest still did not change its tune on the 737 MAX 8.  It could not risk its special relationship with Boeing—or those 45 straight years of profits.

6.     It took government intervention—the grounding of the entire fleet of 737 MAX 8 airplanes by the Federal Aviation Administration ("FAA")—for Southwest to publicly acknowledge a problem.  But in reality, Southwest knew the 737 MAX 8 was fatally flawed and had worked with Boeing to cover it up and falsely tout the safety of the airplane.

7.     And through this all, Southwest kept selling seats, knowing that a significant number of its passengers would fly on the 737 MAX 8.  From August 29, 2017, through March 13, 2019, Southwest knowingly risked the lives of its customers, its pilots, and its other employees.  And Southwest reaped revenues that it never would have received had its customers known they

were potentially buying seats on defective planes that could easily have killed them—as it has killed hundreds of other fliers.

8.     This action seeks to hold Southwest and Boeing responsible for their reckless, greedy conspiracy to launch the defective 737 MAX 8 and to keep it flying.  Each of the Plaintiffs bought a ticket to fly on a safe airline that flew safe planes.  None of them would have bought a ticket—let alone for the price they paid—to potentially fly on a plane that Southwest and Boeing knew was fatally defective.  Put simply, Southwest and Boeing conspired to cover up this indisputable fact:  The 737 MAX 8 was so defective and poorly designed that it could easily kill you.  Plaintiffs want their money back.

*     *     *

9.     In the late 1990s, Southwest founder and Chairman Emeritus Herb Kelleher made a handshake deal with the then CEO of Boeing, Phillip Condit (the "Handshake Agreement"):  No airline would pay less for Boeing aircraft than Southwest, and if any airline did, Southwest would receive a check, "no questions asked."  In exchange, Southwest would continue to operate the largest fleet of exclusively Boeing 737 aircraft in the United States, and when Boeing needed Southwest, it would be there to backstop Boeing with every tool in its arsenal.

10.     For example, in November 2001, in response to decreased demand for air travel following the September 11, 2001 terrorist attacks, Southwest needed to scale back its airplane purchases from Boeing.  Instead of simply deferring its purchases—and thus signaling a decreased demand for Boeing 737 jets to the market—Southwest spent millions of dollars to create and capitalize a special purpose trust through which it obfuscated its deferral and potential cancellation of aircraft orders.  These expenditures made no ostensible financial sense for Southwest—but they helped prop up Boeing through hard times.

11.     Years later, a fatal engine explosion on a Southwest Boeing 737-700 resulted in a passenger being sucked out of an airplane window.  Southwest's swift response was to place a multibillion-dollar aircraft order with Boeing.  Again, Southwest took expensive action simply to calm the market for Boeing, its supplier.  The Handshake Agreement was alive and well.

12.     Southwest's greatest backstop of Boeing to date was a series of massive, multibillion-dollar orders for, and commitments to, the 737 MAX 8 ("MAX 8").  The MAX 8 was Boeing's rushed answer to the A320neo, a fuel-efficient new aircraft manufactured by Airbus SE ("Airbus"), Boeing's only competitor in the large aircraft market.[2]

13.     Pressed for time to meet its competitor in the market, Boeing developed the MAX 8 by modifying an existing airplane to include larger, more fuel-efficient engines positioned further to the front of the plane.  This change in weight and weight distribution meant a significantly different handling profile for the airplane—the nose of the airplane would tend to tilt up from the new weight distribution.

14.     Rather than retrain pilots already trained on other 737 models, including the 737NG, Boeing's solution was to design and implement the Maneuvering Characteristics Augmentation System ("MCAS"), a computer-controlled system that would automatically adjust for the MAX 8's new weight distribution by, among other things, automatically pitching the nose of the airplane down as necessary.

15.     Boeing designed the MAX 8's MCAS in a peculiar way.  The MCAS received information from an angle-of-attack sensor ("AoA Sensor") on the side of the nose of the airplane.[3]

---

[2]  The MAX 8 is one of several narrow-body aircraft models designed and produced by Boeing as the fourth generation of Boeing 737 collectively referred to as the "MAX Series."

[3]  The angle-of-attack ("AoA") is the angle between the vector of the oncoming air flow, or relative wind, and the chord line of the wing on the airplane.  Understanding the AoA is critical

Although the MAX 8 was equipped with two AoA Sensors—one on each side of the nose in the event that one malfunctioned—the MCAS was inexplicably designed to read the angle-of-attack from only one of them.



**How the MCAS (Maneuvering Characteristics Augmentation System) works on the 737 MAX**

**1. The angle-of-attack sensor** aligns itself with oncoming airflow.

*Oncoming airflow*

*Level flight*

The angle of attack is the angle between the wing and the airflow.

**2.** Data from the **sensor** is sent to the flight computer.

*Nose-up flight*

If the angle rises too high, suggesting an approaching stall …

… the **MCAS** activates.

**3.** MCAS automatically swivels the **horizontal tail** to lift the plane's tail while moving the nose down.

*Nose down*

**Horizontal tail**

In the Lion Air crash, the angle-of-attack sensor fed false information to the flight computer.

*Sources: Boeing, FAA, Indonesia National Transportation Safety Committee, Leeham.net, and The Air Current*

Reporting by **DOMINIC GATES**,
Graphic by **MARK NOWLIN / THE SEATTLE TIMES**

16.    The design was reckless because it relied on a single AoA Sensor to dramatically and peremptorily alter the plane's pitch, and the sensor that Boeing chose to place at the heart of the MCAS was known to malfunction at very high rates.  Indeed, pilots had repeatedly reported failures of the same or similar AoA Sensors on Boeing aircraft to the Federal Aviation Administration for years.

17.    To make matters worse, Boeing failed to install on Southwest's MAX 8s a crucial indicator that could alert a pilot to the failure of an AoA Sensor.  Specifically, Boeing had installed on *some* airplanes an indicator on the pilot's command console that would show when the individual AoA Sensors on each side of the nose of the airplane disagreed, which could potentially warn a pilot that a sensor malfunction had occurred (the "AoA Disagree Indicator").  As Boeing

---

to ensuring that air is flowing properly over an airplane's wings and therefore that there is enough lift to keep the plane in the air.

has admitted, its own specifications called for implementation of the AoA Disagree Indicator, but inexplicably, Boeing failed to install and enable the indicator on all MAX 8 aircraft.  Instead, Boeing designated the AoA Disagree Indicator as an "optional" feature on the MAX 8, requiring payment of a higher price for a critical safety feature that Boeing itself believed was necessary.

18.     Boeing did nothing to correct the designation of the AoA Disagree Indicator as optional after the error was discovered by Boeing in 2017, around the date of delivery of the first MAX 8, and the airplanes were delivered to carriers, including to Boeing's launch carrier Southwest, without the vital AoA Disagree Indicator enabled as a standard safety feature.

19.     In addition to ignoring the fatal flaws in its design, Boeing also ignored a fatal flaw in its logic.  Because Boeing wanted to avoid the additional cost and delay of retraining pilots who were already trained on existing 737 aircraft, Boeing and Southwest said *nothing to pilots about the existence of the MCAS*.  Thus, even if a pilot were able to determine that one of the AoA Sensors had malfunctioned, he or she would not know why the airplane was taking absolute control of the plane's pitch and summarily rejecting the pilot's contrary inputs and the pilot's attempts to reassert control over the plane's pitch.

20.     Critically, pilots also did not know that to disengage the MCAS, the MAX 8's entire electric trim system—akin to power steering on a car—had to be disabled and overridden with manual controls.  Assuming the pilot somehow figured this out and was able to manually turn the crank to disable the MCAS (which itself requires above-average physical strength in some emergency conditions), all of this would have to occur in seconds during a crisis situation in order to avoid an accident, particularly when the airplane was at low altitudes or at stall speeds.

21.     Boeing and Southwest thus put pilots in an impossible situation, inevitably setting them up to fail.  If the MCAS erroneously determined that the airplane's nose was pitched too high

because of a sensor failure, it would drive the nose of the airplane down repeatedly, and the airplane's crew would not understand what was happening or how to stop it.  If such an error occurred at low altitudes or at stall speeds, ***a computer-driven crash straight into land or water was certain to occur***.

22.     On August 29, 2017, Boeing delivered the first of the MAX 8 airplanes to Southwest, its "launch carrier"—a designation that typically means early involvement in the development and customization of the airplane.  Detailed contracts between Boeing and Southwest ensured that every item installed on the aircraft was enumerated and subject to inspection upon delivery, and if Southwest had asked Boeing to fix or modify virtually any aspect of the MAX 8, Boeing would have done so.

23.     Southwest's involvement with testing was extensive but wrought with incentives to cut corners and skirt rules.  At launch, the companies jointly produced a promotional video boasting about the extensive testing they had together performed on the MAX 8.  However, Southwest and Boeing failed to mention that Boeing had agreed to pay Southwest a substantial "rebate" if Boeing did not succeed at skirting government-mandated rules requiring simulation and testing during the development process.  In other words, Boeing and Southwest had a secret agreement to avoid the very sort of testing they claimed they had extensively performed on the MAX 8.  Of course, none of that was in the promotional video or other marketing materials.

24.     By February 2019, Southwest had 31 MAX 8s in its fleet, with another 249 ordered for delivery.  Although Southwest had paid for the optional AoA features—including the AoA Disagree Indicator—on its MAX 8s, it discovered after taking possession of the new airplanes that the AoA features had not in fact been enabled.

25.     On October 29, 2018, Lion Air Flight 610—a MAX 8—took off from Soekarno-Hatta International Airport in Jakarta, Indonesia.  Minutes into the flight, the control stick began to shake, warning the pilot that a stall was imminent.  Moments later, the MCAS automatically pushed the aircraft's nose downward.  For eleven horrifying minutes, the flight crew struggled against an automated system that it did not know existed.  The aircraft plunged into the Java Sea and all 189 passengers died (the "Lion Air Crash").  An investigation showed that the sole AoA Sensor feeding into the MCAS had malfunctioned—resulting in the MCAS forcing the plane into a crash.

26.     Both Boeing and Southwest immediately began a joint public-relations and marketing offensive in a concerted effort to control the damage to Boeing's reputation and to public perception of the MAX 8.  Boeing released service bulletins and other guidance that alerted pilots for the first time about the existence of the MCAS and directed the crew to disable the airplane's entire electric trim system if the MCAS malfunctioned.

27.     Both companies appeared on television and other media to tout the safety of the MAX 8 and to perpetuate an entirely false and misleading narrative about the procedures in place at the time of the Lion Air Crash.  For example, both companies repeatedly stated that flight procedures existed at the time of the crash that could have prevented the deaths of those aboard.  The implication was clear—it was pilot error that caused those deaths, not the poor design of the MAX 8 that Boeing proposed and Southwest approved.  But the companies' concerted message was false and misleading, and both companies knew it.  Pilots had not been informed of any procedure that would have prepared them for a failure of the MCAS.  In fact, Boeing and Southwest had purposefully hidden from pilots the very existence of the system; they knew that

pilots would have strongly resisted a design that enabled a computer algorithm to seize control of a plane against the will of the pilots.

28.     Pilots, including the pilots flying airplanes for Southwest, pushed back against this collusive, false narrative.  They were irate that they had not been told about the MCAS and that they had received no training or simulations to prepare them for a failure of the system.  Indeed, none of the relevant manuals mentioned that the MCAS was designed to override pilot input and issue nose-down commands, nor was there any disclosure to pilots before the Lion Air Crash that the MCAS would re-activate just five seconds after a pilot's stick input was registered.  Moreover, because Boeing and Southwest had agreed to a rebate if any simulation would be required, Boeing had avoided crucial simulation and testing and had not therefore required pilot simulations of, and training for, MCAS-related malfunctions.

29.     Boeing and Southwest also misled the public, airline customers, and the FAA about the appropriate fix for the MCAS's flawed design.  Boeing discovered soon after delivering the first aircraft to Southwest that the key AoA Disagree Indicator had not been installed or enabled in many MAX 8s as a standard feature—as required by Boeing's own specifications.  This would have allowed a pilot to potentially detect a sensor malfunction.  Boeing and Southwest said nothing about the missing standard feature.

30.     Moreover, Southwest had asked Boeing to install and enable the disagree feature on its MAX 8 aircraft, but discovered after delivery of the airplanes that the feature had not in fact been enabled.  Southwest said nothing.  After the Lion Air Crash, Southwest asked Boeing to enable the feature, but again told no one that it had not been enabled on delivery.  Southwest then falsely heralded the installation as a new supposed fix for the problems that caused the Lion Air Crash—unequivocally declaring the MAX 8 safe.

31.     Indeed, neither Southwest nor Boeing admitted until recently that the AoA Disagree Indicator they together touted as a potential fix for the MCAS design flaw was specified during the design process to be standard on the aircraft.  In addition to omitting from its statements that the feature was never enabled on its planes, Southwest also omitted the crucial fact that the AoA Disagree Indicator alone was not enough to avoid another accident—among other problems, the MCAS was still tied to only one of the AoA Sensors.  Southwest said nothing about this when it touted the safety of its MAX 8s.

32.     Boeing and Southwest also collusively misled regulators, the public, and airline customers about whether additional training and in-flight procedures were enough to fix problems with the MCAS.  Boeing issued a service bulletin that instructed flight crews to disable the electric trim system of the aircraft in order to override the MCAS when the system malfunctioned.  Akin to turning off power steering while speeding down a highway in bad weather, an override would require several steps and would leave the pilot with only manual controls that would be subject to the aerodynamic forces.  At stall speeds or low altitudes, none of this would be feasible.  With only seconds to react, pilots would be unlikely to be able to shut off the electric trim and then successfully wrestle with manual controls while the aircraft was subject to significant aerodynamic forces during a crisis situation.

33.     Both Boeing and Southwest provided pilots with training based on Boeing's service bulletin.  They then repeatedly touted the MAX 8 as safe.  Both companies, however, knew that significant problems remained with the MCAS, including, *inter alia*, that:  (a) the MCAS continued to read information from only one failure-prone AoA Sensor; (b) the MCAS repeatedly overrode the pilot's control inputs within seconds; (c) the MCAS did not properly take airspeed, altitude, pitch and other data into account when it applied repeated nose-down commands; (d) disabling an

electric trim at low altitudes and at stall speeds was both onerous and dangerous; and (e) manual trim control was not viable given physical forces on the large airplane's controls.[4]

34.     Both Boeing and Southwest knew all of this but conspired to say nothing about it. Instead, they repeatedly stated to the public, to their customers, and to regulators that existing procedures at the time of the Lion Air Crash were adequate and that the additional procedures in Boeing's service bulletin would prevent another crash in the future.   They were unequivocal that the MAX 8 was safe, but they knew otherwise.

35.     The truth was that the MCAS required a massive re-design and the MAX 8 needed to be grounded until that re-design was implemented and then extensively tested.   Indeed, the extraordinary length of time that the MAX 8 has been and will be out of service is testament to the fact that the MAX 8's design flaws were deeply fundamental and inherent in the design and thus laboriously challenging to overcome.   Moreover, pilots would require additional training and documentation to properly fly the redesigned airplane.   This appeared costly and reputationally damaging for both companies, so they instead agreed to pretend that they had fixed the MCAS entirely.

36.     On March 10, 2019, Ethiopian Airlines Flight 302—another MAX 8—took off from Addis Ababa, Ethiopia.   One minute after takeoff, the pilot indicated that he was having problems controlling the aircraft.   Two minutes later, he requested an emergency landing.   The plane pitched frantically up and down.   The pilot struggled with the MCAS but was unable to gain control of the plane.   At just 450 feet above the ground, the pilot had little leeway to recover.

---

[4] To "trim" an aircraft is to adjust the controls so that the aircraft maintains a set altitude without pilot input.  Most aircraft feature several different mechanisms for trimming.

Accident investigators quickly confirmed that a fatal defect in the MCAS had caused the accident. All 157 people aboard the plane were killed (the "Ethiopian Airlines Crash").

37.     Immediately, travelers throughout the world expressed concern and dismay that, despite two very high-profile crashes, the MAX 8s were still in the air, and they voiced their fear of flying aboard the aircraft.  Southwest customers frantically attempted to change airlines, and if they could not, change their flights, to avoid the MAX 8.  Because passengers booking flights would in most cases not be able to choose the aircraft they flew on, they sought guarantees from Southwest that they would not be put on a MAX 8.  Southwest would not, and could not, give any such guarantees.  Meanwhile, passenger apprehension about the MAX 8 was so intense that online booking platforms, such as Kayak.com, began to offer features that allowed those booking flights to avoid flights and airlines that continued to fly the MAX 8.

38.     For three days, Southwest, along with Boeing, engaged in an intensive social media campaign to convince the public that the MAX 8 was safe.  In response to the public's numerous concerns about the safety of the MAX 8, Southwest blithely responded through a social media barrage that it was "confident in the safety and airworthiness of [its] fleet of more than 750 Boeing aircraft."  Not once did Southwest tell anyone that it in fact knew that serious design flaws in the MAX 8 still existed.  Meantime, Boeing was posting publicly on its own social media channels that it had "full confidence in the safety of the 737 MAX."

39.     At the same time, and as part of Boeing's conspiracy with Southwest, Boeing's CEO lobbied the FAA and even the President of the United States to refuse to respond to public outcry and ground the MAX 8.  For several days, Boeing was successful.  Even though numerous countries and every United States-based airline except American Airlines and Southwest had

grounded the MAX 8, the FAA refused to order the grounding and Southwest continued to assure the public that there was no reason for alarm.

40. On March 13, 2019, the FAA finally issued an emergency order grounding the MAX 8 in the United States. The results were devastating for Southwest, with thousands of cancelled flights directly attributable to the grounding, requiring Southwest to refund significant amounts in ticket prices and to dramatically alter its flight routes and schedule.

41. Up to—and even on the day of—March 13, 2019, Boeing and Southwest were engaged in concerted efforts to avoid the grounding of the MAX 8 and to conceal the aircraft's serious design flaws from the public. After the FAA grounding, however, Boeing finally agreed to redesign the MAX 8, and both companies made calculated admissions about their own knowledge and actions.

42. The MAX 8's redesign—which is being implemented by Boeing with Southwest's input and participation—fully exposes the defective design that was hidden by them both. The MCAS has been redesigned to recognize when the pilot's inputs contradict the MCAS's nose-down commands and to only nudge the nose downward once and stop if the pilot's inputs are to the contrary. Two AoA Sensors, rather than one, are to be used for AoA readings. And, critically, Boeing will no longer rely on a manual override of the airplane's entire electric trim system to correct an MCAS malfunction. In other words, Boeing and Southwest have recognized what has been obvious to the rest of the world once it learned of the MAX 8's design—that the MAX 8's original design was deeply flawed and inherently defective.

43. A few months after the March 13 grounding by the FAA, Southwest publicly admitted that the AoA Disagree Indicators had not been enabled in its MAX 8s before the Lion Air Crash.

13

44.     The most stunning admission, however, came in Boeing's first quarter 2019 quarterly report filed with the SEC.  The cost of redesigning the MAX 8 to address the MCAS's flaws was *"immaterial"* to the company.

45.     On June 17, 2019, Kevin McAllister, Boeing's head of commercial aircraft, apologized for the deaths of the 346 people killed in the Lion Air Crash and the Ethiopian Air Crash.  Dennis Muilenburg, Boeing's CEO, admitted that Boeing made a "mistake" in how it handled communications surrounding the MCAS.

46.     Had Boeing and Southwest not actively misled the public, airline customers, and regulators about the safety of the MAX 8, passengers would not have taken those flights and revenue and profits at both companies would have suffered.  Both companies were willing to put lives at risk to protect their revenues and profits, and actively conspired to do so.

47.     Accordingly, tens of thousands of passengers flew on MAX 8s from their release through the grounding.  Due to the defect in the MCAS, those planes were ticking time bombs:  an AoA Sensor was bound to fail, setting in motion a cascade of events that virtually guaranteed the deaths of the people on board.  None of that mattered to Boeing or Southwest.

## PARTIES

I.      **Defendants**

48.     Boeing is a for-profit corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located in Chicago, Illinois.  Boeing maintains substantial and continuing operations in this judicial district, including a 70,000 square-foot division headquarters at 5905 Legacy Drive, Plano, TX 75024.

49.     Boeing chose Plano as the headquarters of its Global Services Division—a company division with 300+ locations and over 23,500 employees—in part because of Plano's proximity to Southwest's headquarters in northern Dallas.  Since 2016—and throughout the

entirety of the Class Period—Boeing's Plano operations have been a hub for meetings, communications, and other coordination between Boeing and Southwest.

50.     Boeing has significant operations elsewhere in Texas, including a 168-acre maintenance facility in San Antonio, TX with 1.6 million square feet of building and hangar space. The San Antonio facility is Boeing's largest maintenance, repair, and overhaul site.  After the MAX Series was grounded by the FAA on March 13, 2019, Boeing stored grounded MAX Series airplanes at its San Antonio maintenance facility.

51.     Southwest is a for-profit corporation, organized and existing under the laws of the State of Texas, with its headquarters located at 2702 Love Field Drive, Dallas, Texas 75235. Southwest has employees and operations throughout Texas, and operates flights from Dallas Love Field, San Antonio, Houston Hobby Airport, Harlingen/South Padre Island, Corpus Christi, Lubbock, Midland/Odessa, El Paso, Austin, and Amarillo.

## II.     Plaintiffs

52.     Unless otherwise indicated, all Plaintiffs identified below purchased tickets on either Southwest Airlines or American Airlines for flights from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive (the "Class Period").  All Plaintiffs identified below and the proposed classes were harmed and suffered actual damages.  The actual prices of the tickets that were purchased as a result of the misrepresentations by Southwest and Boeing about the safety of the MAX 8 and MAX Series Aircraft were significantly higher than the value of those tickets, which for many, if not most, passengers was zero.

53.     The same Boeing-Southwest conspiracy that caused passengers to fly on a MAX 8 on Southwest Airlines (when they otherwise would not have done so) also proximately caused passengers to fly on other airlines that flew the MAX 8, such as American Airlines (when they

would not have done so but for the Boeing-Southwest conspiracy, which hid safety issues with the airplane).   The unlawful conspiracy between Boeing and Southwest therefore caused injury and damages to certain Plaintiffs who flew on American Airlines and risked flying on a MAX 8 aircraft operated by American Airlines.

54.     Further, all Plaintiffs identified below and the proposed classes did not receive the benefit of their bargain.   Specifically, they paid for flights that met ordinary and reasonable consumer expectations regarding safe airplane design and operation but instead received flights of lesser or no value on planes that did not meet ordinary and reasonable consumer expectations of safe airplane design and operation.   Defendants unjustly benefitted from the misrepresentations and material omissions made to Plaintiffs.

55.     Plaintiff Linda Rugg resides in California.   Plaintiff Rugg flew on Southwest Airlines during the Class Period with a purchased ticket.

56.     Plaintiff Muhammad Muddasir Khan resides in Florida.   Plaintiff Khan flew on American Airlines during the Class Period with a purchased ticket.

57.     Plaintiff Alesa Beck resides in Nevada.   Plaintiff Beck flew on Southwest Airlines during the Class Period with a purchased ticket.

58.     Plaintiffs Timothy Blakey Jr. and Stephanie Blakey reside in New York.   Plaintiffs Timothy Blakey and Stephanie Blakey flew on Southwest Airlines during the Class Period with a purchased ticket.

59.     Plaintiff Marisa Thompson resides in Arizona.   Plaintiff Thompson flew on Southwest Airlines and American Airlines during the Class Period with a purchased ticket.

60.     Plaintiff Elizabeth Cooper resides in Indiana.   Plaintiff Cooper flew on Southwest Airlines during the Class Period with a purchased ticket.

61.     Plaintiff Damonie Earl resides in Arizona.  Plaintiff Earl flew on Southwest Airlines during the Class Period with a purchased ticket.

62.     Plaintiffs John and Valerie Mortz-Rogers reside in Indiana.  Plaintiffs John Rogers and Valerie Rogers flew on Southwest Airlines during the class period with a purchased ticket.

63.     Plaintiff Lakesha Goggins resides in Georgia.  Plaintiff Goggins flew on Southwest Airlines during the Class Period with a purchased ticket.

64.     Plaintiffs bring this action on behalf of themselves and all other consumers who similarly purchased a ticket for air travel to fly on a Southwest or American Airlines aircraft from August 29, 2017, the date Southwest first received delivery of the MAX 8, through March 13, 2019, the date that all 737 MAX Series aircraft were grounded by the FAA.

## JURISDICTION AND VENUE

65.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the law of the United States, and 18 U.S.C. § 1964(c), because Plaintiffs assert claims under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are likely to be tens of thousands of putative class members; and the amount in controversy exceeds the jurisdictional amount or $5 million.

66.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), 1391(c)(2), and 1391(d).

67.     First, venue is proper under 28 U.S.C. § 1391(b)(1), because for purposes of this action, Boeing resides in the Eastern District of Texas, and all defendants are residents of Texas.

Boeing is a resident of the Eastern District of Texas for purposes of this action at least by virtue of 28 U.S.C. §§ 1391(c)(2) and (d), because it is subject to the court's personal jurisdiction with respect to this action (Boeing has a major division headquarters and employs hundreds of employees in Plano, and operated the conspiracy alleged in this Complaint at least in part out of that location), and because Boeing's contacts with the Eastern District of Texas would be sufficient to subject it to personal jurisdiction in this district if it were a separate state.  Southwest is a resident of Texas for multiple reasons, the simplest of which is that it is incorporated here.[5]

68.     Second, venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in the Eastern District of Texas.  For example, Boeing maintains offices here from which, on information and belief, it coordinated its conspiratorial efforts with its nearby codefendant Southwest.  Moreover, many of the top Southwest executives who directed the conspiracy alleged here—including Southwest CEO Gary Kelly—reside in the Eastern District of Texas.  On information and belief, many acts and omissions of the Southwest-Boeing conspiracy alleged here (including potential wire fraud) occurred in and around Plano, where Kelly resides and maintains a home office.

## FACTS

**I.      The Southwest and Boeing Relationship:  No "Relationship Like It in the History of the Airline Industry"**

69.     In the late 1990s, Southwest founder and Chairman Emeritus Herb Kelleher cut a handshake deal with Boeing's then CEO Phillip Condit:  No airline would pay less for aircraft than

---

[5] Although it is not required for venue to be proper, Southwest is also a resident of this judicial district for purposes of this action.  For example, under at least 28 U.S.C. § 1391(c)(2), Southwest is subject to this court's personal jurisdiction in this action, given that Southwest's corporate headquarters is just 60 miles from the Paul Brown U.S. Courthouse in Sherman, and just 20 miles from the U.S. Courthouse in Plano.

Southwest.  If any airline received a better deal on any Boeing aircraft, Boeing would cut Southwest a check, "no questions asked."  In exchange, Southwest would lock itself into a Boeing 737-only fleet and backstop Boeing with whatever means it has at its disposal.

70.     Over the years, both companies have staunchly adhered to this agreement, developing and solidifying a troubling, collusive relationship.  In fact, the companies' collusive relationship has grown increasingly more extensive, intertwined, and deleterious to the public.

71.     Southwest and Boeing's relationship began in 1971—just after Southwest was founded—when Southwest took delivery of three unwanted 737-200s from Boeing.  From the beginning, Southwest has staked its entire existence on the Boeing 737.

72.     Since the Handshake Agreement, Southwest has been integral to the development of Boeing 737 aircraft.  It has been the launch carrier for many of Boeing's new 737 models, often the first in line to place large orders.  Having a ready, willing and able launch carrier at hand for new models has been a tremendous benefit to Boeing, while having the inside track to the development and launch of new models has been a tremendous benefit to Southwest.

73.     The development of new airplane models is hugely expensive and cannot be done without the support of a major carrier placing major orders.  The special relationship between Southwest and Boeing allowed Boeing to take on the expense of developing new 737 models with far less risk than if the relationship between Southwest and Boeing did not exist.

74.     From Southwest's perspective, being launch carrier for new 737 models has given Southwest valuable information and input into the Boeing aircraft it relies on to generate profits.  Over the course of decades, Southwest has been deeply involved in the development of several generations of the Boeing 737, including their specifications, manufacturing, and design.  This

allows Southwest to shape each new model to its own preferences and efficiencies and gain first-to-market insights and advantages.

75.     Boeing's and Southwest's mutually beneficial pattern of collusion has historically manifested itself in numerous additional ways.  For example, in a 2016 interview with the Wall Street Journal, Kelleher described a unique aspect of the partnership between Boeing and Southwest.  Kelleher stated that Boeing "regularly" asked Southwest "to relinquish some of [its] delivery positions, so [Boeing] could offer 737s to other new airlines."  Southwest would also phase out older 737s more quickly than an airline would in the normal course in order to offer them to other airlines that needed them at Boeing's request.  This kind of deal, while patently bad for Southwest in the short and medium term, ensured the long-term viability of the Handshake Agreement.

76.     Boeing's and Southwest's collusion has also mutually benefitted the companies when demand for Boeing planes became weak.  For example, Southwest has served as a backstop for Boeing's 737 sales, sometimes taking delivery of unwanted aircraft that Boeing cannot sell.  On at least one occasion, Southwest took delivery of several unwanted jets directly from Boeing.  When leases and second-hand sales are considered, the number of unwanted aircraft acquired by Southwest from Boeing is even higher.

77.     While these transactions made little economic sense for Southwest in the short or medium term, it was part of Southwest's and Boeing's understanding that Southwest would eventually recoup its losses over the longer term on account of Boeing's various accommodations over the longer term, including in the form of lower airplane prices and other benefits as alleged herein.

78.     In November 2001, in response to decreased demand for air travel following the September 11, 2001 terrorist attacks, Southwest needed to scale back its aircraft purchases from Boeing.  To avoid signaling its deferral of existing purchases to the market, Southwest took extraordinary measures to obfuscate its deferral and potential cancelation of orders.  Specifically, Southwest entered into a trust agreement with a special purpose entity (the "Trust") and assigned its purchase agreement with Boeing to the Trust.  Southwest subsequently entered into a purchase agreement with the Trust to purchase the aircraft at new delivery dates.  Boeing then delivered the aircraft to the Trust.

79.     The deal made no real financial sense, as it cost millions in financing to create the Trust, fund the Trust's purchase of airplanes, and defer the purchases.  The primary reason for the transaction was to obfuscate Southwest's deferrals of its Boeing orders, which would have moved the markets and potentially caused cancelations and deferrals by other carriers.

80.     Southwest and Boeing have a relationship like no other in the industry; in no sense is it an ordinary business relationship.  Among numerous peculiarities, the relationship between Southwest and Boeing is and has always been exclusive—unlike most major airlines in the United States, Southwest does not fly any Airbus aircraft.  This is a tremendous benefit for Boeing.  In contrast to all other major United States airlines, Southwest does not and cannot force Boeing to compete with Airbus for its purchase orders.  Boeing can never be sure it will receive purchase orders from any airline—except Southwest.

81.     In return for this fertile and exclusive market, Boeing has guaranteed Southwest the best prices for its aircraft—even after the fact.  No other airline can boast that it receives a lowest-price guarantee on aircraft from one of the two largest aircraft manufacturers in the world.  In an industry where aircraft purchases and leases are one of the largest costs for any airline, Southwest's

cost advantage, arising from its agreement with Boeing, is unprecedented and unparalleled and gives Southwest an enormous competitive advantage over its peers.

82.     Indeed, it is common practice for employees (engineers in particular) to go through a revolving door between the two companies. On information and belief, many Boeing engineers have gone on to work at Southwest and *vice versa*.

83.     Southwest's long-term cost advantages are a necessary part of the *quid pro quo* with Boeing, because Southwest's all-Boeing fleet brings with it disadvantages. Absent the Handshake Agreement, Southwest would be extraordinarily vulnerable to, *inter alia*, price increases by Boeing. Because of the Handshake Agreement, however, Boeing assures itself of an exclusive customer while Southwest assures itself of not being gouged on pricing. Thus, both companies can maintain their competitive positions in each of their own otherwise highly competitive markets.

84.     Southwest's fleet is not just exclusively Boeing aircraft, but ***exclusively Boeing 737s***. Southwest reports in its financial filings that, to date, it has 373 orders and options for 737 MAX aircraft with Boeing and lessors, far surpassing any other single customer.

85.     Southwest gains some advantages from this business model, which allows cost savings. As Southwest Vice President of Ground Operations Chris Wahlenmaier once noted: "We only need to train our mechanics on one type of airplane. We only need extra parts inventory for that one type of airplane. If we have to swap a plane out at the last minute for maintenance, the fleet is totally interchangeable—all our on-board crews and ground crews are already familiar with it. And there are no challenges in how and where we can park our planes on the ground, since they're all the same shape and size."

86.     But Southwest's fleet monoculture also leaves it vulnerable.  Southwest routinely warns in its financial statements filed with the SEC that its business operations would be "materially adversely affected in the event of a mechanical or regulatory issue associated with the Boeing 737 aircraft type, whether as a result of downtime for part or all of the Company's fleet, increased maintenance costs, or because of a negative perception by the flying public."

87.     Because of its complete dependence on the Boeing 737, Southwest has continued its investment in the airplane, even in the face of widespread mechanical failures, regulatory scrutiny, and customer ambivalence.  Indeed, Southwest has done whatever it must to continue to signal to its customers, regulators, and the public that the 737s it flies are safe.  Southwest's aggressive support of the 737 benefits both Southwest and Boeing.  The 737 is the Boeing's biggest seller and having a vociferous cheerleader for the airplane among the plane-purchasing community keeps up purchases and airplane values.

88.     For example, on April 17, 2018, one of the engines of a Boeing 737-700 operated by Southwest exploded in mid-air, shattering one of the aircraft's windows.  One passenger was partially sucked out of the window and was barely pulled back into the aircraft by flight attendants. The passenger, a mother of two, died as a result of the accident.

89.     During widespread scrutiny over the accident, Southwest doubled down on the 737 just days later, on April 27, 2018, placing an order for 737 MAX jets worth $4.68 billion.  This was a show of force by Southwest—a message to the markets that, despite evidence to the contrary, the Boeing 737 was safe and that Southwest would stand by Boeing.

90.     Once again, Southwest had backstopped Boeing by placing a massive order, strategically timed to signal to others that Boeing 737s were safe and that there was continuing demand for them from Boeing's most important 737 customer.

23

91.     Southwest continued its investment in Boeing aircraft throughout 2018.  The airline took delivery of twenty-six new 737-800 aircraft and seventeen MAX 8 aircraft from Boeing, as well as a pre-owned Boeing 737-700 aircraft from a third party.  As of December 31, 2018, Southwest had firm orders in place with Boeing for 219 MAX 8 aircraft and thirty 737 MAX 7 aircraft.

92.     Southwest's investment in new Boeing 737s has been vitally necessary to replace the 775 737-700 aircraft it is retiring at the end of 2019.  Replacing those aircraft with airplanes from Boeing's only rival manufacturer, Airbus, would require expensive pilot training and retooling of its business model, which depends on an all-Boeing 737 fleet and the lowest prices from Boeing for its airplanes.

93.     Southwest therefore had to keep all its Boeing 737s flying and to manage the public perception of their safety to ensure the viability of its business.

94.     Southwest's message to the market, to consumers, and to regulators is clear and consistent:  Southwest will do whatever it takes to keep Boeing 737s in operation and in demand—whether backstopping its exclusive provider with strategically timed orders; concealing a material defect in its MAX 8s; or falsely touting the MAX 8's safety, when in fact Southwest knew the plane was anything but safe.

## II.      The Development of the 737 MAX 8 and Its Fatal Design

95.     Boeing competes in the large jet market with only one rival, Airbus.  Together, Boeing and Airbus make up 99% of the large jet market worldwide.  In 2011, Boeing faced a serious challenge from its rival—the Airbus A320neo, a new single-aisle aircraft by Airbus with cutting-edge fuel efficiency.  The new Airbus model immediately attracted major buyers, including airlines based in the United States, most notably American Airlines.

96.     Started in the 1970s, Airbus began as a minor aircraft manufacturer but grew in significance over the ensuing decades.   In 2008, Airbus delivered 483 airplanes while Boeing delivered only 375.   Billions of dollars are at stake in the corporate struggle between the two companies.   As a result, Boeing began to look for shortcuts to get new airplanes to customers more quickly, and at a lower cost.

## A.     Boeing's Rapid Response to Airbus

97.     When Airbus came out with the A320neo, Boeing needed an immediate answer to its rival's newest product.   The company calculated that it would take too long to design a new aircraft to compete with the A320neo.   Boeing's imperfect solution, therefore, was to adapt of one of its existing narrow-body aircraft into a "new" product, turning it into a competitively fuel-efficient rival to the A320neo.

98.     In August 2011, Boeing's Board of Directors authorized the launch of a new line of products to compete with Airbus—the MAX Series.   The use of the existing 737NG aircraft as a basis for the new MAX Series saved Boeing significant design and development costs.   More importantly, it shaved years off of development time, allowing Boeing to provide a timely response to Airbus's new aircraft.

99.     The use of an existing and widely flown 737 platform also meant that pilots already flying Boeing 737NG aircraft would potentially not have to learn to fly an entirely new aircraft. This saved both the airlines and Boeing extensive transition costs, including test flights, simulators, flight manuals and literature, and certification costs.

100.     To make the new plane more fuel efficient, and therefore competitive with the new Airbus A320neo, the 737NG's engines were replaced with larger, more fuel-efficient engines. This modification meant that the aircraft itself would have to be modified to accommodate the new

engines.  Boeing mounted the engines higher and further forward on the MAX 8's wings and modified the airplane's nose gear to provide more ground clearance for the new engines.

101.    Because the new engines were more powerful and mounted differently on the aircraft, they caused the MAX 8's nose to abnormally pitch up under certain flight parameters, creating the risk that the airplane would suffer an aerodynamic stall.

102.    Stalls can be deadly.  An airplane is lifted by the movement of air over and under its wings.  A stall begins to occur when an airplane's AoA is too steep (usually more than 15 degrees), reducing lift by altering the proper movement of air over and under the wings and causing the formation of air vortices.  At approximately 18-20 degrees, the air above the wings begin to swirl, which results in a complete loss of lift.  The aircraft then tilts forward and passes into a fall, at which point a pilot can lose control.

103.    The FAA addresses stalls in its Airworthiness Standards for Commercial Aircraft, requiring that "[n]o abnormal nose-up pitching may occur . . . ."[6]  Moreover, the aircraft must be designed such that it is "possible to promptly prevent stalling and to recover from a stall by normal use of controls."  Importantly, the FAA requires that a stall be recoverable using "***normal*** use of controls"—not exclusively using computerized systems or manual overrides.  The pilot should remain in control and should have the ability to avoid a dangerous stall.

### B.    The Maneuvering Characteristics Augmentation System

104.    During wind tunnel testing of the MAX 8 in 2012 in Seattle, Boeing engineers observed a tendency for the plane's nose to pitch upward during specific conditions and recognized that they needed to address this problem.

---

[6]  14 C.F.R. § 25.203(a).

105.    However, rather than ensure that the MAX 8 could recover from a stall caused by an upward pitch of the plane's nose through "normal use of controls," Boeing designed a fly-by-wire, computer-controlled system to compensate for the aircraft's tendency to pitch up.  The system was called the Maneuvering Characteristics Augmentation System, or MCAS.  The MCAS was added during the aircraft's Part 25 certification.  It was designed to bring the nose of the aircraft down repeatedly in the event the jet's AoA drifted too high.

106.    The MCAS "commands nose down stabilizer to enhance pitch characteristics during step turns with elevated load factors and during flaps up flight at airspeeds approaching stall."  The "sole function" of the MCAS "is to trim stabilizer nose down."  Additionally—as Boeing admitted when it first disclosed the existence of the system after the Lion Air Crash in late 2018—the MCAS engages "without pilot input."  The MCAS was ***specifically designed*** to drive down the nose of the MAX 8 ***automatically and repeatedly, without pilots knowing what was going on.***

107.    In operation, the MCAS would tilt the MAX 8's horizontal stabilizer upward at a rate of .27 degrees per second for total travel of 2.5 degrees in just under ten seconds.  Just how much the stabilizer moved would depend on the aircraft's speed (or Mach number).  At higher speeds, the stabilizer moved less, and at slower speeds, it moved more.  In other words, at slower speeds near stall, the stabilizer received more aggressive commands to pitch the aircraft's nose down.

## C.    The MCAS's Defective Design

108.    The MCAS was defective by design—fatally so.  In fact, there were multiple defective aspects of the MCAS design.  Any one of these defective aspects by itself would compromise the safety of the aircraft, as Boeing and Southwest well knew.  The MCAS had ***seven*** such aspects, all of which would need to be fixed—at the least—to fly the MAX 8 safely.

### 1.      The Single Sensor Aspect

109.      Although MAX 8 aircraft have two AoA Sensors to relay the aircraft's pitch to the pilot, the MCAS inexplicably drew on data from only one of the sensors.  If the single sensor was damaged, experienced a malfunction, or was incorrectly calibrated, it would send bad data to the MCAS.

110.      In fact, the original version of the MCAS was activated ***only if both of*** two distinct sensors indicated that the nose was pitched upward at a dangerous level.  However, during safety testing, after assessing the possibility that the AoA Sensor would fail and cause the MCAS to fail, Boeing engineers determined that connecting the MCAS to just one sensor would be an acceptable risk.  This was in part dependent on the assumption—later shown to be faulty—that a pilot would be able to respond to an erroneous control input by the MCAS within seconds.

111.      Based on Boeing's decision to connect the MCAS to just one AoA Sensor, if a single sensor sent faulty information to MCAS (*e.g.*, indicating that the angle of attack was high when it was not), MCAS would anticipate a stall and repeatedly pitch the nose of the aircraft down—automatically, silently, and without pilot intervention.

112.      Almost every system in a sophisticated aircraft like the MAX 8 is designed with redundancies.  The use of data from a single AoA Sensor to determine the AoA is baffling and reckless.  As Peter Lemme, one of Boeing's former engineers who helped design systems for the 757 and 767, stated:  "From the beginning it should have been a fail-safe design, which would have relied on two inputs to make sure that you weren't sensitive to one failure."

113.      In addition to failing to build redundancies, Boeing never flight tested the single-input design to determine how MCAS would respond if a sensor malfunction occurred.  As a former Boeing pilot who tested the MAX 8 anonymously told the press, "I don't think we appreciated the ramifications of a . . . failure of an AoA probe."

114.    Another Boeing test pilot commented: "I would be very curious to know what their logic was on that . . . and what drove them to think that was a suitable solution."

### 2.      The Failure-Rate Aspect

115.    The danger of the Single Sensor Aspect was amplified by a defective design aspect that relied upon input from an unreliable sensor.  Indeed, the FAA has received at least 216 reports of AoA Sensors failing or having been repaired, replaced, or adjusted since 2004, according to data from the FAA's Service Difficulty Reporting website.  Approximately one-fifth of the complaints involved Boeing planes, including incidents in which AoA Sensors were frozen, improperly installed, struck by lightning, or even hit by flying birds.  Some of the reported AoA Sensor failures led to stall warnings, forcing pilots to abort takeoffs or perform emergency landings.  Based on these reports, there is no doubt Boeing knew of the risks stemming from sensor failure.  Nevertheless, the company recklessly chose to implement a single-sensor-input design.

116.    Boeing further should have understood the danger of relying on a single data input because recent history has shown that even multiple data inputs from similar sources can lead to crashes.  For example, in 2009, Air France Flight 447 crashed in the mid-Atlantic due to a chain of events begun by the clogging of the aircraft's pitot tubes, which measure airspeed, falsely telling the crew that the plane was losing speed and automatically disengaging the autopilot.  The investigation revealed numerous other safety incidents caused by the failure of the pitot tubes to accurately measure airspeed.  If erroneous data from a redundant measuring system can lead to crashes, then Boeing must have understood that erroneous data from a single measuring instrument was highly likely to lead to crashes.  And it did.

117.    A high rate of failure of AoA Sensors meant that Boeing should have, at a minimum, installed additional AoA Sensors on the MAX 8 if was going to design the MCAS to

essentially commandeer the airplane upon potentially flawed data from those sensors.  Indeed, for example, Boeing 787s have five pitot tubes to measure airspeed.

118.    Further, if Boeing was going to design the MCAS to wrest control of the aircraft away from the pilot upon potentially flawed data input from AoA Sensors, then Boeing should have installed an alternative method of determining the AoA other than AoA Sensors.  Instead, Boeing fatally designed the MCAS to take over control of the plane based on only one type of sensor with a high rate of failure, as shown by the Lion Air and Ethiopian Airline Crashes.

119.    If there was any doubt that Boeing knew about the potential risk, it was eliminated by the FAA.  The FAA issued two directives regarding the AoA Sensors for various Boeing aircraft even before the 737 MAX was released.  These directives prove that Boeing was aware of the potential for the sensors to cause problems in its planes.  As the former managing director of the National Transportation Safety Board ("NTSB") has explained, AoA Sensors are fundamentally the same across different aircraft models.  There is no doubt that Boeing understood the problem and chose to disregard the risk.

### 3.    The Disagree Aspect

120.    Boeing designed a system that could be used to determine whether the two AoA Sensors on the aircraft disagreed with each other.  Boeing was aware that AoA Sensors were not always accurate and specifically designed a feature that would alert a pilot when one of the sensors might not be working correctly.

121.    The MAX 8 could be fitted with an indicator that would display whether the two AoA Sensors agreed with each other as well as a light that would illuminate if there was a disagreement between the AoA Sensors on the aircraft, indicating that one of the sensors may have malfunctioned—the AoA Disagree Indicator.

122.    Boeing, however, made the AoA Disagree Indicator an *optional* feature on the aircraft, meaning airlines would have to pay more to have it enabled.  As Boeing later admitted in a released statement, Boeing's own design requirements included the AoA Disagree Indicator as a *standard* feature in the MAX 8.  However, Boeing mistakenly made the AoA Disagree Indicator *non-standard* on the MAX 8—a software error Boeing discovered in 2017, several months after it had begun delivery of the aircraft:

> The Boeing design requirements for the 737 MAX included the AoA Disagree alert as a standard, standalone feature, in keeping with Boeing's fundamental design philosophy of retaining commonality with the 737NG.  In 2017, within several months after beginning 737 MAX deliveries, engineers at Boeing identified that the 737 MAX display system software did not correctly meet the AoA disagree alert requirements.  The software delivered to Boeing linked the AoA disagree alert to the AoA indicator, which is an optional feature on the MAX and the NG.  Accordingly, the software activated the AoA Disagree alert only if an airline opted for the AoA indicator.[7]

123.    Put simply, Boeing *admits* that it delivered a product that did not meet its own specifications, and that in doing so it made a critical safety feature optional, subject to an upsell. The AoA Disagree Indicator was critical to the safe flight of the MAX 8 because it could reveal a failure of the AoA Sensor—a failure-prone sensor that was the sole input into MCAS.  But when Boeing discovered that it had inadvertently made this critical safety feature optional, it said nothing, instead repeatedly and falsely stating that the aircraft was safe without the feature.

---

[7]    Boeing Statement on AoA Disagree Alert (May 5, 2019), *available at* https://boeing.mediaroom.com/news-releases-statements?item=130431.

124.    In fact, in the same undated statement posted on Boeing's website, Boeing continued to falsely claim that the AoA Disagree Indicator was not necessary to the safety of the aircraft:

> When the discrepancy between the requirements and the software was identified, Boeing followed its standard process for determining the appropriate resolution of such issues.  That review, which involved multiple company subject matter experts, determined that the absence of the AoA Disagree alert did not adversely impact airplane safety or operation.  Accordingly, the review concluded the existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update.

125.    Boeing's position that an AoA Disagree Indicator was not required for safety of the aircraft contradicts its position that the MAX 8 was safe because pilots were capable of manually disabling MCAS if a problem emerged.  Pilots would have no direct way of comparing sensor readings from the two AoA Sensors to determine whether a malfunction had even occurred without an AoA Disagree system.  Moreover, as explained in the next section, when the MAX 8 was first delivered, pilots were never even informed about the existence of the MCAS.

**4.      The Secrecy Aspect**

126.    Boeing designed the MCAS to operate outside the knowledge of pilots.  When the 737 MAX 8 was delivered, Boeing did not tell the pilots that flew the airplanes that the MCAS existed.  There was therefore no way for pilots to know that MCAS was overriding pilot inputs in the background.  There was no way for them to know the system drew on only one of the two sensors on the aircraft.  There was no way for them to know that a manual override of the electric trim system would be required.  And there was no way for them to know of the terrifying consequences that would follow from a malfunction.

127.    In fact, there was no description or mention of the MCAS in the Boeing Flight Crew Operations Manual.  Later, in an internal message to Boeing employees sent on November 19,

2018, Dennis Muilenburg, Boeing's CEO, would falsely represent to employees that the MCAS was included in the Flight Crew Operations Manual all along.

128. When asked why Boeing did not alert pilots to the existence of the MCAS, Boeing responded in November 2018 after the first crash that the company decided against disclosing more details "due to concerns about inundating average pilots with too much information—and significantly more technical data—than they needed or could digest."

129. In fact, the secrecy was motivated by Boeing's rush to market and the avoidance of pilot transition costs for the new aircraft. The MCAS would presumably make the MAX 8 handle like the 737NG, meaning pilots would not have to be retrained to fly a new airplane. Boeing and Southwest therefore said nothing about the MCAS to avoid the significant costs of having to train pilots in simulators or to prepare them for failure modes unique to the MAX 8, including any malfunction of the MAX 8's AoA Sensors or an error that would cause the MCAS to push aircraft into a nose-down position and dive towards the ground.

130. Not only were those failure modes not simulated, they were not tested during the development of the aircraft. Boeing's focus was rushing to market to beat its competitor, Airbus— at any cost. Indeed, Boeing test pilots described a "culture of pressure" inside the company to limit flight testing, which can delay projects when orders are stacking up and cost the company money. Mark Rabin, an engineer who did flight-testing work, recalls that there was always talk about how delays of even one day could cost substantial amounts.

131. Accordingly, pilots transitioning to the MAX 8 from prior models were given a short, self-administered online course that did not mention the MCAS at all. The course was the only training pilots received for the new aircraft and in some cases could be completed in under an hour.

### 5.     The Manual-Disengagement Aspect

132.     When pilots finally became aware of the MCAS after the Lion Air Crash, they learned that the process of disengaging the MCAS was unreasonably complex and onerous, particularly in an emergency situation.  Indeed, if a pilot wished to disengage the MCAS, the prescribed method of doing so was absurdly and unnecessarily difficult, particularly under the kind of conditions that would trigger the MCAS to automatically engage.

133.     To manually shut off the MCAS, the MAX 8 has a STAB TRIM PRI cutout switch and a STAB TRIM B/U cutout switch located on the cockpit's control stand.  If either switch is set to CUTOFF, the autopilot, MCAS *and* manual electric trim inputs are *all* disengaged.

134.     This procedure would mean that all electronic trim would be disabled entirely, and a pilot would have to manually trim the airplane with controls subject to physical resistance from aerodynamic forces on the aircraft.  It is therefore possible that an average pilot would not even have the physical strength to operate the manual crank, let alone do so in time to prevent a crash.

135.     Where a pilot is facing a crisis of a potential nose-down crash into land or sea caused by an insistent algorithm, he or she should be able to disengage the MCAS without sacrificing the entire electric trim system.

136.     Instead, to avoid a crash, Boeing's solution was that the pilot—during a crisis— would execute a checklist full of manual overrides followed by engaging in a physical struggle with the unaided controls of a large aircraft.  To rely on such a procedure was entirely unreasonable and patently reckless.

137.     It is simply astonishing that Boeing designed the MCAS to engage and operate in all respects automatically and electronically, yet in the end the system could only be overridden through brute physical strength.

138.    This design aspect would be problematic and indeed fatal under certain flight conditions.  In fact, the risk that aerodynamic forces on the horizontal stabilizer could be too great for pilots to manually control the airplane without the use of the electric trim is even greater after an MCAS-driven nose down emergency.  Boeing knew this, but failed to provide a means of disengaging the MCAS without losing the use of the airplane's electric trim system.

139.    Of course, in order to even attempt this absurd procedure, a pilot would have to know of the MCAS's existence—but Boeing failed to tell pilots that the system existed until after the Lion Air Crash in late 2018.  In other words, for more than a year after the MAX 8 was released, pilots would have been helpless and unaware if the MCAS received erroneous input and repeatedly pushed the nose of the aircraft down.

### 6.    The Machine-Over-Man Aspect

140.    Perhaps the most egregious and disturbing aspect of Boeing's defective design was its decision to allow MCAS to commandeer the airplane based on erroneous data input from potentially malfunctioning sensors—functionally ignoring repeated pilot input.

141.    Indeed, the MCAS considered nose-up commands from pilots when they occurred, but then the MCAS would reengage seconds later, disregarding any history of contrary pilot input.

142.    Any rationally-designed software system would take into account insistent pilot countermands—nose-up commands—and respond to that input by discontinuing automated nose-down commands (as Boeing has since done in its redesign of the MCAS).

143.    In essence, the MCAS was designed to accept and trust *all* input from a potentially flawed or damaged AoA Sensor over *any* input from the experienced pilots who were flying the planes.  In short, the MCAS fatally treated the pilots, and all input from pilots, as meaningless input, untrustworthy as compared to an error-prone sensor and computer program.

144.    This aspect of the defective MCAS design flaw was especially foolish because the angle of attack is a measurement which trained pilots may be able to calculate using other information.  In particular, the angle of attack is related to pitch angle and flight path angle, which trained pilots may be able to calculate or understand even without AoA Sensors.  Indeed, pilots are trained to also rely on their senses and cockpit sensors *other than the AoA Sensor* to maintain an effective angle of attack.

145.    Boeing thus necessarily entrusted the safety of passengers to MCAS's algorithm over a pilot's judgment and experience, and it was the design of the algorithm that directly led to the Lion Air Crash and Ethiopian Airlines Crash.

146.    Even more troubling is the fact that the MCAS software was poorly written—and done so by the lowest bidder.

147.    The software systems in the MAX Series were developed at a time when Boeing was laying off experienced engineers and pressing its suppliers and contractors to cut costs.  One cost-cutting measure was to rely on third-party contractors outside of the United States for software engineering.  For the MAX series, Boeing relied on temporary workers in India being paid as little as $9 an hour to develop and test the MCAS and other software in the MAX Series.  These workers lacked a deep background in aerospace engineering and did not appropriately allocate resources for Boeing's mission-critical systems.

148.    Indeed, the Indian company that wrote software for the MAX Series, HCL Technologies Ltd., has been sued by other large U.S. companies for, *inter alia*, failing to adequately staff projects and maintain project schedules.

149.    Unsurprisingly, as Mark Rabin, a former Boeing software engineer, explained, the software written for the MAX Series was poorly implemented, and Boeing was forced to

repeatedly seek revisions of the code to address errors made by Boeing's cut-rate software engineers.

150.    This outsourcing not only cut Boeing's development costs, it helped Boeing win several contracts for Indian military and commercial aircraft—including an order for 100 MAX 8s from Indian airline SpiceJet Ltd.

151.    The multiply-defective design of Boeing's MCAS—including the Single Sensor Aspect, the Secrecy Aspect, the Failure-Rate Aspect, the Disagree Aspect, the Manual Disengagement Aspect, and the Machine-Over-Man Aspect (the "Design Aspects")—reflected a perfect storm of reckless design, inadequate disclosure and training, and corporate greed and incompetence.  Hundreds of innocent passengers would lose their lives because of them.[8]

### D.    Boeing's Misrepresentations to Regulators and the MAX 8 Approval Process

152.    During the multi-decade period in which Boeing has manufactured and sold the Boeing 737, the FAA has increasingly delegated its regulatory oversight responsibilities to Boeing itself in important matters of aircraft safety and certification.

153.    Specifically, the FAA operates a designee program, under which the FAA delegates to the private aircraft industry the power to certify aircraft as airworthy.  This power includes the ability to declare the engineering design of an aircraft as fundamentally sound, the manufacturing process as safe, the operation of the aircraft proper, and the maintenance of the aircraft as good.

154.    Designees can be either individuals or organizations.  The program by which organizations become designees is known as the Organization Designation Authorization

---

[8]  The Design Aspects collectively contribute to the "MCAS Defect."

("ODA") program.  ODA holders are typically authorized to conduct the types of functions they would normally seek from the FAA; *e.g.*, design changes in their products.

155.    Boeing holds ODA certifications which allow it to issue airworthiness certificates, approve changes to its quality control manual, and approve major repairs and alterations to aircraft without approval from the FAA.

156.    In 1993, the Government Accountability Office ("GAO") reported that Boeing had self-certified 95% of the Boeing 747-400.   In the 1990s, the Department of Transportation conducted an audit and discovered that Boeing had inspected and certified 95% of the Boeing 777s itself.

157.    Before 2004, Boeing technical employees who evaluated airplane safety on behalf of the FAA were called "Designated Engineering Representatives."  Though paid by Boeing, they were appointed by the FAA and reported directly to their technical counterparts at the FAA.

158.    In 2004, everything changed, further empowering Boeing to certify its own products.  The safety engineers, now called "Authorized Representatives" would not only be appointed by Boeing, but would report to Boeing.

159.    The MAX 8 was designed, approved, and manufactured while Boeing was the holder of these ODA certifications.  Based on this fact, some or all of the Design Aspects were likely deemed safe and airworthy by Boeing itself, rather than by the FAA.

160.    At the time the MAX 8 was designed, certified, and manufactured, there were simply no meaningful constraints on Boeing's self-regulation.  The FAA had become an absentee landlord—captured by one of the very companies Congress had charged it to impartially regulate.

161. Unsurprisingly, the Lion Air Crash and Ethiopian Air Crash sparked increased Congressional scrutiny of the ODA program, which followed years' worth of watchdog reports pointing out problems and risks stemming from the program.

162. As Senator Richard Blumenthal (D-CT) recently wrote in a letter to the FAA, the ODA program has "effectively left the fox guarding the henhouse."

163. It is therefore clear why Boeing's 2017 discovery that it had failed to make the AoA Disagree Indicator a standard feature—as required by internal specifications—went unnoticed by the FAA. Boeing chose not to inform regulators of the issue, admitting only recently in a statement that it unilaterally determined that the lack of redundancy in the AoA was not a safety or operational issue. Curiously, the statement added that "[s]enior company leadership was not involved in the review" and "first became aware of the issue in the aftermath of the Lion Air accident."[9]

## E. Southwest's Involvement with the Development, Specification, and Testing of the MAX 8

164. Boeing and Southwest worked together to speed the MAX 8's launch, including by minimizing simulation and testing of the aircraft. Boeing, for its part, was rushing the MAX 8 to market to catch Airbus. And Southwest simply wanted to avoid the time and expense of simulator training and testing. In fact, Boeing promised Southwest millions of dollars in rebates if the MAX 8 required simulator training for Southwest pilots.

165. Early in the process of selling the MAX 8, consistent with the Handshake Agreement, Boeing promised to give Southwest a substantial rebate for every plane if the MAX 8

---

[9] Boeing Statement on AoA Disagree Alert (May 5, 2019), *available at* https://boeing.mediaroom.com/news-releases-statements?item=130431&printable

required simulator training. One former MAX 8 worker, Rick Ludtke, said the rebate reported to him by managers was $1 million per plane.

166. When asked about the rebates being given by Boeing, a Southwest spokesperson said, "We do not discuss publicly the specific details of our contractual agreements," but added that "the purchase of an aircraft is a significant investment, and guarantees for various items . . . are incorporated into every 737 contract."

167. As Boeing's launch carrier, and consistent with the two Defendants' Handshake Agreement and close relationship, Southwest was directly involved in the testing, specification and development of the 737 MAX 8. Indeed, Southwest placed the first order for the MAX 8 in 2011, long before its development was completed or the planes were certified by the FAA.

168. Southwest knew that the development process would be rushed if Boeing was to hold to its delivery dates. This meant cutting corners on testing and simulation. Indeed, as Rick Ludtke recounted, there were internal pressures during the MAX 8 certification to avoid any changes to the design of the plane that might cause the FAA to lean toward a simulator mandate. This became a significant point of attention for Michael Teal, the 737 MAX Program Manager, and Keith Leverkuhn, Vice President and General Manager of the 737 MAX program.

169. Neither Southwest nor Boeing said anything to the public, regulators, or their customers about this policy of avoiding simulation and testing. Both companies, including Southwest, knew about Boeing's overly ambitious delivery timetable, and Southwest—having helped launch several Boeing 737 aircraft over decades—was used to far more extensive pilot training and simulation for a new model 737. Southwest, however, said nothing to anyone about Boeing's avoidance of simulation and testing regulations for the MAX 8.

170.    Indeed, Southwest employees frequently liaised with Boeing to tailor the new aircraft to the airline's needs.  Moreover, there is a revolving door of employees who work at Boeing and Southwest, particularly in the engineering departments of the companies.  Both companies knew each other's development procedures well, particularly given that Southwest was the launch carrier for several other Boeing aircraft—and both companies knew that development of the MAX 8 was unique in its reckless rush to market, inattention to design details, lack of simulation, and lack of testing.  Still, Southwest never publicly sounded the alarm that this version of the 737 would be rushed to market and would be designed to avoid mandated testing and simulation, nor did either company disclose that a rebate would be predicated on avoiding simulation, testing, and training.

171.    Thus, when Boeing and Southwest released a marketing video in October 2016 boasting that the two companies were putting the MAX Series "through its paces," they omitted any mention of Boeing's policy of avoiding simulation and testing.  Both companies were clear in their marketing that the new aircraft was "taken to several of the airports in Southwests [sic] system to simulate the kind of real-life conditions the airplane will encounter on any given day."  Omitted from that statement was any mention that vital simulation, including of failure modes in the then-undisclosed MCAS, was avoided and never performed.  Although the stated goal of the joint testing was to ensure that there would be "no surprises" and "no secrets," the true extent of the simulation and testing performed on the MAX 8 was deliberately and carefully hidden, as was the fact that Southwest's pilots would not even be told about the existence of the MCAS.

172.    It is also clear from their own contractual agreements that both Southwest and Boeing extensively coordinated during the development, specification and delivery of the MAX 8. The purchase agreements for aircraft between Boeing and its customers are long and complex and

allow for no surprises or secrets between them.  Boeing's contracts for the MAX 8 called for base prices with adjustments for options tailored to the purchaser, and upon delivery, the purchaser would be entitled to a detailed inspection and to perform a battery of tests.  Southwest was entitled to all of that and more, including rebates.

173.    On August 29, 2017, Southwest took delivery of its first MAX 8—the first North American carrier to do so.  In total, at launch, Southwest was scheduled to take delivery of 170 MAX 8 aircraft.

174.    When it took delivery beginning in August, Southwest inspected the MAX 8s it had purchased pursuant to its contracts with Boeing.  Southwest, among other things, examined the optional and standard featured installed on the aircraft and performed tests.  Any non-compliance with detailed specifications in part provided by Southwest and would have resulted in an iterative process by which Boeing would attempt to resolve any issues and Southwest would again inspect and test the airplane.

175.    The aircraft purchase agreement between Southwest and Boeing contained detailed provisions concerning features and items to be installed on the airplanes to be delivered to Southwest.  Indeed, redacted versions of the agreements for the MAX 8 between Southwest and Boeing filed electronically with the SEC contain multiple articles, tables, and exhibits covering aircraft specifications, many of which were negotiated for by Southwest.

176.    One exhibit to the agreement contained specific optional features to be installed on the aircraft along with the relevant prices.  This was a detailed list, covering systems from digital flight recorders to lavatories.  The list includes items for the pilot's cockpit, including the heads-up display, and safety features, such as a ground proximity warning system.  Every single feature— optional and standard—on the aircraft would have been inspected and tested by Southwest and

every feature would have been subject to negotiations and detailed specification.  Southwest knew about everything installed in the airplane—and it was entitled to check, inspect and test everything.

177.    On October 1, 2017, Southwest became "the first airline in North America to offer scheduled service utilizing the Boeing 737 MAX 8 aircraft."  That day, Southwest Chairman and CEO Gary Kelly said that "[t]he MAX 8 is the future of the Southwest fleet."

178.    Kelly also said at launch that the MAX 8 was the best narrow-body plane in the world and affectionately called it a "great airplane."

### III.    The Crash of Lion Air Flight 610

#### A.    The Crew Struggles for Eleven Minutes with the MCAS Before All Aboard Perish

179.    Lion Air Flight JT610, a MAX 8, took off from Soekarno-Hatta International Airport in Jakarta, Indonesia at 6:20 a.m. local time.

180.    Shortly after takeoff, the aircraft's stall warning system activated.  The aircraft's control stick began to shake, warning the pilot that an aerodynamic stall was imminent.  Moments later, the airplane's nose was suddenly and repeatedly pushed downward to the ground by the MCAS.

181.    The airplane's left AoA Sensor had failed and was sending erroneous data to the airplane's Flight Control Computer, causing the stall warning system to trigger.

182.    Because the flight crew did not know about the MCAS—let alone that to disengage the system would require disabling the aircraft's electric trim entirely—the flight crew attempted to manually trim the aircraft in order to stabilize the aircraft, not realizing that the MCAS had taken over.

183.    Their response to the MCAS was doomed from the beginning.  The system would disable for several seconds, then re-activate, again pushing the airplane's nose down towards the

ground.  About eleven minutes after takeoff, the crew's struggle with the MCAS was over.  JT610

plunged into the Java Sea.  Like a tale from some science fiction dystopia, a computer system the

crew knew nothing about had taken control of the airplane and crashed it.

184.     The investigation of the Lion Air Crash confirmed that the left AoA Sensor, which

was the sole sensor feeding the in-flight computer information, had malfunctioned.  The flight

recorder confirmed that the crew had struggled against the MCAS, which had repeatedly pushed

the nose of the aircraft down.  The crash was not an aberration but the perfectly predictable result

of the MAX 8's built-in design flaws.  Indeed, the MCAS did exactly what it was programmed to

do—accept a single sensor's input as 100% accurate and ignore any and all input from the pilots,

until the sensor ceased malfunctioning or the plane crashed.

### B.     Boeing's Response to Lion Air Crash

185.     The very reason the MCAS was installed was because manual pilot control was

found during test flights of the MAX 8 to be difficult at slow speeds, which would lead to an

aerodynamic stall.  Thus, if manual control was viable, the MCAS would have never been installed

to begin with.  Yet that is precisely the procedure Boeing suggested after the accident in its service

bulletin, dated November 6, 2018:

> In the event of erroneous AoA data, the pitch trim system can trim
> the stabilizer nose down in increments lasting up to 10 seconds.  The
> nose down stabilizer trim movement can be stopped and reversed
> with the use of the electric stabilizer trim switches but may restart 5
> seconds after the electric stabilizer trim switches are released.
> Repetitive cycles of uncommanded nose down stabilizer trim
> switches are released.  Repetitive cycles of uncommanded nose
> down stabilizer continue to occur unless the stabilizer trim system is
> deactivated through use of both STAB TRIM CUTOUT switches in
> accordance with the existing procedures in the Runaway Stabilizer
> NNC.  It is possible for the stabilizer to reach the nose down limit
> unless the system inputs are counteracted completely by pilot trim
> inputs and both STAB TRIM CUTOUT switches are moved to
> CUTOUT.

186.    On November 7, 2018, the FAA issued an emergency airworthiness directive to address the Lion Air Crash (the airworthiness directive referred to as the "AD").  The AD stated that the cause of the accident was erroneous sensor input from the aircraft's AoA Sensor but made no express reference to Boeing's MCAS:

> This emergency AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AoA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands for the horizontal stabilizer.  This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain.

187.    There was no mention in the AD of Boeing's fatally flawed design, nor was there any mention of the fact that Boeing's MCAS software was the cause of the repeated nose-down commands to the aircraft.

188.    The AD, however, acknowledged that the condition described could occur in other similar products:

> We are issuing this AD because we evaluated all the relevant information and determined the unsafe condition described previously is likely to exist or develop in other products of the same type design.

189.    The FAA's solution was to require an amendment to the operating procedures of flight crew on MAX 8 aircraft:

> This AD requires revising certificate limitations and operating procedures of the airplane flight manual (AFM) to provide the flight crew with the runaway horizontal stabilizer trim procedures to follow under certain conditions.

190.    Boeing did nothing to correct the FAA's statements that the flaw was caused by a "runaway horizontal stabilizer" rather than a fatally flawed design that would require the grounding of the MAX 8 until the MCAS was wholly redesigned.

191.    Moreover, Boeing said nothing about the fact that it had discovered months earlier that the AoA Disagree feature on the MAX 8 had not been activated as a standard feature, as required by its own specifications.

192.    On November 14, 2018, Boeing CEO Dennis Muilenberg appeared on the Fox Business Channel to tout the safety of the MAX 8.  He stated:

> The bottom line here is the 737 MAX is safe and safety is a core value for us at Boeing and it always has been and we ensure that our airplanes are safe.  In fact, this airplane went through thousands of hours of tests and evaluation, certification, ***working with the pilots***, and ***we've been very transparent on providing information*** and being fully cooperative on the investigative activity. . . . As the Indonesian authorities have pointed out, initially, there were some indications of an inaccurate angle of attack signal that was being sent to the airplane and of course ***our airplane has the ability to handle that with procedures in place*** and we've already issued a couple of additional bulletins to our operators and pilots around the world that ***point them back to existing flight procedures*** to handle that kind of condition.

193.    These statements were false.  In fact, at the time of the Lion Air Crash, pilots were not told about the existence of the MCAS, let alone that the airplane was designed to pitch the nose of the airple down if a too-high AoA was purportedly detected.  Nor were pilots told that unless they disengaged electric trim system, the MCAS would re-activate within seconds and countermand pilot inputs.  Neither pilots nor airlines were told that the AoA Disagree Indicator was erroneously made an option when the aircraft specifications called for it to be standard.  And Muilenberg echoed Boeing's false statement that existing procedures were in place that would safeguard against the MCAS's defective design.

194.   Muilenberg continued to make false and misleading statements during the same interview, repeating the same false language that existing procedures covered a potential AoA Sensor and MCAS error:

> Again, we ensure that we provide **all of the information that is needed to safely fly our airplanes and this comes out of thousands of hours of testing and evaluating and simulating and providing the information our pilots need to operate our airplanes safely**. And we'll continue to do that.  As part of the process, we've already issued a couple of bulletins to pilots and operators that **point them back to existing flight procedures to handle this kind of situation**. We're going to continue to fully cooperate with the investigation. It's very important here—the bottom line here is that **the 737 MAX is a very safe airplane and we're very confident in that**.

195.   Muilenberg's statements were false for the additional reason that Boeing had never simulated the sort of MCAS failure that would occur if an AoA Sensor malfunctioned.  Muilenberg and Boeing knew all of this, but, desperate to tout the safety of the MAX 8, he continued to make misleading statements about the Lion Air Crash.

196.   When asked squarely whether Boeing had added a new system to the aircraft that had not been disclosed to the pilots, Muilenberg again responded with false and misleading statements:

> Q. But was there a new system that wasn't disclosed to the pilots?
>
> A. **No.**  There are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions and those systems operate properly and again in certain failure modes if there is an inaccurate angle of attack sensor feeding information to the airplane **there is a procedure to handle that**. . . .  **The airplane is safe**.  We know how to fly it safely.  And **we're very confident in that**.

197.   Muilenberg not only falsely denied that the system had not been disclosed to pilots, but again repeated the lies that the MCAS operated properly, that procedures at the time of the crash existed to handle an MCAS failure, and that the airplane was safe.

198.    Muilenberg also stated that an existing procedure was part of the Boeing MAX 8's training manual:

> Q. Was that information in terms of what to do should something change, was that information available to the pilots?  Did they know how to operate it?   Should the nose be in a different position?
>
> A. Yeah, in fact ***that's part of the training manual***.  It's an existing procedure.  So the bulletin we put out again last weekend, over the weekend, ***pointed to that existing flight procedure***.

199.    Muilenberg's statement was again false.   Pilots were not notified about the existence of the MCAS, let alone trained to handle its failure due to a malfunctioning AoA Sensor. In fact, the Southwest Airlines Pilots Association ("SAPA") stated clearly that the system was not in the aircraft's manuals before the Lion Air Crash.

### C.    Southwest Makes False Statements Nearly Identical to Boeing's and Quietly Installs AoA Indicators, Pretending They Were Always There

200.    For Southwest, the Lion Air Crash—a disaster that happened on the other side of the world—threatened its operations in a very immediate way.  The Lion Air Crash came after the mid-air explosion of a Southwest airplane on April 17, 2018, which horrifically resulted in the death of a Southwest passenger who had been partially sucked out of a passenger window.  After that incident, Southwest had attempted to signal to the market that Boeing's airplanes were safe by strategically placing an order for billions of dollars of MAX Series aircraft weeks after the accident.   The multibillion-dollar order for MAX 8, Southwest hoped, would quell fears that Boeing's aging aircraft were dangerous, but now the MAX 8 became a new reason for concern.

201.    Southwest had bet its business on the Boeing 737 and on the MAX 8 specifically. Indeed, Southwest's 2018 10K filing with the SEC boasted about the company's investment the MAX 8s and the aircraft's purported promise:

> The Company focuses on reducing fuel consumption and improving fuel efficiency through fleet modernization and other fuel initiatives.

> For example, the Company previously retired all Boeing 737-300 aircraft from its fleet and has begun scheduled service with the Boeing 737 MAX 8 aircraft.  The Boeing 737 MAX 8 is expected to continue to significantly reduce fuel use and $CO_2$ emissions, as compared with the Company's other aircraft.  The Company added 18 Boeing 737 MAX 8 aircraft to its fleet in 2018 and ended 2018 with 31 Boeing 737 MAX 8 aircraft in its fleet.  In 2019, the Company expects to continue its fleet modernization initiative through the scheduled delivery of an additional 37 Boeing 737 MAX 8 aircraft and the Company's initial delivery of seven Boeing 737 MAX 7 aircraft.

202.    With its entire modernization effort hinged on the transition to the MAX 8 aircraft, Southwest needed to convince the public and its customers that the aircraft was safe.  Doing so would preserve the Handshake Agreement and special relationship with Boeing, the value of its existing MAX 8 aircraft, and the value of its massive order for additional MAX 8 aircraft.  Southwest—the airline with "nothing to hide"—and Boeing would have to work together to conceal the true defect with the MAX 8 aircraft, namely, dangerously designed flight software and deeply flawed systems.

203.    On November 12, 2018, the Seattle Times reported that Southwest's pilots were not informed during training about the MCAS aboard the MAX 8.  John Weaks, president of SAPA, expressed dismay at the failure to tell pilots about the MCAS:

> We do not like the fact that a new system was put on the aircraft and wasn't disclosed to anyone or put in the manuals. . . .  Is there anything else on the MAX Boeing has not told the operators?  . . . If there is, we need to be informed.

204.    Indeed, neither Southwest nor Boeing had told the pilots flying the planes that a computer-controlled system could potentially issue erroneous commands to the aircraft and that the only way to turn it off was to disable the aircraft's electric trim capabilities.

205.    The pilots had not been informed during training about the system, according to pilot representatives of Southwest.  According to Weaks, pilots "were kept in the dark."

206.    At the end of November, Southwest informed pilots of the MAX 8's MCAS and stated that it had put in place procedures for pilots to follow in response to the FAA's airworthiness directive.   However, Southwest misleadingly implied that it had maintained such procedures all along:

> Southwest has thoroughly reviewed the guidance issued by Boeing earlier today, and **our existing 737 MAX 8 operating procedures address the scenarios described in the bulletin** . . . . To underscore our commitment to safety, Southwest is taking steps to highlight the existing procedures to the over 9,500 pilots that operate our 737 MAX 8 fleet.

207.    Southwest's statement was deceptive—and strikingly similar to the false statements made by Boeing's CEO at the about the same time.   The airline's own pilots had been recently told for the first time that the MCAS existed.   It therefore could not have been the case that Southwest's "*existing*" operating procedures at the time of the bulletin reflected the scenarios addressed in the then-recently released bulletin.   Moreover, Southwest's false statement was eerily similar to Boeing's with respect to its falsities.   The inference is unmistakable: both companies had coordinated on talking points designed to give the public and Southwest customers the false impression that procedures had already been in place at the time of the Lion Air Crash to prevent a crash of that type in Southwest MAX 8s.   Both companies offered similar falsehoods that wrongly implied that the Lion Air Crash had more to do with Lion Air than any problem with the MAX 8.

208.    It is clear that Southwest's nearly identical statement was false, and that Southwest knew it.   Southwest's then-existing flight procedures and manuals did not contemplate that pilots would have to struggle with the MCAS, and that the only way to disable the system was to disable electric trim control entirely.

209.    Southwest also made false statements in the press, stating that it had not received any reports from pilots of issues concerning the AoA Sensors.  Southwest, however, knew about frequent malfunctions in the same or similar sensors in other aircraft, and the workings of those sensors were not materially different than those on the MAX 8.  If the sole sensor feeding information to the MCAS failed, the MCAS would begin its repeated and relentless attempt to push the aircraft's nose down, completely ignoring all directions and inputs from the pilots to lift the nose.

210.    After the Lion Air Crash, Southwest had also discovered that an important safety feature had not been installed on its airplanes.  Specifically, Boeing had not activated the AoA Disagree Indicator that would show pilots that the AoA Sensors on each side of the aircraft disagreed with each other.  Southwest made no mention of this until after a subsequent crash resulted in the grounding of the aircraft.

211.    In fact, Southwest covered up the error, sweeping the problem under the rug by claiming that it had installed new features that would prevent a repeat of the Lion Air Crash.  On November 29, 2018, a Southwest spokesperson told the press the following:

> **Currently**, the MAX and NG have an AoA disagree light that provides an alert of erroneous AoA data. . . .  The AoA indicator will provide a valuable supplemental cross-check in the event there is an erroneous AoA signal present.

212.    This statement was false and misleading.  It omitted entirely that Boeing had failed to activate the feature on the aircraft—as it should have to begin with—but instead Southwest implied that its MAX 8 aircraft had the feature all along.  The statement also falsely implied that the activation of the AoA Disagree Indicator would cure the problems with the MAX 8, when in fact the MAX 8 still suffered from a defective design that would require grounding and extensive testing to fix.

213.     Southwest's false statements were coordinated with and closely echoed Boeing's party line, implying that procedures and features were already in place at Southwest at the time of the Lion Air Crash that could prevent or compensate for a failure of the AoA Sensors and an MCAS malfunction.

214.     Southwest knew that, at this stage, a permanent fix would require grounding the MAX 8, causing its airline operations to be severely reduced and strained.  It also knew that if the reputation of the MAX 8 suffered, demand for Southwest airline tickets would fall, and the value of Southwest's fleet would decrease.

215.     Southwest and Boeing therefore echoed the same false narrative: (a) that the MAX 8 was safe; (b) that the then-existing flight procedures and documentation covered the malfunction that caused the Lion Air Crash; and (c) that the addition of the AoA Disagree Indicator in the aircraft would prevent future problems with the MCAS.  All of this was false.  To fix the MCAS would require grounding the MAX 8 for a lengthy period of time until the MCAS was entirely redesigned to address its many flaws, but that was a fix that neither company was willing to implement—despite the passenger lives that were at stake.

### D.     Pilots Demand Answers

216.     On November 27, 2018, in the wake of the Lion Air Crash, the American Airlines pilots union (the Allied Pilots Association) met with representatives from Boeing at the union's headquarters.  In that meeting, the pilots demanded answers about the MAX 8's safety:  Why were these planes still in the air?  Why was this not being treated like an emergency?

217.     Boeing's response alarmed the pilots.  Despite clear evidence, Boeing acted as if everything was fine.

218.     Dissatisfied with Boeing's response and concerned that Boeing was not treating the situation like the emergency it was, the pilots filed a Freedom of Information Act Request with the

FAA for documents related to the MCAS and correspondence between the FAA and American Airlines about updating the MAX 8's flight manual.

219.     In the meeting, an unidentified Boeing representative responded to the pilots' concerns by saying, "I don't know that understanding this system [the MCAS] would have changed the outcome [of the crash] . . . .  In a million miles, you're going to maybe fly this airplane, maybe once you're going to see this ever."  Boeing's words were hauntingly specious, as events would show.

### IV.     Disaster Strikes Again:  The Crash of Ethiopian Airlines Flight 302

#### A.     The Accident

220.     On March 10, 2019, Ethiopian Airlines Flight 302 took off from Addis Abba, Ethiopia, headed for Nairobi, Kenya.  One minute after takeoff, the pilot calmly indicated that he was having problems controlling the aircraft.  After three minutes, the pilot's calm demeanor had vanished as he requested an emergency landing at Addis Abba.

221.     The plane accelerated erratically, oscillating up and down.  The pilot was engaged in a struggle with the MCAS for his life and the life of his passengers.  All communications with Flight 302 abruptly stopped.  The pilot had lost the struggle with the plane's MCAS.  The defective flight control system had crashed the aircraft into the ground, killing all 157 people on board.

222.     The MCAS had pitched the nose of the aircraft down when the aircraft was just 450 feet above the ground, giving the pilot no leeway to recover from the malfunction.  Indeed, at 450 feet, there was no time to execute the onerous procedures Boeing had claimed could overcome an error in flight.  There was no time to manually override the MCAS by shutting off all electric trimming, and at stall speeds, manual control would have likely been ineffective anyway.  A computer program had taken over the control of the flight, barring any input from the pilot.  While

the pilot struggled helplessly against the MCAS, the computer program insisted on driving the plane into the ground.

223.    Accident investigators quickly confirmed that the defective MCAS had caused the accident.

### B.    The Immediate Aftermath and Southwest's False Assurances of Safety

224.    On March 10, 2019, the evening of the Ethiopian Airlines Crash, Bloomberg reported that travelers throughout the world had taken to social media to express dismay that MAX 8 flights were continuing and their fear of flying on the aircraft.   Southwest customers frantically attempted to change flights and airlines to avoid the MAX 8.

225.    Although some airlines allow passengers to see the airplane type as they book their travel online, these features can be difficult to find or hidden, and many passengers—particularly before the Ethiopian Airlines Crash—make decisions based on other factors, such as airport location, flight time, or extra fees associated with certain add-ons.

226.    In any event, airlines routinely reserve the right to switch airplanes, reschedule or cancel a flight, change the itinerary, or make other alterations to the flight between the time of purchase and the actual flight.   In other words, passengers are not entitled to select their aircraft.

227.    The next day, on March 11, 2019, the FAA released the following statement:

> An FAA team is on-site with the NTSB in its investigation of Ethiopian Airlines Flight 302.  We are collecting data and keeping in contact with international civil aviation authorities as information becomes available.   Today, the FAA will issue a Continued Airworthiness Notification to the International Community (CANIC) for Boeing 737 MAX operators.  The FAA continuously assesses and oversees the safety performance of U.S. commercial aircraft.  If we identify an issue that affects safety, the FAA will take immediate and appropriate action.

228.    Noticeably absent was any indication that the FAA was grounding the MAX 8 aircraft.  The comments to the FAA's tweeted statements were incredulous that the FAA, Boeing, and Southwest had not grounded the aircraft in response to the accident:





229.    On the same day, Southwest issued a statement on Twitter doubling down on its

support of the MAX 8:

> We remain confident in the Safety of our fleet of more than 750
> Boeing aircraft and currently have a fleet of 34 Boeing 737 MAX 8
> aircraft on property.  – Nicole.

230.    Southwest's statement was reckless and false.  The company did not have a good faith basis at the time for having confidence in the safety of the MAX 8 and in fact was aware of facts that seriously undermined its confidence in the airplane.

231.    The posts on Southwest's Twitter account continued, echoing the identical false statements, but with different, first-name-only "signatures":



232.    These statements were false.  Southwest knew that the two strikingly similar accidents were caused by the same MCAS malfunction and that the root cause of the problem did not arise because of faulty AoA Sensors or the failure to follow in-flight procedures.  It was clear to Southwest well before even the Lion Air Crash that the MAX 8 needed to be grounded and the

MCAS redesigned.  The company was well aware of numerous facts that seriously undermined its confidence in the airplane.

233.    Southwest customers expressed disbelief and desperately sought to avoid MAX 8 aircraft:



234.    Southwest continued to take to Twitter to assure its customers that its planes were safe when it had no basis to make any such a claim:



235.    Again and again, Southwest expressed "confidence" in the safety of its MAX 8 aircraft—confidence that it did not have and should not have had.  After two strikingly similar accidents, customers were not buying it, and Southwest would do nothing to accommodate those customers too terrified to board a Southwest flight given the risk that they would end up on a MAX 8:



236.    Public confidence in Southwest and the Boeing MAX Series had shattered.  A poll taken several months later found that 70% of Americans *still* had some hesitation in booking a flight on a MAX Series aircraft and that 41% of Americans would only choose to fly on a MAX Series aircraft after six months of safe operation.  With the knowledge of the MAX 8's deep flaws, Americans placed little to no value on a flight aboard a MAX 8 airplane.

237.     At the same time, Boeing issued statements of its own emphasizing the "safety" of the MAX Series and the "confidence" that Boeing had in the aircraft:



238.     These statements were false.   Profits—not safety—were Boeing's number one priority.   Boeing was only concerned about safety issues to the extent that they impacted the company's profits.   In addition, Boeing did not and should not have had full confidence in the safety of the MAX 8.   Boeing was aware of numerous facts that seriously undermined its confidence in the airplane.   Further, Boeing in fact did have a basis—indeed many bases—to issue new guidance to airlines and pilots regarding the MAX 8, as Boeing understood that the plane's design was defective.

239.     Moreover, both Southwest and Boeing again used virtually identical words in their attempt to calm the markets and signal safety to customers—demonstrating the careful coordination of the two companies' false messaging.

240.     From March 10 through the morning of March 13, the FAA continued to refuse to ground the aircraft.  The Trump administration, despite bipartisan calls to ground the planes, also refused.  The uproar continued.

241.     In a statement on March 12, 2019, the FAA stated that it would not ground the aircraft:

> The FAA continues to review extensively all available data and aggregate safety performance from operators and pilots of the Boeing 737 MAX.   Thus far, our review shows no systemic performance issues and provides no basis to order grounding the aircraft.  Nor have other civil aviation authorities provided data to us that would warrant action.  In the course of our urgent review of data on the Ethiopian Airlines Flight 302 crash, if any issues affecting the continued airworthiness of the aircraft are identified, the FAA will take immediate and appropriate action.

242.     The FAA was alone in its lack of caution, as the significance of the problem with the MAX 8 was obvious to the rest of the world.  The FAA maintained this position despite recognition that a complete overhaul of the MCAS was required.

243.     On the morning of March 13, 2019, Ray Lahood, the former U.S. Transportation Secretary, vocally questioned the government's stance on the MAX 8: "Those planes should be pulled down and inspected.  The flying public is owed that."

244.     By March 13, airlines and regulators in Europe had grounded the 737 MAX 8, pending an investigation.  India, Hong Kong, China, New Zealand, and the United Arab Emirates had completely grounded MAX 8 flights.  In the U.S., however, flights continued, to the horror of airline customers, including Southwest customers throughout the country.[10]

---

[10]  Although other countries had grounded the MAX 8, Southwest only provides domestic flights and Southwest had the largest MAX 8 fleet in the country.  Rather than take the cautious approach and ground the planes, Southwest continued flying the MAX 8.

245.    In response to widespread panic over the prospect of flying on a MAX 8, flight-booking aggregator Kayak developed a software tool to allow its customers to avoid the aircraft. Kayak's CTO, Girgos Zacharia, stated the following in a statement to the press:

> We've recently received feedback to make KAYAK's filters more granular in order to exclude particular aircraft models from search queries. . . .  We are releasing that enhancement globally later this week and are committed to providing our customers with all the information they need to travel with confidence.

246.    USA Today reported that by March 13, 2019, American Airlines and Southwest were the only airlines to continue flying MAX 8 aircraft after the Ethiopian Airlines Crash:

> American Airlines and Southwest are now the world's only carriers flying the 737 MAX 8 version that was involved in two recent crashes.  The U.S. was the sole nation flying Boeing 737 MAX 8 planes on Wednesday as the aircraft-manufacturing giant and the Federal Aviation Administration steadfastly defended the safety of the hot-selling jetliners.

247.    With profits per passenger averaging $19.65 and profit margins averaging 9%, grounding even a single plane is an expensive proposition for any airline.

248.    Nevertheless, in the wake of the Ethiopian Airlines Crash, nearly every United States carrier grounded the MAX Series, clearly determining that the risk outweighed the lost profits.

249.    Southwest and Boeing, in coordination with each other, nonetheless recklessly and falsely stated that they remained "confident" in the "safety" of the MAX 8.

## C.    The FAA Finally Grounds the 737 MAX 8

250.    After speaking with Boeing CEO Dennis Muilenburg on March 12, 2019, the Trump administration continued to insist that the MAX 8 was safe and refused to order the grounding of the aircraft.

251.    Within a day, the White House, in response to immense bipartisan and international pressure,[11] reversed course and ordered the grounding of MAX 8 and 9 aircraft.

252.    On March 13, 2019, the FAA issued its Emergency Order of Prohibition grounding the MAX Series in the United States:

> On March 13, 2019, the investigation of the [Ethiopian Airlines Crash] developed new information from the wreckage concerning the aircraft's configuration just after takeoff that, taken together with newly refined data from satellite-based tracking of the aircraft's flight path, indicates some similarities between the [Ethiopian Airlines Crash] and [the Lion Air Crash] that warrant further investigation of the possibility of a shared cause for the two incidents that needs to be better understood and addressed. Accordingly, the Acting Administrator is ordering all Boeing 737 MAX airplanes to be grounded pending further investigation.

253.    The result for Southwest was devastating, with thousands of cancellations directly attributable to the 737 MAX grounding.

## V.    Southwest Admits that Boeing Had Failed to Install AoA Indicator Features Prior to the Lion Air Crash

254.    On April 28, 2019, Southwest—the airline that proclaims it has "nothing to hide"— made a stunning statement.  Southwest had in fact been hiding something very important.

255.    Southwest admitted that the AoA Disagree Indicator had ***not*** been enabled on its MAX 8 aircraft prior to the Lion Air Crash in October 2018:

> Upon delivery (prior to the Lion Air event), the AoA Disagree lights were depicted to us by Boeing as operable on all MAX aircraft, regardless of the selection of optional AoA Indicators on the Primary Flight Display (PFD).   The manual documentation presented by Boeing at Southwest's MAX entry into service indicated the AoA Disagree Light functioned on the aircraft, like the Lights on our NG series.  After the Lion Air event, Boeing notified us that the AoA Disagree Lights were inoperable without the optional AoA Indicators on the MAX aircraft.   At that time,

---

[11]  That same day, Canada had banned 737 MAX 8 and 9 flights from taking off or landing in Canada.

Southwest installed the AoA Indicators on the PFD, resulting in the activation of the AoA Disagree lights—both items now serve as an additional crosscheck on all MAX aircraft.

256. The admission by Southwest was astonishing. None of its statements after the Lion Air Crash ever mentioned that key safety features had not been activated by Boeing. In fact, in repeated statements, both Southwest and Boeing had suggested that existing procedures and features were in place at the time of the accident to compensate for a failure of the MCAS.

257. Boeing's statement in April 2019 made clear that Southwest and Boeing had discovered that the AoA Disagree Indicator, had not been enabled on Southwest's aircraft. Not only did both companies say nothing, but they also misled the public about the safety of the MAX Series aircraft and the existing safety features and procedures on the aircraft.

258. Both Southwest and Boeing knew that the root cause of the Lion Air Crash was a flawed design of the MCAS and that a repair would require grounding the aircraft, but both companies tried to sweep the problem under the rug. Southwest even misleadingly suggested that it had installed the AoA Disagree Indicator for the first time after the Lion Air accident *as a fix* for the MCAS problem that caused the Lion Air Crash.

259. Southwest and Boeing helped each other avoid the grounding of the MAX 8 from October 2018 until the end of March 2019. From Southwest's perspective, the companies' mutual support for each other would help to: (a) ensure that Southwest continued to sell tickets to customers and remain profitable; (b) prop up the value of Southwest's assets and its stock price; and (c) further enable Southwest's business model of flying only Boeing 737 jets.

260. From Boeing's perspective, the companies' mutual support for each other would help to: (a) ensure that Southwest maintained its massive order for additional 737 aircraft; (b) persuade other airlines to maintain their orders for MAX Series aircraft; and (c) sustain the market for the MAX Series and Boeing aircraft in general.

261.    For both parties, the companies' mutual support for each other would: (a) allow them to continue to try to convince the public that the planes were safe to fly; and (b) continue the Handshake Agreement and collusive relationship that both parties relied on to sustain their businesses even at the cost of defrauding regulators and the public.

## VI.    Boeing Admits that the Cost of Fixing the MCAS Was "Immaterial"

262.    After the Ethiopian Airlines Crash in March 2019 and the subsequent grounding of the MAX Series aircraft, including the MAX 8, Boeing began work on a permanent fix: a redesign and testing of the MCAS.

263.    The system would be redesigned to properly fix the problems with the MCAS: (1) the redesigned system would now compare data from both AoA Sensors on the aircraft, rather than rely a single AoA Sensor; (2) the MCAS would be programmed to drop the plane's nose only once each time it detected a high angle of attack instead of doing so persistently; (3) the nose-down movement would be designed to be more easily overcome by the pilots in order to override MCAS input with sufficient maneuvering ability that the aircraft could still climb; and (4) pilots would receive more detailed training on the differences between the MAX and earlier generation Boeing 737s.

264.    *Every single one of these measures* could have been taken after the Lion Air Crash, but Boeing chose not to ground the planes to implement the measures.  Southwest, knowing that the grounding would be devastating to both Southwest and Boeing and their ongoing pricing and backstopping agreement, told no one that a redesign was needed.

265.    Boeing filed its form 10-K with the SEC for the fiscal year ending in the first quarter of 2019.  In a stunning admission, Boeing told its investors that the costs related to redesigning the MCAS was *immaterial*:

> We have been developing a software update to the Maneuvering Characteristics Augmentation System (MCAS) on the 737 MAX, together with an associated pilot training and supplementary education program.  We continue to work with the GFAA and other regulatory agencies worldwide to develop and certify the software update and training program.  Charges recognized during the first quarter of 2019 related to the MCAS software update and related pilot training were immaterial.

266.    Boeing's statement to its own investors made clear that the reason Boeing never properly fixed the MCAS was not the cost to fix the system.  It was because Boeing could not risk eroding confidence in its aircraft and potentially grounding the MAX 8 thereby threatening its relationship with its largest customer, Southwest—the only airline whose entire company is built around Boeing's 737.  Delaying a fix to the MAX 8 in order to keep Southwest's planes in the air was exactly the sort of action the collusive relationship between Boeing and Southwest demanded of Boeing from 2017 to 2019, and as usual, Boeing acted accordingly.

267.    Boeing and Southwest put their profits above safety.  Fixing the MAX 8 aircraft the right way would have been an immaterial cost to Boeing.  Indeed, Boeing could have made all the changes it eventually recognized were necessary to the MCAS immediately after the Lion Air Crash.  But it chose not to do so, instead putting thousands of fliers in danger in order to bolster Southwest's bottom line (and ultimately, its own).

268.    Both Boeing and Southwest knew what was required to properly fix the MCAS, but both companies pretended that the installation of AoA Disagree Indicators—which should have been installed on MAX 8 aircraft to begin with—would somehow eliminate the risk of crash associated with an MCAS failure.  Moreover, the fact that Ethiopian Air Flight 302 experienced

MCAS nose-down commands while only 450 feet in the air proved that a manual override procedure that entirely shutoff electric trim control was not feasible when there was little time—and insufficient altitude—to react to an MCAS failure.

### VII.   Investigations into the Causes of the Tragedies

269.    Shortly after it became clear that the same design defect caused the Lion Air Crash and the Ethiopian Airlines Crash, Boeing became the target of several government-led inquiries into the MAX Series and its path to certification and flight.

270.    The first of these investigations is a criminal investigation led by the U.S. Department of Justice ("DOJ"), aided by the Department of Transportation's Inspector General and the Federal Bureau of Investigation (the "DOJ Investigation").

271.    The DOJ has sought information from Boeing on safety, certification, and marketing procedures for the MAX Series aircraft.  Investigators are looking into the process by which Boeing certified the plane as safe, and the data it presented to the FAA about that self-certification.  The DOJ has also served a subpoena on Southwest in connection with its investigation.

272.    The DOJ Investigation is not the only investigation that Boeing faces.  The Department of Transportation ("DOT") is in the process of conducting a formal audit of the certification process for the 737 MAX aircraft.  In addition, in response to the two fatal crashes, the DOT also announced the formation of a Special Committee to review internal FAA procedures for the certification of new aircraft, including the Boeing 737 MAX.

273.    In addition to these two investigations, the SEC has opened an inquiry into Boeing's 737 MAX Disclosures.  The SEC is examining whether Boeing was adequately forthcoming to shareholders about material problems with the plane; shareholders have also filed a civil lawsuit against Boeing for the same reason.

274.    The SEC's inquiry is based on Boeing's May 5, 2019 statement that it knew for more than a year that the AoA Disagree Indicator was not properly functioning.  Boeing did not disclose this flaw with the MAX Series to shareholders, customers, or the FAA until after the Ethiopian Airlines Crash.  Indeed, it omitted this material information from every statement about the safety of the MAX 8 that it made before the Ethiopian Airlines Crash.

275.    Boeing also faces Congressional inquiries.  The Senate Committee on Commerce, Science and Transportation and the subcommittee on Aviation and Space have both launched investigations into the process by which the MAX Series was certified as airworthy.  The House of Representatives has launched its own, concurrent, investigation through the House Aviation Committee.

276.    While the scope of the government investigations remains largely confidential, the investigations have brought to light several concerning aspects of Boeing's airplane development that are reflective of the culture of elevating profits over people at the expense of passenger safety and which may be indicative of criminal fraud within the company:

      a.   First, Boeing outsourced large portions of its software business to Indian companies in exchange for contracts with Air India (India's state-owned airline) and SpiceJet.  Boeing and its subcontractors relied on temporary workers making as little as $9 an hour to develop and test software—often from countries lacking a deep background in aerospace engineering.  These coders from Indian software developer HCL Technologies Ltd. were designing to specifications from Boeing but Mark Rabin, a former Boeing software engineer, said that the practice was controversial because "it was far less efficient than Boeing engineers just writing the code . . . it took

many rounds going back and forth because the code was not done correctly."  In January 2017, Boeing received a $22 billion order which included 100 MAX 8s and represented Boeing's largest order ever from an Indian airline—a market traditionally dominated by Airbus.

b. Second, the defect in the MCAS itself was not the only software flaws in the MAX Series.  On June 26, 2019, Boeing and federal regulators announced that they had identified a new problem with the MAX Series. This new issue involved software that was separate from the MCAS, but related to an emergency procedure that could be used by pilots to counteract the MCAS in the event of a malfunction.  Essentially, due to an overload of information, a certain chip would malfunction in the event of an emergency situation.  This software issue caused pilots to experience delays in executing critical steps to override the MCAS.  The FAA has rated this software error as "catastrophic."  The FAA identified the problem during simulator tests after an FAA pilot determined that the procedure took more time than was acceptable to execute.

c. Third, presumably concerned by what the DOJ Investigation has revealed about the Boeing 737 thus far, the DOJ has expanded its investigation into another airplane—the Boeing 787 Dreamliner.  The 787 Dreamliner was introduced in 2007 and billed as Boeing's most important new plane in a generation.  Following two battery-overheating incidents, the 787 Dreamliner was grounded for four months in early 2013.  The DOJ expanded the scope of the investigation due to whistleblower reports from

a South Carolina manufacturing plant that the 787 Dreamliner is shoddily and hastily produced.  The Seattle Times reported that the allegations relating to the 787 Dreamliner arose out of concerns about "shoddy work and cutting corners at [Boeing's] South Carolina plant" and said that, while there are differences in the investigations into the MAX Series and the 787 Dreamliner, "prosecutors are likely looking into whether broad cultural problems run throughout the company" which "could include pressure to sign off on faulty work to avoid delays in delivering planes to customers."

277.    U.S. agencies are not the only ones who have concerns about the safety of the MAX Series.  In early July 2019, the European Union Aviation Safety Agency ("EASA") sent a list of five major requirements that Boeing must fix before it will allow the MAX Series to return to service.  The EASA's list includes the potential difficulty that pilots have in turning the jet's manual trim wheel, the unreliability of the AoA Sensors, inadequate training procedures, the recently discovered additional software issue described above, and the failure of the MCAS to disengage during certain emergencies.

278.    Boeing faces extensive civil litigation as well.  More than 400 pilots are suing Boeing, alleging that Boeing conducted an "unprecedented cover-up" of the plane's "known design flaws."  The pilots are suing for lost wages during the grounding and future career uncertainty.

## VIII.   Boeing Admits that Its Handling of the Situation Surrounding the AoA Disagree Indicator Was a "Mistake"

279.    On June 16, 2019, Boeing acknowledged at the annual International Paris Air Show that the company made a "mistake" in how it handled the situation surrounding the warning lights on the MAX Series.

280.    Calling the company's communications with regulators and customers about the AoA Disagree Indicator "inconsistent," the CEO conceded that the company "fell short in the implementation of the AoA disagree alert and [Boeing] clearly should have communicated better with [its] regulators and the airlines."

281.    Kevin McAllister, Boeing's Executive Vice President, said that "safety is sacred" at Boeing and that the company was doing everything it could "to get this airplane [the MAX 8] safely back to service," acknowledging that without the fixes to the MCAS and the AoA Disagree Indicator, the MAX 8 could not be safely returned to service.

282.    Boeing's communication regarding the AoA Disagree Indicator was not "inconsistent"—it was false and reckless and put countless lives in danger.  Further, it omitted the larger underlying problem:  the MCAS Defect.

283.    In statements after the Ethiopian Air Crash, Boeing all but admitted that its earlier statements about the safety of the aircraft between and March 13, 2019, were false.  The MAX 8 was unsafe and needed to be grounded in order to protect the lives of the passengers on board.  Rather than acknowledge that fact at the time, Boeing and Southwest in coordination with each other falsely touted the safety of the airplane and actively misled consumers—often using the same language.

284.    Boeing and Southwest's communication campaign regarding the MAX 8 was not a "mistake."  The two companies intentionally spread false and misleading safety information in order to avoid having to ground the MAX 8 and to dodge a potentially devastating crisis of confidence and financial catastrophe for both companies.

285.    The average ticket price for a flight on Southwest in 2018 was $151.  More than 70 million people fly Southwest each year; approximately 40 million flew Southwest during the Class Period.

286.    Southwest's net income was $654 million for the fourth quarter 2018 and $387 million for the first quarter 2019.  During the Class Period, Southwest's net income from misleading consumers into purchasing tickets that they would not have purchased but for the misrepresentations made by Southwest and Boeing was $1.032 billion.

287.    On a Southwest quarterly earnings call on April 25, 2019, Tom Nealon, Southwest's CEO acknowledged that passengers were less likely to purchase tickets knowing about the flaws in the MAX Series:  "There's certainly going to be some people that, I expect, will probably book away for some period of time."

288.    Also on that call, Boeing CEO Muilenburg acknowledged that Boeing has "some work to do to earn and re-earn the trust of [Boeing's] customers and the flying public in particular."

### INJURY TO AMERICAN AIRLINES TICKETHOLDERS

289.    Individuals who purchased tickets for air travel on Southwest were not the only ones adversely injured by Boeing and Southwest's collusive campaign to prop up the MAX 8.

290.    American Airlines had twenty-eight MAX 8s in its fleet at the time of the Ethiopian Airlines Crash.  Given the significant number of MAX 8 aircraft in the American Airlines Fleet, American Airline ticketholders would not have flown on American Airlines if the truth about the MAX 8 was known.  Because Boeing and Southwest conspired to spread false information about the MAX 8's safety and suppress information about the MAX 8's defect, as well as to actively work to prevent the grounding of the airplane, American Airlines passengers were also misled into believing that the MAX 8 was safe.

291.    It was a foreseeable consequence of Boeing and Southwest's conspiracy that their conduct would allow MAX 8s used by American Airlines to continue flying and that American Airlines customers would purchase tickets that they would not have otherwise purchased.  In the alternative, it was a foreseeable consequence of Defendants' unlawful conspiracy that prices of American Airlines tickets would have been inflated.

292.    Thus, individuals who purchased tickets for travel on American Airlines between August 29, 2017, and March 13, 2019, suffered general and specific damages, including but not limited to, the amounts paid for tickets and/or overpaid for tickets, and any interest that would have accrued on those monies, in an amount to be proven at trial.

293.    The above described acts by Boeing and Southwest were direct, but-for, and proximate causes of the injury to purchasers of American Airlines tickets.

## CLASS ACTION ALLEGATIONS

294.    The classes' claims all derive directly from a course of conduct by Boeing and Southwest.  Boeing and Southwest have engaged in uniform and standardized conduct toward the class.  They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual class members.  The objective facts on these subjects are all the same for all class members.  Within each Claim for Relief asserted by the class, the same legal standards govern.  Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide class or classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2)

and/or (c)(4).   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### The Nationwide Southwest Airlines Consumer Class

295.   Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Southwest Airlines Consumer Class defined as follows:

> All persons in the United States who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[12]

296.   Excluded from the Nationwide Southwest Airlines Consumer Class are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Nationwide American Airlines Consumer Class

297.   Individuals who purchased tickets for air travel on Southwest were not the only ones adversely affected by Boeing and Southwest's coordinated campaign to prop up the MAX 8. American Airlines had twenty-eight MAX 8s in its fleet at the time of the Ethiopian Airlines Crash. Due to the ubiquitous nature of the statements made by Boeing and Southwest about the safety of

---

[12]   In the alternative, the Nationwide Southwest Airlines Consumer Class should be defined to include at a minimum individuals who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

the MAX 8, American Airlines passengers were also misled into believing that these aircraft were safe.

298.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a American Airlines Subclass defined as follows:

> All persons in the United States who purchased a ticket for air travel to fly on an American Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[13]

299.    Excluded from the Nationwide American Airlines Consumer Class are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants, class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The California Subclass

300.    Plaintiff Rugg brings this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of herself and a California Subclass defined as follows:

> All persons who reside in the State of California who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[14]

---

[13]   In the alternative, the Nationwide American Airlines Consumer Class should be defined to include at a minimum individuals who purchased tickets for air travel to fly on an American Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

[14]   In the alternative, the California Subclass should be defined to include at a minimum

301.    Excluded from the California Subclass are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Florida Subclass

302.    Plaintiff Khan brings this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of himself and a Florida Subclass defined as follows:

> All persons who reside in the State of Florida who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[15]

303.    Excluded from the Florida Subclass are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

---

individuals who reside in the State of California and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

[15]   In the alternative, the Florida Subclass should be defined to include at a minimum individuals who reside in the State of Florida and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

### The Nevada Subclass

304.    Plaintiff Beck brings this action and seek to certify and maintain it as a class action

under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on

behalf of herself and a Nevada Subclass defined as follows:

> All persons who reside in the State of Nevada who purchased a
> ticket for air travel to fly on a Southwest Airlines aircraft from the
> date Southwest first took delivery of the MAX 8, August 29, 2017,
> until the date that all 737 MAX Series aircraft were grounded by the
> FAA, March 13, 2019, inclusive.[16]

305.    Excluded from the Nevada Subclass are the Boeing and Southwest Defendants,

their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly

owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their

employees; and the judicial officers and their immediate family members and associated court staff

assigned to this case.

### The New York Subclass

306.    Plaintiffs Timothy Blakey Jr. & Stephanie Blakey bring this action and seek to

certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of

the Federal Rules of Civil Procedure on behalf of themselves and a New York Subclass defined as

follows:

> All persons who reside in the State of New York who purchased a
> ticket for air travel to fly on a Southwest Airlines aircraft from the
> date Southwest first took delivery of the MAX 8, August 29, 2017,
> until the date that all 737 MAX Series aircraft were grounded by the
> FAA, March 13, 2019, inclusive.[17]

---

[16]   In the alternative, the Nevada Subclass should be defined to include at a minimum
individuals who reside in the State of Nevada and who purchased tickets for air travel to fly on a
Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date
that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

[17]   In the alternative, the New York Subclass should be defined to include at a minimum

307.    Excluded from the Class are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Arizona Subclass

308.    Plaintiffs Thompson and Earl bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Arizona Subclass defined as follows:

> All persons who reside in the State of Arizona who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[18]

309.    Excluded from the Arizona Subclass are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

---

individuals who reside in the State of New York and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

[18]    In the alternative, the Arizona Subclass should be defined to include at a minimum individuals who reside in the State of Arizona and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

**The Indiana Subclass**

310.    Plaintiffs Cooper, Rogers, and Mortz-Rogers bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and an Indiana Subclass defined as follows:

> All persons who reside in the State of Indiana who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[19]

311.    Excluded from the Indiana Subclass are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The Georgia Subclass**

312.    Plaintiff Goggins brings this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of herself and a Georgia Subclass defined as follows:

> All persons who reside in the State of Georgia who purchased a ticket for air travel to fly on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.[20]

---

[19]    In the alternative, the Indiana Subclass should be defined to include at a minimum individuals who reside in the State of Indiana and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

[20]    In the alternative, the Georgia Subclass should be defined to include at a minimum individuals who reside in the State of Georgia and who purchased tickets for air travel to fly on a Southwest Airlines aircraft from the date of the Lion Air Crash, October 29, 2018, until the date that the 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive.

313.    Excluded from the Class are the Boeing and Southwest Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Southwest and Boeing Defendants; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity and Ascertainability

314.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).   There are hundreds of thousands of purchasers of Southwest and American Airlines tickets nationwide, and thousands in each of the States.  Individual joinder of all Class members is impracticable.

315.    The Class is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants Boeing and Southwest or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

### Predominance of Common Issues

316.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for the Class predominate over questions affecting only individual Class members.   These include, without limitation, the following:

> a.  Whether Defendants knew or should have known about the MAX 8's fatally defective nature and, if so, how long Defendants have known of the defective nature;

b.  Whether the defective nature of the MAX 8 constitutes a material fact that reasonable consumers would have considered in deciding whether and at what price to purchase a ticket for air travel;

c.  Whether Defendants had a duty to disclose the defective nature of the MAX 8;

d.  Whether Defendants omitted and failed to disclose material facts about the MAX 8;

e.  Whether Defendants concealment of the true defective nature of the MAX 8 induced Plaintiffs and Class members to act to their detriment to purchase tickets for air travel during the relevant time period;

f.  Whether Defendants misrepresented that the MAX 8 was safe;

g.  Whether Defendants engaged in unfair, deceptive, unlawful, and/or fraudulent acts or practices in trade or commerce by failing to disclose that the MAX 8 was designed, manufactured, and sold with a defective AoA Disagree Indicator and MCAS;

h.  Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

i.  Whether Defendants' statements, concealments, and omissions regarding the MAX 8 and the MCAS Defect were material in that a reasonable consumer could consider them important in purchasing a ticket for air travel;

j.  Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

k.  Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

l.  Whether Defendants have been unjustly enriched by their conduct;

m.  Whether Plaintiffs and the Classes are entitled to equitable relief including, but not limited to, a preliminary and/or permanent injunction;

n.  Whether Defendants should be declared responsible for notifying all Class members of the MCAS Defect and ensuring that all aircraft with the defect are promptly recalled and repaired;

o.  What aggregate amounts of statutory penalties are enough to punish and deter Defendants and to vindicate statutory and public policy;

p.  How such penalties should be most equitably distributed among Class members;

q.  Whether Southwest and Boeing conspired together to violate RICO; and

r.  Whether Southwest and Boeing associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**Typicality**

317.  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of other Class members and arise from the same course of conduct by Defendants Boeing and Southwest. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

**Adequate Representation**

318.  Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

319.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### Superiority

320.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants Boeing and Southwest have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

321.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The common questions of law and fact regarding Defendants Boeing and Southwest's conduct and responsibility predominate over any question affecting only individual Class members.

322.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

323.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation.  Compared

to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23 (b)(3)(D).

324.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

325.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the MCAS Defect without waiving or dismissing such claims.  Plaintiffs are informed and believe that injuries suffered in crashes as a result of the MCAS Defect implicate Defendants Southwest and Boeing's aircraft and constitute evidence supporting various claims, including overcharge for tickets.  The increased risk of injury from the MCAS Defect serves as an independent justification for the relief sought by Plaintiffs and the Class.

### REALLEGATION AND INCORPORATION BY REFERENCE

326.    Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

## CLAIMS FOR RELIEF

I.     **Nationwide Claims**

A.     **Federal Claims**

### COUNT ONE:
### Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and
### Corrupt Organization Act, ("RICO")
### (All Plaintiffs against Defendants Boeing and Southwest)

327.    Plaintiffs bring this Count on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class.

328.    Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

329.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

330.    Defendants violated 18 U.S.C. § 1962(b) by participating in or conducting the affairs of the Boeing-Southwest association-in-fact through a pattern of racketeering activity.

### The Boeing-Southwest RICO Enterprise

331.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the "Boeing-Southwest RICO Enterprise":

a.     Boeing, which designed, manufactured, and sold thousands of MAX 8 aircraft, knowing that they were fatally defective, and which actively concealed the scope and nature of this defect from and lied to the public and regulators.

b.     Southwest, which participated in the design of, launched, purchased, marketed to consumers, sold tickets for, and operated commercial flights with MAX 8 aircraft, knowing that they were fatally defective, and which actively concealed the scope and nature of this defect from and lied to the public and regulators.

85

332.    The Boeing-Southwest RICO Enterprise, which engages in and whose activities affect interstate and foreign commerce, is an association-in-fact of corporate entities within the meaning of 18 U.S.C. §1961(4) and consists of "persons" associated together for a common purpose.   The Boeing-Southwest RICO Enterprise has an ongoing organization with an ascertainable structure and functions as a continuing unit with separate roles and responsibilities.

333.    While Boeing and Southwest participate in the conduct of the Boeing-Southwest RICO Enterprise, they have an existence separate and distinct from the Boeing-Southwest RICO Enterprise.   Further, the Boeing-Southwest RICO Enterprise is separate and distinct from the pattern of racketeering in which Boeing and Southwest engage.

334.    At all relevant times, Boeing has operated, controlled, or managed the Boeing-Southwest RICO Enterprise, through various actions.   Boeing's participation in the Boeing-Southwest RICO Enterprise is necessary for the operation of its scheme to defraud because (among other reasons) Boeing designed, manufactured, and sold the MAX 8 aircraft, knowing that it was fatally defective; concealed and lied about the safety risks of the MAX 8; and has profited and is profiting from its concealment and lies.

335.    At all relevant times, Southwest operated, controlled, or managed the Boeing-Southwest RICO Enterprise, through various actions.   Southwest's participation in the Boeing-Southwest RICO Enterprise is necessary for the operation of its scheme to defraud because Southwest assisted in the design of, launched, operated, and sold tickets for the MAX 8 aircraft, knowing that it was fatally defective; concealed and lied about the safety risks of the MAX 8; and has profited and is profiting from its concealment and lies.

336.    Boeing and Southwest, as members of the Boeing-Southwest RICO Enterprise, serve a common purpose: to, among other things, preserve the collusive relationship between

Boeing and Southwest, as described throughout this Complaint, including but not limited to in paragraphs 69 to 171, *supra*.

337.    Boeing and Southwest benefit from this common purpose by receiving, for example, the benefits described in paragraphs 69 to 94, *supra*.

**Pattern of Racketeering Activity**

338.    Boeing and Southwest conduct and participate in the conduct of the affairs of the Boeing-Southwest RICO Enterprise through a pattern of racketeering activity that has consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

339.    For Boeing, the purpose of the scheme is detailed throughout this Complaint, including, for example, at paragraphs 69 to 94, *supra*.   For example, Boeing conducts and participates in the Boeing-Southwest RICO Enterprise for the purpose of concealing the scope and nature of the deadly safety issues present in the MAX 8 aircraft in order to sell more aircraft, sell them at a higher price and/or for a higher profit, and to, *inter alia*, avoid incurring costs associated with (a) designing and testing a new aircraft to compete with the AirBus A320neo; and/or (b) repairing and/or modifying the MAX 8 aircraft to remove its safety defect.   By concealing the scope and nature of the safety defect in hundreds of MAX 8 aircraft, Boeing also maintains and boosts consumer confidence in the Boeing brand and in the Southwest brand, and avoids remediation costs and negative publicity, all of which furthers the scheme to defraud and helps Boeing sell more MAX 8 aircraft than it otherwise would sell, and to sell them at a much greater price and/or for greater profit.

340.    For Southwest, the purpose of the scheme is detailed throughout this Complaint, including, for example, at paragraphs 69 to 94, *supra*.  For example, Southwest conducts and participates in the Boeing-Southwest RICO Enterprise for the purpose of, *inter alia*, concealing the scope and nature of the deadly safety issues present on the MAX 8 aircraft in order to sell more tickets, sell them at a greater price and/or for a greater profit, and to reduce costs, including those associated with retraining Southwest pilots.  By concealing the scope and nature of the of the safety defect in hundreds of MAX 8 aircraft, Southwest also maintained and boosted consumer confidence in the Southwest brand and in the Boeing brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped Southwest sell more tickets for flights on MAX 8 aircraft than it otherwise would have sold, and to sell them at a much higher price and/or for a higher profit.

341.    As detailed in the general factual allegations, Boeing and Southwest were aware of the risk of crashes in the MAX 8 posed its fatal defect, but they intentionally subjected Plaintiffs and Class members to that risk, and consciously disregarded that risk in order to maximize their profits.

342.    To further the scheme to defraud, Boeing and Southwest repeatedly misrepresented and concealed the nature of the MAX 8 safety defect.

343.    To carry out or attempt to carry out the scheme to defraud, Boeing and Southwest have conducted or participated in the conduct of the affairs of the Boeing-Southwest RICO Enterprise through a pattern of racketeering activity that employs the use of the mail and wire facilities, in violation of 18 U.S.C. § 1431 (mail fraud) and § 1343 (wire fraud), including, for example:

a.  Boeing and Southwest devised a scheme—in furtherance of their collusive relationship—to defraud by use of the mail, telephone, television and internet, or caused to be transmitted by means of mail and wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including the Boeing website, the Southwest website, communications between Boeing and Southwest, communications with the FAA, statements to the press,  statements to consumers through the use of Twitter, as well as advertisements and other communications to Southwest consumers, including Plaintiffs and Class members; and

b.  Boeing and Southwest utilize and have utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

344.    Boeing and Southwest's pattern of racketeering activity in violation of the mail and wire fraud statutes includes, but is not limited to, the conduct alleged throughout this Complaint, including (for example), the conduct alleged in paragraphs 95 to 268, *supra*.

345.    Boeing and Southwest's conduct in furtherance of their scheme was intentional. Plaintiffs and class members were directly harmed as a result of Boeing and Southwest's intentional conduct.

346.    As described throughout this Complaint, Boeing and Southwest engaged in a pattern of related and continuous predicate acts and are likely to continue to do so.  The predicate acts constituted and constitute a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other class members and obtaining significant monies and

revenues from them.  The predicate acts also had the same or similar results, participants, victims and methods of commission.  The predicate acts were related and not isolated events.

347.    The predicate acts all had the purpose of generating significant revenue and profits for Boeing and Southwest at the expense of Plaintiffs and class members.  The predicate acts were committed or caused to be committed by Boeing and Southwest through their participation in the Boeing-Southwest RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated  in that they involved the collusive relationship and common purposes described throughout this Complaint, including (for example) in paragraphs 69 to 94, *supra*.

348.    By reason of and as a result of the conduct of Boeing and Southwest, and the pattern of racketeering activity engaged in on behalf of the Boeing-Southwest RICO enterprise, Plaintiffs and class members have been injured in their business and/or property—for example, through paying for tickets on flights aboard fatally flawed MAX 8 jets, tickets that Plaintiffs never would have purchased had they known they were going to be flying on a defective airplane that could easily kill them.

349.    Boeing and Southwest's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

**COUNT TWO:**
**Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and**
**Corrupt Organization Act, ("RICO")**
**(All Plaintiffs against Defendants Boeing and Southwest)**

350.    Plaintiffs bring this Count on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class.

351.    In addition to the General Factual Allegations re-alleged and re-incorporated herein through the general Reallegation and Incorporation by Reference paragraph above, Plaintiffs re-allege and incorporate by reference the allegations set forth in Count One.

352.    At all relevant times, Boeing and Southwest have been and continue to be associated with the Boeing-Southwest RICO enterprise and have agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Boeing-Southwest RICO enterprise, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

353.    Boeing and Southwest knew that their predicate acts of wire fraud and mail fraud were a part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud Plaintiffs and class members.

354.    As a direct and proximate result of Boeing and Southwest's conspiracy, and the multiple overt acts taken by Boeing and Southwest in furtherance of that conspiracy, Plaintiffs and class members have been injured in their business and/or property.

**B.**    **Common Law and State Law Claims**

**COUNT THREE:**
**Fraud by Concealment**
**(All Plaintiffs against Defendants Boeing and Southwest)**

355.    Plaintiffs bring this claim on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class under the common law of fraud by concealment, as there are no true conflicts (case dispositive differences) among various states' laws of fraud by concealment.  In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their tickets.

356.    Defendants Boeing and Southwest concealed and suppressed material facts regarding the MAX 8—for example, that the AoA Disagree System was not operational and that the MCAS was connected to only one of the two AoA Sensors.

357.    Boeing and Southwest took steps to hide the MCAS Defect from the public in order to avoid grounding MAX Series aircraft and protect their collusive relationship.

358.    Boeing and Southwest had a duty to disclose the MCAS Defect because they:

a.  Had exclusive and/or far superior knowledge and access to the facts than Plaintiffs and Class Members, and knew that the facts were not known to or reasonably discoverable by Plaintiffs and Class Members;

b.  Intentionally concealed the foregoing from Plaintiffs; and

c.  Made incomplete and misleading representations about, *inter alia*, the safety and reliability of the MAX8 while purposefully withholding material facts from Plaintiffs that contradicted these representations.

359.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing a ticket.  Whether a manufacturer's products and a common carrier's means of transit are safe and reliable, and whether the manufacturer and common carrier stand behind their products, are material concerns to a consumer.  Plaintiffs and Class members trusted Southwest not to sell tickets on airplanes that were defective and unsafe.

360.    Boeing and Southwest concealed and suppressed these material facts to falsely assure purchasers and consumers that the MAX 8 was safe—as represented by Boeing and Southwest and as reasonably expected by consumers.

361.    Boeing and Southwest actively concealed and/or suppressed these material facts, in whole or in part, in order to protect their profits and their collusive relationship.   Boeing and Southwest concealed these facts at the expense of Plaintiffs and Class Members' safety.

362.    Plaintiffs and Class Members were not aware of these omitted material facts and would not have purchased tickets as they did if they had known of the concealed and/or suppressed facts.

363.    Statements disseminated by Defendants in marketing materials and in other public statements about the MAX Series and MAX 8 specifically would have been seen by potential consumers throughout the country—including by Plaintiffs and Class members.   Plaintiffs and Class members relied on statements by Defendants regarding the safety of the airplanes when purchasing tickets.   Had they been aware that the MAX 8 was defective, Plaintiffs and the Class would not have purchased tickets.

364.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they purchased tickets for air travel that were worth significantly less than what they paid—if not zero.

365.    The value of the tickets was less than paid, if not zero, as a result of Defendants' fraudulent concealment of the MCAS Defect, which would have caused any reasonable customer to refuse to purchase tickets and instead make other travel plans.

366.    Accordingly, Defendants are liable to the Class for their damages in an amount to be proven at trial.

367.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Defendants.   Defendants conduct, which exhibits the highest degree of

reprehensibility, as it was intentionally and continuously placed members of the public at risk of death and injury, and adversely affected public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT FOUR
### Fraud by Misrepresentation
### (All Plaintiffs against Defendants Boeing and Southwest)

368.    Plaintiffs bring this claim on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class under the common law of fraudulent misrepresentation as there are no true conflicts (case dispositive differences) among various states' laws of fraudulent misrepresentation.  In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their tickets.

369.    Defendants marketed and sold its tickets to consumers—including Plaintiffs and Class members—in a manner that was intentionally designed to deceive them into believing that MAX Series aircraft—and specifically the MAX 8—were safe for passengers.

370.    Statements disseminated by Defendants in marketing materials and in other public statements about the MAX Series and MAX 8 specifically would have been seen by potential consumers throughout the country—including by Plaintiffs and Class members.  Plaintiffs and Class members relied on statements by Defendants regarding the safety of the airplanes when purchasing tickets.

371.    Defendants' misrepresentations are material because reasonable consumers attach importance to statements regarding the safety of airplanes and are induced to make purchasing decisions based on such representations.

372.    At all relevant times when such misrepresentations were made, Defendants knew that the misrepresentations were false and misleading.

373.    Plaintiffs and members of the Classes reasonably and justifiably relied on Defendants' fraudulent misrepresentations when purchasing tickets, and had the correct facts been known, would not have purchased the tickets at all.

374.    Therefore, as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the tickets, and any interest that would have accrued on those monies, in an amount to be proven at trial.

## COUNT FIVE:
### Negligent Misrepresentation
### (All Plaintiffs against Defendants Boeing and Southwest)

375.    Plaintiffs bring this claim on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class under the common law of negligent misrepresentation, as there are no true conflicts (case dispositive differences) among various states' laws of negligent misrepresentation.  In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their tickets.

376.    Defendants marketed and sold air travel to consumers—including Plaintiffs and Class members—in a manner that was intentionally designed to deceive them into believing that MAX Series aircraft—and specifically the MAX 8—were safe for passengers.

377.    Defendants' misrepresentations are material because reasonable consumers attach importance to statements regarding the safety of airplanes and are induced to make purchasing decisions based on such representations.

378.     At all relevant times when such misrepresentations were made, Defendants knew that the misrepresentations were false and misleading, or acted recklessly in making the representations without regard to their truth.  At a minimum, Defendants acted negligently in failing to be aware and/or inform the public of the defect in the MAX Series aircraft and the safety concerns regarding the MCAS.  Defendants have no reasonable grounds for believing that the misrepresentations about the safety of the MAX Series aircraft were not false and misleading.

379.     Plaintiffs and members of the Classes reasonably and justifiably relied on Defendants' negligent misrepresentations when purchasing tickets, and had the correct facts been known, would not have purchased the tickets at all.

380.     Therefore, as a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the tickets, and any interest that would have accrued on those monies, in an amount to be proven at trial.

**COUNT SIX:**
**Unjust Enrichment**
**(All Plaintiffs against Defendants Boeing and Southwest)**

381.     Plaintiffs bring this claim against Southwest on behalf of the Nationwide Southwest Airlines Consumer Class and the Nationwide American Airlines Consumer Class under the common law of unjust enrichment.  In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their tickets.

382.     Southwest has received and retained a benefit from Plaintiffs and inequity has resulted.

383.   Southwest benefitted through its unjust conduct by selling tickets for flights, at a profit, for more than the tickets were worth to Plaintiffs who would not have purchased these tickets at all had they been aware of the MCAS Defect in the MAX 8s flown by Southwest.

384.   It is inequitable for Southwest to retain these benefits.

385.   Plaintiffs do not have an adequate remedy at law.

386.   As a result of Southwest's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**COUNT SEVEN:**
**Negligence**
**(The Nationwide American Airlines Consumer Class against Defendant Southwest)**

387.   Plaintiffs bring this claim against Southwest on behalf of the Nationwide American Airlines Consumer Class under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence.   In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their tickets.

388.   Southwest owed a duty of care to Plaintiffs, who were prospective passengers on a common carrier, to provide vehicles safe and fit for the purposes to which they are put.

389.   Southwest breached their duty of care by, among other things:

   a.   Negligently and recklessly failing to take all necessary steps to ensure that its aircraft were safe;

   b.   Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

   c.   Negligently and recklessly failing to take necessary steps to ensure that the MAX Series aircraft did not suffer from a common, uniform defect; and

d.   Negligently and recklessly concealing the nature and scope of the MCAS

Defect.

390.   Southwest's negligence was the direct, actual, and proximate cause of foreseeable

damages suffered by Plaintiffs.

391.   Therefore, as a direct and proximate result of Southwest's negligence, Plaintiffs

and members of the Nationwide American Airlines Consumer Class have suffered economic losses

and other general and specific damages, including but not limited to the amounts paid for the

tickets, and any interest that would have accrued on those monies, all in an amount to be proven

at trial.

**COUNT EIGHT:**
**Negligence**
**(All Plaintiffs against Defendant Boeing)**

392.   Plaintiffs bring this claim against Boeing on behalf of the Nationwide Southwest

Airlines Consumer Class and the Nationwide American Airlines Consumer Class under the

common law of negligence, as there are no true conflicts (case-dispositive differences) among

various states' laws of negligence.  In the alternative, Plaintiffs bring this claim under the laws of

the states where Plaintiffs and Class Members reside and/or purchased their tickets.

393.   Boeing owed a duty of care to Plaintiffs, who were passengers on a common carrier,

to provide vehicles safe and fit for the purposes to which they are put.

394.   Boeing breached their duty of care by, among other things:

a.   Negligently and recklessly failing to inform pilots and carriers about the

MCAS in the MAX Series aircraft;

      b.   Negligently and recklessly failing to take all necessary steps to ensure that its aircraft were safe, including failing to rectify the problems with the AoA Sensor after the Lion Air Crash;

      c.   Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

      d.   Negligently and recklessly failing to take necessary steps to ensure that the MAX Series aircraft did not suffer from a common, uniform defect; and

      e.   Negligently and recklessly concealing the nature and scope of the MCAS Defect.

395.    Boeing's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Plaintiffs.

396.    Therefore, as a direct and proximate result of Boeing's negligence, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the amounts paid for the tickets, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**II.    State Subclass Claims**

**A.    Claims Brought on Behalf of the California Subclass**

**COUNT NINE:**
**Violation of the Consumer Legal Remedies Act**
**Cal. Civ. Code §§1750,** *et seq.*
**(The California Subclass against Defendants Boeing and Southwest)**

397.    This claim is brought by Plaintiff Rugg on behalf of herself and the California Subclass.

398.    The tickets are "services" as defined in Cal. Civ. Code § 1761(b).

399.    Plaintiffs, the California Subclass, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

400.    Plaintiffs and the California Subclass are "consumers" as defined in Cal. Civ. Code § 1761(d).

401.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

402.    Defendants have engaged in unfair or deceptive acts or practices that violated Cal Civ. Code §§ 1750, *et seq.*, as described above and below, by among other things representing that the MAX Series and/or MCAS have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; and omitting material facts in describing them.

403.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the MAX Series and/or the MCAS installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

404.    Defendants also engaged in unlawful trade practices by representing that the MAX Series and/or MCAS have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; and omitting material facts in describing them. Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA.

405.    California Civil Code § 1770(a)(5) further prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which

they do not have. . . ."  By offering tickets for sale with misleading and false information regarding the safety of the MAX Series aircraft, Defendants have misrepresented that their flights have characteristics which they do not have in violation of § 1770(a)(5) of the CLRA.

406.    Plaintiffs and Class members relied on Defendants' false representations regarding the safety of the MAX Series aircraft.  Plaintiffs and Class members would not have purchased the tickets but for Defendants' unlawful conduct.

407.    Under Cal. Civ. Code § 1780(a), Plaintiffs and Class members seek injunctive and equitable relief for Defendants' violations of the CLRA.

408.    Plaintiffs request that this Court enjoin Defendants from continuing to violate the CLRA as discussed herein and/or from violating the CLRA in the future and to order restitution to Plaintiffs and the Classes.  Plaintiffs also request an award of actual and punitive damages, attorneys' fees and costs, and any other relief that the Court deems proper, pursuant to California Civil Code § 1780(a).

## COUNT TEN:
### Violation of the California False Advertising Law
### Cal. Bus.  & Prof. Code §§ 17500, *et seq*.
### (The California Subclass against Defendants Boeing and Southwest)

409.    This claim is brought by Plaintiff Rugg on behalf of herself and the California Subclass.

410.    California Bus.    &  Prof.  Code  § 17500  states:  "It  is  unlawful  for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever

including over the Internet, any statement . . . which is untrue or misleading, and which is known

or which by the exercise of reasonable care should be known to be untrue or misleading."

411.     Defendants caused to be made or disseminated throughout California and the

United States, through advertising, marketing and other publications, statements that were untrue

or misleading, and which Defendants knew, or through the exercise of reasonable care should have

known, were untrue and misleading, to consumers, including Plaintiffs and the Class.

412.     Defendants have violated § 17500 because the misrepresentations and omissions

regarding the safety, reliability, and functionality of the MAX 8 and/or the MCAS installed in it

as set forth in this Complaint were material and were likely to deceive a reasonable consumer.

413.     Plaintiffs saw misleading statements by Boeing and Southwest, examples of which

are described in paragraphs 185 to 215 and 224 to 249 *supra*, misrepresenting or omitting facts

regarding the safety of MAX Series aircraft prior to purchasing their tickets.

414.     Plaintiffs and the Class have suffered an injury in fact, including the loss of money

or property, as a result of the Defendants' unfair, unlawful, and/or deceptive practices.   In

purchasing their tickets, Plaintiffs and the Class relied on the misrepresentations and/or omissions

by Defendants with respect to the safety and reliability of the MAX Series.   Defendants'

representations turned out not to be true because the MAX Series and the MCAS contained a

defect, which compromised the safety and reliability of the aircraft and exposed Plaintiffs to

possible bodily injury and death.   Had Plaintiffs and the Class known the truth, they would not

have purchased their tickets.   Accordingly, Plaintiffs and the other Class members overpaid for

their tickets and did not receive the benefit of their bargain.

415.    All the wrongful conduct alleged herein occurred in the conduct of Defendants'

business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that

was perpetuated and repeated, both in the State of California and nationwide.

416.    Plaintiffs, individually and on behalf of the other Class members, request that this

Court enter such orders or judgments as necessary to enjoin Defendants from continuing their

unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money

Defendants acquired by unfair competition, including restitution and/or restitutionary

disgorgement and for such other relief set forth below.

**B.    Claims Brought on Behalf of the Florida Subclass**

**COUNT ELEVEN:**
**Violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §§ 501.201, *et seq*.**
**(The Florida Subclass against Defendants Boeing and Southwest)**

417.    This claim is brought by Plaintiff Khan on behalf of himself and the Florida

Subclass.

418.    Plaintiffs are "consumers" within the meaning of § 501.203(7).

419.    Defendants are engaged in "trade or commerce" under the FDUTPA within the

meaning of § 502.203(8).

420.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

§ 501.204(1).

421.    Defendants willfully failed to disclose, and indeed, actively worked together to

conceal the dangerous risks posed by the MCAS software system on the MAX 8.  Defendants

exacerbated the Deception by repeatedly asserting that the MAX 8 was safe and by claiming to be

a manufacturer with an unparalleled safety record.

422.    Defendants caused to be made or disseminated throughout Florida and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

423.    Plaintiffs saw misleading statements by Boeing and Southwest, examples of which are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts regarding the safety of MAX Series aircraft prior to purchasing their tickets.

424.    Defendants have violated § 501.201 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the MAX 8 and/or the MCAS installed in it as set forth in this Complaint were material and were likely to deceive a reasonable consumer.

425.    Defendants' unfair and deceptive acts and practices were likely to mislead or deceive reasonable consumers, including the Florida Subclass, about the true safety risks and reliability of the MAX 8 and/or the defective MCAS software.

426.    Defendants knew or should have known that their conduct violated the FDUTPA.

427.    Defendants engaged in their conspiracy to conceal the flaws of the MAX 8 to protect their profits, protect and preserve their collusive relationship, avoid remediation, and a costly public relations scandal.  The conspiracy allowed Plaintiffs to continue to buy tickets and fly on highly dangerous aircraft.

428.    Defendants owed the Florida Subclass a duty to disclose the true safety risks and reliability of the MAX 8 and/or the defective MCAS because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the MCAS software; (b) intentionally concealed those risks from Plaintiffs; and/or (c) made deceiving statements about the safety and reliability of the MAX 8 generally which contradicted the true facts.

429.    Because of the true safety risks of the aircraft, the tickets bought by Plaintiffs were effectively worthless or worth substantially less than what was paid for them.  Had Plaintiffs been aware of the design flaws of the MCAS and/or MAX 8 aircraft, Plaintiffs either would not have paid as much for their tickets as they did or would not have purchased them at all.

430.    Plaintiffs and the Class have suffered an injury in fact, including the loss of money or property, as a result of the Defendants' unfair, unlawful, and/or deceptive practices.   In purchasing their tickets, Plaintiffs and the Class relied on the misrepresentations and/or omissions by Defendants with respect to the safety and reliability of the MAX Series.   Defendants' representations turned out not to be true because the MAX Series and the MCAS contained a fatal defect that affected the safety and reliability of the aircraft, which exposed Plaintiffs to possible bodily injury and death.   Had Plaintiffs and the Class known the truth, they would not have purchased their tickets.   Accordingly, Plaintiffs and the other Class members overpaid for their tickets and did not receive the benefit of their bargain.

431.    All wrongful conduct alleged herein occurred in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated and repeated, both in the State of Florida and nationwide.

432.    Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement and for such other relief set forth below.

### C.   Claims Brought on Behalf of the New York Subclass

**COUNT TWELVE:**
**Violation of New York General Business Law ("NY GBL") § 349**
**N.Y. Gen. Bus. Law. §§ 349 *et seq.***
**(The New York Subclass against Defendants Boeing and Southwest)**

433.    This claim is brought by Plaintiffs Timothy Blakey Jr. and Stephanie Blakey on behalf of themselves and the New York Subclass.

434.    Plaintiffs and Defendants are "persons" within the meaning of the N.Y. Gen. Bus. Law § 349.

435.    N.Y. Gen. Bus. Law § 349(a) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

436.    N.Y. Gen. Bus. Law § 349(h) provides a civil right of action to "any person injured by reason of any violation of [§ 349]."

437.    Defendants' actions as set forth above occurred in the conduct of trade and/or commerce.

438.    In the course of their business, Defendants actively concealed the dangers and risks posed by the MCAS software and the MAX 8 as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

439.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the tickets.

440.    By failing to disclose and actively concealing the MCAS software defect, by marketing the MAX 8 as a safe and reliable aircraft, and by presenting themselves as corporations

that valued safety, Defendants engaged in unfair or deceptive business practices in violation of the GBL.

441.    Defendants deliberately withheld information about the MAX 8 defect in order to ensure Plaintiffs would purchase the tickets.  Defendants compounded the deception by repeatedly asserting that the MAX 8 was a safe aircraft and by claiming that they were corporations that valued safety.

442.    Defendants intentionally and knowingly misrepresented material facts regarding the MAX 8 with an intent to deceive Plaintiffs.

443.    Defendants caused to be made or disseminated throughout New York and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

444.    Plaintiffs saw misleading statements by Boeing and Southwest, examples of which are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts regarding the safety of MAX Series aircraft prior to purchasing their tickets.

445.    Defendants knew or should have known that their conduct violated the NY GBL.

446.    Defendants engaged in their conspiracy to conceal the flaws of the MAX 8 to protect their profits, protect and preserve their collusive relationship, avoid remediation, and avoid a costly public relations scandal.  The conspiracy allowed Plaintiffs to continue to buy tickets and fly on highly dangerous aircraft.

447.    Defendants owed the New York Subclass a duty to disclose the true safety risks and reliability of the MAX 8 and/or the defective MCAS because Defendants:  (a) possessed exclusive knowledge of the dangers and risks posed by the MCAS software; (b) intentionally

concealed those risks from Plaintiffs; and/or (c) made deceiving statements about the safety and reliability of the MAX 8 generally which contradicted the true facts.

448.     Because of the true safety risks of the aircraft, the tickets bought by Plaintiffs were effectively worthless.  Had Plaintiffs been aware of the design flaws of the MCAS and/or MAX 8 aircraft, Plaintiffs either would not have paid as much for their tickets as they did or would not have purchased them at all.

449.     Select members of the New York Subclass are also elderly persons within the meaning of N.Y. Gen. Bus. Law § 349-c, and are therefore entitled to restitution under § 349-c(4).

450.     Defendants knew, or reasonably should have known, that select members of the New York Subclass were elderly persons within the meaning of N.Y. Gen. Bus. Law § 349-c(2)(b)(1).

**COUNT THIRTEEN:**
**Violation of New York General Business Law ("NY GBL") § 350**
**N.Y. Gen. Bus. Law. §§ 350 *et seq.***
**(The New York Subclass against Defendants Boeing and Southwest)**

451.     This claim is brought by Plaintiffs Timothy Blakey Jr. and Stephanie Blakey on behalf of themselves and the New York Subclass.

452.     Defendants are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

453.     N.Y. Gen. Bus. Law § 350 outlaws "false advertising in the conduct of any business, trade or commerce."

454.     N.Y. Gen. Bus. Law § 350-a defines false advertising as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account . . . the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the

commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

455.   Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to the New York Subclass.

456.   Defendants' misrepresentations of the safety of the 737-MAX aircraft were material and likely to deceive a reasonable customer.  Accordingly, they violated § 350.

457.   Plaintiffs have suffered an injury, including the loss of money and/or property, as a result of Defendants' false advertising.   In purchasing the tickets, Plaintiffs relied on the misrepresentations and/or omissions of Defendants with respect to the safety of the MAX airplane. Defendants' representations were false and/or misleading because the true safety risks of the MAX airplane rendered the tickets worthless.

458.   Had the New York Subclass known about the true safety risks of the MAX airplane, they would not have purchased their tickets.

459.   Pursuant to N.Y. Gen. Bus. Law § 350, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Subclass member.

460.   Because of the Defendants' willful conduct, Plaintiffs are entitled to recover treble damages, up to $10,000 for each class member.

**D.      Claims Brought on Behalf of the Arizona Subclass**

**COUNT FOURTEEN:**
**Violation of the Arizona Consumer Fraud Act ("ACFA")**
**Ariz. Rev. Stat. §§ 44-1521, *et. seq*.**
**(The Arizona Subclass against Defendants Boeing and Southwest)**

461.     This claim is brought by Plaintiffs Thompson and Earl on behalf of themselves and the Arizona Subclass.

462.     Plaintiffs and Defendants are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

463.     The MAX 8 Aircraft and/or the tickets are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

464.     "Advertisement" includes "the attempt by publication, dissemination, solicitation or circulation, oral or written, to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise" under Ariz. Rev. Stat. § 44-1521(1).

465.     Ariz. Rev. Stat. § 44-1522 makes unlawful the "act, use, or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby."

466.     In the course of their business, Defendants actively concealed the dangers and risks posed by the MCAS software and the MAX 8 as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

467.     By actively concealing the MCAS software flaws on the MAX 8, Defendants engaged in unfair or deceptive practices prohibited by the ACFA, including (a) representing that

the MAX 8 had characteristics, uses, benefits, and qualities which it did not have and (b) representing that it was of a particular standard, quality, and grade, when it was not. Defendants participated in unfair or deceptive acts or practices that violated the ACFA.

468.    In the course of their business, Defendants actively concealed the dangers and risks posed by the MAX 8 and the MCAS software and otherwise engaged in activity designed to deceive consumers.

469.    By failing to disclose and actively concealing the MCAS software defect, by marketing the MAX 8 as a safe and reliable aircraft, and by presenting themselves as corporations that valued safety, Defendants engaged in unfair or deceptive business practices in violation of the ACFA.

470.    Defendants deliberately withheld information about the MAX 8 defect in order to ensure Plaintiffs would purchase the tickets.  Defendants compounded the deception by repeatedly asserting that the MAX 8 was a safe aircraft and by claiming that they were corporations that valued safety.

471.    Defendants intentionally and knowingly misrepresented material facts regarding the MAX 8 with an intent to deceive Plaintiffs.

472.    Defendants caused to be made or disseminated throughout Arizona and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

473.    Plaintiffs saw misleading statements by Boeing and Southwest, examples of which are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts regarding the safety of MAX Series aircraft prior to purchasing their tickets.

474. Defendants knew or should have known that their conduct violated the ACFA.

475. Defendants engaged in their conspiracy to conceal the flaws of the MAX 8 to protect their profits, protect and preserve their collusive relationship, avoid remediation, and a costly public relations scandal. The conspiracy allowed Plaintiffs to continue to purchase tickets and fly on highly dangerous aircraft.

476. Defendants owed the Arizona Subclass a duty to disclose the true safety risks and reliability of the MAX 8 and/or the defective MCAS because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the MCAS software; (b) intentionally concealed those risks from Plaintiffs; and/or (c) made deceiving statements about the safety and reliability of the MAX 8 generally which contradicted the true facts.

477. Because of the true safety risks of the airplane, the tickets purchased by Plaintiffs were worthless. Had Plaintiffs been aware of the design flaws of the MCAS and/or MAX 8 aircraft, Plaintiffs either would not have paid as much for their tickets as they did or would not have purchased them at all.

478. Plaintiffs seek monetary relief from Defendants in an amount to be determined at trial. Plaintiffs seek punitive damages because there is evidence that Defendants engaged in outrageous conduct with an evil mind.

### E. Claims Brought on Behalf of the Indiana Subclass

**COUNT FIFTEEN:**
**Violation of the Indiana Deceptive Consumer Sales Act ("IDCSA")**
**Ind. Code. §§ 24-5-0.5-0.1, *et seq.***
**(The Indiana Subclass against Defendants Boeing and Southwest)**

479. This claim is brought by Plaintiffs Cooper, Rogers, and Mortz-Rogers on behalf of themselves and the Indiana Subclass.

480. Plaintiffs are persons within the meaning of Ind. Code § 24-5-0.5-2(2).

481.    Plaintiffs bring this action as a class pursuant to their rights under Ind. Code 24-5-0.5-4(b).

482.    Defendants are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3)(A).

483.    Plaintiffs' purchase of tickets was a "consumer transaction" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

484.    Pursuant to Ind. Code 24-5-0.5-3(a), it is unlawful for a supplier to commit an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."

485.    Ind. Code 24-5-0.5-3(b) prohibits suppliers from representing, *inter alia*:

    a.   "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have"; or

    b.   "(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not."

486.    Defendants' caused to be made or disseminated throughout Indiana and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

487.    In the course of their business, Defendants' actively concealed the dangers and risks posed by the MCAS software and the MAX 8 as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

488.     By actively concealing the MCAS software flaws on the MAX 8, Defendants'
engaged in unfair or deceptive practices prohibited by the IDCSA, including (a) representing that
the MAX 8 had characteristics, uses, benefits, and qualities which it did not have and
(b) representing that it was of a particular standard, quality, and grade, when it was not.

489.     By failing to disclose and actively concealing the MCAS software defect, by
marketing the MAX 8 as a safe and reliable aircraft, and by presenting themselves as corporations
that valued safety, Defendants engaged in unfair or deceptive business practices in violation of the
IDCSA.

490.     Defendants deliberately withheld information about the MAX 8 defect in order to
ensure Plaintiffs would purchase the tickets.  Defendants compounded the deception by repeatedly
asserting that the MAX 8 was a safe aircraft and by claiming that they were corporations that
valued safety.

491.     Plaintiffs saw misleading statements by Boeing and Southwest, examples of which
are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts
regarding the safety of MAX Series aircraft prior to purchasing their tickets.

492.     Defendants' owed the Indiana Subclass a duty to disclose the true safety risks and
reliability of the MAX 8 and/or the defective MCAS because defendants:  (a) possessed exclusive
knowledge of the dangers and risks posed by the MCAS software; (b) intentionally concealed those
risks from Plaintiffs; and/or (c) Made deceiving statements about the safety and reliability of the
MAX 8 generally which contradicted the true facts.

493.     Because of the true safety risks of the aircraft, the tickets purchased by Plaintiffs
were effectively worthless.  Had Plaintiffs been aware of the design flaws of the MCAS and/or

MAX 8 aircraft, Plaintiffs either would not have paid as much for their tickets as they did or would not have purchased them at all.

494.    Plaintiffs seek actual damages or $500, whichever is greater, each for the deceptive acts of Defendants.  Because Defendants' actions were extreme, willful, and outrageous, Plaintiffs ask the court to award treble damages and attorneys' fees in accordance with Ind. Code 24-5-0.5-4(a).

## F.    Claims Brought on Behalf of the Georgia Subclass

### COUNT SIXTEEN:
### Violation of the Georgia Fair Business Practices Act ("FBPA")
### Ga. Code. §§ 10-1-390, *et seq*.
### (The Georgia Subclass against Defendants Boeing and Southwest)

495.    This claim is brought by Plaintiff Goggins on behalf of herself and the Georgia Subclass.

496.    Plaintiffs are "consumers" within the meaning of Ga. Code Ann. § 10-1-392(6).

497.    Plaintiffs, Boeing, and Southwest Airlines are "persons" within the meaning of Ga. Code Ann. § 10-1-392(a)(24).

498.    Defendants were and are engaged in "trade" and "commerce" within the meaning of Ga. Code Ann § 10-1-392(a)(28).

499.    Pursuant to Ga. Code Ann. § 10-1-393(a), "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" are unlawful.

500.    Pursuant to Ga. Code Ann. § 10-1-393(b) it is unlawful to represent "[t]hat goods or services…have uses, benefits,  or quantities that they do not have"; or to represent "[t]hat goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another."

501.    By actively concealing the MCAS software flaws on the MAX 8, Defendants engaged in unfair or deceptive practices prohibited by the FBPA, including (a) representing that the MAX 8 had characteristics, uses, benefits, and qualities which it did not have and (b) representing that it was of a particular standard, quality, and grade, when it was not.  Defendants participated in unfair or deceptive acts or practices that violated the FBPA.

502.    In the course of their business, Defendants actively concealed the dangers and risks posed by the MAX 8 and the MCAS software and otherwise engaged in activity designed to deceive consumers.

503.    By, *inter alia*, failing to disclose and actively concealing the MCAS software defect, by marketing the MAX 8 as a safe and reliable aircraft, and by presenting themselves as corporations that valued safety, Defendants engaged in unfair or deceptive business practices in violation of the FBPA.

504.    Defendants deliberately withheld information about the MAX 8 defect in order to ensure Plaintiffs would purchase the tickets.  Defendants compounded the deception by repeatedly asserting that the MAX 8 was a safe aircraft and by claiming that they were corporations that valued safety.

505.    Defendants intentionally and knowingly misrepresented material facts regarding the MAX 8 with an intent to deceive Plaintiffs.

506.    Defendants caused to be made or disseminated throughout Georgia and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

507.     Plaintiffs saw misleading statements by Boeing and Southwest, examples of which are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts regarding the safety of MAX Series aircraft prior to purchasing their tickets.

508.     Defendants knew or should have known that their conduct violated the FBPA.

509.     Defendants engaged in their conspiracy to conceal the flaws of the MAX 8 to protect their profits, protect their collusive relationship, avoid remediation, and avoid a costly public relations scandal.  The conspiracy allowed Plaintiffs to continue to buy tickets and fly on highly dangerous aircraft.

510.     Defendants owed the Georgia Subclass a duty to disclose the true safety risks and reliability of the MAX 8 and/or the defective MCAS because defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the MCAS software; (b) intentionally concealed those risks from Plaintiffs; and/or (c) made deceiving statements about the safety and reliability of the MAX 8 generally which contradicted the true facts.

511.     Because of the true safety risks of the aircraft, the tickets purchased by Plaintiffs were effectively worthless or worth substantially less than what was paid for them.  Had Plaintiffs been aware of the design flaws of the MCAS and/or MAX 8 aircraft, Plaintiffs would not have purchased them at all.

**COUNT SEVENTEEN:**
**Violation of the Georgia Uniform Deceptive Trade Practices Act ("UDTPA")**
**Ga. Code. §§ 10-1-370, *et seq.***
**(The Georgia Subclass against Defendants Boeing and Southwest)**

512.     This claim is brought by Plaintiff Goggins on behalf of herself and the Georgia Subclass.

513.     Plaintiffs and Defendants are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

514. The UDPTA prohibits "deceptive trade practices," which a person engages in when he, in the course of business: represents that goods or services "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; represents that "goods or services are of a particular standard, quality, or grade"; "advertises goods or services with intent not to sell them as advertised"; and "engage[s] in any . . . conduct which . . . creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. §§ 10-1-372(5, 7, 9, 12).

515. In the course of their business, Defendants actively concealed the dangers and risks posed by the MCAS software and the MAX 8 as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

516. By actively concealing the MCAS software flaws on the MAX 8, Defendants engaged in unfair or deceptive practices prohibited by the UDTPA, including (a) representing that the MAX 8 had characteristics, uses, benefits, and qualities which it did not have and (b) representing that it was of a particular standard, quality, and grade, when it was not. Defendants participated in unfair or deceptive acts or practices that violated the UDTPA.

517. In the course of their business, Defendants actively concealed the dangers and risks posed by the MAX 8 and the MCAS software and otherwise engaged in activity designed to deceive consumers.

518. By failing to disclose and actively concealing the MCAS software defect, by marketing the MAX 8 as a safe and reliable aircraft, and by presenting themselves as corporations that valued safety, Defendants engaged in unfair or deceptive business practices in violation of the UDTPA.

519. Defendants deliberately withheld information about the MAX 8 defect in order to ensure Plaintiffs would purchase the tickets. Defendants compounded the deception by repeatedly

asserting that the MAX 8 was a safe aircraft and by claiming that they were corporations that valued safety.

520.    Defendants intentionally and knowingly misrepresented material facts regarding the MAX 8 with an intent to deceive Plaintiffs.

521.    Defendants caused to be made or disseminated throughout Georgia and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to consumers, including Plaintiffs and the Class.

522.    Plaintiffs saw misleading statements by Boeing and Southwest, examples of which are described in paragraphs 185 to 215 and 224 to 249, *supra*, misrepresenting or omitting facts regarding the safety of MAX Series aircraft prior to purchasing their tickets.

523.    Defendants knew or should have known that their conduct violated the UDTPA.

524.    Defendants engaged in their conspiracy to conceal the flaws of the MAX 8 protect their profits, protect and preserve their collusive relationship, avoid remediation, and a costly public relations scandal.  The conspiracy allowed Plaintiffs to continue to buy tickets and fly on highly dangerous aircraft.

525.    Defendants owed the Georgia Subclass a duty to disclose the true safety risks and reliability of the MAX 8 and/or the defective MCAS because defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the MCAS software; (b) intentionally concealed those risks from Plaintiffs; and/or (c) made deceiving statements about the safety and reliability of the MAX 8 generally which contradicted the true facts.

526.    Because of the true safety risks of the aircraft, the tickets bought by Plaintiffs were effectively worthless or worth substantially less than what was paid for them.  Had Plaintiffs been

aware of the design flaws of the MCAS and/or MAX 8 aircraft, Plaintiffs would not have purchased them at all.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.      Enter an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.      Enter a judgment declaring that Defendants have committed the violations of law alleged in this case;

C.      Award actual, compensatory, statutory, consequential damages;

D.      Award punitive and treble damages;

E.      Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

F.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

G.      Enjoin Defendants from continuing to falsely market and advertise, conceal material information from the public, and commit unlawful and unfair business acts and practices; and order Defendants to engage in a corrective notice campaign;

H.      Award declaratory relief;

I.      Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

J.      Grant such further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: Sherman, Texas
      July 10, 2019

Brian J. Dunne (CA 275689)
*bdunne@piercebainbridge.com*
PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
333 S. Grand Ave., 44th Floor
Los Angeles, CA 90071
Telephone: (213) 262-9333

Respectfully submitted,

/s/ Yavar Bathaee
**Yavar Bathaee (NY 4703443) (Lead Counsel)**
*yavar@piercebainbridge.com*
David L. Hecht (NY 4695961)
*dhecht@piercebainbridge.com*
Andrew Lorin (NY 2368249)
*alorin@piercebainbridge.com*
Michael M. Pomerantz (NY 2920932)
*mpomerantz@piercebainbridge.com*
Barron M. Flood (NY 5585765)
*bflood@piercebainbridge.com*
Pierce Bainbridge Beck Price & Hecht LLP
277 Park Avenue, 45th Floor
New York, New York 10172
Tel: (212) 484-9866

*Attorneys for Plaintiffs*