# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DAMONIE EARL, LINDA RUGG, ALESA BECK, TIMOTHY BLAKEY, JR., STEPHANIE BLAKEY, MARISA THOMPSON, MUHAMMAD MUDDASIR KHAN, ELIZABETH COOPER, JOHN ROGERS, VALERIE MORTZ-ROGERS, and LAKESHA GOGGINS, each individually and on behalf of all others similarly situated | § § § § § § § § § § | Civil Action No. 4:19-cv-00507 <br> Judge Mazzant |
| v. | § § | |
| THE BOEING COMPANY and SOUTHWEST AIRLINES CO. | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are two motions to dismiss: (1) Defendant Southwest Airlines' ("Defendant Southwest") Motion to Dismiss Pursuant to Rules 12(b)(1), 12(b)(6), and 9(b) or, in the Alternative, Motion to Strike the Class Allegations (Dkt. #19); and (2) Defendant The Boeing Company's ("Defendant Boeing") Motion to Dismiss for Lack of Standing and Failure to State a Claim (Dkt. #21). Having considered Defendant Southwest and Defendant Boeing's (collectively, "Defendants") motions, the relevant pleadings, and the December 9, 2019 hearing, the Court finds that the motions should be granted in part and denied in part.

## BACKGROUND

This litigation centers around the allegedly fraudulent representations and conspiratorial conduct of Defendants (Dkt. #1 ¶ 8). Plaintiffs Damonie Earl, Linda Rugg, Alesa Beck, Timothy Blakey, Jr., Stephanie Blakey, Marisa Thompson, Muhammad Muddasir Khan, Elizabeth Cooper, John Rogers, Valerie Mortz-Rogers, and Lakesha Goggins (collectively, "Plaintiffs") bring their own claims against Defendants and seek to represent a putative class of similarly situated

individuals who—they claim—were overcharged at the moment they purchased their airplane tickets (Dkt. #1 ⁋ 325).

According to Plaintiffs, increasing competition from Airbus, another aircraft manufacturer, caused Defendant Boeing to look for shortcuts in order to get its new airplanes to customers quicker (Dkt. #1 ⁋ 96). After the launch of the Airbus A320neo, Plaintiffs contend that Defendant Boeing chose to adapt one of its existing aircraft into a new product to compete with Airbus (Dkt. #1 ⁋ 97). Defendant Boeing wanted to save on design and development costs with the new plane, and it also wanted to avoid forcing pilots—who were used to flying the old Boeing 737s—from having to learn to fly an entirely new aircraft (Dkt. #1 ⁋⁋ 98–99). Enter the Boeing 737 MAX 8 (the "MAX 8") (Dkt. #1 ⁋ 98).

Defendant Boeing allegedly took the old 737 and modified the engine, engine position, and the airplane's nose gear in an effort to make the MAX 8 more fuel efficient (Dkt. #1 ⁋ 100). But because the engines were more powerful and mounted differently than on prior models, Defendant Boeing had to combat the increased risk that the nose of the MAX 8 would pitch up, which could result in a deadly aerodynamic stall (Dkt. #1 ⁋⁋ 101–02). To combat the tendency of the nose to pitch up, Defendant Boeing designed the Maneuvering Characteristics Augmentation System ("MCAS"), a computer-controlled system designed to bring the MAX 8's nose down in the event of a pitch up without the need for pilot input (Dkt. #1 ⁋⁋ 104–06).

Plaintiffs state that the "MCAS was defective by design—fatally so," and claim that Defendants knew of this defect (Dkt. #1 ⁋ 108). Plaintiffs also assert that Defendant Boeing made misrepresentations to regulators during the MAX 8 approval process and that Defendant Southwest was involved with the development and testing of the MAX 8 (Dkt. #1 ⁋⁋ 152–78). The purpose

of these misrepresentations, as Plaintiffs allege, was to signal that the MAX 8 was safe in order to keep demand and ticket prices up (Dkt. #1 ⁋⁋ 2, 46, 200, 214, 238, 247–48, 259, 334, 339–40).

But Defendants' claims of safety were soon undermined by two tragic MAX 8 crashes: both the Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashed due to the alleged MCAS defect (Dkt. #1 ⁋⁋ 25, 36, 183, 221). Every passenger died (Dkt. #1 ⁋⁋ 25, 221). Soon after the crashes, the Federal Aviation Administration ("FAA") grounded the MAX 8 in the United States (Dkt. #1 ⁋ 252). According to Plaintiffs, it was only after the FAA grounded the plane that Defendants made "calculated admissions" about their knowledge of and actions surrounding the MAX 8's defect (Dkt. #1 ⁋ 41).

Throughout their pleadings, Plaintiffs allege two theories of injury: (1) if Plaintiffs had known the MAX 8 was fatally defective, Plaintiffs would never have purchased tickets, so Plaintiffs want their money back; and (2) Defendants' fraudulent misrepresentations and omissions allowed Defendant Southwest to overcharge Plaintiffs for their tickets (Dkt. #1 ⁋⁋ 8, 52–53, 364–65; Dkt. #48 at pp. 42–43).

Plaintiffs do not dispute that they used the tickets they purchased to complete a flight (Dkt. #1 ⁋⁋ 55–63). And Plaintiffs "expressly disclaim any recovery in this action for physical injury resulting from the MCAS Defect" (Dkt. #1 ⁋ 325). The relevance of the MAX 8's defect to this suit, Plaintiffs claim, is that the "injuries [nonparties] suffered in crashes as a result of the [defect] implicate Defendants Southwest and Boeing's aircraft and constitute evidence supporting various claims, including overcharge for tickets" (Dkt. #1 ⁋ 325).

Plaintiffs allege causes of action against Defendants for: (1) violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"); (2) fraud by concealment; (3) fraud by misrepresentation; (4) negligent misrepresentation; (5) unjust enrichment; (6) negligence; and

(7) various claims brought on behalf of California, Florida, New York, Arizona, Indiana, and Georgia subclasses (Dkt. #1 at pp. 88–123).

On September 13, 2019, Defendants filed their motions to dismiss (Dkt. #19; Dkt. #21). Plaintiffs responded on October 11, 2019 (Dkt. #28). Defendants filed their replies on October 28, 2019 (Dkt. #34; Dkt. #35), and on November 12, 2019, Plaintiffs filed their sur-reply (Dkt. #39). On December 9, 2019, the Court held a hearing on Defendants' motions to dismiss (Dkt. #48).

## LEGAL STANDARDS

### I. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain

that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.     Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and

disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

### A. Federal Rule of Civil Procedure 9(b)

Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s

heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186.

Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

## ANALYSIS

### I. Article III Standing

The "judicial Power of the United States" extends only to "Cases" and "Controversies." U.S. CONST. art. III, §§ 1–2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). The doctrine of standing is "rooted in the traditional understanding of a case or controversy," and it "limits the category of litigants empowered to maintain a lawsuit in federal court . . . ." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). So, the Court must decide issues of standing before all other issues because it "determines the court's fundamental power even to hear the suit." *Ford v. NYLCare Health Plan of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002).[1]

---

[1] At the December 9, 2019, hearing on Defendants' motions to dismiss, counsel for Defendant Boeing represented that under *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Court could address either the Article III question or the question of "RICO standing" first (Dkt. #48 at p. 69). Defendant Boeing is incorrect.

So-called "RICO standing" does not implicate subject-matter jurisdiction—i.e., the *power* of the Court to hear the case. *See Meier v. UHS of Del., INC.*, 2019 WL 6465314, at *5–7 (E.D. Tex. Dec. 2, 2019) (analyzing the effect of *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), in the context of "RICO standing" and collecting cases). Whether a plaintiff is statutorily authorized to sue under RICO requires the Court to address whether the plaintiff plausibly pleaded a cause of action—a Rule 12(b)(6) inquiry. *Id.* And the Court may

To establish standing, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). It is the first element—whether Plaintiffs suffered an injury in fact—that the parties dispute.

### A. Plaintiffs Have Pleaded a Cognizable Economic Injury

The Court finds that Plaintiffs have sufficiently pleaded an injury in fact. The injury-in-fact requirement is "[f]irst and foremost" among the three. *Steel Co.*, 523 U.S. at 103. It requires a plaintiff to plead and prove that he "suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which 'affect[s] the plaintiff in a personal and individual way.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560 & n.1). Basically, it is not enough that there is some injury to a cognizable interest—the plaintiff must be "himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). Because Defendants challenge Plaintiffs' standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs advance two theories of economic injury to establish an injury in fact: (1) if Plaintiffs had known the MAX 8 was fatally defective, Plaintiffs would never have purchased a ticket, so Plaintiffs want their money back; and (2) Defendants' RICO enterprise and fraudulent actions allowed Defendant Southwest to overcharge Plaintiffs for their tickets (Dkt. #1 ¶¶ 8, 52–53, 364–65; Dkt. #48 at pp. 42–43).

---

not examine the merits of a claim without first determining if it has the jurisdiction to do so. *See Steel Co.*, 523 U.S. at 101 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning.") (citations omitted).

Defendants counter Plaintiffs' dual theories of injury with two main arguments of their own: (1) Plaintiffs' first "injury" is the kind of no-injury products liability claim proscribed by *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002); and (2) Plaintiffs cannot claim they were overcharged for their tickets because they purchased a safe flight and received a safe flight, which was the benefit of their bargain (Dkt. #19 at pp. 18–22; Dkt. #21 at pp. 14–16).

Defendants' first argument is correct. Under *Rivera*, Plaintiffs cannot establish an injury in fact on their theory that, had Plaintiffs known about the risk of physical harm, they would never have purchased tickets and are now entitled to a refund. Plaintiffs' first theory of injury is the type of no-injury products liability claim that *Rivera* definitively foreclosed.

But Plaintiffs can and do plead an economic injury in fact on their second theory: that Defendants' RICO enterprise and fraudulent actions allowed Defendant Southwest to overcharge Plaintiffs for their tickets. And despite what Defendants suggest, the fact that Plaintiffs received a safe flight—or some benefit from their ticket purchase—does not vitiate Plaintiffs' otherwise well-pleaded economic injury in fact. Because Plaintiffs have properly pleaded an economic injury, Plaintiffs have satisfied their burden at this stage and may invoke the Court's jurisdiction.[2]

### 1. Plaintiffs' argument that the MAX 8's alleged defect entitles them to a refund, thus representing an economic injury, is foreclosed by *Rivera*

Plaintiffs' first claim of economic injury—that had Plaintiffs known the MAX 8 was fatally defective, Plaintiffs would never have purchased a ticket—is identical to the no-injury products liability claim foreclosed by *Rivera*. Plaintiffs cannot establish an injury by pointing to an alleged design defect that injured others but did not injure Plaintiffs.

---

[2] Defendants do not argue that Plaintiffs failed to meet the causation and redressability requirements for Article III standing, and the Court is satisfied that Plaintiffs have met their burden for these requirements at the pleadings stage.

In *Rivera*, the defendant, Wyeth, was a drug manufacturer that distributed Duract, a non-steroidal anti-inflammatory drug intended for short-term management of acute pain. 283 F.3d at 316. Clinical trials of Duract uncovered negative side effects atypical for a drug of its kind, so the defendant included an insert in each box of Duract warning prospective patients of those enhanced dangers. *Id.* at 316–17. After several reports of liver failure from Duract users, the defendant issued a new, revised package insert, reporting those cases of liver failure and emphasizing Duract's risks when used as a long-term pain reliver. *Id.* at 317. Since reports of liver failure continued, the defendant voluntarily withdrew Duract from the market and refunded Duract users for any unused portion of their prescription. *Id.*

The plaintiffs sought to represent a nationwide class of patients who were prescribed, purchased, and ingested Duract but suffered no physical or emotional injury. *Id.* As explained by the Fifth Circuit: "Rivera's claim to injury runs something like this: Wyeth sold Duract; Rivera purchased and used Duract; Wyeth did not list enough warnings on Duract, and/or Duract was defective; other patients were injured by Duract; Rivera would like her money back." *Id.* at 319. Although characterizing their injury as economic and requesting their money back, the plaintiffs never defined their claimed economic injury. *Id.*

Instead of defining their economic injury, the *Rivera* plaintiffs pointed to wrongs suffered by non-class member patients as evidence of injury:

> The plaintiffs claim that Wyeth violated the implied warranty of merchantability by selling a defective drug, but then aver that the drug was not defective as to them. Similarly, the plaintiffs claim Wyeth violated the DTPA by failing to issue warnings sufficient to advise injured users, but then concede they were not among the injured.

*Id.* at 320. In determining that these "wrongs cannot constitute an injury in fact," the Fifth Circuit differentiated between a valid, contract-law suit and the plaintiffs' impermissible "no-injury products liability law suit . . . ." *Id.* As the Fifth Circuit explained, because the plaintiffs paid for

10

and received a pain killer that was effective as to them, the plaintiffs' "no-injury 'damages' will not vary with Wyeth's degree of negligence or the drug's propensity for harm." *Id.* Because the plaintiffs failed to allege an injury in fact, the Fifth Circuit rendered a judgment of dismissal for lack of jurisdiction. *Id.* at 321–22.[3]

Like the *Rivera* plaintiffs' no-injury products liability claim, Plaintiffs' first theory of injury is: Defendants manufactured and operated the MAX 8; Plaintiffs purchased a ticket for a flight, potentially on a MAX 8; Defendants did not warn Plaintiffs of the MAX 8's dangers and/or the MAX 8 was defective; people other than Plaintiffs were killed by the MAX 8's defect; Plaintiffs want their money back for their tickets (Dkt. #1 ¶¶ 8, 53, 108–223, 325). This theory of damages is nearly identical to the one rejected by the Fifth Circuit in *Rivera*.

Pointing to the tragic fatalities of *other* passengers at the hands of a potentially defective airplane is not a basis that Plaintiffs can use to show that they were injured because they paid money for a ticket. Just like the plaintiffs in *Rivera*, Plaintiffs do not allege they were physically or emotionally injured by the alleged MAX 8 defect—in fact, Plaintiffs disclaim recovery for any physical injuries (Dkt. #1 ¶ 325). To put it in *Rivera*'s terms: "[Plaintiffs'] no-injury 'damages' will not vary with [Defendants'] degree of negligence or the [airplane's] propensity for harm." *See Rivera*, 283 F.3d at 320.

Accordingly, Plaintiffs' first theory of injury—that had Plaintiffs known the MAX 8 was fatally defective, Plaintiffs would never have purchased a ticket—is not a cognizable injury-in-

---

[3] The Fifth Circuit also held that the plaintiffs failed to plead facts essential to causation, which is the second requirement of Article III standing. *Id.* at 321.

fact. Plaintiffs may not invoke the Court's power to decide "Cases" and "Controversies" under Article III with this damages theory.[4]

### 2. Plaintiffs' argument—that Defendants overcharged Plaintiffs for their tickets—presents an economic injury in fact

While Plaintiffs' first theory does not represent an injury in fact, Plaintiffs successfully established an economic injury in fact on their second theory. Plaintiffs allege that they suffered economic injury at the time of their ticket purchase; basically, Defendants were able to overcharge Plaintiffs for their tickets as a result of Defendants' RICO violations, fraudulent misrepresentations, and omissions (Dkt. #1 ¶¶ 8, 52–53, 364–65; Dkt. #28 at p. 47; Dkt. #48 at pp. 42–43).[5] Accepting Plaintiffs' allegations as true, the overcharge is an economic injury—separate and distinct from any alleged risk of physical harm—that constitutes an injury in fact.

Defendants' arguments are almost exclusively tailored toward Plaintiffs' first theory of injury and how that theory of injury is proscribed by *Rivera*.[6] And the Court agrees with Defendants on that point; Plaintiffs cannot establish standing on the theory that they would not have purchased a ticket had they known there was a risk of physical injury caused by the MAX 8's defect. *Supra* I.A.1. But as Defendants acknowledged on several occasions, Plaintiffs also alleged economic injury in the form of an overcharge (Dkt. #34 at pp. 3–6; Dkt. #35 at p. 2). While Defendants argued at the December 9 hearing that labeling Plaintiffs' injury as an overcharge does not establish injury in fact, Defendants once again tied the overcharge theory to *Rivera*, claiming

---

[4] Plaintiffs' failure to establish standing on this theory of injury does not preclude Plaintiffs from establishing standing based on another, alternative theory of injury pleaded by Plaintiffs. *See, e.g.*, *Lujan*, 504 U.S. at 560 ("the plaintiff must have suffered *an* injury in fact . . . .") (emphasis added) (quotation and citations omitted).

[5] Whether Plaintiffs can actually *recover* under this theory is a question on the merits. It is not part of the standing analysis. *See, e.g.*, *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("Whether recovery for such a claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.").

[6] *See* (Dkt. #19 at pp. 18–22; Dkt. #21 at pp. 14–16; Dkt. #34 at pp. 1–7; Dkt. #35 at pp. 1–4).

that Plaintiffs were merely attempting to monetize the risk of physical harm (Dkt. #48 at pp. 10, 21). Defendants are incorrect.

The two MAX 8 crashes are what *alerted* Plaintiffs to the Defendants' alleged scheme of concealing the MAX 8's defect in order to overcharge customers; the economic injury does not stem from the risk of physical injury. Rather, taking Plaintiffs' allegations as true, Defendants knew about the MAX 8's defect from the beginning, but they chose to hide that defect to keep ticket prices inflated (Dkt. #28 at p. 47). Plaintiffs' claim of economic injury via an overcharge is similar to the economic injury suffered by the plaintiffs in *Cole*.

In *Cole*, a class of plaintiffs sued General Motors ("GM") over its 1998 and 1999 model-year Cadillac DeVille. 484 F.3d at 718. The "class action center[ed] on alleged defects" in the DeVille's side-impact Air Bag Systems and Side Impact Sensing Modules. *Id.* The defect could have caused the DeVille's side-impact Air Bag Systems to deploy unexpectedly and without a crash. *Id.* at 718–19. Though this defect posed a threat of physical harm to the car's occupants, the plaintiffs' motion for class certification specifically excluded all DeVille owners "who sustained bodily injury or death as the result of the unexpected or premature deployment of a side impact air bag." *Id.* at 719.

GM argued that the plaintiffs lacked standing because the air bags never inadvertently deployed. *Id.* at 722. Because the air bags never deployed, GM reasoned that the plaintiffs had not suffered an injury in fact. *Id.* GM contended that the plaintiffs' theory of injury was identical to the "no-injury products liability" suit that the Fifth Circuit dismissed for lack of standing in *Rivera*. *Id.* The plaintiffs countered by arguing that they had suffered economic loss satisfying the injury-in-fact requirement because all DeVilles were defective at the moment of purchase. *Id.*

In determining that the plaintiffs had alleged a concrete injury in fact sufficient to confer standing, the Fifth Circuit distinguished *Rivera*. *Id.* at 722–23. As the Fifth Circuit noted, "[t]he *Rivera* plaintiffs did not assert economic harm emanating from anything other than potential physical harm." *Id.* at 723. Unlike the *Rivera* plaintiffs, the *Cole* plaintiffs asserted "their own actual economic injuries." *Id.* The *Cole* plaintiffs alleged that they "suffered economic injury at the moment [they] purchased a DeVille because each DeVille was defective." *Id.* Essentially, the manifested defect indicated to the plaintiffs that they had—unknowingly—sustained an economic injury the moment they purchased their car. *See id.* at 722 ("Plaintiffs claim that all DeVilles contained defective [Side Impact Sensing Modules] at the moment of purchase and that therefore, their injury was concrete at the moment they purchased their DeVilles."). As a result, the fact that plaintiffs were seeking "recovery for their actual economic harm (e.g., overpayment, loss in value, or loss of usefulness)" was sufficient to establish injury in fact. *Id.*[7]

Defendants' alleged RICO enterprise and fraudulent conduct—designed to hide the MAX 8's defect—allowed them to inflate the price of an airplane ticket, resulting in an overcharge of Plaintiffs. Like the *Cole* plaintiffs, Plaintiffs' economic injury centers around a design defect that, once revealed, allowed Plaintiffs to identify an economic injury that occurred at the moment of purchase. And, unlike the *Rivera* plaintiffs, Plaintiffs here do not allege an economic harm that emanated only from potential physical harm. *See Cole*, 484 F.3d at 723 (distinguishing *Rivera*).

---

[7] The Fifth Circuit also noted that the *Cole* plaintiffs properly alleged claims under a contract theory that would allow them to recover benefit-of-the-bargain damages. *See id.* This further distinguished the *Cole* plaintiffs from the *Rivera* plaintiffs, who oscillated between tort and contract claims to "obscure the fact that they [] asserted no concrete injury." *Rivera*, 283 F.3d at 320–21. Plaintiffs allege they were overcharged for their tickets—overcharges are recoverable under a civil RICO claim. *See Alcorn Cty. v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1169 (5th Cir. 1984) ("The injury alleged by Alcorn County in this case, including unauthorized purchases at inflated prices . . . falls within the scope of a civil RICO action."), *abrogated on other grounds by United States v. Cooper*, 135 F.3d 960 (5th Cir. 1998). Like the *Cole* plaintiffs did with their claimed injuries, Plaintiffs alleged a cause of action that would—if successful on the merits—allow them to recover for the alleged overcharges.

Rather, it is the Defendants' fraudulent scheme that inflated the price of the tickets (Dkt. #48 at pp. 42–43). It defies logic to think *Cole* would have been decided differently had GM been *more* devious and fraudulently concealed the DeVille's defective airbags from the public in a scheme to inflate the car's price. Like the plaintiffs in *Cole*, Plaintiffs defined their economic injuries. This is sufficient for their showing of injury in fact at the pleadings stage.[8]

Also, Plaintiffs' theory of injury—inflated prices leading to an overpayment—is sufficient to confer standing in a myriad of other cases. *See, e.g.*, *Martone v. Robb*, 902 F.3d 519, 524 (5th Cir. 2018) ("Here, Martone alleged exactly that: he 'purchased and held shares of Whole Food's stock . . . during the Class Period,' and '[w]hen the truth came out' about the alleged overcharging scheme, 'the stock price fell.' In doing so, he alleged an injury-in-fact sufficient to establish his standing to sue.") (alterations in original); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) ("[A] person who claims to have paid inflated prices resulting from an antitrust conspiracy clearly alleges an Article III injury"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 56 (D.D.C. 2016) ("Plaintiffs' allegation is that they suffered a pecuniary injury by paying artificially inflated ticket prices as a result of the conspiracy. This is sufficient to establish injury in fact for purposes of standing."). Defendants do not explain how Plaintiffs' overpayment theory is any different. The allegation that Plaintiffs paid an artificially inflated ticket

---

[8] Defendant Boeing cites for the first time in its reply *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Liability Litigation*, 903 F.3d 278 (3d Cir. 2018), to further support Defendants' argument that Plaintiffs do not have standing to complain about overpaying for an unsafe product that was safe as to them (Dkt. #35 at p. 2). While Defendant Boeing's argument correctly summarizes why Plaintiffs cannot have standing under their *first* theory of injury, it is not persuasive as to Plaintiffs' second theory. Defendants (allegedly) conspired to conceal the MAX 8's defect in order to inflate ticket prices. It is not the risk of physical harm to Plaintiffs that underlies the injury; it is Defendants' actions in concealing the defect in order to maintain ticket prices.

price as the result of Defendants' conspiracy and fraudulent conduct is a well-pleaded injury in fact.[9]

Defendants repeatedly point to *Rivera* when arguing that Plaintiffs have pleaded no injury, but Plaintiffs were able to define their economic injury beyond some unmanifested risk of physical harm—something the *Rivera* plaintiffs were unable to do. *Rivera*, 283 F.3d at 319. Taking Plaintiffs' allegations as true, the inflated ticket prices present an economic injury sufficient for Article III's injury-in-fact requirement.

### a. The Court will not engage in an accounting to determine whether Plaintiffs' economic injury was outweighed by some benefit

Defendants argue that Plaintiffs do not have standing because they received the benefit of the flight they paid for (Dkt. #19 at p. 20; Dkt. #21 at pp. 15–16; Dkt. #34 at p. 6). Relying on *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547 (5th Cir. 2016), Defendants claim that this benefit precludes Plaintiffs from having Article III standing and is "dispositive of Plaintiffs' claims" (Dkt. #34 at p. 6). Defendants are incorrect and overstate *Wendt*'s narrow holding.

Defendants' argument—that any injury Plaintiffs may have suffered is outweighed by the benefit Plaintiffs received from their tickets—is antithetical to the purpose and principles of Article III standing: "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury." *Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015) (quoting 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.4, at 147 (3d

---

[9] It is true that the standing analysis "often turns on the nature and source of the claim asserted." *Raines*, 521 U.S. at 818 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Civil RICO claims have "become a tool for everyday fraud cases . . . ." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985). Plaintiffs' claims share a similar nature and source with the claims alleged by the plaintiffs in *Martone* (breach of fiduciary duty) and *In re Domestic Airline Travel* (antitrust claim against airlines).

ed. 2015)). This is because the standing analysis is not an "accounting exercise . . . ." *Id.* at 156 (quotation and citation omitted). The rare exception to this rule is if there is a "tight[] nexus" between the offsetting benefits that "are of the same type and arise from the same transaction as the costs." *See id.* at 155–56 (citation omitted). So once a party meets its burden of showing injury, the injury-in-fact analysis nearly always stops there. *See id.*[10]

Defendants point to *Wendt* to support their argument that the benefit of the flights Plaintiffs received defeats standing. But *Wendt* is inapposite here. In *Wendt*, the plaintiffs claimed that their membership contracts with 24 Hour Fitness did not comply with several technical provisions of the Texas Health Spa Act. 821 F.3d at 549. The plaintiffs made no allegations of fraudulent conduct by 24 Hour, nor did the plaintiffs argue that their injury was caused by anything other than the same membership contract that granted them access to 24 Hour's facilities. *See id.* In fact, the plaintiffs conceded that the statutory violations never adversely impacted them. *Id.* The Fifth Circuit held that the plaintiffs lacked standing for two reasons: (1) they were not entitled to a full refund of their membership dues under Texas law; and (2) 24 Hour's alleged violations did not cause the plaintiffs actual damages or any form of economic harm, in part because they paid for and received use of 24 Hour's facilities. *Id.* at 550–51, 550 n.10.

Recognizing the general rule that standing is not a cost-benefit accounting, the Fifth Circuit explained that that it could only consider whether the benefits the plaintiffs received from the membership contract offset the cost of the membership fees because all the costs and benefits arose from that single transaction. *Id.* at 550 n.10. The Fifth Circuit determined that the benefits from

---

[10] The *Rivera* court's analysis was consistent with this well-settled principle. The *Rivera* court did not hold that the plaintiffs suffered an injury *but-for* their receipt of some benefit from the pain killer; rather, the Fifth Circuit was clear the plaintiffs never pleaded a cognizable injury in fact. *Rivera*, 283 F.3d at 320. It is only upon a plaintiff's threshold showing of injury that the Court will not engage in a harm-benefit accounting for purposes of determining standing. *See Texas*, 809 F.3d at 155–56. The *Rivera* plaintiffs never made that threshold showing. Plaintiffs here did.

that transaction—access to 24 Hour's facilities—had offset the costs from that transaction—the membership dues. *Id* at 550 & n.10.

Unlike the *Wendt* plaintiffs, Plaintiffs' alleged costs and benefits here did not arise from a single transaction. In *Wendt*, the plaintiffs' injury was caused by an allegedly void contract. *Id.* at 551. This was the *same* contract that also conferred the benefit of access to 24 Hour's facilities. *Id.* The contract was the entirety of the parties' relationship, and the *Wendt* plaintiffs never alleged *any* fraud or overcharge based on 24 Hour's conduct outside that contractual relationship. *See id.*

Conversely, the economic injury Plaintiffs allege stems from Defendants' years of fraud, conspiracy, and deceit unrelated to each individual Plaintiff's decision to purchase a ticket. It was not the ticket itself or a contract governing the terms of the flight that resulted in Plaintiffs' injury— it was Defendants' conspiracy and fraud that caused the alleged injury. Accordingly, there is no "tight[] nexus" between the offsetting benefits that "are of the same type and arise from the same transaction as the costs." *See Texas*, 809 F.3d at 155–56 (citation omitted).

Plaintiffs have pleaded an economic injury. *Supra* I.A.2. The Court will not search for reasons to unravel that well-pleaded injury by weighing any and all benefits Plaintiffs may have received during their relationship with Defendants against the alleged injury. To do so would be in contravention of the well-established principles underlying Article III standing and injury in fact. *See Texas*, 809 F.3d at 155–56.

## II. Dismissal Under Rule 12(b)(6)

In their response, Plaintiffs abandoned all but five causes of action (Dkt. #28 at p. 9 n.2; Dkt. #34 at p. 8). Thus, Plaintiffs' state-law claims alleged in counts six through seventeen of their Complaint for: (1) unjust enrichment; (2) negligence against Defendant Southwest; (3) negligence against Defendant Boeing; (4) violation of the California Consumer Legal Remedies Act; (5) violation of the California False Advertising Law; (6) violations of the Florida Deceptive and

Unfair Trade Practices Act; (7) violations of the New York General Business Law § 349; (8) violation of the New York General Business Law § 350; (9) violation of the Arizona Consumer Fraud Act; (10) violation of the Indiana Deceptive Consumer Sales Act; (11) violation of the Georgia Fair Business Practices Act; and (12) violation of the Georgia Uniform Deceptive Trade Practices Act are dismissed without prejudice. Accordingly, the Court's 12(b)(6) analysis will address Plaintiffs' remaining claims for: (1) civil RICO violations under 18 U.S.C. § 1962(c); (2) civil RICO violations under 18 U.S.C. § 1962(d); (3) fraud by concealment; (4) fraud by misrepresentation; and (5) negligent misrepresentation.

Defendants assert that Plaintiffs failed to plead the elements of their state-law claims and failed to plead a cause of action under RICO (Dkt. #19 at pp. 22–28, 35–37; Dkt. 21 at p. 27). Defendants also argue that the Airline Deregulation Act (the "ADA") preempts Plaintiffs' remaining state-law claims for fraud by concealment, fraud by misrepresentation, and negligent misrepresentation (Dkt. #19 at p. 20; Dkt. 21 at p. 27). The Court disagrees with Defendants' assertion that Plaintiffs' failed to plead the elements of their state-law claims and failed to plead a cause of action under RICO. But the Court agrees that Plaintiffs' remaining state-law claims for fraud by concealment, fraud by misrepresentation, and negligent misrepresentation are preempted by the ADA.[11]

### A. Plaintiffs Have Alleged Sufficient Facts to Overcome Defendants' Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

After reviewing Plaintiffs' Complaint, Defendants' motions to dismiss, the response, the replies, and the sur-reply, the Court finds that Plaintiffs have stated plausible claims for purposes

---

[11] Because preemption raises a constitutional question under the Supremacy Clause, the Court first addresses Defendants' argument that Plaintiffs did not sufficiently plead their claims. *See Ill. Cent. R. Co. v. Fordice*, 165 F.3d 23 (5th Cir. 1998) (per curiam) ("We do not reach the issue of preemption as it is prudential to avoid constitutional questions when possible."); *see also Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) ("It is a well established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.")

of defeating a Rule 12(b)(6) motion to dismiss with respect to their remaining causes of action for: (1) civil RICO violations under 18 U.S.C. § 1962(c); (2) civil RICO violations under 18 U.S.C. § 1962(d); (3) fraud by concealment; (4) fraud by misrepresentation; and (5) negligent misrepresentation.

### B. Plaintiffs' State-Law Claims Are Preempted by the Airline Deregulation Act

Plaintiffs' remaining state-law claims for fraud by concealment, fraud by misrepresentation, and negligent misrepresentation are preempted by the ADA. Congress enacted the ADA in 1978 to deregulate domestic air transport. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). The ADA contains the following preemption clause:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

The ADA's preemption clause is one of "unusual breadth . . . ." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 85 (2008). The Supreme Court of the United States has interpreted the preemption clause's "related to" language as "having a connection with, or reference to, airline rates, routes, or services." *See Wolens*, 513 U.S. at 223 (internal quotations omitted) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).[12] And the preemption clause applies fully to state common-law rules. *Ginsberg*, 572 U.S. at 281–84. However, the ADA does not "shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Wolens*, 513 U.S. at 229.

---

[12] This interpretation of the ADA's preemption clause—established in *Morales*—mirrors the Supreme Court's interpretation of "relates to" under the Employee Retirement Income Security Act of 1974. *Id.* (citing *Morales*, 504 U.S. at 384). After *Morales*, Congress recodified the ADA and tweaked the preemption clause's wording; but Congress made it clear that those changes were not substantive. *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014) (quoting Pub. L. No. 103-272, § 1(a), 108 Stat. 745 (1994)).

So, in deciding whether Plaintiffs' common-law claims are preempted by the ADA, the Court must first determine whether the state-law claims have a connection with or reference to a price, route, or service of an air carrier; if they do, the Court then must determine whether Plaintiffs' claims are based on a state-imposed obligation. *See id.* at 284–85. The Court finds that: (1) Plaintiffs' claims have a connection with or reference to a price, route, or service of an air carrier; and (2) Plaintiffs' claims are based on a state-imposed obligation rather than an obligation that the parties voluntarily undertook.

### 1. Plaintiffs' claims have a connection with or reference to a price, route, or service of an air carrier

Plaintiffs' fraud by concealment, fraud by misrepresentation, and negligent misrepresentation claims quite clearly have a connection with airline rates—Plaintiffs claim Defendants overcharged Plaintiffs for their tickets (Dkt. #1 ¶¶ 8, 53, 108–223, 325, 364–65, 374, 380). Plaintiffs do not dispute this reality. *See* (Dkt. #28 at pp. 44–46). Consequently, Plaintiffs' claims are preempted by the ADA unless Plaintiffs are seeking recovery "solely for the airline's alleged breach of its own, self-imposed undertakings." *Wolens*, 513 U.S. at 229.[13]

### 2. Plaintiffs' claims are based on a state-imposed obligation rather than an obligation that the parties voluntarily undertook

In *Wolens*, the Supreme Court of the United States held that the plaintiffs' claims against an air carrier under an Illinois anti-fraud statute were preempted by the ADA. *Id.* at 228. On the other hand, the plaintiffs' breach-of-contract claim was not preempted because "terms and conditions airlines offer and passengers accept are privately ordered obligations, and thus do not amount to a State's enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other

---

[13] Plaintiffs do not contest Defendant Boeing's argument that the ADA preempts Plaintiffs' state-law claims against it despite the fact that Defendant Boeing is not itself an air carrier (Dkt. #21 at p. 20; Dkt. #28 at pp. 44–46). With Plaintiffs providing no authority to the contrary, the Court accepts Defendant Boeing's position.

provision having the force and effect of law . . . ." *Id.* at 228–29 (alterations in original) (internal quotations and citation omitted). As the Supreme Court explained, the fact that courts are confined in breach-of-contract actions to the parties' bargain, "with no enlargement or enhancement based on state laws or policies external to the agreement," enables certain breach-of-contract claims to survive ADA preemption. *See id.* at 233.

Recently, the Supreme Court addressed whether a plaintiff's claim that an airline breached the implied covenant of good faith and fair dealing under Minnesota law was preempted by the ADA—it held that because the implied covenant was a state-imposed obligation, it was preempted. *Ginsberg*, 572 U.S. at 286–88. The Supreme Court explained that "[w]hen the law of a State does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted under the reasoning of *Wolens*." *Id.* at 287. This is because the ADA's language— preempting all actions "having the force and effect of law"—is "most naturally read to 'refe[r] to binding standards of conduct that operate irrespective of any private agreement . . . .'" *Id.* at 282 (quoting *Wolens*, 513 U.S. at 229 n.5) (alteration in original).

Plaintiffs here argue that *Wolens* controls and counsels against ADA preemption of Plaintiffs' state-law claims (Dkt. #28 at p. 45). Plaintiffs allege that the self-imposed undertaking Defendants breached was their "duties to speak fully on the subject of [the] MAX 8 after *voluntarily deciding to speak partially on the subject*." (Dkt. #28 at p. 45) (emphasis in original). To support the existence of this duty, Plaintiffs argue that: "The *law in each State* identified in the Complaint is clear: when a party voluntarily speaks partially on a subject, he *assumes a duty* to speak fully and truthfully." (Dkt. #28 at p. 45 & n.19) (emphasis added) (collecting cases analyzing various state laws). By Plaintiffs' own tacit admission, this duty is created by state-

imposed obligations; under the reasoning of both *Wolens* and *Ginsberg*, Plaintiffs' state-law claims are preempted by the ADA.

As pointed out by Defendants, Plaintiffs implicitly acknowledge that this "duty to speak fully" only exists as a function of several state-law obligations—in other words, it was not "solely" Defendants' self-imposed undertaking (Dkt. #34 at p. 9). Without the state common law cited by Plaintiffs, there would be no duty for Defendants to comply with. This is unlike a claimed breach of the "privately ordered obligations"—i.e., the "terms and conditions airlines offer and passengers accept"—that the Supreme Court held was outside the reach of the ADA's preemption clause. *Wolens*, 513 U.S. at 228. Rather, the state-imposed duty cited by Plaintiffs enhances and enlarges Plaintiffs' rights in order to prevent fraud—a hallmark of an ADA-preempted claim. *See id.* at 233.

While Plaintiffs argue that Defendants voluntarily chose to speak, creating the obligation to speak truthfully (Dkt. #39 at p. 15), it is not the voluntary speech that Plaintiffs seek to recover from. Plaintiffs do not claim that the voluntary speech created a "privately ordered obligation[]" between the parties. Rather, it is what Defendants allegedly left *unspoken*—despite having a state-law obligation to the contrary—that creates Plaintiffs' right to recovery. This obligation—to "speak fully" so as not to defraud—is a "binding standard[] of conduct that operate[s] irrespective of any private agreement." *See Ginsberg*, 572 U.S. at 282 (quoting *Wolens*, 513 U.S. at 229 n.5).

So, this allegedly "voluntarily assumed duty" does not flow from a private obligation that Defendants made with Plaintiffs—it flows directly from state anti-fraud protections. And like the claim for breach of the implied covenant of good faith and fair dealing that the Supreme Court held was preempted in *Ginsberg*, Defendants could not free themselves of this supposedly "voluntary" obligation through some private agreement with Plaintiffs. *See id.* at 287. What

23

Plaintiffs claim was Defendants' voluntary decision is only "voluntary" in the sense that Defendants allegedly chose not to comply with a state-imposed duty. *See* (Dkt. #28 at p. 45 & n.19) (identifying the state laws Defendants allegedly violated). Under this logic, the ADA's preemption clause would have no teeth—many violations of state-imposed duties could then be artfully traced back to a "voluntary decision" to escape the clause's broad scope.[14]

Plaintiffs do not point to any contract that Defendants breached; Plaintiffs do not point to a voluntary undertaking that gives them a right of recovery absent some state-created obligation; and Plaintiffs do not provide a citation to a single, analogous case where a court held that similar state-law fraud claims were not preempted by the ADA. Plaintiffs cannot escape the "unusual breadth" of the ADA's preemption clause. Accordingly, Plaintiffs' state-law claims for fraud by concealment, fraud by misrepresentation, and negligent misrepresentation are preempted by the ADA.[15]

## III. Defendant Southwest Argues, in the Alternative, That Plaintiffs' Class Allegations Should be Stricken

Defendant Southwest claims that three reasons support striking Plaintiffs' class allegations at the pleadings stage: "(A) individual issues of injury, causation, reliance, and damages will

---

[14] Further, the conduct Plaintiffs take exception with—Defendants' speech on the subject of the MAX 8 in an attempt to overcharge Plaintiffs—comes dangerously close to attempting to use state law to recover for allegedly deceptive airline advertisements. The Supreme Court held in *Morales* that state law regulating allegedly deceptive advertisements with respect to fare advertising was preempted by the ADA. *Wolens*, 513 U.S. at 223 (discussing *Morales*).

[15] Defendant Boeing separately argued in its motion that *all* of Plaintiffs' claims—including Plaintiffs' RICO claims—are barred by the Federal Aviation Act (the "FAAct") because Plaintiffs were attempting to recover for Defendant Boeing's alleged fraud on the FAA (Dkt. #21 at pp. 29–31). But after reviewing the argument in Plaintiffs' response against FAAct preemption (Dkt. #28 at pp. 41–44), Defendant Boeing "accept[ed] Plaintiffs' disclaimer on any fraud-on-the-FAA allegations" (Dkt. #35 at p. 9). While Plaintiffs retorted that "[n]one of these allegations in the Complaint have been abandoned, abrogated, or even narrowed" (Dkt. #39 at p. 15), Plaintiffs also agree that their claims against Defendant Boeing are for fraud on the public and the Plaintiffs—not for fraud on the FAA (Dkt. #39 at p. 15). Given Defendant Boeing's retreat and Plaintiffs' agreement—albeit defiantly—that Plaintiffs are not seeking recovery for fraud on the FAA, the Court will not address whether the FAAct preempts Plaintiffs' claims against Defendant Boeing at this time.

predominate, (B) the laws of all 50 states governing their state-law claims vary, so common issues will not predominate, and (C) the proposed class is facially overbroad for myriad reasons" (Dkt. #19 at p. 37).

Defendant Southwest's second argument for striking the class allegations—that the laws of all 50 states governing Plaintiffs' state-law claims vary—can no longer be a concern; Plaintiffs do not have any state-law claims remaining. And Defendant Southwest's other two arguments are better addressed at the certification stage; Plaintiffs' claims are sufficiently alleged to defeat a Rule 12(b)(6) motion. *See Squires v. Toyota Motor Corp*, No. 4:18-CV-138, 2019 WL 1300072, at *2 (E.D. Tex. Mar. 21, 2019); *see also Merrill v. S. Methodist Univ.*, 806 F.2d 600, 608 (5th Cir. 1986) ("However, we have stated on numerous occasions that the district court should ordinarily conduct an evidentiary hearing on th[e] question [of class certification]").

## CONCLUSION

It is therefore **ORDERED** that Defendant Southwest Airlines' Motion to Dismiss Pursuant to Rules 12(b)(1), 12(b)(6), and 9(b) or, in the Alternative, Motion to Strike the Class Allegations (Dkt. #19), and Defendant The Boeing Company's Motion to Dismiss for Lack of Standing and Failure to State a Claim (Dkt. #21) are hereby **GRANTED in part** and **DENIED in part**.

It is further **ORDERED** that Plaintiffs' claims for: (1) unjust enrichment; (2) negligence against Defendant Southwest; (3) negligence against Defendant Boeing; (4) violation of the California Consumer Legal Remedies Act; (5) violation of the California False Advertising Law; (6) violations of the Florida Deceptive and Unfair Trade Practices Act; (7) violations of the New York General Business Law § 349; (8) violation of the New York General Business Law § 350; (9) violation of the Arizona Consumer Fraud Act; (10) violation of the Indiana Deceptive

Consumer Sales Act; (11) violation of the Georgia Fair Business Practices Act; and (12) violation of the Georgia Uniform Deceptive Trade Practices Act are **DISMISSED without prejudice**.

It is further **ORDERED** that Plaintiffs' claims for: (1) fraud by concealment; (2) fraud by misrepresentation; and (3) negligent misrepresentation are **DISMISSED with prejudice**.

Accordingly, Plaintiffs have two remaining causes of action for: (1) civil RICO violations under 18 U.S.C. § 1962(c); and (2) civil RICO violations under 18 U.S.C. § 1962(d).

It is further **ORDERED** that all other relief requested is **DENIED**.

**SIGNED this 14th day of February, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE