**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

Damonie Earl, et al.,

      *Plaintiffs*,

v.

The Boeing Company, et al.,

      *Defendants*.

Case No. 4:19-CV-507-ALM

**<u>Plaintiffs' Motion for Class Certification</u>**[1]

**(Filed under Seal)**

---

[1] The Court granted Plaintiffs leave to file an opening brief up to 50 pages in length. (Dkt. No. 273.)

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 1

    A.    The Southwest and Boeing relationship ........................................................... 1

    B.    The MAX 8 ....................................................................................................... 2

    C.    The Defendants jointly design and seek certification for the MAX 8 .............. 3

        1.    █████████████████████████████████ ................... 3

        2.    The Defendants' secret agreement ██████████████ ........................ 4

        3.    Boeing technical pilot Mark Forkner works on Southwest's behalf
            to convince regulators not to ███████████████████ ............ 5

        4.    Forkner ██████████████████████████████████
            ████████ ............................................................................................ 6

        5.    FAA response threatens Southwest's core business model ...................... 6

        6.    With Southwest's core business in jeopardy, Boeing allows
            Southwest to ████████████████████████████████
            ████████████████████████████████ ................................. 7

        7.    Defendants delete all MCAS references from the MAX
            documentation ....................................................................................... 8

        8.    Defendants mislead regulators as to other differences in the plane ........... 9

        9.    Defendants succeed in obtaining a Level B training requirement ............. 9

    D.    Southwest and Boeing prepare for the launch of the MAX 8 .............................. 10

        1.    Boeing and Southwest discover additional differences between the
            MAX 8 and the 737 NG but do not tell the regulators ............................. 10

        2.    Southwest and Boeing coordinate statements to the public ...................... 11

    E.    The Lion Air crash and Defendants' response ...................................................... 12

        1.    The Lion Air crash ............................................................................... 12

        2.    ███████████████████████████████████████
            ██████████ | ███████████████████ .................................. 12

        3.    Southwest ████████████████████████████ ................. 13

        4.    Southwest and Boeing coordinate and disseminate false statements ........ 14

    F.    The Ethiopian Air crash and its aftermath ........................................................... 17

        1.    The Ethiopian Air crash and Defendants' continued false
            statements .............................................................................................. 17

        2.    Southwest lies to its pilots about its secret agreement with Boeing,
            referring to the agreement in code ........................................................ 18

i

G.      The recertification and return to service of the MAX 8........................................ 19

    1.      Southwest's continued attempts to avoid pilot training............................ 19

    2.      Boeing pays Southwest to continue flying the MAX 8 ................................ 19

THE CLASSES PROPOSED FOR CERTIFICATION ................................................................ 20

ARGUMENT ............................................................................................................................. 21

I.      PLAINTIFFS AND THE CLASSES HAVE ARTICLE III STANDING ...................... 21

II.     PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(a)................................... 22

    A.      The proposed classes are sufficiently numerous.................................................... 22

    B.      The classes are ascertainable ................................................................................ 23

    C.      Plaintiffs satisfy the commonality requirement .................................................... 24

    D.      Plaintiffs satisfy the typicality requirement .......................................................... 25

    E.      Plaintiffs satisfy the adequacy requirement .......................................................... 26

        1.      The proposed class representative plaintiffs are adequate........................ 26

        2.      Proposed plaintiffs' class counsel are adequate........................................ 27

III.    PLAINTIFFS SATISFY RULE 23(b)(3) ...................................................................... 29

    A.      Common questions will predominate ..................................................................... 29

        1.      Plaintiffs will prove Defendants' pattern of racketeering, including predicate acts of mail and wire fraud, through common evidence ........... 30

        2.      Plaintiffs will prove Defendants' association-in-fact conspiracy through common evidence ........................................................................ 31

        3.      Plaintiffs will prove proximate cause through common evidence............ 32

            (a)     Plaintiffs will prove foreseeability through common evidence ................................................................................... 32

            (b)     Defendants' contention that individual reliance is required is wrong................................................................................... 35

            (c)     The jury can infer causation on a classwide basis ........................ 41

        4.      Plaintiffs will prove their economic injury and damages through common evidence ..................................................................................... 43

            (a)     Plaintiffs will prove damages using a trusted methodology, common evidence, and formulaic calculations............................. 43

                (1)     Conjoint analysis is a trusted methodology ..................... 43

                (2)     Dr. Allenby demonstrated that conjoint analysis can determine the overcharge alleged in this case.................. 45

                (3)     Mr. Mills demonstrated that damages can be calculated with a straightforward formula ........................ 47

(b)    Defendants' arguments cannot defeat class certification.............. 48

B.    Superiority............................................................................................... 49

CONCLUSION..................................................................................................................... 50

# TABLE OF AUTHORITIES

### Cases

*Abraham v. Singh*,
    480 F.3d 351 (5th Cir. 2007) ................................................................. 29

*Allen v. ConAgra Foods, Inc.*,
    331 F.R.D. 641 (N.D. Cal. 2019)............................................................. 44

*Allstate Ins. Co. v. Plambeck*,
    802 F.3d 665 (5th Cir. 2015) ................................................................. 36

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ................................................................. 43

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)................................................................... *passim*

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ................................................................. 50

*Chavez v. Plan Benefit Servs., Inc.*,
    957 F.3d 542 (5th Cir. 2020) ................................................................. 21

*Clay v. Cytosport, Inc.*,
    2018 WL 4283032 (S.D. Cal. Sept. 7, 2018)............................................ 45

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................ 43

*Earl v. Boeing Co.*,
    __ F. Supp. 3d. __, 2020 WL 759385 (E.D. Tex. Feb. 14, 2020)................... 22, 43

*Flynn v. FCA US LLC*,
    327 F.R.D. 206 (S.D. Ill. 2018) ............................................................ 44

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*,
    786 F.3d 400 (5th Cir. 2015) ................................................................. 30

*Hasemann v. Gerber Prods. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019)............................................................ 45

*Horton v. Goose Creek Indep. Sch. Dist.*,
    690 F.2d 470 (5th Cir. 1982) ................................................................. 26

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ............................................................ 21, 43

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    320 F.R.D. 326 (D.N.H. 2017) ............................................................ 45

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
    2020 WL 1180550 (D. Kan. Mar. 10, 2020) .......................................... 34, 41, 48

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013)................................................................. 35

**TABLE OF AUTHORITIES**
(*continued*)

Cases
(*continued*)

*In re Packaged Seafood Prods. Antitrust Litig.*,
   332 F.R.D. 308 (S.D. Cal. 2019) ........................................... 48

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013) ........................................... 42

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ........................................... 42

*Jenkins v. Raymark Indus., Inc.*,
   782 F.2d 468 (5th Cir. 1986) ........................................... 24

*Khoday v. Symantec Corp.*,
   2014 WL 1281600 (D. Minn. Mar. 13, 2014) ........................................... 45

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ........................................... 42

*Lightbourn v. County of El Paso, Tex.*,
   118 F.3d 421 (5th Cir. 1997) ........................................... 24

*Marcus v. J.C. Penney Co.*,
   2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ........................................... 48

*Mitchell v. State Farm Fire & Cas. Co.*,
   954 F.3d 700 (5th Cir. 2020) ........................................... 21, 43

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ........................................... 22, 25, 26

*Price v. L'Oreal USA, Inc.*,
   2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) ........................................... 45

*Seeligson v. Devon Energy Prod. Co., L.P.*,
   761 F. App'x 329 (5th Cir. 2019) ........................................... 23, 24

*Stirman v. Exxon Corp.*,
   280 F.3d 554 (5th Cir. 2002) ........................................... 25

*Torres v. S.G.E. Management, L.L.C.*,
   838 F.3d 629 (5th Cir. 2016) ........................................... *passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ........................................... 29

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) ........................................... 23

*Vine v. PLS Fin. Servs., Inc.*,
   331 F.R.D. 325 (E.D. Tex. 2019) ........................................... *passim*

# TABLE OF AUTHORITIES
(*continued*)

Cases
(*continued*)

*Vine v. PLS Fin. Servs., Inc.*,
807 F. App'x 320 (5th Cir. 2020) ........................................................... 39

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......................................................................... 21, 24

*Waste Mgmt. of La. L.L.C. v. River Birch, Inc.*,
920 F.3d 958 (2018) ............................................................................ 32

Statutes and Rules

18 U.S.C. § 1962(c) ................................................................................... 29

18 U.S.C. § 1962(d) ................................................................................... 29

18 U.S.C. § 1964(c) ................................................................................... 30

Fed. R. Civ. P. 23(a) .......................................................................... *passim*

Fed. R. Civ. P. 23(b) .......................................................................... *passim*

Other Authorities

W. RUBENSTEIN,
1 NEWBERG ON CLASS ACTIONS § 3:72, 3:80 (5th ed. Dec. 2020 update) .............................. 27

W. RUBENSTEIN,
1 NEWBERG ON CLASS ACTIONS § 3:80 (5th ed. Dec. 2020 update) ......................................... 27

Pursuant to Fed. R. Civ. P 23, Plaintiffs move for class certification, for appointment as class representatives, and for appointment of class counsel, for the reasons given herein:

## INTRODUCTION

Over the course of several years, Boeing and Southwest devised, executed, and eventually covered up a coordinated fraudulent scheme regarding the Boeing 737 MAX 8. Pursuant to the scheme, Defendants conspired to avoid simulator training for the Boeing 737 MAX 8, to hide important information about the plane from pilots, to lie to regulators, and to make coordinated false statements to the public before and after two fatal crashes. All of this was done for the purpose of launching the MAX 8, keeping it in the air, and selling airline tickets. The scheme resulted in inflated market prices. As demonstrated with detail in this motion, the trial here will focus almost entirely on common evidence about *Defendants'* conduct, including the foreseeability and directness of classwide overcharges. And those overcharges will be proven at trial on a classwide basis, through mathematically computable methods. Put simply, this case presents common issues that will predominate; and it involves typical plaintiff claims, an ascertainable class, and adequate class representatives and counsel to vindicate the rights of the class members in their absence. Class certification, which is the superior device to litigate these claims, is appropriate here.

## STATEMENT OF FACTS

### A.      The Southwest and Boeing relationship

Boeing and Southwest have a unique, longstanding relationship that goes far beyond a mere supplier/customer pairing. Defendants' unique relationship began nearly fifty years ago, when ████████████████████████████ ████████████████ ████████████████ ████████████████ (Ex. 1 at SWA_Earl_00648341.) The relationship quickly became ████████ (*id.*), with Southwest flying only 737 airplanes as part of its operational model. In the late 1990s, Boeing and Southwest cut a handshake deal, ████████████████████████████

1

on 737 airplanes, no questions asked—as Southwest referred to it, ███████████ (Ex. 2 at BOE_EDTX_011_0003513, 16.) In exchange, Southwest has offered unique and substantial support for Boeing—for example, by publicly backstopping Boeing with new or expanded orders for airplanes when market demand is notably soft, or public confidence shaken in the period following a crash. (FAC ¶¶ 4, 9, 69-94; *see, e.g.*, Ex. 3 at SWA_Earl_01115682 (exercising options to buy MAX 8s soon after accident on a 737 operated by Southwest).) To use Defendants' terminology, Southwest is Boeing's ███████████ which gives Southwest a ████████ ███████████ (Ex. 4 at BOE_EDTX_011_0003675 (underlining in original).) Defendants' unique relationship has allowed Southwest to develop and sustain a ███████████████████████████████████ (Ex. 5 at 89:16-90:8 (Kasher Dep.).) ███████████ ███████████ (*Id.* at 91:4-92:3.)

## B.     The MAX 8

Boeing has only one significant competitor in the narrow-body commercial jet market: Airbus, whose A320 family of jets has competed neck and neck with Boeing's 737 since the 1990s. (*See, e.g.*, Ex. 18 (https://leehamnews.com/2016/09/22/boeing-positioned-narrow-market-share-gap/).) In 2010, Airbus launched the A320neo, a significant redesign with 15-20% greater fuel efficiency over its predecessors. Jet fuel is the most significant variable cost for most commercial airlines, including Southwest. Within months of its announcement, the A320neo became the fastest selling commercial aircraft in history. (Ex. 19 at SWA_Earl_01096980-81.) Boeing, which had not released a new version of the 737 since 1997 (the NG), had no competitor to the fuel-efficient A320neo, and quickly began losing orders and even customers to Airbus.

At the same time, Boeing's most important 737 customer, Southwest, sought a fuel-efficient option for its own fleet, which was due for a large-scale replacement at the end of the

2010s. Boeing and Southwest quickly saw mutual value in collaborating on a new 737 variant, and by 2011 the companies jointly announced that Boeing would release a new, fuel-efficient 737 variant to compete with the A320neo, and that Southwest would be the launch customer for this variant, with a massive initial order of 300 new aircraft (150 firm, 150 options). (*See* Ex. 6 at SWA_Earl_00397580 ( ███████████████████████████████████

█████████████████████████████ ).)[2]

### C.    The Defendants jointly design and seek certification for the MAX 8

Defendants set out to jointly design the MAX 8.[3] From the outset, Southwest pushed back against including improved technology that would require costly pilot training.

**1.    ██████████████████████████████████**

Southwest's ██████████████ (or mandate) to Boeing was to ███████████████

████████████████████[4] That meant its entire fleet could fly the MAX with

███████████████████████████████████████████[5]

Initially, the cockpit design presented a challenge to this mandate. Any new displays, alerts, or warnings could require additional training. Southwest therefore demanded that Boeing

---

[2] (*See, e.g.*, Ex. 7 at BOE_EDTX_011_0004201; Ex. 8 at BOE_EDTX_011_0004623; Ex. 9 at SWA_Earl_00311610.)

[3] Southwest has vehemently claimed to this Court that it is simply one of many MAX 8 customers. But in its own (pre-lawsuit) words, Southwest described itself as ████████████ ██████████ (Ex. 10 at BOE_EDTX_08_0043081 █████████████████████████ ████████████ (emphasis added).)

[4] (Ex. 11 at SWA_Earl_00164874 ( ██████████████████████████████ ); *see* Ex. 12 at SWA_Earl_00694431 ███████████████████████

[5] (*See* Ex. 13 at SWA_Earl_00173669; Ex. 5 at 103:13-22 (Kasher Dep.) ██████ █████████████████████████████████████████████ *see also id.* at 129:13-23; Ex. 14 at 176:5-177:15 (Lusk Dep.).)

██████████████████████████████████████████████ (Ex.  10  at
BOE_EDTX_08_0043081.) ████████████████████████████ (Ex.
14 at 111:19-113:8 (Lusk Dep.).) ███████████████████████████
████████████████ (*See, e.g.*, Ex. 15 at SWA_Earl_01055353 (█
██████████████████████████████████████████████████
██████████████████████████████████████████████).) Southwest
thus wanted the new displays to have ███████████████████████
█████████████████████ (Ex. 10 at BOE_EDTX_08_0043081.) Southwest likewise
rejected Boeing's plans to ██████████████████████████████████
█████████████████████████████████████████████ (Ex.  16  at
BOE_EDTX_08_0000883.)

### 2.     The Defendants' secret agreement ████████████████

In May 2013, Southwest and Boeing entered into a secret agreement—negotiated and
signed by ████████████████████, in which Boeing promised that, for the MAX 8,
Boeing would ████████████████████████████████████████████
██████████████████████ (Ex.  20  at  SWA_Earl_00311611-12  (2013  letter
Agreement).) The agreement ensured that Southwest would be able to ███████████
██████████████████████████████ (*id.*), ensuring in turn that
Southwest's core business model and competitive advantage would not be impaired by regulation.

The  letter  agreement,  which  was  converted  to  a  Program  Directive,  specified
████████████████████ if it failed to deliver its end of the bargain: █████████
██████████████████████ (Ex. 21 at BOE_EDTX_20_0022337), including █████████
██████████████████████ (*Id.*) Boeing also agreed to ███████████████
██████████████████████████████████████████████████

4

████████████████████████████████████████████████████████

(Ex. 20 at SWA_Earl_00311612; *see also* Ex. 21 at BOE_EDTX_20_0022337-38.)

     **3.**     **Boeing technical pilot Mark Forkner works on Southwest's behalf to convince regulators not to** ████████████████████████████████

Agreement or not, the FAA would have to be convinced that ████████████████

████████████████████████ (Ex. 15 at SWA_Earl_01055342.) There was still a █████████ that

the FAA would ████████████████████████████████████████████

████████████████████████ (Ex. 22 at BOE_EDTX_20_0011639.) But Southwest

could not █████████. Southwest turned to Boeing technical pilot Mark Forkner, a pilot who

████████████████████████████ (Ex.  23  at  BOE_EDTX_06_0002475),  but  who

████████ ██ ██████████████████████████████████████████

████████████ (Ex. 24 at BOE_EDTX_010_0000091.)

Forkner worked on Southwest's behalf to ensure Boeing adhered to the secret agreement,

████████████████████████████ (Ex. 25 at BOE_EDTX_20_0001555-56)

██████████████████████████████████████████ (*id.*  at

BOE_EDTX_20_0001554). Forkner ████████████████████████████

████████████████████████████████████████████████████████

████ (Ex. 25 at BOE_EDTX_20_0001555-56.) When Forkner tried to determine ████████

████████████████████████████, he concluded that ██████████████████

████████████████████████████████████████████████████

(Ex. 26 at BOE_EDTX_012_0016270.) The bottom line was that ████████████████

██████████████████████████████████████ (*Id.*) Forkner then

████████████████████████████████████ (Ex. 27 at BOE_EDTX_20_0011643

(████████████████████████████████).) He  and  Boeing  also

understood that ███████████████████████████████

██████████████████████████ (Ex. 28 at BOE_EDTX_20_0022335.) It was the

only way to ████████████████████████ (*Id.*)

### 4.    Forkner ███████████████████████████
████

One of the first hurdles Forkner encountered in this role was with the Roll Command

Alerting System ("RCAS"). This system would ████████████████████████████

████████████. (Ex. 29 at BOE_EDTX_16_0001157.) ███████████████████

███████████████████████████████████████████████

█████████████████ As Forkner explained to his colleagues ███████████

███████████████████████████████████████████████

██████████████████████████████████████ (Ex. 30 at

BOE_EDTX_20_0019216.) █████████████████████████████████

███████████████████████████████████████████████

██ █████████████████████████████████████████████

██████████████████████ (*Id.*) In November 2014, Southwest █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ (Ex. 31 at BOE_EDTX_22_0009094.)

### 5.    FAA response threatens Southwest's core business model

In January 2015, the FAA dealt a potentially fatal blow to Southwest's entire business

model, ████████████████████████████████████████████

████████████████████████ (Ex. 32 at SWA_Earl_00169140; Ex. 5 at

86:15-105:18   (Kasher   Dep.);   Ex.   21   at   BOE_EDTX_20_0022337;   Ex.   20   at

SWA_Earl_00311611-12.)  Forkner  immediately ███████████████████████████

███████████████████████████████████. (*Id.*) A short time later, Southwest

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. (*Id.*) This meant Southwest would ███████████████████

████████████████████████████████████████████. (*Id.*)

      **6.**    **With Southwest's core business in jeopardy, Boeing allows Southwest to** ████████████████████████
████████████████████████

In January 2015, Southwest ████████████████████████████████████

████████████████████████████████████████████████████████████

████████. (*See, e.g.,* Ex. 32 at SWA_Earl_00169309 (█████████████████████████

████████████████████████████████████████████).) Boeing gave Southwest

unprecedented access and control.

████████████████████████████████████████████████████████████

████████████████████████████████ (Ex. 33 at SWA_Earl_00311299.) Southwest

was tasked ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. (*Id.*)

████████████████████████████████████████████████ (Ex.  33  at

SWA_Earl_00311300; Ex. 5 at 145:14-145:21 (Kasher Dep.).) ████████████████████████

████  a new system  on  the  MAX 8:  the  Maneuvering  Characteristic  Augmentation  System

("MCAS"). (Ex. 5 at 131:21-132:25 (Kasher Dep.).)

    The inclusion of the MCAS in the MAX 8 was a result of █████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ (Ex. 14 at 35:1-36:10 (Lusk Dep.).) ██████████

███████████████████████████████████████████████████████ (*Id.*) If

uncorrected, the NG and MAX would be too different for mere Level B training to suffice. That is

why Boeing designed the MCAS, which ████████████████████████████████████████

████████████████████████████████. (Ex. 5 at 139:5-16 (Kasher Dep.).)[6]

### 7.    Defendants delete all MCAS references from the MAX documentation

Southwest also discovered ██████████████████████████████. (Ex. 33 at

SWA_Earl_00311300; Ex. 5 at 145:14-21 (Kasher Dep.).) Telling the pilots about the MAX 8's

MCAS system meant ████████████████████████████████. (Ex. 33 at

SWA_Earl_00311300; Ex. 5 at 78:10-92:16, 118:20-124:17, 131:21-132:25; 145:22-146:7

(Kasher Dep.).) Southwest's Operational Steering Committee ███████████████████

████████. (Ex. 33 at SWA_Earl_00311301; Ex. 5 at 113:16-114:25 (Kasher Dep.).) They then

recommended that ██████████████████████████████████████████. (Ex. 33

at SWA_Earl_00311301; Ex. 5 at 147:25-150:25 (Kasher Dep.).)

Boeing ██████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (Ex. 33 at

SWA_Earl_00311301; Ex. 5 at 150:7-150:25 (Kasher Dep.).) Defendants thus provided detailed

manuals to MAX 8 pilots, but deliberately omitted that a new automated system was on the plane.

---

[6] The system would activate near stall speeds when the plane was at a "████████████████

████████████" by pushing the plane's nose downward. (Ex. 5 at 133:3-19 (Kasher Dep.).)

### 8.    Defendants mislead regulators as to other differences in the plane

Southwest continued to identify and eliminate any other threats to its Level B certification, and Boeing carefully coordinated with Southwest before any interactions with regulators.[7] █

█████████████████████████████

In April 2016, ████████████████████████████████████████████████. (Ex. 36 at BOE_EDTX_05_0512805-06.) The companies decided on a devious plan to skirt the FAA's focus on this difference between the MAX and the NG models: Southwest told Boeing to ████████████████████████████████████████████████. This way Boeing could tell regulators that ██████████████████████████████████ ██████████████████████. (*Id.*) Southwest emphasized that █████████████ ██████████████████████████████████████████████████ █████████████ (*Id.*) █████████████████████████████ █████████████████████ (*Id.*) In May 2016, █████████████████ █████████████████████████████–██████████ ██████████████████████████████████████. (Ex. 37 at SWA_Earl_00903585.) █████████████████ █████████████████████████████████████████ ████████████████████████████████. (*Id.*)

### 9.    Defendants succeed in obtaining a Level B training requirement

On August 16, 2016, Forkner ██████████████████████████████ ██████████████████████████████████████. (Ex. 38 at

---

[7] (Ex. 34 at SWA_Earl_00351783; Ex. 35 at BOE_EDTX_20_0019759 █████████████ ██████████████████████████████████████████

BOE_EDTX_010_0000015.) ███████████████████████████████

███████████████████████████████████████████████████████

███████████████ (*Id.*) This meant that Southwest pilots already trained on the 737 NG

model ████████████████████████████████████████████████████

████████████████████████████████████████████████ to be able to

also fly the MAX. (*Id.* at BOE_EDTX_010_0000014.) As Forkner explained ███████████

████████████████████████████████████ (*Id.*)

     Forkner had also ████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████ (Ex. 38 at

BOE_EDTX_010_0000014.) ███████████████████████████ (*See, e.g.*, Ex. 39 at

BOE_EDTX_010_0000035-40   (████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ ) In December 2017, ████████████████████ (Ex.

40 at BOE_EDTX_22_0045635), and in early 2018, ██████████████████

███████████████████████████████████. (Ex. 13 at 242:25-243-11

(Lusk Dep.); Ex. 41 at SWA_Earl_00815304-05.)



     **D.      Southwest and Boeing prepare for the launch of the MAX 8**

          **1.      Boeing and Southwest discover additional differences between the
                    MAX 8 and the 737 NG but do not tell the regulators.**

     Even after convincing the FAA not to require more than level B training, Boeing and

Southwest continued to discover additional differences between the MAX 8 and the earlier 737

NG model. But they kept quiet about it. For example, in Fall 2016, Southwest ██████████████

███████████████████████████████████████████████████. (Ex. 42 at

BOE_EDTX_012_0064682.) Boeing complied because, 

(*Id.* (emphasis added).)

More alarmingly, Forkner

(Ex. 23 at BOE_EDTX_06_0002474.) Forkner discovered this because the MCAS was "

" (*Id.*) He described this as "

(*id.* at BOE_EDTX_06_0002475), and concluded that he had "

(*id.* at BOE_EDTX_06_0002474). Forkner's colleague Patrick

Gustavsson agreed, lamenting that "                                    " on MCAS changes.

(*Id.* at BOE_EDTX_06_0002475.) Defendants never told the FAA or any other regulators about

the change to the MCAS and the dangers it posed.

### 2. Southwest and Boeing coordinate statements to the public

Boeing began delivering the MAX to Southwest. In October 2016, Defendants put out a

marketing video boasting that they had each put the MAX 8 "through its paces." (FAC ¶ 171.) The

video stated that the companies had "simulate[d] the kind of real-life conditions the airplane will

encounter on any given day," and that because of their joint testing, there would be "no surprises"

and "no secrets." (*Id.*) The video, of course, did not mention that, among other things, Defendants

had entered an agreement to avoid simulator-based testing; they had removed any reference to the

MCAS system from crew manuals; they had removed important safety features from the MAX to

further avoid training costs; and there were additional changes to the plane, including to the MCAS

design, that the FAA was never told about.

As the launch of the MAX began,

11

████████████████████████████████████████████████████████

████████   (Ex. 43 at BOE_EDTX_011_0009351.)

### E.    The Lion Air crash and Defendants' response

#### 1.    The Lion Air crash

On October 29, 2018, Lion Air Flight JT610, a MAX 8, departed Jakarta, Indonesia at 6:20 a.m. local time. (FAC ¶ 179.) Shortly after takeoff, a stall warning system activated, the control stick began to shake, and the airplane's nose was suddenly and repeatedly pushed downward to the ground by the plane's MCAS system. (*Id.* ¶ 180.) A failure in the left Angle of Attack ("AoA") sensor of the airplane resulted in erroneous information being sent to the airplane's flight control computer, causing the stall warning to trigger and the MCAS to take control of the plane. (*Id.* ¶ 181.) The MCAS was at the time still unknown to pilots operating the MAX—because references to the system had been removed from operating manuals for the plane at Southwest's behest. (*Id.* ¶ 182.) For eleven minutes, the crew struggled with the MCAS until they plunged to their deaths into the Java Sea. (*Id.* ¶ 184.)

#### 2.    ████████████████████████████████████

One week after the Lion Air crash, Mark Forkner (now working at Southwest) learned from his former colleagues that Boeing ████████████████████████████████████

████████   (Ex. 44 at SWA_Earl_00470770.) ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ (*Id.*) A Southwest working group ████████████

████████████████████████████████████████████████████████

████████████████████████████ (Ex. 45 at SWA_Earl_00257310-21; Ex. 5 at 169:8-177:14 (Kasher Dep.).) The group recommended ████████████   ████████████



██████████████████████████████████████ (Ex. 5 at 169:8-177:14 (Kasher Dep.).) ████████████████████████████████ ████ (*Id.*) ███████████████████ ██████████████████████ ███████████████████ (Ex. 44 at SWA_Earl_00470769.) ████████████████████████ (*Id.*) ████████████████ █████████ (Ex. 5 at 178:5-185:9 (Kasher Dep.).) ███████████ ██████████████████████████████████████ (*Id.*) ███████████████████████████████████████ ████████████████████████████

**3.    Southwest** ███████████████████████████████

Southwest and Boeing would have to convince regulators (and the public) that the MAX was safe despite the Lion Air crash. They did this through a series of carefully coordinated false statements to the public, to Southwest pilots, and the press. The central premise of the coordinated message was that "existing procedures" were adequate to address the cause of the Lion Air crash.

As an initial matter, Southwest had to ████████████████████████████



████████████████████████████████████████ ████ ███████████████████████████████ and Southwest was livid that he was ████████████████████████████████████████ ████████████ (Ex. 46 at SWA_Earl_00563199.) ████████████████ ████████ ████████████████████████ (*Id.*) That was false. ████████████████ ████ ███████████████████████████ ████ (Ex. 5 at 174:17-24 (Kasher Dep.) (████████████████████████████████ ████████████████████████████████████████



Southwest also lied to its pilots. ████████████████████████████

█████████████████████████████████████████  ███████████████

███████████, told a Southwest Pilot, ████████████████████████

█████████████ (Ex. 47 at SWA_Earl_00471235.)

### 4.  Southwest and Boeing coordinate and disseminate false statements

Defendants also made coordinated, false statements to the press and public. On November 14, 2018, Boeing CEO Dennis Muilenburg appeared on Fox Business Channel to assuage fears about the MAX 8. During the interview, he made several false and misleading statements and omissions, including that "all of the information that is needed to safely fly our airplanes" had been provided to pilots and that Boeing merely needed to "point them back to existing flight procedures to handle this kind of situation." (FAC ¶ 194.) Repeatedly, Muilenburg stated that "existing flight procedures" were adequate to address the Lion Air crash and that information the pilots need was "part of the training manual." (*Id.* ¶ 198.) As Boeing engineer Curtis Ewbank testified, ████

███████████████████████████████████████████████████████████

████████████████████████████████████ (Ex. 17 at 167:15-173:10 (Ewbank Dep.); Ex. 48 at BOE_EDTX_17_0000002.)

Internally, Southwest acknowledged that ████████████████████████

███████████████████████████████████████████████████████████

████████████ (Ex. 45 at SWA_Earl_00257310-21.) But publicly, Southwest ████████████

███████████████████████████████████████████████████████████

████████████████ (Ex. 49 at SWA_Earl_00564658.)

14

On November 29, 2018, a Wall Street Journal reporter █████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ The reporter's story would say that ████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ (Ex. 50 at BOE_EDTX_14_0030440.) The story

would also report that a █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ (*Id.*)

██████████████████████████    ████████████████████████████████████████

████████████████████████████ (*Id.*) The next morning, multiple Boeing and Southwest

communications employees and executives, ███████████████████████████████████

████████    ████████████████████████████████████████████████████ (*Id.* at

BOE_EDTX_14_0030438-40.)

The Wall Street Journal specifically asked, among other things, ████████████████

████████████████████████████████████████████████████████████████████

(*Id.*) ██████████████████████████████    ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ (*Id.*) ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ (*Id.*)

On the morning of November 30, Southwest's ███████████████████████████████

██████████████████████████████████ (*Id.* at BOE_EDTX_14_0030442.)

On the afternoon of November 30, Boeing and Southwest communications personnel ████████

████████████████████████████████████████████████████████████████████



(Ex. 51 at SWA_Earl_00259094.) Southwest's on-the-record responses were false:

- (Ex. 52 at SWA_Earl_00564805-06).)

- (*Id.*)

- (*Id.*)

On December 2, 2018, the reporter followed up with Southwest to note that

(*Id.* at SWA_Earl_00564805.) Southwest's response:

(*Id.* at SWA_Earl_00564804 (emphasis added).) This was false.

As described above, the evidence shows Southwest's direct, multi-year involvement in determining a training level, creating a differences table, and getting manuals approved for the MAX. Indeed, between 2015 and 2016, Southwest was so closely involved in each of the above activities that it

(*See* Ex. 33 at SWA_Earl_00311301; Ex. 5 (Kasher Dep.) 113:16-114:25; Ex. 52 at SWA_Earl_00564803-04.)

As of November 30, 2018, the above lies about Southwest/Boeing and MAX training were

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Ex. 49 at

SWA_Earl_00564656.)

On December 4, 2018, Southwest held a ████████████████████████████████

████████████████████████████ (Ex. 53 at SWA_Earl_00564663.) ████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ (*id.* at SWA_Earl_00564664-65), and

Southwest sent ██████████████████████████████████████████. (*Id.* at

SWA_Earl_00564663.) The evening was ████████████████████████████████

██████████████████ (*id.*), and Southwest ████████████████████████████ (*Id.* at

SWA_Earl_00564661.) All of the Southwest attendees received a █████████████

███████████████████████████████████████████████████████████████████

████████████████████ (*See id.* at SWA_Earl_00564670.)

### F.    The Ethiopian Air crash and its aftermath

#### 1.    The Ethiopian Air crash and Defendants' continued false statements

On March 10, 2019, another 737 MAX 8—this one operated by Ethiopian Air—suffered a

fatal nose-down crash that killed everyone aboard. This time, the crew was aware of the MCAS

and apparently executed Boeing's procedures. It did not matter. The MCAS took hold of the plane

and killed all 157 people aboard. Although many airlines and international regulators promptly

grounded the MAX 8, Southwest refused to do so. Both Boeing and Southwest then made repeated

false statements about the safety of the MAX, including in response to calls from passengers to

ground the plane or refund their tickets. (FAC ¶¶ 228-35; *see also* Ex. 54 at SWA_Earl_00582732

███████████████████████████████████████████████████████████████████

██████████████████████████████ For example, Southwest stated on Twitter that it remained "confident in the Safety of our fleet," including the "34 Boeing 737 MAX 8s it flew." (FAC ¶ 229.) Boeing, in tandem, also falsely touted "confidence in the safety of the 737 MAX." (*Id.* ¶ 237.) The companies had been ███████████████, as they did after Lion Air. (*See* Ex. 55 at SWA_Earl_00582522.) On March 13, 2019, the FAA issued an emergency order grounding the MAX. (Ex. 56 at SWA_Earl_00582705.)

### 2. Southwest lies to its pilots about its secret agreement with Boeing, referring to the agreement in code

After the Ethiopian Air crash, ████████████████████



(Ex. 57 at SWA_Earl_00878746.) ███████████████████████████████████ (Ex. 58 at SWA_Earl_00477330.) Notably, ████████████ ██████████████████ an apparent reference to "Secret Squirrel," a phrase used in military intelligence and other classified military contexts, particularly in the United States Air Force—where Southwest's Waltz previously served as an officer for more than a decade. (*See, e.g.*, Ex. 59 "From SNAFU to Secret Squirrel – Popular Phrases Made by the Military," https://bit.ly/37No9Va (noting "secret squirrel" used in CIA memos and to confidential material); Ex. 60 "Surprised by Secret Squirrel," https://bit.ly/2HG2gMm (phrase used throughout U.S. Air Force history to describe classified missions, including the first strike of Desert Storm using "[t]he Air Launched Cruise Missile AGM-86B . . . developed by lead contractor Boeing.").)

In response to 

G.    **The recertification and return to service of the MAX 8**

1.    **Southwest's continued attempts to avoid pilot training**

Even after the two crashes, Southwest continued its campaign to avoid training of its pilots.

Internally, Boeing had begun to question its basic assumptions about pilot responsiveness as part

of its efforts to certify and return the MAX to service.  In May 2019, Southwest asked Boeing for



. (Ex. 65 at SWA_Earl_00930859.)

2.    **Boeing pays Southwest to continue flying the MAX 8**

Ultimately, Boeing was left with little choice. Boeing would have to pay Southwest to prop

up demand for the MAX with orders. On December 12, 2019, Southwest announced that it had

reached an agreement with Boeing for financial reparations for the grounding of the MAX. (Ex.

19

66 (http://cnb.cx/390qtHt).) And, on December 16, 2020, Southwest released an 8-K to its Investors stating that it had reached "an agreement" with Boeing "to take delivery of the delayed MAX aircraft" and that it had received "delivery credits" from Boeing that made its "capital expenditures" on the new aircraft "immaterial." (Ex. 67 (Dec. 16, 2020 SWA 8-K).) Less than a month later, Boeing filed a public submission to the FAA that "recommended extra flight-simulator training for 737 MAX pilots. (Ex. 68 (http://on.wsj.com/2WTMYb9).) On November 18, 2020, the FAA approved a return to service plan for the MAX 8. (*Id.*)

## THE CLASSES PROPOSED FOR CERTIFICATION

Plaintiffs seek certification of two classes, one consisting of Southwest Airlines ticket purchasers and the other American Airlines ticket purchasers.[8] The proposed Southwest Airlines Class is defined as follows:

> All persons who purchased a ticket for air travel within, to, or from the United States on a Southwest Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (i.e., routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

The proposed American Airlines Class is defined as follows:

> All persons who purchased a ticket for air travel within, to, or from the United States on an American Airlines aircraft from the date Southwest first took delivery of the MAX 8, August 29, 2017, until the date that all 737 MAX Series aircraft were grounded by the FAA, March 13, 2019, inclusive, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was

---

[8] Excluded from both Classes are Boeing and Southwest, their employees, officers, directors, legal representatives, successors, and wholly or partly owned subsidiaries or affiliates of Boeing and Southwest; class counsel and their employees and experts; and the judicial officers and their immediate family members and associated court staff assigned to this case.

not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (i.e., routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

## ARGUMENT

To certify a class under Rule 23, plaintiffs "must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635–36 (5th Cir. 2016) (en banc) (citing Fed. R. Civ. P. 23(a)). The plaintiffs "must next satisfy the provisions of one of Rule 23(b)'s three subsections"—here, subsection (3). *Id.* Under Rule 23(b)(3), the plaintiffs must also satisfy the requirements of predominance and superiority. *See id.*; Fed. R. Civ. P. 23(b)(3).

A decision to certify a class is left to the district court's "substantial discretion," *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 709 (5th Cir. 2020), but must be made "only where 'the trial court is satisfied, after a rigorous analysis,' that [Rule 23's] requirements are met. *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545 (5th Cir. 2020) (emphasis removed) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). The district court, however, "may not require a plaintiff to establish his claims at the class certification stage." *Vine v. PLS Fin. Servs., Inc.*, 331 F.R.D. 325, 330 (E.D. Tex. 2019) (citation omitted); *see also Chavez*, 957 F.3d at 546 n.3 (noting it is "inappropriate at the certification stage" for court to "decide the merits of the plaintiffs' claims"). But "[i]f some of the determinations . . . cannot be made without a look at the facts, then the judge must undertake that investigation." *Chavez*, 957 F.3d at 546 (citation omitted). To enable effective appellate review, "it's up to the district judge to find the facts." *Id.* at 547.

## I.      PLAINTIFFS AND THE CLASSES HAVE ARTICLE III STANDING

Plaintiffs and members of the proposed Classes have Article III standing. On a Rule 23 motion, the elements of Article III standing—injury in fact, traceability to the defendant's conduct,

and redressability by the relief requested—are assessed based on the allegations in the pleadings. *In re Deepwater Horizon*, 739 F.3d 790, 799, 802-804 (5th Cir. 2014). This Court has already made that determination. *Earl v. Boeing Co.*, __ F. Supp. 3d. __, 2020 WL 759385, at *4-10 (E.D. Tex. Feb. 14, 2020). At this stage, that is sufficient.

But in addition, there is now clear evidence of overcharge in addition to pleaded facts, including ███████████████████████████████████. (Ex. 79 at SWA_Earl_00933828 (███████████████████████████████████ ███████████████████████████████████████); *id.* ██████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████); Ex. 69 at SWA_Earl_00933599 (███████████████████████████████████████████████ ███████████████████████████████████); *id.* at 603 (███████████████████████████████████████████████ ███████████████████████████); Ex. 70 at SWA_Earl_00934699 (██████████████ ███████████████████████████████████████████████ ██████████████████████████; *id.* at 709 (████████████ ███████████████████████████████████████████████.) As explained below, Plaintiffs' expert also ███████████████████████████. (Allenby Decl. Ex. A2 ¶¶ 4, 6; Allenby Decl. Ex. A1 at 19-27.)

## II.   PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(a)

### A.   The proposed classes are sufficiently numerous

"The numerosity requirement is satisfied when 'the class is so numerous that joinder of all members is impracticable,' such as when 'a class consist[s] of more than forty members.'" *Vine*,

331 F.R.D. at 332 (quoting Fed. R. Civ. P. 23(a)(1) and *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Boeing and Southwest do not dispute that this element is met. (Ex. 71 at 4 (Boeing 10/26/20 Interrogatory Response); Ex. 72 at 4-5   (SWA 10/26/20 Interrogatory Response) (absence of numerosity in challenged 23(a) elements).) Nor could they, as there are likely millions of members in each class given that there are at least ███████ Southwest Airlines flight segments (Mills Decl. Ex. M1 at 12) and ████████ American Airlines flight segments (*id.* at 17) within the class period.[9]

## B.   The classes are ascertainable

"[I]n order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012). This means that there is "sufficient objective criteria from which to identify class members." *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019).

Here, there can be no dispute that the Classes are ascertainable. Southwest ██████ ████████████████████████████████████████████████████████████████ (Ex. 75 at 49:21-50:13 (Whelchel Dep.)), ███████████████████████████████████ █████████████ (*id.* at 29:25-30:8). American Airlines ████████████████████. (*See* Ex. 73 (Aug. 26, 2020 Letter from American Airlines) at App'x A (██████████████████████████ ███████████████████████████████████████████████████████████████████).)

Indeed, both Southwest and American have produced flight records for the class period that have allowed Plaintiffs to identify each relevant flight. (Mills Decl. ¶ 4.) Southwest omitted personally

---

[9] ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ (Ex. 75 at 24:18-25:6 (Whelchel Dep.).)



identifying information from those records, but it is clear from the records that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*) Southwest has in fact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) And it is implausible that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by American as well. (*Id.*)

### C.      Plaintiffs satisfy the commonality requirement

"The commonality requirement demands that 'there [be] questions of law or fact common to the class.'" *Vine*, 331 F.R.D. at 332 (quoting Fed. R. Civ. P. 23(3)(a)(2)). "The threshold of 'commonality' is not high." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). It requires "only that resolution of the common questions affect all or a substantial number of the class members." *Id.*; *see also Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997) ("The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."). In other words, a "common question 'must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Seeligson*, 761 F. App'x at 334 (quoting *Dukes*, 546 U.S. at 350).

Common issues abound in this case, including factual questions establishing whether Defendants (a) formed an association-in-fact conspiracy, (b) engaged in acts of mail and/or wire fraud in furtherance of the conspiracy, and (c) engaged in a pattern of racketeering. For example, as set forth in the statement of facts above, Plaintiffs will prove that:

- Defendants made false and misleading statements to the press and the public about the MAX 8, procedures for the operation of the airplane, and Southwest's involvement in the training and simulation requirements for the aircraft. (*See, e.g.*, pp. 14-18, *supra.*)

- Defendants coordinated false statements made to the press and the public as part of an association-in-fact conspiracy to keep the MAX 8 flying and to continue ticket sales. (*See, e.g.*, pp. 11-12, *supra.*)

24

- Defendants made false or misleading statements to regulators in furtherance of their conspiracy to maintain Southwest's business model of using the same crew to fly all of its fleet aircraft. (*See, e.g.*, pp. 9-10, *supra*.)

- Defendants made false and misleading statements to pilots to conceal the MCAS system on the MAX 8 and to avoid simulation and testing. (*See, e.g.*, pp. 18-19, *supra*.)

- Southwest compelled Boeing to remove information from pilot manuals to hide differences between the 737 NG and MAX 8 airplanes in order to avoid regulatory requirements to provide simulation and training to pilots. (*See, e.g.*, pp. 8-9, *supra*.)

- Defendants entered into secret agreements ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ all as part of their association-in-fact conspiracy. (*See, e.g.*, pp. 3-6, *supra*.)

These and other issues set forth below in the section on predominance are all established as to the entirety of each class. Proof of these issues would establish entire elements of each Plaintiff and class members' claims in one stroke. Commonality as to at least one issue is met here.

### D.    Plaintiffs satisfy the typicality requirement

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625 (citation omitted). "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (citation omitted). Thus, "[i]f the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.*

Here, the named plaintiffs and the other class members share precisely the same remedial theory—recovery for a fraudulent overcharge on airplane tickets during the Class Period. Their

claims concern precisely the same course of conduct—a fraudulent conspiracy by Defendants and other co-conspirators that inflated ticket prices. And no Plaintiff seeks any damages different other than overcharge damages. (Pls.' Decls. ¶ 4 & nn. 1, 2.[10]) These uniform claims asserted by Plaintiffs and the other members of the proposed classes easily meet this standard. *See Mullen*, 186 F.3d at 625 ("The class complaint indicates that they will all premise liability for the Casino's defective air ventilation system under the Jones Act and the doctrine of seaworthiness. Any variety in the illness the Named Plaintiffs and the class members suffered will not affect their legal or remedial theories, and thus does not defeat typicality.").

### E.    Plaintiffs satisfy the adequacy requirement

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." This requirement "mandates an inquiry into the zeal and competence of the representative[s'] counsel and into the willingness and the ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982).

### 1.    The proposed class representative plaintiffs are adequate

The class representatives here have each committed to taking an active role in the litigation, representing the interests of the class, and controlling the litigation as necessary.[11] (Pls.' Decls. ¶ 8.) Five of the proposed class representatives have sat for depositions, during which they were asked personal, intrusive, and irrelevant questions by defense counsel, and in almost all cases, for

---

[10] Each of the named plaintiffs has submitted a declaration. The citation to "Pls.' Decls." collectively refers to each Plaintiffs' declaration.

[11] The proposed representatives of the Southwest Airlines Class are Plaintiffs Alesa Beck, Ruben Castro, Damonie Earl, Lance Hogue, Jr., Litaun Lewis, Valerie Mortz-Rogers, Brett Noble, John Rogers, Linda Rugg, and Marisa Thompson. The proposed representatives of the American Airlines Class are Plaintiffs James LaMorte, Litaun Lewis, and Fritz Ringling.

the maximum seven hours of questioning allotted under the Federal Rules. (Dunne Decl. ¶ 8.) Despite being offered deposition dates for the six newly added Plaintiffs, Defendants have yet to depose any of those Plaintiffs. (Dunne Decl. ¶ 9.) Nonetheless, each of those Plaintiffs—and all other proposed class representatives—submit declarations with this motion demonstrating their understanding of the case and committing to represent the absent class members, control the litigation, and stay apprised of developments. (Pls.' Decls. ¶ 8.) This is sufficient to establish Plaintiffs' adequacy. *Cf. Vine*, 331 F.R.D. at 335 (finding proposed class representatives adequate where they demonstrated a "general understanding" of the case, "seem[ed] to appreciate that they are representing those who are similarly situated as part of a class, and have expressed substantial interest in the outcome of this litigation").

### 2. Proposed plaintiffs' class counsel are adequate

Under Rule 23(g), in appointing class counsel a court must consider: "[1] the work counsel has done in identifying or investigating potential claims in the action; [2] counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; [3] counsel's knowledge of the applicable law; and [4] the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).[12]

---

[12] Before 2003, courts scrutinized proposed class counsel under Rule 23(a)(4). Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment. "In 2003, Congress adopted Rule 23(g) that creates an explicit textual mooring for the class counsel analysis; but most courts continue to employ the substantive standards generated under Rule 23(a)(4) prior to Rule 23(g)'s adoption in their analysis of counsel's adequacy." W. RUBENSTEIN, 1 NEWBERG ON CLASS ACTIONS § 3:72 (5th ed. Dec. 2020 update); *see also id.* § 3:80 (discussing interplay of Rules 23(a)(4) and 23(g)).

Per its interrogatories, Boeing does not challenge the adequacy of counsel at Bathaee Dunne LLP ("BD") or Dovel & Luner, LLP ("DL"). Southwest contends that it does intend to challenge counsels' adequacy, but does not provide any good-faith factual basis for such a challenge in its interrogatory response. (Ex. 72 at 4 (SWA Interrogatory Resp.).) This is unsurprising, as proposed Co-Lead Class Counsel from the BD and DL are plainly adequate to represent the Classes. Lawyers from each firm have extensive experience litigating class actions and RICO claims. With respect to BD, counsel have years of experience litigating complex class actions, including RICO class claims. (*See* Dunne Decl. Ex. D1 (attorney biographies).) Counsel at DL also have experience litigating class actions and have been appointed as class leadership in other cases. (*See* Eichmann Decl. Ex. E1 (attorney biographies).) Proposed Co-Lead Class Counsel bring to bear experience from the defense and plaintiffs' bar; extensive experience trying complex cases, including in multibillion- and multimillion-dollar securities, patent, and antitrust cases; extensive experience litigating in this District; top academic credentials; former practices at elite law firms; and clerkships for judges on courts including the United States Supreme Court, Third Circuit, Ninth Circuit, Southern District of New York, and the New York State Court of Appeals. (Dunne Decl. ¶ 3 & Ex. A; Eichmann Decl. Ex. E1.)

In this litigation, proposed Co-Lead Class Counsel have, in addition to investigating and pleading the operative claims, taken and defended more than a dozen depositions, reviewed hundreds of thousands of documents, briefed and argued discovery motions, briefed and argued a motion to dismiss, briefed a motion for interlocutory appeal, briefed a motion to amend the complaint to add new plaintiffs, and have defended proposed class representatives at deposition. (Dunne Decl. ¶ 5.) Proposed Co-Lead Class Counsel have also assisted with the preparation of expert reports, defended expert depositions, litigated Daubert motions, and advanced several

28

hundred thousand dollars on behalf of the class as part of that effort. (*Id.*) None of the proposed Co-Lead Class Counsel—nor any proposed Class Counsel for that matter[13]—have any conflicts and have to date fully and zealously represented the interests of the class. (*Id.* ¶ 6.) They will continue to do so if appointed Co-Lead Class Counsel.

## III.    PLAINTIFFS SATISFY RULE 23(b)(3)

### A.    Common questions will predominate

To certify a class, "the questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted). "The trial court must weigh common issues against individual ones and determine which category is likely to be the focus of a trial." *Mitchell*, 954 F.3d at 710 (5th Cir. 2020) (citation and internal quotation marks omitted).

Each element of the claims asserted here presents common issues that predominate. A mail- or wire-fraud-based RICO claim under 18 U.S.C. § 1962(c) (Count One) requires "a pattern of racketeering activity" that is "connected to the acquisition, establishment, conduct, or control of

---

[13] Elizabeth DeRieux and Calvin Capshaw of Capshaw DeRieux LLP also represent Plaintiffs and are proposed as Class Counsel alongside proposed Co-Lead Class Counsel from BD and DL. Both are highly skilled litigators with decades of experience practicing in this District and before the Fifth Circuit, among many other courts. (*See* Dunne Decl. ¶ 4 & Ex D2.)

an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007).[14] Next, a civil RICO claim must show injury to (1) "business or property" (2) "by reason of" the fraudulent scheme—that is, RICO injury and proximate causation. *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 408-09 (5th Cir. 2015); 18 U.S.C. § 1964(c). In this case, the facts establishing these elements classwide will be proven through common evidence at trial, and none of that proof will require individualized inquiries, let alone the sort that would become the focus at trial.[15]

### 1. Plaintiffs will prove Defendants' pattern of racketeering, including predicate acts of mail and wire fraud, through common evidence

Plaintiffs will prove at trial through common evidence that Defendants engaged in predicate acts of mail and/or wire fraud in furtherance of the fraudulent scheme. None of the evidence that will establish these predicate acts requires individualized inquiry as to the class members. For example, Plaintiffs will prove through common evidence that:

- Boeing, in coordination with Southwest, made false and misleading statements to U.S. and international regulators, including through the statements and conduct of Mark Forkner. (*See, e.g.*, pp. 9-10, *supra*.)

- Boeing and Southwest colluded to remove references to the MCAS system from aircraft manuals in order to keep pilots in the dark about differences among the airplanes and to avoid more than Level B training requirements. (*See, e.g.*, p. 7, *supra*.)

- Boeing and Southwest coordinated their statements to the press and the public after each MAX 8 crash, and those statements—many communicated through electronic means—contained false and misleading representations. (*See, e.g.*, pp. 14-17, *supra*.)

---

[14] The elements underlying a claim under 18 U.S.C. § 1962(d) for conspiracy to violate § 1962(c) (Count Two) largely overlap those for a claim under § 1962(c) itself, so the same analysis applies. *See Abraham*, 480 F.3d at 355 ("Regardless of subsection, RICO claims under § 1962 have three common elements . . . .").

[15] Defendants and other members of the alleged conspiracy are indisputably "persons" within the meaning of the RICO statute. Nor is there any basis to dispute that the jurisdictional elements of mail and wire fraud (*i.e.*, use in interstate commerce of the mail or wires) are also met. In any event, these elements are unquestionably proven through common evidence and concern solely attributes of the Defendants, their co-conspirators, their conduct, and their communications. Establishing the necessary facts for these legal issues will establish them as to the entire class.

- Southwest, ████████████████████████████████████████
  ████████████████████████████████████████████ (*See, e.g.*,
  pp. 18-19, *supra*.)

- Boeing provided Southwest with a secret payment to purchase additional MAX 8s after
  the grounding, thereby creating the false appearance of sustained demand for MAX 8
  aircraft by a major carrier. (*See, e.g.*, p. 20, *supra*.)

Because all of this evidence is exclusively focused on Defendants' conduct, it will not vary
from class member to class member. And it will establish the required predicate acts for all of
Plaintiffs' and the Classes' RICO claims without any need for individualized inquiry.

### 2. Plaintiffs will prove Defendants' association-in-fact conspiracy through common evidence

All the evidence of Defendants' association-in-fact conspiracy is again centered on
Defendants' conduct, not individualized issues concerning Plaintiffs or the members of the classes.
Accordingly, the trial evidence on this issue will be common to all class members, and will not
vary from member to member. For example, Plaintiffs will prove through common evidence that:

- Boeing and Southwest had a decades-long relationship in which Southwest received
  the lowest prices on Boeing 737 airplanes and in return provided Boeing with support
  that included collusive "backstopping"—*i.e.*, deceptively signaling to other carriers
  demand for Boeing aircraft. (*See, e.g.*, pp. 1-2, *supra*.)

- Boeing and Southwest worked together from 2012 through the launch of the 737 MAX
  8 in 2017 to create and revise the technical and regulatory specifications for the MAX,
  including by jointly evaluating, then collaboratively determining final specifications
  for, proposed design choices, regulatory submissions, flight crew documentation and
  procedures, and training requirements for the MAX 8. (*See, e.g.*, pp. 7-8, *supra*.)

- Boeing and Southwest coordinated statements to the press, to pilots and regulators, and
  to the public about the Boeing 737 MAX, including statements that were knowingly
  false and/or misleading. (*See, e.g.*, pp. 14-17, *supra*.)

This evidence is entirely focused on Defendants' conduct and unique relationship, and in
no way presents individualized issues as to Plaintiffs and the classes.

### 3.   Plaintiffs will prove proximate cause through common evidence

#### (a)   Plaintiffs will prove foreseeability through common evidence

RICO causation requires a showing of "proximate cause," which exists where a plaintiff is "a foreseeable victim, and not one wronged by the caprice of chance." *Torres*, 838 F.3d at 637 (citation and internal quotation marks omitted). "When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 636 (citation omitted).

Here, the alleged RICO violation is a multi-year, coordinated scheme to defraud carried out by the Defendants (*see* pp. 1-20, *supra*), and there is only one theory of injury in this case, which is common to all Plaintiffs and to both proposed classes: a fraudulently induced overcharge in the purchase of airline tickets (*see* pp. 34-35, *infra*). As a result, the RICO proximate cause inquiry—which "requires Plaintiff to establish that its damages 'were a foreseeable and natural consequence' of Defendants' action," *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 965 (5th Cir. 2019) (citation omitted)—will in this matter test whether Defendants' fraudulent scheme regarding the 737 *MAX* could foreseeably inflate the price of airline tickets on carriers that flew the MAX prior to its grounding. This inquiry will turn on the scheme's nature and purpose; the circumstances of its execution; and most critically, the specific actions, communications, and knowledge of the Defendants during the life of the scheme and the class period. All this will necessarily be established through common evidence focused on *Defendants* and the foreseeable impact of their conduct, not through proof that varies from class member to class member.

On the merits, proximate causation is clearly present here, as a classwide matter, based on common proof. In fact, the chain of causation in this case is incredibly straightforward.

***Defendants' RICO-Violating Conduct***: Over the course of a decade, Southwest and Boeing worked hand in hand to design, document, certify, market, and launch a radically different,

untested new 737 variant—the 737 MAX—with the express goal of collusively hiding the plane's differences from regulators, pilots, and the public. The companies' scheme, which was designed to preserve Southwest's forty-year business model of fleet interchangeability, was a massive undertaking, requiring years of near-constant communication between high-level principals at both Defendants on issues ranging from system design; to regulatory submissions, flight crew documentation, and training requirements; to statements to regulators, pilots, the media, and the public. Between 2011 and 2017, Defendants' scheme ended up introducing multiply redundant flaws in the MAX's systems, documentation, and procedures that rendered the aircraft fatally unsafe at launch. Later in the scheme—principally from 2015 forward, both Defendants developed and disseminated numerous misrepresentations and outright lies to regulators, pilots, the press, and the public regarding the MAX to keep the planes in the air and to sell tickets.

*Plaintiffs' Injury*: The sole theory of injury in this case—asserted by all Plaintiffs and both classes—is an airline ticket overcharge due to Defendants' fraudulent scheme. Specifically, Plaintiffs bought airline tickets on domestic carriers (Southwest and American) that flew the MAX prior to its grounding. The price of airline tickets sold by these carriers during the class period was higher than it should have been, because Defendants' fraudulent scheme improperly inflated demand for tickets on airlines flying the MAX. In particular, during the class period, the price of airline tickets on carriers that operated the MAX was *higher than it would have been, but for Defendants' fraudulent scheme*.

Plaintiffs' injury—inflated demand and price for tickets on MAX-flying airlines during the class period—is self-evidently a foreseeable consequence of a multiyear fraudulent scheme by two industry giants to Jedi Mind-Trick regulators, pilots, operators, reporters, and the general public about the MAX. In fact, this was not just a foreseeable consequence of the fraudulent scheme

here—it was its *intended* effect. Plaintiffs will establish this at trial with common, classwide proof, including common evidence that Defendants' scheme was directed toward timely launching the MAX regardless of technical prematurity; keeping the MAX in the air irrespective of safety and other concerns; and boosting Southwest's profits through inflated ticket demand and price levels. For example:

- Boeing and Southwest entered into a secret agreement ██████████████████████ ███████████████ (*See, e.g.*, pp. 4-7, *supra*.)

- When Southwest faced an existential threat to its 737-only business model from the FAA, Boeing and Southwest worked together to hide the MCAS from pilots, who would have demanded additional training if they knew the truth, and from regulators who would have insisted on training requirements that would disrupt Southwest's mixed-fleet business model. (*See, e.g.*, pp. 7-10, *supra*.)

- When the head of the Southwest Pilots Association ████████████████████ ███████████████████████ he truth would have threatened Southwest's ability to sell tickets on its mixed fleet of planes. (*See, e.g.*, pp. 18-19, *supra*.)

- After the Lion Air crash, ████████████████████████████████████████ ██████████████████████████████████████████████████ (Ex. 44 at SWA_Earl_00470769.) Southwest then coordinated false public statements with Boeing, including about the "existing procedures" in place to avoid a repeat of the crash. (*See, e.g.*, pp. 13-14, *supra*.)

The above is hardly exhaustive; indeed, the Background section of this brief recites myriad other specific facts (subject to common proof through classwide evidence) that Plaintiffs will use to show that Plaintiffs' overcharge injury was not just foreseeable to defendants, it was *intended by them*. None of the proof on this issue at trial will vary between class members or named Plaintiffs. Proximate cause will be proven on behalf of the entire classes using *Defendants'* conduct, which was aimed at keeping the MAX 8 in the air and maintaining Southwest's highly profitable business model. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices*

34

& *Antitrust Litig.* ("*EpiPen*"), 2020 WL 1180550, at *47 (D. Kan. Mar. 10, 2020) ("And, to prove their allegations, plaintiffs will rely on common evidence about defendants' conduct in the EpiPen pricing scheme, the intended targets of that scheme, and how that scheme injured the plaintiff class as a whole."); *see also In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 35 (1st Cir. 2013) (plaintiff was "primary and intended victim" of scheme to defraud and injury was therefore a "foreseeable and natural consequence" of the scheme because the scheme was "designed to fraudulently inflate the number of Neurontin prescriptions for which TPPs paid.").

Second, there is no question that Boeing and Southwest not only foresaw—but *knew*—that their statements to the public would be relied upon by airline customers and that information they misleadingly omitted would have been material to them if provided. That is why both companies:

- meticulously coordinated their statements to the press and the public, including through coordinated false statements by executives to members of the press, (*see, e.g.*, pp. 14-18, *supra*);

- carefully cataloged likely questions and concerns from customers and responded to them with false and misleading statements, (*see, e.g.*, pp. 17-18, *supra*);

- and, like Plaintiffs' expert in this litigation, engaged in statistical analyses and conjoint studies to determine the impact of the MAX 8 grounding after the second crash, (*see, e.g.*, pp. 45-48, *infra*). *See In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d at 42 (aggregate statistical data can be used to show causal relationships).

All of this is common proof that establishes foreseeability as to the entire class.

### (b)    Defendants' contention that individual reliance is required is wrong

Boeing and Southwest contend in their interrogatory responses that the proximate cause inquiry will require individualized proof. (Ex. 72 at 7-8 (SWA Interrogatory Resp.); Ex. 71 at 4 (Boeing Interrogatory Resp.) ("Plaintiffs' claims lack the same essential characteristics," including as to fraud, reliance and causation).) This contention misunderstands the proximate cause standard and the role of reliance evidence in RICO cases predicated on mail and wire fraud.

*First*, controlling United States Supreme Court and Fifth Circuit precedent is clear: first-party reliance—*i.e.*, reliance by the injured party—is *not* an element of a RICO claim predicated on mail or wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008) ("[W]e hold that a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations"); *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) ("In cases predicated on mail or wire fraud, reliance is not necessary."). And *Bridge*'s holding regarding reliance is anything but formalistic: *Bridge* expressly holds that reliance is not a prerequisite for proving RICO proximate causation under a "directness" analysis. *See Bridge*, 553 U.S. at 657-58 ("Nor is first-party reliance necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*."). Thus, in *Bridge*, the defendant was accused of rigging an auction by defrauding (among other parties) the county running the auction. *Id.* at 643-44. The *Bridge* plaintiff was a competing bidder who lost valuable lien opportunities because the auction was rigged—even though the rigging was done through false statements by the defendant *directed to persons other than Plaintiff* (the county). *Id.* at 643-45, 647-49. Justice Thomas, writing for a unanimous Supreme Court, reasoned that the *Bridge* facts were "a case in point" as to why first-party reliance is not necessary to prove RICO causation, even though "directness" is required:

> Respondents' alleged injury—the loss of valuable liens—is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And here, unlike in Holmes and Anza, there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.

36

*Id.* at 658.

Justice Thomas's analysis of proximate causation under the *Bridge* facts applies equally well (perhaps even more strongly) to the facts of this action. As noted in the previous subsection, Plaintiffs' injury—inflated market demand and price for tickets on airlines that flew MAX aircraft—was not just a foreseeable, natural, and direct consequence of Defendants' coordinated multiyear scheme to defraud regulators, pilots, the media, and the public about the MAX, it was the *specifically intended goal of Defendants' scheme*. Moreover, nothing in the proximate cause inquiry in this case requires individualized proof.

The Supreme Court's decision in *Bridge* on proof of reliance isn't just binding; it also makes a good deal of practical sense in the context of a RICO fraudulent scheme. Unlike a so-called "garden variety" fraud in which A lies to B, then B sues A, a RICO scheme by definition involves a group of coordinated actors (the enterprise) engaging in a pattern of illegal activity over a sustained period of time. Again, the facts of this case are instructive: as set forth above, the Boeing-Southwest scheme has persisted for nearly a decade; includes statements and actions by dozens of principals at both companies, up to and including apex executives; has at various times between 2012 and 2019 expressly sought to mislead all the world's regulators, Southwest's own pilots, government investigators, the media, and the general public; and included in its purview everything from design, certification, and documentation of the MAX; to coordinated press coverups; to multiple market backstop actions by Southwest for the MAX in the short life of that aircraft. Given the complexity (but logical rigor) of the RICO allegations here, it's plain why the Supreme Court rejected any sort of hard-line "check the box" reliance requirement.

Moreover, Plaintiffs' proof of proximate causation here will necessarily address any causation-related reliance arguments. This is because reliance by *someone* is in many cases the

connective tissue between the fraudulent scheme and RICO injury. That connective tissue either exists, in which case the scheme functions and has causal effect, or it does not, rendering the entire scheme inviable. The focus is not on whether any particular class member relied or did not rely on a false statement, but rather whether the mail and wire fraud foreseeably caused someone to rely on the false statements such that asserted RICO injury—here, inflated prices—occurred.

This reasoning underpins Justice Thomas's observation that "[i]n most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation," *Bridge*, 553 U.S. at 658, which is why "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation," *id.* at 659. Such proof would, to be sure, demonstrate precisely how the RICO injury resulted from the fraudulent scheme, "[b]ut the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." *Id.* The Supreme Court's unanimous opinion in *Bridge* was unambiguous—it rejected reliance as "an element of a civil RICO claim based on mail fraud" and the Court saw "no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim." *Id.* at 655-56.

The Fifth Circuit's *en banc* decision in *Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629 (5th Cir. 2016), holds precisely this. There, plaintiffs were the victims of a pyramid scheme who lost money and sued under RICO. *Id.* at 632-33. Members of the pyramid scheme made money when they signed up new Independent Associates ("IAs"), who in turn sold energy and signed up other IAs. *Id.* at 633. The vast majority of these IAs, who were members of the class, lost money in the scheme. *Id.* The court rejected the defendants' argument that proximate cause for RICO

would "require individualized proof" of reliance by each class member. *Id.* It held that the *Torres* defendants' "premise, and thus much of their opposition to class certification is at odds with recent decisions from the Supreme Court and this court emphasizing that RICO claims predicated on mail and wire fraud do not require first-party reliance to establish that the injuries were proximately caused by the fraud." *Id.* at 636-37. That is because "[a] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* (quoting *Bridge*, 553 U.S. at 649). The Fifth Circuit reasoned that "this understanding of the causation requirement for fraud-based RICO claims—that such claims, unlike most common law fraud claims, do not require proof of first-party reliance—largely dooms the Defendants' attempt to identify individual issues of causation sufficient to preclude a finding of predominance." *Id.* at 638.

The *Torres* court held that plaintiffs there were injured by joining the pyramid scheme, which "inheres in its concealment of the deceptive nature of the 'robbing Peter to pay Paul' payment structure." *Id.* The court explained:

> Whether the Plaintiff relied on a misrepresentation about the scheme is thus not determinative of whether the Plaintiff can prove proximate causation under *Bridge*. As was true in that case, the class members here can prove injury "'by reason of' a pattern of mail fraud even if [they have] not relied on any misrepresentations." The participants' injuries arise from the scheme's payment structure, and the inherent concealment of the inevitableness of those injuries.

*Id.* at 640. The scheme caused injury because payment was required to participate, and the scheme was inherently concealed—it would not otherwise work to defraud anyone.[16]

---

[16] The Fifth Circuit recently affirmed this Court's application of the *Torres* rule to common law fraud claims, where reliance is an element of the claim, noting that reliance can be shown on a classwide basis where it can be inferred from the nature of the scheme. *See Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 329-30 (5th Cir. 2020) ("As the en banc court in *Torres* explained, common issues can still predominate if common evidence of fraudulent misrepresentation 'gives rise to a reasonable inference that that misrepresentation induced [the class members' actions] and

The scheme here is similar. Over a period of several years, Boeing and Southwest collusively deceived and outright lied to regulators, pilots, reporters, and ticket buyers about numerous aspects of the 737 MAX. Defendants' lies and omissions were carefully timed, carefully coordinated, and carefully targeted, as part of a cohesive scheme with a single principal goal: getting the 737 MAX approved and launched as soon as possible, without new training requirements that would disrupt Southwest's core business model. Thus, from 2013-2016, Defendants principally focused their deceptions on regulators and crew members, carefully hiding, obfuscating, and lying about the MAX's many new and different systems and functionalities in regulatory filings, in flight crew documentation, and even in the MAX's flight deck displays and alerts themselves. By 2016, as the MAX launch date approached, Defendants' scheme had created a monster: a hastily engineered new 737 variant with drastic yet intentionally hidden operational differences from the NG; deliberately incomplete documentation; confusing and inadequate procedures; and no meaningful regulatory or pilot understanding of any MAX specifics. However, only Boeing and Southwest—who jointly created MAX's fatally flawed design, documentation, and training *on purpose* to meet their respective business goals—actually knew this to be the case. As a result, by 2016 and thereafter, Defendants worked to ensure that no one—especially not regulators, pilots, and industry journalists, who were best equipped to recognize the serious problems with the MAX if provided complete, accurate information—could find out the real truth about the MAX.

This scheme to defraud regarding the MAX 8 directly inflated the *market price* for airlines that used a significant number of MAX 8s as part of their fleet. As a result, any member of the

---

caused their losses. Other circuits have likewise 'permitted inferences of reliance when [they] follow[] logically from the nature of the scheme, and there is common circumstantial evidence that class members relied on the fraud." (internal citations omitted)).

classes who purchased a ticket at inflated market prices was injured by Defendants' complained-of conduct, regardless of whether that class member or Plaintiff knowingly relied on—or was even aware of—any particular misrepresentation by Defendants.[17] Indeed, much of the scheme was designed to prevent information about the MAX 8, its certifications, and the training of pilots from reaching the market and thereby propping up demand and therefore ticket prices. That is precisely why demand dropped dramatically once the truth about the MAX 8 was partially revealed and after the grounding of the plane in March 2019. (*See* pp. 22-23, *supra*.) Under these circumstances, it is foreseeable that if the truth had been known, demand for Southwest and American Airlines tickets would have dropped and so would the market price for those tickets.

### (c)      The jury can infer causation on a classwide basis

Independently, causation can be inferred on a class wide basis here. Defendants' conduct, which consisted of intentional conduct, such as modifying the MAX flight control documentation and procedures to hide key systems, preventing review of flight control changes in the MAX by regulators, making false statements to the press and public, and avoiding MAX-specific training, resulted in inflated ticket demand and inflated ticket prices. Just as "it is reasonable to infer that individuals do not knowingly join pyramid schemes," *Torres*, 838 F.3d at 643, it is also reasonable to infer that no one would have paid a full market price for a ticket that could not have been sold without the existence of a fraudulent scheme. Indeed, courts have allowed for such an inference in circumstances where a price or product has been fraudulently held out as a legitimate one. *See, e.g.*, *In re EpiPen*, 2020 WL 1180550, at *45 (holding "classwide inference" of causation

---

[17]   Southwest's own documents state that commercial fliers tend to rely on the determinations of regulators and pilots with respect to safety and reliability issues. It is therefore unsurprising that Defendants directed significant efforts toward misleading those entities, as part of an effort to inflate demand and prices for commercial fliers.

appropriate because plaintiffs 'would not [have made] a payment for' their EpiPens had they known—as plaintiffs allege—that they were paying an inflated price for that product due to defendants' misconduct in delaying generic competition." (alterations in original)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) ("In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1258 (11th Cir. 2004)); *Vine*, 331 F.R.D. at 340 ("Evidence from data maintained by the District Attorney's office that each class member paid the processing fees (on top of the money owed on the loan) is sufficient class-wide circumstantial evidence of reliance."); *cf. In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) ("inference of class-wide impact" where antitrust conspiracy "artificially inflated the baseline for price negotiations").

Such a classwide inference is appropriate here, particularly given that there is no evidence that any member of the class would have paid more for such a ticket knowing the truth, and no evidence that any feature of a flight, such as peanuts or legroom, would have increased the market price if the truth about the fraudulent scheme surrounding safety of the MAX were known. *Torres*, 838 F.3d at 643 ("[I]n the absence of any evidence showing that individuals joined the pyramid scheme knowingly—the district court correctly ruled that individual issues of reliance will not predominate," and even evidence that a "few class members decided to take the risk of being a winner in an illegal pyramid scheme does not automatically rebut the inference of reliance for the overwhelming remainder of the class . . . .").

### 4. Plaintiffs will prove their economic injury and damages through common evidence

To satisfy the predominance requirement it is not necessary to show that damages are susceptible to classwide proof, *In re Deepwater Horizon*, 739 F.3d at 815–17, but where (as here) damages *can* be measured "across the entire class," this supports a finding of predominance. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Damages can be measured across the entire class if "the calculation of damages for each class member is 'susceptible to a mathematical or formulaic calculation.'" *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711 (5th Cir. 2020) (internal citations omitted). "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Comcast*, 569 U.S. at 35 (internal quotations and citations omitted).

Here, Plaintiffs allege that "Defendants were able to overcharge Plaintiffs for their tickets as a result of Defendants' RICO violations." *Earl*, 2020 WL 759385, at *7. At trial, Plaintiffs will prove the existence and amount of this overcharge for each class member on a classwide basis, using exclusively common evidence. There will be no "need for individual proof of damages." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).

### (a) Plaintiffs will prove damages using a trusted methodology, common evidence, and formulaic calculations

### (1) Conjoint analysis is a trusted methodology

Conjoint analysis is a marketing research technique used to predict the market value of a product feature or attribute. ████████████████████████████████████

████████████████████████████████████████ (Allenby Decl. Ex. A1 at 3.) ████████████████

████████████████████████████████████████ (*Id.*) ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ (Ex.

Allenby Decl. Ex. A2 at 2, 10.)

Conjoint analysis uses a special type of consumer survey. The consumer survey does not directly ask respondents how much they would value a particular feature of interest (this type of direct measurement was done in the past but proved to be unreliable). Instead, the survey asks respondents to select their preferred choices among various products having different prices, with some of those products including the feature of interest (as well as other features). The responses reveal what tradeoff the respondent is willing to make between and among price and other features, including the feature of interest, without having to ask the respondent directly about the value of each feature. ████████████████████████████████████████

██████████████████████████████████████████ (Allenby Decl.

Ex. A1 at 3.)

████████████████████████████████████████████

██████████████████████████ (Allenby Decl. Ex. A1 at 3.) ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████ (Ex.

76 (Russell Dep.) at 66:18-68:2; Ex. 77 (2018 Fare Product Choice Study).)

Conjoint analysis is also used frequently to calculate damages (including overcharge damages) in class actions. *See Flynn v. FCA US LLC*, 327 F.R.D. 206, 225 (S.D. Ill. 2018) (noting that conjoint analysis is "a methodology often used to calculate damages in class actions," approving of it to measure overcharge damages, and certifying classes); *Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 671 (N.D. Cal. 2019) (holding that "plaintiffs have shown that damages are

calculable on a classwide basis" using conjoint analysis, and certifying classes).[18]

**(2)  Dr. Allenby demonstrated that conjoint analysis can determine the overcharge alleged in this case**

Dr. Greg Allenby, a highly regarded expert in conjoint analysis, was asked to conduct a conjoint analysis to measure the overcharge damages Plaintiffs allege— ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ (Allenby Decl. Ex. A1 at 2.) To do that,

Dr. Allenby ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ (*See id*. at 7.) ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ (*See*

*id.* at 25-26 (Table 10).) ████████████████████████████

---

[18] *See also Khoday v. Symantec Corp.*, 2014 WL 1281600, at *33 (D. Minn. Mar. 13, 2014) (holding that "damages are measurable on a classwide basis" through the use of conjoint analysis, and certifying class); *Clay v. CytoSport, Inc.*, 2018 WL 4283032, at *13 (S.D. Cal. Sept. 7, 2018) (holding that a conjoint analysis used to a measure price premium "is sufficient to meet Plaintiffs' burden to show that damages can be calculated on a class-wide basis" and certifying classes); *Price v. L'Oreal USA, Inc.*, 2018 WL 3869896, at *11 (S.D.N.Y. Aug. 15, 2018) (approving of conjoint analysis to calculate price premium, holding that "Plaintiffs have satisfied their burden of showing that an appropriately designed Conjoint Analysis can reliably estimate the economic value to consumers of the Challenged Claims," and certifying classes); *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 278 (E.D.N.Y. 2019) (certifying classes because "Plaintiffs identify a number of class-wide methods to quantify the alleged price premium," including conjoint analysis); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D.N.H. 2017) (holding that Plaintiffs' proposed conjoint analysis was capable of reliably calculating classwide, benefit-of-the-bargain damages, and certifying class).

45



(Allenby Decl. ¶ 4 (citing Allenby Decl. Ex. A1 at 25).)

      The U.S. airline market encompasses a variety of submarkets made up of different routes and fare classes, with different types of travelers. Thus, it was theoretically possible that differences between various submarkets (*e.g.*, routes with more frequent flyers), would have resulted in a MAX 8 overcharge for a submarket that was different than the MAX 8 overcharge calculated using the 2000 survey respondents. To test this, Dr. Allenby (*Id*. at 28.)[19]

(*Id.*)

[20] (Allenby Decl. ¶ 7; Ex. 74at 196:21-197:8, 271:18-272:14 (Allenby Dep.).)

---

[19] (Allenby Decl. ¶ 7; Allenby Decl. Ex. A1 at 28-29.)

[20]



(*Id.*)

(Ex. 78 at 40:13-41:5 (Gierke

Dep.).) Moreover, as Dr. Allenby explained,

(Ex. 74 at 273:12-276:13

(Allenby Dep.); Allenby Decl. ¶ 7; Allenby Decl. Ex. A2 at 6.)

### (3) Mr. Mills demonstrated that damages can be calculated with a straightforward formula

Using data produced by Southwest and American Airlines, Mr. Mills

(Mills Decl. Ex. M1 at 12-14

(Southwest); 17 (American).) He then

(Mills Decl. ¶ 6.)

(*Id.*) Thus,

using Dr. Allenby's results, data in fare databases, and a basic algebraic calculation, Mr. Mills will

be able to estimate not just the aggregate overcharge Defendants' conduct allowed, but also the

individual overcharge damages each class member sustained at the merits stage.

**(b)      Defendants' arguments cannot defeat class certification**

Defendants' attempt to exclude Plaintiffs' expert analysis (*see* Mot. to Exclude Allenby, Dkt. No. 253; Mot. to Exclude Mills, Dkt. No. 254) should be rejected, as we will demonstrate in opposing their motions. Moreover, Defendants' arguments cannot defeat class certification for two fundamental reasons.

*First*, to show that common issues predominate the damages inquiry at the class certification stage, Plaintiffs need only demonstrate (as they have above) that they have a damages model that fits the theory of injury and that is capable of determining classwide damages. *Comcast*, 569 U.S. at 35. Plaintiffs do not need to prove their damages—or prove that their experts are correct and Defendants' experts are wrong. Those matters go to the merits of the case, not to the issue of class certification. *EpiPen*, 2020 WL 1180550, at *24 ("At class certification, plaintiffs need not prove that a proposed method for determining damages is valid; instead, the proper inquiry at this stage asks whether damages are capable of proof on a classwide basis."); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019) ("[D]etermining which expert is correct is beyond the scope of this Motion. To determine whether class certification is appropriate, the Court is only concerned with whether the method itself is capable of showing [impact] to all, or nearly all of the Class members—not that it does in fact show that the injury occurred." (internal citation omitted; brackets in original); *Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *10 (E.D. Tex. Aug. 29, 2016) ("Defendants may disagree with the methodology or feel that another methodology is correct, but that does not make this methodology inconsistent with the Fund's theory of liability. Thus, any challenges Defendants have to this methodology are not proper at the class certification stage.").

*Second*, Defendants' criticisms do not demonstrate that Plaintiffs' methodologies are unsound or unreliable—they at most identify ways in which Plaintiffs' conjoint survey can be

improved.  For example, Defendants complain about the content of the information about the MAX

8 that was  presented to the survey participants. This can be dealt with by ████████████████

████████████████████████████ (Allenby  Decl.  Ex.  A2  at  8.)  As  another  example,

Defendants criticize Dr. Allenby for not directly accounting for submarkets made of up different

routes.  As mentioned above, this too can be addressed ████████████████████████████



████████ (Ex. 74 at 273:12-274:9, 275:5-276:13 (Allenby Dep.); *see* Allenby Decl. Ex. A2 at

6.) There is no valid or plausible criticism identified by Defendants that could not be addressed

simply by modifying the survey and collecting additional data. And, contrary to Defendants'

complaints, Plaintiffs are entitled to commission a further study and report from Dr. Allenby, with

the deadline for merits reports still many months away.

    **B.**    **Superiority**

    Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing superiority, a

court should consider the "class members' interests in individually controlling prosecution" of

"separate actions"; the litigation "already begun" by class members; the desirability of litigating

in the forum; and the "likely difficulties" of class action management. *Id.* This standard is met

here. The amount of overcharge is likely to be a small amount of money, making it unlikely and

unreasonable for an individual Plaintiff to prosecute a claim absent the class device. *See Vine*, 331

F.R.D. at 341. Indeed, the claims here are plainly "negative value" claims, meaning the cost of litigating them would exceed the amount recovered on an individual basis, and the existence of negative value claims is "the most compelling rationale for finding superiority in a class action." *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996). The other factors are met: there are no other actions asserted by class members; the forum is appropriate (Boeing Answer to FAC, Dkt. No. 191, ¶ 66; SWA Answer to FAC, Dkt. No. 192, ¶ 67); and there are no foreseeable difficulties in managing the class, as the redress would merely involve payments of the calculated overcharge amount determined at trial with little or no need for ongoing supervision by the Court.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Class Certification.

Dated: December 31, 2020

Respectfully submitted,

John Jeffrey Eichmann (CA 227472)
jeff@dovel.com
Gregory S. Dovel (CA 135387)
greg@dovel.com
Simon Franzini (CA 287631)
simon@dovel.com
Julien A. Adams (CA 156135)
julien@dovel.com
Jonas Jacobson (CA 269912)
jonas@dovel.com
Christin Cho (CA 238173)
christin@dovel.com
Rick Lyon (CA 229288)
rick@dovel.com
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Tel: (310) 656-7066

*Attorneys for Plaintiffs*

Elizabeth L. DeRieux (TX 05770585)
ederieux@capshawlaw.com
S. Calvin Capshaw (TX 03783900)
ccapshaw@capshawlaw.com

/s/ Yavar Bathaee
Yavar Bathaee (NY 4703443) (Lead Counsel)
yavar@bathaeedunne.com
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (TX 24081931)
egrauman@bathaeedunne.com
Andrew Wolinsky (NY 4892196)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel: (332) 205-7668

*Attorneys for Plaintiffs*

**CAPSHAW DERIEUX LLP**
114 E. Commerce
Gladewater, Texas 75647
Tel: (903) 236-9800
Fax: (903) 236-8787

*Attorneys for Plaintiffs*

## Certificate of Service

I certify that the above document was served on counsel of record for all parties on the above listed date via the ECF filing system.


*/s/ Yavar Bathaee*


## Certificate of Authorization to Seal

Under the Stipulated Protective Order entered by the Court (Dkt. No. 132), and in compliance with LR CV-5(7), I hereby certify that this document and any sealed attachments are properly filed under seal.


*/s/ Yavar Bathaee*