# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DAMONIE EARL, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action No.  4:19-cv-507 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| THE BOEING COMPANY, ET AL., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion to Compel Boeing to Produce Information Withheld Based on Annex 13 (Dkt. #203).  Having considered the Motion, the relevant pleadings, and the arguments of counsel, the Court finds it should be **GRANTED**.

## BACKGROUND

This case arises out of allegations made by Plaintiffs that Defendants The Boeing Company ("Boeing") and Southwest Airlines Co. ("Southwest") colluded to cover up fatal defects in Boeing's 737 MAX 8 aircraft and encourage public confidence to fly aboard these aircrafts while aware of the defects (Dkt. #165).  Defendants deny these allegations (Dkts. #191–92).

The current dispute concerns discovery to which Plaintiffs allege they are entitled. Plaintiffs assert that, throughout the discovery process, Boeing "has produced documents containing redactions that simply state that the redactions are made pursuant to 'Annex 13'" (Dkt. #203, Exhibit A at p. 2).  And according to Plaintiffs, with the exception of two documents (*see* Dkt. #203, Exhibit E at p. 2), "Boeing has never produced a log of documents it has withheld or redacted in its production" under this Annex 13 privilege (Dkt. #203, Exhibit A at p. 2).  Boeing does not deny these allegations and instead argues that Annex 13 precludes it from disclosing

otherwise discoverable material to Plaintiffs.  The Court heard arguments on the matter at an October 19, 2020 discovery hearing and subsequently permitted the parties to brief the issue.

On October 30, 2020, Plaintiffs filed their Motion to Compel Boeing to Produce Information Withheld Based on Annex 13 (Dkt. #203), currently before the Court.  On November 9, 2020, Boeing filed its response (Dkt. #225).  On November 13, 2020, Plaintiffs filed their reply (Dkt. #231).  On November 17, 2020, Boeing filed its sur-reply (Dkt. #234).  And on December 8, 2020, the Court held a hearing on the Motion (Dkt. #269).

## LEGAL STANDARD

Together with pretrial procedures, the tools of discovery serve to make trial "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."  *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).  Discovery conducted in a manner that identifies and narrows the relevant factual considerations is "of the utmost importance" in "our justice system" to "promot[e] . . . efficiency . . . and demonstrate[] a respect to the sacrifice a call to service imposes on a summoned jury."  *Weatherford Tech. Holdings, LLC v. Tesco Corp.*, No. 2:17-CV-00456-JRG, 2018 WL 4620634, at *3 (E.D. Tex. Apr. 27, 2018).  The Federal Rules of Civil Procedure govern discovery, operating to streamline the interparty exchange of information. The Rules are "liberally construed to encourage full and fair disclosure of the facts," *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13202145, at *3 (N.D. Tex. Sept. 14, 2011), *report and recommendation adopted in part*, 2011 WL 13201877 (N.D. Tex. Dec. 21, 2011), and a presumption exists in favor of broad disclosure, *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex. 2005).

Parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1).  Nonprivileged material is relevant when the request is reasonably calculated to lead to the discovery of admissible evidence.  *Id.*; *Crosby v. La. Health & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011).  Per the Court's scheduling order, the parties must produce all "documents containing, information 'relevant to the claim or defense of any party'" as part of their initial disclosure (Dkt. #52 at p. 4).  Moreover, the Local Rules provide further guidance, instructing that information is "relevant to any party's claim or defense [if] . . . it includes information that would not support the disclosing parties' contentions; . . . [or] . . . it is information that deserves to be considered in the preparation, evaluation or trial of a claim or defense."  E.D. TEX. LOCAL RULE CV-26(d).  It is well established that "control of discovery is committed to the sound discretion of the trial court."  *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 382 (5th Cir. 1987).

On notice to other parties and all affected persons, a discovering party may "move for an order compelling disclosure or discovery."  FED. R. CIV. P. 37(a)(1); *see Crosswhite v. Lexington Ins. Co.*, 321 F. App'x 365, 368 (5th Cir. 2009) ("A party may move to compel production of materials that are within the scope of discovery and have been requested but not received.").  The moving party bears the burden to show that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence.  *Exp. Worldwide, Ltd. v. Knight*, 241 F.R.D. 259, 263 (W.D. Tex. 2006).  Once the moving party establishes that the materials requested fall within the scope of discovery, the burden shifts to the nonmovant to show "how the requested discovery is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."  *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 580 (N.D. Tex. 2018).

Federal Rule of Civil Procedure 34 governs requests for the production of documents, electronically stored information, and tangible things.  This rule requires the nonmovant's responses to request for production to "either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." FED. R. CIV. P. 34(b)(2)(B).  "An objection [to the entire request] must state whether any responsive materials are being withheld on the basis of that objection."  FED. R. CIV. P. 34(b)(2)(C).  If there is an objection only to part of a Rule 34 request, the objection "must specify [which] part and permit inspection of the rest."  *Id.*

After responding to each request with specificity, the attorney must sign their request, response, or objection and certify that it is complete and correct to the best of the attorney's knowledge and that any objection is consistent with the Rules and warranted by existing law or a non-frivolous argument for changing the law.  FED. R. CIV. P. 26(g).  This rule "simply requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection."  FED. R. CIV. P. 26(g) advisory committee's note to 1983 amendment.

Moreover, even though Rule 26(b)(1) includes only "nonprivileged matter" within the proper scope of discovery, "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged," the party must "expressly make the claim" and "describe the nature of the documents, communications, or tangible things not produced or disclosed," doing so "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  FED. R. CIV. P. 26(b)(5)(A).  The party asserting a privilege "bears the burden of demonstrating its applicability."  *In re Santa Fe Intern. Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).

## ANALYSIS

The Court's opinion is broken down into three parts.  First, the Court addresses the applicability of the Chicago Convention and Annex 13 to the privilege Boeing claims.  Next, the Court turns to and examines the relevant statutes and regulations from which Boeing derives its purported privilege.  Finally, the Court evaluates various remaining arguments.

## I.     Domestic Enforceability of Treaty Obligations

Interspersed throughout the arguments of counsel are references to the Chicago Convention and Annex 13.  Plaintiffs maintain that these authorities do not affect the Court's analysis (Dkt. #203 at p. 17 n.3; Dkt. #269 at p. 5:7–22).  Boeing appears to agree only in part.  While also stating that the Chicago Convention and Annex 13 are non-self-executing (Dkt. #269 at pp. 26:19–27:2), Boeing nevertheless offers these documents as justification for the privilege it invokes (Dkt. #225 at p. 17; Dkt. #269 at pp. 30:17–25, 31:8–23).   Specifically, Boeing argues that Plaintiffs' interpretation of the relevant statutes and regulations "would prevent the NTSB from fulfilling the United States's obligations under the [Chicago] Convention" and that, "if the NTSB lacks the authority to prohibit the release of investigative information in connection with international accident investigations," the "United States's ability to meet its treaty obligations" would be threatened (Dkt. #225 at pp. 16–17).  But precisely because Annex 13 is non-self-executing, its provisions are not enforceable by law and cannot be considered by the Court.

### a.   Chicago Convention and Annex 13

Recognizing the existence of a "world lacking in uniform air-traffic rules and providing no adequate political or legal foundation for global flight," fifty-four nations convened in 1944 "to create a framework of international law and politics" for civil aviation.  Erwin Seago & Victor E. Furman, *Internal Consequences of International Air Regulations*, 12 U. Chi. L. Rev. 333, 333

5

(1945).  The conference delegates produced the Convention on International Civil Aviation (the "Convention"), which President Truman ratified on the Senate's advice and consent in 1946. Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 1212 [hereinafter Chicago Convention].[1]  The Convention took effect on April 4, 1947, and continues to govern nearly all global air transportation to this day.  *See Bd. of Cnty. Comm'rs of Dade Cnty., Fla. v. Aerolineas Peruanasa, S.A.*, 307 F.2d 802, 803 (5th Cir. 1962).

The Convention consists of ninety-six articles that delineate the regulatory standards of the international civil-aviation regime.  The drafters included language forming the International Civil Aviation Organization ("ICAO"), the "specialized agency of the United Nations" that "establish[es] standards for regulating international civil aviation."  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 26 n.8 (D.D.C. 2018), *aff'd*, 946 F.3d 607 (D.C. Cir. 2020).  As part of its duties under the Convention, ICAO "adopt[s] and amend[s] from time to time, as may be necessary, international standards and recommended practices and procedures" related to different matters of the Convention—most relevant here, for the "investigation of accidents."  Chicago Convention, *supra*, at 1187, 90–91.  The standards and recommended practices promulgated by ICAO are referred to as the annexes.  *See generally* Menachem Sheffy, *The Air Navigation Commission of the International Civil Aviation Organization—Part II: A Study of Its Functions and Powers and an Outline of Its Main Fields of Activity*, 25 J. AIR. L. & COM. 428, 428–37 (1958). In the event a signatory state

> finds it impracticable to comply in all respects with any such international standard or procedure, or to bring its own regulations or practices into full accord with any international standard or procedure after amendment of the latter, or which deems it necessary to adopt regulations or practices differing in any particular respect from those established by an international standard,

---

[1] The Convention on International Civil Aviation is known more commonly as the Chicago Convention.  *See Wardair Can., Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9–10 (1986).

the Convention requires that state to immediately notify ICAO "of the differences between its own practice and that established by the international standard."  Chicago Convention, *supra*, at 1191.

Together with the Convention, Annex 13 outlines the "procedures for aircraft accident and incident investigation."  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 26 n.8.  When an accident or incident involving the aircraft of a signatory state occurs in the territory of another signatory state, the state in which the event occurred—the State of Occurrence—"will institute an inquiry into the circumstances of the accident."  Chicago Convention, *supra*, at 1187; *see* INT'L CIV. AVIATION ORG., AIRCRAFT ACCIDENT AND INCIDENT INVESTIGATION, ANNEX 13 TO THE CONVENTION ON INTERNATIONAL CIVIL AVIATION 5-1 (11th ed. 2016) [hereinafter ANNEX 13].  Annex 13 entitles certain signatory states, depending on the circumstances giving rise to the investigation, to designate an individual, known as an "accredited representative," to "participat[e] in [the State of Occurrence's] investigation."  ANNEX 13, *supra*, at 1-1, 5-7.  Annex 13 authorizes, among others, the State of Design and the State of Manufacture to appoint an accredited representative.  *Id.* at 5-7; *see id.* at 1-3 (defining "State of Design" and "State of Manufacture").

Regarding information disclosure, Annex 13 prohibits the State of Occurrence from disclosing, except in specific circumstances, information and records related to the accident or incident for purposes unrelated to the investigation.  ANNEX 13, *supra*, at 5-5; *see id.* at 5-5 to -6 (elaborating on the nondisclosure provision).  And of particular significance to this litigation, Annex 13 prohibits the accredited representatives and "technical advisers" to an investigation from "divulg[ing] information on the progress and the findings of the investigation without the express consent of the State conducting the investigation."  *Id.* at 5-9.  *See generally* Paul Stephen Dempsey, *Independence of Aviation Safety Investigation Authorities: Keeping the Foxes from the*

*Henhouse*, 75 J. AIR L. & COM. 223, 230–41 (2010) (describing the Annex 13 framework comprehensively).

Following the Lion Air 737 MAX 8 accident in 2018 and the Ethiopia Air 737 MAX 8 accident in 2019, the United States, in its capacity as the State of Manufacture and State of Design for the 737 MAX 8 aircraft, appointed the NTSB as its accredited representative to the Annex 13 investigations led by the States of Occurrence—Indonesia and Ethiopia, respectively (Dkt. #225, Exhibit 1 at p. 2). The NTSB then proceeded to appoint Boeing as a technical adviser for both investigations (Dkt. #225, Exhibit 1 at p. 2). It is in its role as technical adviser to the NTSB that Boeing invokes Annex 13 to support the existence of the privilege asserted here (Dkt. #225 at pp. 7, 17).

### b.  Applicable Law

Treaties are "compact[s] between independent nations." *Head Money Cases*, 112 U.S. 580, 598 (1884); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations."). Just like the Constitution and "the Laws of the United States," "all Treaties made, or which shall be made, under the Authority of the United States" are "the supreme Law of the Land."[2] U.S. CONST. art. VI, cl. 2; *see* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 389–90 (Max Farrand ed., rev. ed. 1937) (striking the term "enforce treaties" from Article I, Section 8, Clause 15 as "superfluous since treaties were to be 'laws'"). Notwithstanding this constitutional reality, the federal judiciary plays a somewhat

---

[2] The Constitution vests the President with the power, "by and with the Advice and Consent of the Senate," to enter into treaties, "provided two thirds of the Senators present concur." U.S. CONST. art. II, § 2, cl. 2. The Framers structured the treaty-making authority this way to ensure "the best qualified for the purpose" would exercise this power "in the manner most conducive to the public good." THE FEDERALIST NO. 64, at 388 (John Jay) (Clinton Rossiter ed., 1961).

different role regarding the interpretation of treaties than when expounding upon other sources of law.

To be certain, Article III tribunals at all times retain the "judicial Power," U.S. CONST. art. III, § 1, which "necessarily extends to the independent determination of all questions, both of fact and law," *Crowell v. Benson*, 285 U.S. 22, 60 (1932).   But as opposed to standard domestic law, the enforcement of treaties has historically depended "on the interest and the honor of the governments which are parties." *Head Money Cases*, 112 U.S. at 598; *see* Carlos Manuel Vázquez, *Treaties as Law of the Land: The Supremacy Clause and the Judicial Enforcement of Treaties*, 122 HARV. L. REV. 599, 605 (2008) ("At the time of the Framing of the Constitution, the mechanisms for enforcing treaties were primarily diplomacy and, as a last resort, war.").   Consequently, the judicial power does not stretch to each and every treaty because "not all international law obligations automatically constitute binding federal law enforceable in United States courts." *Medellín v. Texas*, 552 U.S. 491, 504 (2008).[3]   Simply put, "[n]ot all treaties are created equal in terms of enforceability." *Republic of Marsh. Is. v. United States*, 865 F.3d 1187, 1190 (9th Cir. 2017).

The Supreme Court has "long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." *Medellín*, 552 U.S. at 504. When a treaty "operates of itself without the aid of any legislative provision," it is self-executing, meaning it is "equivalent to an act of the legislature." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 254 (1829), *overruled on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833).   By

---

[3] While domestic obligations pursuant to international law may arise outside of the Treaty Clause process, neither party characterizes the Convention or Annex 13 as an executive agreement or part of customary international law.  *See* Curtis A. Bradley, Chevron *Deference and Foreign Affairs*, 86 VA. L. REV. 649, 657–59 (2000).  Therefore, the Court does not address these categories of international law.

contrast, when a treaty "does not evince such executory intentions," it is "non-self-executing, and does not take force absent an implementing statute." *Cardenas v. Stephens*, 820 F.3d 197, 202 n.5 (5th Cir. 2016) (citing *Medellín*, 552 U.S. at 505).  "In sum, while treaties 'may comprise international commitments[,] they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing" and is ratified on these terms.'" *Medellín*, 552 U.S. at 505 (ellipsis omitted) (quoting *Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)).

The distinction between self-executing and non-self-executing treaties is legally significant.  Non-self-executing treaties do not "'give rise to domestically enforceable federal law' absent 'implementing legislation passed by Congress,'" *Bond v. United States*, 572 U.S. 844, 851 (2014) (citing *Medellín*, 552 U.S. at 505 n.2), and with no law to expound upon, federal courts have no role to play.  But when a treaty "contains stipulations which are self-executing," federal courts exercise their Article III power since the treaty has "the force and effect of a legislative enactment."  *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *see Sanchez-Llamas v. Oregon*, 548 U.S. 331, 353–54 (2006) ("If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' . . . ." (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))).  Determining whether a treaty is self-executing is effectively synonymous with establishing whether an international-law obligation constitutes law American courts are bound to enforce.

To determine whether a treaty provision is self-executing, the Court uses the framework the Supreme Court outlined in *Medellín*.  *Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 734 (5th Cir. 2009) (en banc) (Clement, J., concurring in the judgment).  Just as with statutory interpretation, interpreting treaties begins with "the text of the

treaty and the context in which the written words are used." *Air Fr. v. Saks*, 470 U.S. 392, 397 (1985).  "The text of a treaty must be 'interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose.'" *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638 (5th Cir. 1994); *see Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 163 (1940) (affirming the "accepted canon" that treaties must be construed "liberally" to effectuate "the purpose[s] which animate[]" them). At all times, courts must remain vigilant to avoid "alter[ing], amend[ing], or add[ing]" to the language of a treaty, for doing so would be "an usurpation of power, and not an exercise of judicial functions." *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821); *id.* ("It would be to make, and not to construe a treaty.").  And while "[c]ourts often speak to whether a treaty as a whole is self-executing," this inquiry is "best understood as requiring an assessment of whether *the particular treaty provision at issue* is self-executing."  RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 310 cmt. b (AM. L. INST. 2018) (emphasis added) (citing *United States v. Postal*, 589 F.2d 862, 884 n.35 (5th Cir. 1979)).

### c.   Analysis

Annex 13 cannot and does not influence the Court's analysis because Annex 13 is non-self-executing and, therefore, is not enforceable domestic law.[4]  Annex 13's standards and recommended practices are adopted by the ICAO Council and ratified by the ICAO Assembly. Chicago Convention, *supra*, at 1197, 1205.  In no way does this process create a binding obligation

---

[4] While the parties agree the Convention is non-self-executing, courts have analyzed various articles of the Convention and disagree with the parties' general position.  *See Medellín*, 552 U.S. at 575 app. B (Breyer, J., dissenting); *British Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153, 1161 (D.C. Cir. 1981) (Article 33); *Ricart v. Pan Am. World Airways, Inc.*, No. 89-0768, 1990 WL 236080, at *3 (D.D.C. Dec. 21, 1990) (Article 13); *Aerovias Interamericanas De Pan., S.A. v. Bd. of Cnty. Comm'rs of Dade Cnty., Fla.*, 197 F. Supp. 230, 248 (S.D. Fla. 1961) (Article 15), *rev'd sub nom. on other grounds Bd. of Cnty. Comm'rs of Dade Cnty., Fla. v. Aerolineas Peruanasa, S.A.*, 307 F.2d 802 (5th Cir. 1962).  *But see* Anthony J. Broderick & James Loos, *Government Aviation Safety Oversight—Trust, But Verify*, 67 J. AIR L. & COM. 1035, 1039 (2002) ("[T]he Convention is not a self-executing document.").

for federal courts to enforce the terms of Annex 13.  The Convention became effective per the Treaty Clause, having been made by the President and ratified by the Senate.  *See id.* at 1212.  By contrast, the ICAO Council, not the President, forges the text of Annex 13, and the Senate has never ratified any version of Annex 13.  Therefore, Annex 13 cannot give rise to binding obligations under domestic law.  *See Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 340 (S.D.N.Y. 2013) ("[I]nternational obligations enacted pursuant to treaties . . . do not give rise to rights under domestic law absent an implementing statute or self-executing terms . . . .").[5] Consequently, the only way any aspect of Annex 13 could constitute an enforceable legal obligation is if Congress enacted an implementing statute.  Congress has not done so.  *See* PAUL STEPHEN DEMPSEY, PUBLIC INTERNATIONAL AIR LAW 53 (2008) (stating that annexes to the Convention are non-self-executing); John Cobb Cooper, *The Chicago Convention—After Twenty Years*, 19 U. MIAMI L. REV. 333, 338 (1965) (same).  Just as the parties stated at the December 8, 2020 hearing, the Court finds Annex 13 to be non-self-executing and, therefore, nonbinding as legal authority.

In spite of this consensus, Boeing puzzlingly insists the dynamics of Annex 13 should influence the Court's analysis because these standards and recommended practices "are the way that international investigations are conducted" (Dkt. #269 at p. 30:19–20).  Even if Annex 13 represents the optimal approach for the United States to take regarding aircraft investigations,

---

[5] Further, even if the Court assumed the Convention were a wholly self-executing treaty, the Convention's text confirms the non-binding nature of Annex 13's standards and recommended practices.  The plain and ordinary meaning of Article 26's language indicates that any aircraft investigation must conform to the standards and recommended practices (found in Annex 13) *only as far as the State of Occurrence's domestic law allows*.  *See* Chicago Convention, *supra*, at 1187; *see also id.* at 1191 (allowing any signatory state to diverge from ICAO's standards and recommended practices related to aircraft investigations if that state "finds it impracticable to comply in all respects with any such international standard or procedure").  So even if Article 26 is self-executing, the Convention's drafters did not impose particular investigatory procedures on the signatory states.  *See* Peter Martin, *Death and Injury in International Air Transport*, 41 J. AIR L. & COM. 255, 259–60 (1975); *see also Olympic Airways v. Husain*, 540 U.S. 644, 651 (2004) (noting courts' "responsibility to read . . . treat[ies] in a manner 'consistent with the shared expectations of the contracting parties'" (quoting *Saks*, 470 U.S. at 399)).

Annex 13 remains non-self-executing and cannot "itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). Article III proscribes the Court from considering the provisions of Annex 13 in any fashion because "[i]nternational-law norms that have not been incorporated into domestic U.S. law by the political branches are not judicially enforceable." *Al-Bihani v. Obama*, 619 F.3d 1, 9 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc); *see id.* at 34 (finding "no persuasive evidence" to show "Congress would want a court to alter its interpretation of a statute based on a non-self-executing treaty"). The argument Boeing offers could persuade Congress or the President to give effect to the provisions of Annex 13 in some form or fashion—but as of now, Annex 13's standards and recommended practices are nothing more than "international law commitments" and do not "function as binding federal law." *Medellín*, 552 U.S. at 504 (majority opinion). Therefore, the Court cannot consider the language of Annex 13 in its analysis.

## II. Statutory Construction and *Chevron* Deference

The crux of the dispute before the Court concerns the parties' conflicting interpretations of the statutes governing the NTSB. Generally speaking, Boeing argues that the statutory scheme enacted by Congress and the corresponding regulations promulgated by the NTSB "specifically prevent Boeing's disclosure of the relevant information in civil litigation" (Dkt. #225 at p. 6). In response, Plaintiffs counter that the statutory scheme cannot allow the privilege Boeing claims to exist and that the Court should overrule "Boeing's objections to producing relevant information" (Dkt. #203 at p. 5).

### a. Existing Regulatory Scheme

Congress created the NTSB to facilitate increased levels of safety throughout the American transportation infrastructure, initially placing the NTSB within the Department of Transportation

as an independent agency.  Department of Transportation Act of 1966, § 5, 80 Stat. 931, 935–37.

Later concluding that no agency could perform this function properly unless "totally separate and

independent from any other department, bureau, commission, or agency," H.R. REP. NO. 93-1589,

at 13 (1974), Congress reestablished the NTSB as an independent agency outside the Department

of Transportation.  *See* Transportation Safety Act of 1974, Pub. L. No. 93 633, tit. III, § 303(a), 88

Stat. 2156, 2167; *see also* 49 U.S.C. § 1111(a) ("The National Transportation Safety Board is an

independent establishment of the United States Government.").  Today, the NTSB's primary

functions are "investigating airplane accidents, determining the probable cause of accidents, and

making recommendations to help protect against future accidents."  *Chiron Corp. & PerSeptive*

*Biosystems, Inc. v. NTSB*, 198 F.3d 935, 937 (D.C. Cir. 1999).

Congress specifically tasks the NTSB with investigating and "establish[ing] facts,

circumstances, and cause or probable cause" of aircraft accidents over which the NTSB has

investigative authority.   49 U.S.C. § 1131(a)(1)(A).   Most relevant here, the NTSB must

investigate any accident involving "civil aircraft," which is statutorily defined as "any contrivance

invented, used, or designed to navigate, or fly in, the air," excluding "public aircraft."  *Id.*

§ 1132(a)(1)(A); *see id.* §§ 1101, 40102(a)(6), (16).  Subject to specific exceptions, the NTSB's

authority to conduct these investigations takes priority "over any investigation by another

department, agency, or instrumentality of the United States Government."  *Id.* § 1131(a)(2)(A).

The NTSB's governing statutes sketch the general requirements by which the agency must abide

in fulfilling its congressional mandates.  *See id.* §§ 1111–19.

Two statutory sections are specifically relevant to the matter at hand.  First, § 1114 governs

the disclosure, availability, and use of information pertaining to NTSB-related activities.  Section

1114 starts with its general instruction:  "[A] copy of a record, information, or investigation

14

submitted or received by the National Transportation Safety Board, or a member or employee of the Board, shall be made available to the public on identifiable request and at reasonable cost." *Id.* § 1114(a)(1).  From there, the statute outlines exceptions to § 1114(a)(1), *i.e.*, situations in which the statute's general disclosure requirement is not entirely applicable.  *See, e.g.*, *id.* ("This subsection does not require the release of information described by section 552(b) of title 5 or protected from disclosure by another law of the United States."); *see also id.* § 1114(b)–(e), (g). Section 1114(f) is an exception to § 1114(a)(1)'s directive, exempting the NTSB and agencies receiving information from the NTSB from disseminating "records or information related to [their] participation in foreign aircraft accident investigations."  *Id.* § 1114(f)(1).   Finally, within § 1114(f)(1), Congress enacted exceptions to the subsection's nondisclosure requirements.  *See id.* § 1114(f)(1)(A)–(B).

Then there is § 1113, which governs the NTSB's administrative actions and lists specific powers and responsibilities the NTSB has when conducting statutorily authorized investigations. *See id.* § 1113(a)–(e).  Critically here, Congress authorized the NTSB to "prescribe regulations to carry out this chapter."  *Id.* § 1113(f).

Citing § 1113(f) as the enabling statute, the NTSB recently revised the regulations governing the agency's procedures for accident investigations.  Investigation Procedures, 82 Fed. Reg. 29,670, 29,685–90, June 29, 2017 (codified at 49 C.F.R. pt. 831).  Unless specified by the NTSB, these procedures apply to all investigations "conducted under its statutory authority."  49 C.F.R. § 831.1(a).   The regulations provide that the NTSB is the "agency that fulfills the obligations of the United States under Annex 13[] in coordination with and consistent with the requirements of the United States Department of State," participating "as the accredited representative to an international investigation" in most circumstances.  *Id.* § 831.22(b)(1)–(2).

"Once designated the accredited representative" in a foreign aircraft investigation, the NTSB may appoint one or more "technical advisers" to assist during the investigation.  *Id.* § 831.22(c).  Technical advisers "[w]ork at the direction and under the supervision of the NTSB accredited representative" and "[a]re subject to the provisions of [49 C.F.R.] § 831.13 . . . while working under the supervision of the NTSB accredited representative."  *Id.* § 831.22(c)(1)–(2).  Section 831.13 prohibits "[p]arties," except as otherwise provided, "from releasing information obtained during an investigation at any time prior to the NTSB's public release of information."  *Id.* § 831.13(c); *see id.* § 831.13(c)(1)–(4) (listing the exceptions); *id.* § 831.13(a) (indicating to which information § 831.13 applies).  Section 831.22 concludes in relevant part by stating the "NTSB's disclosure of records of a foreign investigation is limited by statute (49 U.S.C 1114(f))."  *Id.* § 831.22(e).

### b.  Statutory-Interpretation Framework

Plaintiffs and Boeing contend the *Chevron* framework should govern the Court's analysis (Dkt. #203 at p. 12; Dkt. #225 at p. 11).  *See Nevada v. U.S. Dep't of Lab.*, 275 F. Supp. 3d 795, 804 (E.D. Tex. 2017) ("The Supreme Court established in *Chevron* a two-step standard for reviewing agency decisions." (citing *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842–43 (1984))).  While the Court ultimately agrees with the parties, it is crucial for courts to apply the *Chevron* framework "reflective[ly], not reflexive[ly]."  *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019); *see City of Arlington, Tex. v. FCC*, 569 U.S. 290, 310 (2013) (Breyer, J., concurring in part and concurring in the judgment) ("The question whether Congress has delegated to an agency the authority to provide an interpretation that carries the force of law is for the judge to answer independently.").  Inquiring as to the appropriate statutory-interpretation framework is particularly important here since Boeing attributes its nondisclosure of the Annex 13

16

discovery material in significant part to specific directives from the NTSB—directives which the agency bases on its interpretation of the statutes at issue (Dkt. #269 at p. 27:22–23; *see* Dkt. #225, Exhibits 1–3; Dkt. #243, Exhibit 1).  As Plaintiffs state, the Court must decide "whether the NTSB, by letter demand or otherwise, has the legal authority to preclude the production of relevant information held by Boeing in this lawsuit" (Dkt. #231 at p. 3).

Without question, if after "a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue," the statutory text controls.  *Chevron*, 467 U.S. at 843 n.9.  But when such is not the case, a court must determine whether Congress "would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001).  In other words, an agency's interpretation of a statute is not automatically entitled to *Chevron* deference.  *See Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013).  Courts afford this level of deference only as a consequence of congressional delegation of authority.  *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990); *see AKM LLC dba Volks Constructors v. Sec'y of Lab.*, 675 F.3d 752, 765 (D.C. Cir. 2012) (Brown, J., concurring) ("What makes an agency's interpretation of a provision special is that Congress has manifested its intent that the agency's interpretation of that provision *be* special.").

"The fair measure of deference to an agency" varies with the circumstances of each case. *Mead*, 533 U.S. at 228.  To determine the appropriate level of deference owed to an agency, courts look to "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."  *Id.* (footnotes omitted); *see, e.g.*, *United States v. Harmon*, No. 19-CR-395 (BAH), 2020 WL 7668903, at *7–9 (D.D.C. Dec. 24, 2020).  "*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally

to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 558 (2012) (quoting *Mead*, 533 U.S. at 226–27); *see WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1188 (10th Cir. 2013) ("Whether *Chevron* applies 'depends in significant part upon the interpretive method used and the nature of the question at issue.'" (quoting *Barnhart v. Walton*, 535 U.S. 212, 222 (2002))).  When an agency's interpretation "has no claim to judicial deference," it remains "eligible to claim respect according to its persuasiveness."  *Mead*, 533 U.S. at 221; *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

In this case, certain factors counsel against *Chevron* deference.  For instance, a justification the *Chevron* Court offered to support its decision was the political accountability of agencies.  *See Chevron*, 467 U.S. at 865–66.  Yet this rationale is not fully present here.  Congress structured the NTSB as an independent bureaucratic entity to limit the agency's accountability to the political branches.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–95 (2010); *see also* Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2273–74, 2372–77 (2001) (suggesting a more limited form of deference for independent agencies' interpretations of statutes on political-accountability grounds).  Another explanation undergirding *Chevron* is the superior expertise agencies possess in their respective regulatory fields.  *See Chevron*, 467 U.S. at 865.  While the NTSB certainly possesses "expertise in areas outside the conventional experience of judges," *Gaunce v. deVincentis*, 708 F.2d 1290, 1292 (7th Cir. 1983) (per curiam), it far from clear that the NTSB is any more expert in matters of information disclosure than are courts, *see Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019).  Further, under *Chevron*, it is "'a matter of the courts,' not agencies," to reconcile "distinct statutory regimes" because "[a]n agency eager to advance its statutory mission" might "seek to diminish [a] second statute's scope in favor of a

18

more expansive interpretation of its own." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) (quoting *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 685–86 (1975)).  The NTSB regulations at issue in this case conceivably encroach upon the statutory domain of the Federal Aviation Administration.  *See, e.g.*, 49 U.S.C. §§ 40101(e), 40104(b), 40105.

Nevertheless, the NTSB's interpretation of the statutes in Chapter 11 of Title 49 most likely warrants *Chevron* deference.  Courts defer to an agency's understanding of a statutory provision under *Chevron* "only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006) (quoting *Mead*, 533 U.S. at 226–227).  By authorizing the NTSB to "prescribe regulations to carry out this chapter," Congress appears to have delegated this authority to the NTSB.  *See* 49 U.S.C. § 1113(f).  As well, in the process of its notice-and-comment rulemaking, the NTSB cited § 1113(f) for the authority to promulgate the regulations Boeing invokes, which is a "'very good indicator' that Congress intended the regulation to carry the force of law." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Mead*, 533 U.S. at 229–30); *see Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 467 (D.C. Cir. 2007) ("Although publication in the federal register is not in itself sufficient to constitute an agency's intent that its pronouncement have the force of law, where . . . publication reflects a deliberating agency's self-binding choice, as well as a declaration of policy, it is further evidence of a *Chevron*-worthy interpretation." (citation omitted)).

While the Court understands the NTSB letters put Boeing in a precarious position here, *Chevron* does not allow the Court to consider these letters until the Court "determines Congress

has not directly addressed the precise question at issue." 467 U.S. at 843. After independently

concluding *Chevron* deference is appropriate here, the Court proceeds accordingly.

### c. *Chevron* Analysis

The *Chevron* framework "is rooted in a background presumption of congressional

intent"—if a statute contains a gap to be filled, Congress desired the agency administering the

statute, rather than the courts, to resolve this gap. *City of Arlington*, 569 U.S. at 296 (majority

opinion). Under *Chevron*, courts first determine "whether Congress has 'directly spoken to the

precise question at issue,' and if so, whether it has unambiguously foreclosed the agency's

statutory interpretation." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (per

curiam) (citation omitted) (quoting *Chevron*, 467 U.S. at 842). "[I]f the intent of Congress is clear,

that is the end of the matter." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233

(1986) (citing *Chevron*, 467 U.S. at 843). Courts "rely on 'the conventional standards of statutory

interpretation'—*i.e.*, 'text, structure, and the overall statutory scheme'—as well as 'authoritative

Supreme Court decisions'" to evaluate statutes at *Chevron*'s initial step. *Sw. Elec. Power Co. v.*

*EPA*, 920 F.3d 999, 1023 (5th Cir. 2019) (quoting *Chamber of Com. v. U.S. Dep't of Lab.*, 885

F.3d 360, 369 (5th Cir. 2018)). If a court determines Congress directly spoke to the precise

question at issue, then no deference is owed to the agency's interpretation, and "the plain meaning

of the statute applies, whatever it is." *Adkins v. Silverman*, 899 F.3d 395, 401 (5th Cir. 2018); *see*

*NLRB v. Alt. Ent., Inc.*, 858 F.3d 393, 417 (6th Cir. 2017) (Sutton, J., concurring in part and

dissenting in part) (explaining that when Congress speaks directly, "*Chevron* leaves the stage").[6]

---

[6] Unfortunately for courts, "no metric for clarity" exists to interpret statutes. Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 62 (1988). But because the Constitution commits Article III tribunals to say what the law is, the Court must dutifully and exhaustively apply the conventional tools of statutory construction to determine if Congress has directly spoken to a precise question, even when an unambiguous answer is less than explicit. *See Forrest Gen. Hosp.*, 926 F.3d at 228 ("Under bedrock separation-of-powers principles, Article III courts need not—indeed *must* not—outsource their constitutionally assigned interpretive duty to Article II agencies when the Article I Congress has spoken clearly.").

But if Congress has not spoken directly to the precise question at issue, courts proceed to "the second step of *Chevron* and assess[] 'whether the agency interpretation is a permissible construction of the statute.'" *W. Ref. Sw., Inc. v. FERC*, 636 F.3d 719, 723 (5th Cir. 2011) (quoting *La. Env't Action Network v. EPA*, 382 F.3d 575, 581–82 (5th Cir. 2004)); *see SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (explaining that courts proceed to *Chevron* step two only if "unable to discern Congress's meaning").   As phrased in *Chevron*, if a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."   467 U.S. at 842–43.  "A permissible construction is one that 'reasonably accommodates conflicting policies that were committed to the agency's care by the statute.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (cleaned up) (quoting *Chevron*, 467 U.S. at 845).  An "agency's view 'governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts.'" *Coastal Conservation Ass'n v. U.S. Dep't of Com.*, 846 F.3d 99, 106 (5th Cir. 2017) (emphasis omitted) (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)).  As long as an agency's interpretation "reasonably resolves a genuine statutory ambiguity, then it deserves *Chevron* deference." *Garcia v. Barr*, 969 F.3d 129, 132 (5th Cir. 2020).

### i.  Step One

The issue in this case is whether Congress has shielded private parties (like Boeing) from disclosing information received in the course of a foreign aircraft investigation.  At *Chevron*'s first step, the Court looks to see if Congress has spoken to this precise question.  Congress directly addressed the issue in this case in 49 U.S.C. § 1114(f).

As in all statutory-interpretation cases, the Court begins with the text of the law.  *Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020).  To restate, § 1114(f) reads, in relevant part:

> **(f) Foreign investigations.—**
> **(1) In general.—**Notwithstanding any other provision of law, neither the Board, nor any agency receiving information from the Board, shall disclose records or information relating to its participation in foreign aircraft accident investigations . . . .

49 U.S.C. § 1114(f)(1).  Courts interpret statutes "according to their plain meaning," *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047 (5th Cir. 2012) (citing *Gaddis v. United States*, 381 F.3d 444, 472 (5th Cir. 2004)), because "deference to the supremacy of the Legislature, as well as recognition that [c]ongressmen typically vote on the language of a bill, generally requires [courts] to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used,'" *United States v. Locke*, 471 U.S. 84, 95 (1985) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)).  As such, the Court interprets § 1114(f)'s language according to its plain meaning and "give[s] undefined words 'their ordinary, contemporary, common meaning.'"  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (quoting *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003)).

In § 1114(f)(1), Congress explicitly identified the subjects of its command—"the Board" and "any agency receiving information from the Board."  49 U.S.C. § 1114(f)(1).  One of the subjects is easy to identify, as "the Board" is statutory shorthand for the NTSB.  *See id.* § 1114(a), (f)(1).  The statute does not define "agency," however.  The common meaning of "agency" is "a person or thing through which power is exerted or an end is achieved."  *Agency*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1172 (1993).[7]

---

[7] "The Court interprets statutory language 'consistently with its ordinary meaning at the time Congress enacted the statute.'"  *Swanston v. City of Plano, Tex.*, No. 4:19-CV-412, 2020 WL 7080817, at *6 n.7 (E.D. Tex. Dec. 3, 2020) (brackets omitted) (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018)).  Congress originally

But "statutory words are often known by the company they keep," *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018), and linking "the Board" and "agency" with the correlative-conjunction pairing of "neither" and "nor" sheds light on the meaning of "agency" in this context.  *See United States v. Koutsostamatis*, 956 F.3d 301, 306–07 (5th Cir. 2020) (detailing the *noscitur a sociis*, or associated-words, canon).[8]  When applying the associated-words canon, the Fifth Circuit instructs courts to locate "the 'common quality' in a list" because "the focus of the inquiry 'should be its most general quality—the least common denominator, so to speak— relevant to the context.'"  *In re Crocker*, 941 F.3d 206, 219 (5th Cir. 2019) (cleaned up) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 196 (2012)).  Here, as the more specific statutory term, "the Board" limits the definitional scope of "agency."  In examining the term "the Board" and searching for the broadest commonality it shares with "agency," the Court finds the most relevant general quality to be the NTSB's nature as an entity within the federal bureaucracy.  This "common feature" of the "gather[ed]" statutory terms allows the Court "to extrapolate" and contextually define "agency" as such.  *S.D. Warren Co., v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 379–80 (2006); *see Federal Agency*, BLACK'S LAW DICTIONARY 63 (7th ed. 1999) ("A department or other instrumentality . . . of the federal government").  Furthermore, reading the statutory language in this organic fashion "avoid[s]

---

enacted § 1114(f) in 1996.  National Transportation Safety Board Amendments of 1996, Pub. L. No. 104-291, § 102, 110 Stat. 3452, 3452.

[8] Because the general term "agency" follows the more specific term "the Board" in § 1114(f)(1), the *ejusdem generis* canon is also applicable, which dictates that "the general term should be understood as a reference to subjects akin to the one with the specific enumeration."  *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991); *see United States v. Buluc*, 930 F.3d 383, 388–89 (5th Cir. 2019) (detailing the *ejusdem generis* canon).  While *noscitur a sociis* applies with greater frequency because "*ejusdem generis* is only properly applied when interpreting a specific-to-general sequence of words," these canons "often work in tandem [and] . . . 'produce identical results in most situations.'"  *Koutsostamatis*, 956 F.3d at 307 n.2 (quoting 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:16 (7th ed.)).  Applying these canons to § 1114(f)(1) yields the same result; therefore, the Court focuses on the *noscitur a sociis* principle.  *See, e.g.*, *Wash. Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003).

ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'"  *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).[9]

Having determined the appropriate definition of "agency" for purposes of § 1114(f), the Court is unable to see how Boeing qualifies as an "agency" under § 1114(f)(1).  Neither party contests that Boeing has "receiv[ed] information from the Board"—but Boeing is "a private company," not an entity within the federal bureaucracy (Dkt. #203 at p. 14).  By its terms, § 1114(f) applies only to the NTSB and "any agency receiving information from" the NTSB.  Looking only to § 1114(f)'s text, the Court cannot detect any indication that Congress meant to include an entity like Boeing within the scope of § 1114(f).

But exclusively examining the statutory provision at issue is not enough—"the meaning of statutory language, plain or not, depends on context."  *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *see Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) ("Courts have a 'duty to construe statutes, not isolated provisions.'" (quoting *Gustafson*, 513 U.S. at 568)).  Ascertaining the plain meaning of § 1114(f) requires the Court to examine "the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  This is so because "reasonable statutory interpretation must account for both 'the specific context in which language is used' and 'the broader context of the statute as a whole,'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)), and any interpretation

---

[9] Plaintiffs urge another—albeit less compelling—approach to define the term "agency" (Dkt. #203 at pp. 13–14). Section 1113(b)(1)(A) grants the NTSB authority to "procure the temporary or intermittent services of experts or consultants" as an "agency" pursuant to 5 U.S.C. § 3109(b).  49 U.S.C. § 1113(b)(1)(A).  For purposes of 5 U.S.C. § 3109, an "agency" is one of nine types of entities delineated in 5 U.S.C. § 5721(1)(A)–(I).  5 U.S.C. § 3109(a)(1). As a private company, Boeing would not qualify as an "agency."  *See* S. REP. NO. 104-324, at 9 (1996); H.R. REP. NO. 104-682, at 3–4 (1996).  While this rationale is not as strong as the one the Court details, these analytical paths share something in common—an end result finding that Boeing is not an "agency" for purposes of § 1114(f).

"'inconsistent with the design and structure of the statute as a whole' does not merit deference," *id.* (citation and brackets omitted) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)).  Nevertheless, the Court proceeds with caution, for relying on "context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.'"  *King v. Burwell*, 576 U.S. 473, 498 (2015) (quoting *Palmer v. Massachusetts*, 308 U.S. 79, 83 (1939)).

Scrutinizing subsection (f) in the context of § 1114 bolsters the Court's understanding that Congress did not intend to shield private parties from disclosing information they receive in the course of a foreign aircraft investigation.  The *expressio unius* canon proves particularly helpful in elucidating the statute's meaning.  *See Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 80–81 (2002) (detailing the *expressio unius* canon).  *Expressio unius* stands for the commonsense idea that the "[e]xpression of the one is exclusion of the other."  Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION 3, 25 (Amy Gutmann ed., 1997).  Although this canon is sometimes inapplicable because "[n]ot every silence is pregnant," *Ill. Dep't of Pub. Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983), *expressio unius* normally does nothing more than clarify that "expressing one item of a commonly associated group or series excludes another left unmentioned," *United States v. Vonn*, 535 U.S. 55, 65 (2002).  *See, e.g.*, *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health."); *see also* SCALIA & GARNER, *supra*, at 107 ("Context establishes the conditions for applying [*expressio unius*].").

That is exactly how *expressio unius* functions here—applying this canon to § 1114 further clarifies Congress's statutory design.   Section 1114 singles out the primary subject of the disclosure requirements: the NTSB.  The law's general provision specifically directs its command at the NTSB and requires the agency to make all "record[s], information, [and] investigation[s]" it receives or submits "available to the public."  49 U.S.C. § 1114(a)(1).[10]  In the subsections that follow, Congress created exceptions to § 1114(a)(1)'s directive, and in doing so, precisely identified to whom these exceptions apply.  *See id.* § 1114(b)(1), (c)–(d), (e)(2)–(3), (f)(1)(A)–(B), (f)(2), (g) (the NTSB); *id.* § 1114(b)(3), (f)(1) (the NTSB or any agency receiving information from the NTSB).  To Boeing's chagrin, private parties are not listed among the statute's subjects, and *expressio unius* strongly indicates to the Court that Congress intended this result.

Employing *expressio unius* in this manner aligns with Fifth Circuit precedent.  In *Cazorla v. Koch Foods of Mississippi, L.L.C.*, the Fifth Circuit faced an analogous question regarding the applicability of statutory-disclosure requirements.  *See* 838 F.3d 540 (5th Cir. 2016).  There, the plaintiffs, Hispanic employees of defendant Koch Foods ("Koch"), filed suit against their employer, alleging on-the-job harassment and abuse.  *Id.* at 544–45.   Believing plaintiffs manufactured these allegations to obtain U visas, Koch sought discovery of plaintiffs' "U visa-related information" from the plaintiffs *and* the EEOC.  *Id.* at 546.  Both refused Koch's demand, leading Koch to file a motion to compel.  *Id.*  Ruling on Koch's motion, the district court determined that the applicable law, "8 U.S.C. § 1367 and its implementing regulation," barred the EEOC—but *not* the plaintiffs—from "revealing any information related to the [plaintiffs'] U visa applications" in discovery.  *Id.*; *see* 8 U.S.C. § 1367(a)(2); 8 C.F.R. § 214.14(e)(2).

---

[10] Section 1114(a)(1) also applies to the records, information, and investigations submitted or received by "a member or employee of the [NTSB]."  49 U.S.C. § 1114(a)(1).  Because the NTSB controls the disclosure of information by affiliated personnel, *see* 49 C.F.R. pts. 835, 837, the Court considers any "member or employee of the Board" part of the NTSB for purposes of § 1114.

On appeal, the Fifth Circuit affirmed the district court's interpretation of the disclosure statute. *Cazorla*, 838 F.3d at 554. Writing for the panel, Judge Higginbotham found, as a matter of law, the language of 8 U.S.C. § 1367 "clearly" and "unambiguous[ly]" did not preclude U visa-related discovery from the plaintiffs because the statute "applies only to certain enumerated government officials, and says nothing about whether other individuals may disclose U visa information." *Id.* at 552; *see St. Regis Paper Co. v. United States*, 368 U.S. 208, 217–18 (1961) ("[T]he prohibitions against disclosure . . . run only against the officials receiving such information and do not purport to generally clothe [the] information with secrecy."). Therefore, the statute could not be read "to preclude such disclosure," *Cazorla*, 838 F.3d at 552, for "[w]here Congress explicitly enumerates certain exceptions, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent," *id.* at 552 n.35 (ellipsis and internal quotation marks omitted) (quoting *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980)). *See Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016) ("Absent persuasive indications to the contrary, [courts] presume Congress says what it means and means what it says.").

Just as in *Cazorla*, § 1114 applies only to certain government agencies and says nothing about whether other entities—like Boeing—are subject to the strictures of § 1114 during a foreign aircraft investigation. *See* 838 F.3d at 552. Nowhere in § 1114's text did Congress mention (let alone allude to) private entities. Congress knows how to regulate private entities' disclosure of information and chose not to do so, instead directing § 1114's language at the NTSB and other government agencies.[11] *See City of Arlington*, 569 U.S. at 296 ("Congress knows to speak in plain

---

[11] The NTSB is familiar with Congress's legislative capabilities and has actively engaged Congress in this respect. *See* S. REP. NO. 106-386, at 3 (2000) ("The bill includes language *requested by the [NTSB]* to require the withholding from public disclosure of voice and video recorder information . . . ." (emphasis added)); National Transportation Safety Board Amendments Act of 2000, Pub. L. No. 106-424, § 5, 114 Stat. 1883, 1884–85 (enacting the NTSB's requested disclosure-related provision); *see also* Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 368 (1986) (opining on the "close contact" between agency personnel and "relevant legislators and staffs").

terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."). Congress is well aware of how to regulate the dissemination of information, doing so within the very statutory scheme at issue. *See* 49 U.S.C. §§ 1114(b)(1)(C), 1154. Read together, context confirms what the text states—the provisions of § 1114 corroborate that subsection (f) does not unambiguously preclude private parties from disclosing information received during a foreign aircraft investigation.[12]

### ii.  Boeing's Statutory Arguments

Boeing views § 1114 differently, offering three general arguments to support its view of the case at step one of *Chevron*. The Court addresses each in turn.

### 1.  Statutory Silence

First, Boeing maintains that § 1114 is "irrelevant" to the analysis because the statute's text is silent as to entities like Boeing (Dkt. #225 at pp. 17–19, 18 n.3).[13] Faced with the statute's silence toward private parties, Boeing construes § 1114(f) to be inapposite in light of § 1113(f) and § 1132, arguing that the regulations promulgated pursuant to these authorities control (Dkt. #225 at pp. 17–19; Dkt. #234 at pp. 4–5). This position misunderstands the nature of *Chevron* silence and runs counter to Fifth Circuit precedent.

---

[12] Boeing additionally asks the Court to consider the *Charming Betsy* canon of construction in its *Chevron* analysis (Dkt. #225 at p. 16; Dkt. #234 at p. 7; Dkt. #269 at pp. 31:13–32:17). This canon instructs courts that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). The Court cannot consider the *Charming Betsy* canon, however, because it applies only when analyzing an *ambiguous* statute. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *see Sampson v. Fed. Republic of Ger.*, 250 F.3d 1145, 1152 (7th Cir. 2001) ("[The *Charming Betsy* canon] has traditionally justified a narrow interpretation of *ambiguous* legislation to avoid violations of international law." (emphasis added)).

[13] In its Answer to Plaintiffs' First Amended Complaint, Boeing invokes § 1114, among other authorities, to argue that it "is prohibited" from divulging certain "information concerning aviation accidents" here (Dkt. #191 at p. 2). But in its Response to the Motion, Boeing maintains that Plaintiffs "have focused on the wrong statute" (Dkt. #224 at p. 18). The Court is unsure what to make of this inconsistency, but it is certainly not, as Boeing suggests, "a red herring" (Dkt. #234 at p. 6 n.1).

Legislative silence comes in many shapes and sizes.  And compared to the expansive universe of its legislative authority, Congress is often silent.  This can be "the result of Congress's failure to 'consider [a] question,' its inability 'to forge a coalition on either side of [a] question[,]' or its conscious decision to delegate [a] question to the agency." *Friends of Earth v. Reilly*, 966 F.2d 690, 695 (D.C. Cir. 1992) (quoting *Chevron*, 467 U.S. at 865).  Regardless of the reason, congressional silence is a standard consideration in statutory interpretation, and courts exercise their independent judgment to understand statutory silences and what Congress intends by them.

But "not all statutory silences are created equal." *Or. Rest. & Lodging Ass'n v. Perez*, 843 F.3d 355, 360 (9th Cir. 2016) (en banc) (O'Scannlain, J., dissenting from denial of rehearing en banc).  On the one hand, statutory silence may "convey nothing more than a refusal to tie the agency's hands," meaning Congress intended to defer to the agency, within the bounds of congressional authorization, as to the implementation of the statute.  *Entergy Corp.*, 556 U.S. at 222.  This is the type of silence to which *Chevron* applies.  When Congress leaves a gap in the statutory scheme—in the form of silence—for the administering agency to fill, courts must respect the agency's reasonable interpretation of such a gap.  *Util. Air Regul. Grp.*, 573 U.S. at 326 ("Agencies exercise discretion only in the interstices created by statutory silence or ambiguity.").[14] On the other hand, statutory silence may be "interpreted as limiting agency discretion," *Entergy Corp.*, 556 U.S. at 223, serving to indicate where Congress decided to end an agency's regulatory authorization, *Or. Rest.*, 843 F.3d at 360.  Courts cannot afford *Chevron* deference to this kind of

---

[14] Within the *Chevron* context, silence and ambiguity are indicia of the same concept—congressional intent to delegate the interpretive function regarding a particular statute to an agency.  *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 691 (D.C. Cir. 1991); *see Fleming Cos. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 757 (E.D. Tex. 2004) (defining ambiguity under *Chevron* as an instance in which statutory text "ha[s] 'more than one accepted meaning'" (quoting *United Servs. Auto. Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996))), *aff'd*, 164 F. App'x 528 (5th Cir. 2006).  This conceptual underpinning of *Chevron* explains why silence and ambiguity are not synonyms in common parlance yet can be for *Chevron* purposes.  *See, e.g.*, *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 754–55 (5th Cir. 2011) (finding 33 U.S.C. § 2703(a)(3) silent *and* ambiguous as to the term "any contractual relationship").

statutory silence because an agency cannot fill a statutory gap Congress did not intend to create. *See SAS Inst.*, 138 S. Ct. at 1355 ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written . . . ."). In short, some statutory silences warrant judicial deference to agency interpretation, and others do not. *See Or. Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1094 (9th Cir. 2016) (Smith, J., dissenting) ("The Supreme Court has made clear that it is only in the ambiguous 'interstices' *within* the statute where silence warrants administrative interpretation, not the vast void of silence on either side of it." (citing *Util. Air Regul. Grp.*, 573 U.S. at 326)).

This distinction prompts the pivotal question—what distinguishes statutory silences entitled to *Chevron* deference from those that are not? The answer lies within the text of a statute itself. For an agency to wield the authority entitling its interpretation of statutory silence to *Chevron* treatment, "there must be a grant of power in the first instance." *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 9 (D.C. Cir. 2000) (Sentelle, J., concurring). In other words, before promulgating rules or regulations pursuant to a statute, agencies must demonstrate a clear "textual commitment of authority" in the language Congress enacted. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Courts must afford *Chevron* deference to statutory silences related to matters *within* the ambit of a statute's directives, whereas statutory silences pertaining to matters *outside* the statutory space do not warrant deference under *Chevron*.

To demonstrate this modest yet essential difference, compare the following cases involving statutory silence. First, in *Luminant Generation Co. LLC v. EPA*, petitioners sought review of a final rule related to Texas's State Implementation Plan ("SIP") the EPA promulgated pursuant to the Clean Air Act ("CAA"). 714 F.3d 841, 845 (5th Cir. 2013). Under the CAA, civil penalties may be recovered following violation of a SIP. *Id.* at 846. To assess the amount of the

corresponding civil penalty, courts must consider a variety of statutory factors, including those "justice may require."  *Id.* (internal quotation marks omitted) (quoting 42 U.S.C. § 7413(e)(1)). The portion of the SIP at issue in *Luminant* created "an affirmative defense against civil penalties for excess emissions during both planned and unplanned startup, shutdown, and maintenance/malfunction ('SSM') events."  *Id.* at 847.  Petitioners contended that the "final rule conflict[ed] with the plain language of the [CAA] authorizing civil penalties."  *Id.* at 851.  The Fifth Circuit found this argument unconvincing.  After identifying the precise question at issue as "whether a state may include in its SIP the availability of an affirmative defense against civil penalties for unplanned SSM activity," then-Chief Judge Stewart, writing for the panel, examined the language of 42 U.S.C. § 7413 and determined the statute was silent as to the precise question in the case.  *Id.* at 852.

*Luminant* provides an example of the statutory silence contemplated by the *Chevron* Court. The law at issue directly addressed a specific issue—the "[p]enalty assessment criteria" for violations of a SIP under the CAA.  42 U.S.C. § 7413(e).  The statutory text outlined what must be considered in assessing the civil enforcement penalty but left a gap—in the form of silence— to be filled by the EPA in allowing the agency to consider "other factors as justice may require." *Luminant*, 714 F.3d at 846, 852.  And the regulation at issue directly related to a specific matter addressed in the relevant statute.  *See id.* at 852–53.  This being the case, the Fifth Circuit moved to step two of the *Chevron* analysis.

By contrast, in *Gulf Fishermens*, the Fifth Circuit stopped its inquiry at step one of *Chevron* when considering "whether a federal agency may create an 'aquaculture,' or fish farming, regime in the Gulf of Mexico" pursuant to the Magnuson-Stevens Act.  968 F.3d at 456.  This law establishes "eight Regional Fishery Management Councils and tasks them with drafting Fishery

Management Plans ('FMPs')," and these FMPs turn on the terms "fishery" and "fishing."  *Id.*; *see* 16 U.S.C. § 1802(13), (16).  The suit arose when the Gulf of Mexico Fishery Management Council "became the first regional council to put forward a plan to regulate and permit aquaculture."  *Gulf Fishermens Ass'n*, 968 F.3d at 458–59.  Petitioners challenged this regulation, arguing it was invalid because establishing an aquaculture regime fell outside the Gulf of Mexico Fishery Management Council's "authority to regulate 'fisheries'" under the act at issue.  *Id.* at 459.

The Fifth Circuit ultimately invalidated the regulation in question.  After identifying the precise question to be whether the statute "unambiguously precludes the agency from creating an aquaculture regime," Judge Duncan, writing for a split panel, began by characterizing the Magnuson-Stevens Act as a "textual dead zone"—in context, the statutory provisions "defining the agency's regulatory power sa[id] nothing about creating or administering an aquaculture or fish farming regime."  *Id.* at 460.  Conceding as much, the agency responded that its claim to regulatory authority was based on the statute's failure to express "Congress's unambiguous intent to foreclose the regulation of aquaculture."  *Id.* at 462 (emphasis omitted).  The panel majority was unconvinced, holding that the agency's argument "gets *Chevron* backwards."  *Id.* at 462.

"*Chevron* step two is not implicated," the Fifth Circuit explained, "merely because 'a statute does not expressly negate the existence of a claimed administrative power.'"  *Id.* at 461 (quoting *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (mem.) (per curiam)).  If courts simply "presume[d] a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."  *Texas*, 809 F.3d at 186 (internal quotation marks and emphases omitted) (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)).  Rather, the panel majority articulated, "It is only legislative

*intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*."  *Gulf Fishermens Ass'n*, 968 F.3d at 461 (internal quotation marks omitted) (quoting *Ethyl*, 51 F.3d at 1060).  Because the agency based its claim to regulatory authority on the fact that "Congress did not withhold [such] power" and did not "identify[] any [congressional] intent to delegate authority," the Fifth Circuit rejected the agency's argument and ended its inquiry at *Chevron* step one.  *Id.* at 462.

*Gulf Fishermens* illustrates what statutory silence undeserving of *Chevron* treatment looks like.  The applicable statute addressed many issues, just not the matter the agency sought to regulate.  *See id.* ("[The agency] asks us to believe Congress authorized it to create and regulate an elaborate industry the statute does not even mention.").  While the statutory scheme in the case addressed many conceivably related matters, nowhere did the Magnuson-Stevens Act exhibit Congress's intent to regulate the aquaculture industry.  *Id.*  Finding no statutory gap for the agency to fill, the Fifth Circuit invalidated the agency's attempt to regulate matters outside the statutory scheme's ambit.  *Id.* at 456.

Juxtaposing these cases provides crucial insight into the differences between the two forms of statutory silence and aids the Court in its analysis of 49 U.S.C. § 1114(f).  To refresh, § 1114(f)(1) provides that "[n]otwithstanding any other provision of law, neither the Board, nor any agency receiving information from the Board, shall disclose records or information relating to its participation in foreign aircraft investigations."  The precise question at issue is whether private parties are shielded from disclosing information received during a foreign aircraft investigation.  Congress directed § 1114(f)(1)'s command only at the NTSB and various government agencies.  Yet Boeing purports the NTSB may prohibit it from disclosing records or information relating to

Boeing's participation in foreign aircraft investigations because § 1114(f)(1) does not mention Boeing (Dkt. #225 at p. 18).  Fifth Circuit precedent holds otherwise.

Section 1114(f)'s silence as to private parties is more akin to the statutory silence in *Gulf Fishermens* than that in *Luminant*.  Like the statutory scheme in *Gulf Fishermens*, § 1114(f) and its surrounding provisions speak to several issues regarding the disclosure of information received during aircraft accident investigations, just not the matter the NTSB sought to regulate—namely, a private party's ability to disclose information received during a foreign aircraft investigation (Dkt. #203 at pp. 15–16; Dkt. #231 at p. 3).  *See* 968 F.3d at 462.  And unlike the statute in *Luminant*, there is no evidence in § 1114—let alone the entirety of the chapter regulating the NTSB—that evinces Congress's intent to regulate private parties' disclosure of information received during a foreign aircraft investigation (Dkt. #203 at pp. 13–16; Dkt. #231 at p. 3).  *See* 714 F.3d at 851–53.  Even though Boeing maintains § 1114(f)'s inapplicability to private parties based on the sound of statutory silence, under Fifth Circuit precedent, this silence distinctly denotes the absence of a gap in the statutory scheme for the NTSB to fill.  Boeing's argument simply misunderstands the "basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."  *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978).

The American constitutional structure supports this conclusion.  The Constitution endows Congress with "[a]ll legislative powers herein granted," U.S. CONST. art. I, § 1, with which Congress may "prescribe general rules for the government of society," *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810).  This bequest of legislative power is incredibly immense in both volume and gravity.  Needless to say, in an "increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power

under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) ("The legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation.").  As such, Congress possesses the power to delegate "substantial discretion" on agencies "to implement and enforce the laws." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion).[15] Delegations to agencies are permissible "so long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the authority is directed to conform.'"  *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441 (5th Cir. 2020) (brackets omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *see City of Arlington*, 569 U.S. at 304 n.4 (explaining that, although agency rulemaking and adjudications may "take 'legislative' and 'judicial' forms," agency activities are, by necessity, exercises of executive power).  And in order "to fulfill 'their duty as faithful guardians of the Constitution,'" *Forrest Gen. Hosp.*, 926 F.3d at 228 (quoting THE FEDERALIST NO. 78, at 528 (Alexander Hamilton) (Jacob Cooke ed., 1961)), courts must exercise the judicial power and determine "whether the statutory text forecloses the agency's assertion of authority," *City of Arlington*, 569 U.S. at 301.[16]

---

[15] Although "Congress may not constitutionally delegate its legislative power to another branch of Government," *Touby v. United States*, 500 U.S. 160, 165 (1991), the Framers did not envision "total separation of each . . . branch[] of Government," for "hermetic[ally] sealing off" the three branches from one another "would preclude the establishment of a Nation capable of governing itself effectively."  *Buckley v. Valeo*, 424 U.S. 1, 121 (1976) (per curiam); *see Bowsher v. Synar*, 478 U.S. 714, 748 (1986) (Stevens, J., concurring) (identifying the "unsound premise that there is a definite line that distinguishes executive power from legislative power").

[16] As stated by a leading administrative-law expert, the task for courts in these situations is "to determine when a statute that vests discretionary authority . . . has crossed the line from a necessary and proper implementing statute to an unnecessary and/or improper delegation of distinctively legislative power."  Gary Lawson, *The Rise and Rise of the Administrative State*, 107 HARV. L. REV. 1231, 1239 (1994).

These structural principles buttress the Court's conclusion as to the meaning of § 1114(f)'s silence.  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  As creatures of statutory origin, agencies are "restrained by the four corners of its enabling statute and 'literally ha[ve] no power to act unless and until Congress confers power upon [them].'" *Collins v. Mnuchin*, 938 F.3d 553, 562 (5th Cir. 2019) (en banc) (quoting *New York v. FERC*, 535 U.S. 1, 18 (2002)), *cert. granted*, 141 S. Ct. 193 (2020) (mem.); *see Whitman*, 531 U.S. at 475 (acknowledging that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred").  Thus, the Court cannot enforce NTSB regulations pertaining to § 1114's subject matter absent a clear demonstration of Congress's intent to consign a silence warranting agency gap-filling within the statute's ambit.  *See Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001) ("Agency authority may not be lightly presumed.").  "If it were otherwise, within each statute granting administrative authority, Congress would need to erect walls, making it clear that the agency is limited to regulating only that which the statute expressly addresses, or implies within those parameters." *Or. Rest.*, 816 F.3d at 1094 (emphasis omitted); *see Texas v. United States*, 497 F.3d 491, 503 n.9 (5th Cir. 2007) ("[C]ongressional silence . . . [cannot] be used as a panacea justifying rulemaking authority untethered from any trace of congressional intent.").

Were deference nevertheless accorded to the NTSB's interpretation here, the Court would effectively imbue the agency with tremendous plenary power, in the process running afoul of precedent and turning the Constitution's separation-of-powers configuration on its head.  *See Contender Farms*, 779 F.3d at 269 ("[A]n administrative agency does not receive deference under *Chevron* merely by demonstrating that 'a statute does not expressly *negate* the existence of a

claimed administrative power (*i.e.*, when the statute is not written in "thou shalt not" terms).'" (quoting *Ry. Lab. Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc))).  The NTSB would brandish legislative power, a result by which the Court cannot abide in this instance without abdicating its judicial responsibilities.  *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Through § 1114, Congress directly spoke to the precise issue in this case and did not delegate to the NTSB, by way of statutory silence, the authority Boeing purports.

## 2.  Statutory Silence Plus General Rulemaking Authority

Boeing's next argument centers on the NTSB's general rulemaking authority under § 1113(f) and the agency's investigative authority under § 1132 (Dkt. #225 at pp. 16–19).[17] Taking § 1114(f)'s silence regarding private parties together with these other provisions, Boeing offers this statutory sequence as a valid basis for the NTSB to promulgate the regulations at issue (Dkt. #225 at pp. 17–18; Dkt. #234 at p. 2).  But not so—this reasoning is simply a variation on the theme of Boeing's statutory-silence argument.  *See Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) ("An agency's general rulemaking authority plus statutory silence does not . . . equal congressional authorization."), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020).  Merely invoking "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006).  No matter the nature or extent of the issue it seeks to address, an agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v.*

---

[17] Worth noting, the NTSB is "not currently conducting investigative activities" related to the Ethiopia Air 737 MAX 8 accident (Dkt. #241, Exhibit A at p. 2).

37

*Missouri*, 484 U.S. 495, 517 (1988)); *see Merck*, 385 F. Supp. 3d at 92 ("Even broad rulemaking

power must be exercised within the bounds set by Congress.").

Section 1113(f)'s general grant of rulemaking authority is less than precisely defined by its

terms, but the Court need not gauge its reach here.  For even if the NTSB's rulemaking power is

as sweeping as Boeing asserts, this authority cannot overcome § 1114's directives because "a

broad grant of general rulemaking authority does not allow an agency to make amendments to

statutory provisions." *Contender Farms*, 779 F.3d at 273; *accord Allegheny Def. Project v. FERC*,

964 F.3d 1, 16 (D.C. Cir. 2020) ("'A general grant of authority cannot displace the clear, specific

text of' a statute." (quoting *Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019))).

Section 1113(f) does not—and indeed cannot—provide *carte blanche* rulemaking authority to the

NTSB as to enable the agency to sidestep the parameters within which Congress circumscribed

the NTSB's power.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14 (1976) ("The

rulemaking power granted to an administrative agency charged with the administration of a federal

statute is not the power to make law.  Rather, it is 'the power to adopt regulations to carry into

effect the will of Congress as expressed by the statute.'" (quoting *Dixon v. United States*, 381 U.S.

68, 74 (1965))).  However far its rulemaking authority extends under § 1113(f), it is implausible

to assert that the NTSB possesses the capability to "circumvent [the] specific statutory limits"

Congress set out in § 1114 "by relying on separate, general rulemaking authority."[18] *Air All. Hous.*

*v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see, e.g.*, *Gulf Fishermens Ass'n*, 968 F.3d at 465

---

[18] This understanding demonstrates exactly why Boeing's repeated overtures to the NTSB's broad investigative authority are ultimately unpersuasive (*see* Dkt. #225 at pp. 5–6, 12–15; Dkt. #234 at pp. 3, 5; Dkt. #269 at pp. 39:19–41:17).  Even if the NTSB possesses the investigative power Boeing alleges, the NTSB's authority could not overcome the specific statutory command Congress enacted regarding disclosure of information from a foreign aircraft investigation.  Moreover, by the terms of its own regulation, the NTSB is "authorized to investigate [e]ach accident involving a civil aircraft in the United States, and any civil aircraft registered in the United States when an accident occurs in international waters."  49 C.F.R. § 831.20(a)(1).  Notably, neither accident at issue in this matter falls within this definition.

("The grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carrying out.'" (brackets omitted) (quoting 16 U.S.C. § 1855(d))).   The Court finds this variant of Boeing's statutory-silence argument unpersuasive.

### 3.   Legislative Purpose

No longer able to anchor its arguments to the statutory text, Boeing suggests the Court look to and rely upon the purpose of the relevant statutes to affirm Boeing's position (*see* Dkt. #225 at p. 19; Dkt. #234 at pp. 4, 7).   But to do so would violate the well-established rule that, "when 'the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.'"   *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).   Courts engage statutes under "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."   *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).   If the text of a statute is unambiguous, then, by definition, Congress's intent is clear, and any further judicial inquiry ends.   *See supra* Section II.c.i.

Giving credence to legislative purpose at the expense of statutory text would be troubling. In the first place, decoding the purpose (or purposes) of a statute is a traditionally problematic endeavor given the competencies of courts and the Judiciary's proper role in the federal government.   *See generally* John F. Manning & Matthew C. Stephenson, Legislation and Regulation 56–58 (2d ed. 2013).   As well, chasing notions of statutory purpose instead of relying on the language Congress enacted "takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent."   *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986); *see Ethyl*, 51 F.3d at 1061 n.9 ("[An] agency

may not simply disregard the specific scheme Congress has created . . . in order to follow a broad purpose statement.").  And, perhaps most importantly, "[i]t is within *Congress's* purview to say what the law should be," not the courts'. *Tex. Voters All. v. Dall. Cnty.*, No. 4:20-CV-775, 2020 WL 6146248, at *12 (E.D. Tex. Oct. 20, 2020) (emphasis added).  When judges begin to toe the line delimiting Congress's domain, they "risk 'arrogating legislative power'" and "cast[ing] aside the structural integrity of the federal government's separation of powers."  *Id.* (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020)); *see 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 600 (1951) ("In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.").

Boeing is effectively asking the Court to add language to the statutory scheme Congress did not include.  *See Env't Integrity Project v. EPA*, 969 F.3d 529, 541–42 (5th Cir. 2020) (identifying the omitted-case canon, "under which a statute should not be read to include matter it does not include").  Obliging this request would thrust the Court into an arena in which it does not belong.  *See Gonzalez v. CoreCivic, Inc.*, No. 19-50691, 2021 WL 192717, at *1 (5th Cir. Jan. 20, 2021) ("Legislators write laws—judges faithfully interpret them.").  The question "is not what Congress 'would have wanted' but what Congress enacted."  *Republic of Arg. v. Weltover*, *Inc.*, 504 U.S. 607, 618 (1992); *cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[C]ongress designed the Act in a specific way, and it is not our proper role to redesign the statute.").  "It is a fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by the courts,'" *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–361 (2019) (brackets omitted) (quoting SCALIA & GARNER, *supra*, at 94), which "applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported

by the text," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).  The Court is bound by this convention "unless and until the first and third branches of government swap duties and responsibilities."  *Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016); *see Iselin v. United States*, 270 U.S. 245, 251 (1926) ("What the [party] asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope.  To supply omissions transcends the judicial function.").

Even under the best of circumstances, venturing beyond "the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously.'"  *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982) (quoting *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977)).  And even though legislative intent is the guiding light of statutory interpretation, in all but exceptional cases, courts must discern Congress's intent from a statute's text.  *Gardner v. Collins*, 27 U.S. (2 Pet.) 58, 93 (1829) ("The spirit of the act must be extracted from the words of the act, and not from conjectures aliunde.").  Boeing's "purposive argument simply cannot overcome the force of the plain text."  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 460 (2012).  As such, the Court relies on the unambiguous text of the statute to ascertain congressional intent and will not inquire further as to Congress's purpose in enacting these statutes.[19]

### iii.  Conclusion: *Chevron* Analysis Ends at Step One

"Saying nothing," it is said, "sometimes says the Most."  Emily Dickinson, Letter 408, *in* SELECTED LETTERS 203, 219 (Thomas H. Johnson, ed., 1971) (1874).  And while congressional silence may certainly speak volumes, the difficulty typically lies in deciphering its message.  Here,

---

[19] While the Court does not directly consider legislative purpose in its statutory-interpretation analysis, Congress's purposes for enacting the statutory scheme at issue could be "highly relevant to [a] Rule 26 analysis."  *Cazorla*, 838 F.3d at 553; *see id.* at 562–64 (accounting for statutory purpose in the Rule 26 inquiry).  Plaintiffs and Boeing agree relevancy is not at issue in the Motion (Dkt. #269 at pp. 3:17–5:6, 26:9–18).

Boeing's attempts to parse the statutory silence in its favor fall short.  The inference Boeing asks the Court to draw from § 1114's silence simply "cannot be credited[, as] it is contrary to all other textual and contextual evidence of congressional intent."  *Burns v. United States*, 501 U.S. 129, 136 (1991).  Section 1114(f)'s silence is best understood as a manifestation of Congress's intent to exclude Boeing and other like entities from the statute's reach.  Based on the plain language of the statute and the statutory scheme as a whole, the Court finds Congress directly spoke to the precise question at issue—private parties are not prohibited from disclosing information received during a foreign aircraft investigation.  "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent."  *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004).  Until then, the Court must give effect to Congress's unambiguously expressed intent and ends its inquiry at *Chevron* step one.

## III.   Remaining Contentions

Boeing offers two other arguments to justify the existence of a privilege under Annex 13. The Court briefly addresses each.

### a.   Privileging Through Regulation

Throughout its arguments, Boeing proffers evidence to demonstrate the NTSB created a privilege exempting private parties from disclosing certain information in the course of judicial proceedings (Dkt. #225 at p. 15; Dkt. #234 at pp. 5–7).  Plaintiffs see matters quite differently, arguing that § 1113(f) does not authorize the NTSB to create a litigation privilege for private parties through regulatory means and that 49 C.F.R. § 831.22(c)(2) specifically contradicts the statutory scheme Congress enacted (Dkt. #203 at pp. 18–19; Dkt. #231 at pp. 5–7).  Even if the Court had found the statute at issue sufficiently ambiguous to proceed to step two of *Chevron*,

Plaintiffs' position is more compelling because the enabling language of § 1113(f) is insufficient to empower the NTSB to create such a litigation privilege through regulatory action.

While still up for debate, the modern consensus holds that the power to create rules governing the inferior federal courts lies with Congress. *Hanna v. Plumer*, 380 U.S. 460, 472 (1965); WINIFRED R. BROWN, FEDERAL RULEMAKING: PROBLEMS AND POSSIBILITIES 39 (1981) ("It is now generally agreed that the power to make rules for lower federal courts has been delegated to the Supreme Court by Congress, and that Congress may withdraw or modify that power." (footnote omitted)). Congress may delegate this power to the Supreme Court "to make rules not inconsistent with the statutes or Constitution of the United States," *Sibbach v. Wilson & Co.*, 312 U.S. 1, 9–10 (1941), which is what Congress did when it passed the Rules Enabling Act. *See* 28 U.S.C. §§ 2071–72. While this law authorizes the Supreme Court "to exercise some legislative authority to regulate the courts, Congress at all times maintains the power to repeal, amend, or supersede its delegation of authority or the rules of procedure themselves." *Jackson v. Stinnett*, 102 F.3d 132, 134 (5th Cir. 1996).

Congress and the Supreme Court may amend federal privilege law, but the same cannot be said for the Executive Branch. *See* FED. R. EVID. 501 (stating that common law governs a claim of privilege unless otherwise provided for in the Constitution, a federal statute, or rules prescribed by the Supreme Court). This is not for lack of trying—agencies have long sought to shield information from the public for various reasons and have attempted to do so by promulgating rules and regulations pursuant to claimed grants of statutory authority. *See, e.g.*, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). These agency efforts to privilege information through regulatory means have not been met with great success in federal court. *E.g.*, *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 925–26 (7th Cir. 2004). Generally speaking, judicial opposition to these

efforts boils down to this: allowing an agency to privilege information, "acting on only general authority," would effectively "strip courts of the authority to determine the scope of discovery."[20] *AgriVest P'ship v. Cent. Iowa Prod. Credit Ass'n*, 373 N.W.2d 479, 483 (Iowa 1985); *see Carr v. Monroe Mfg. Co.*, 431 F.2d 384, 388–89 (5th Cir. 1970).

Nevertheless, it has not been definitively ruled out that agencies are unable to privilege by regulation.[21]  Up to this point, federal judges have gravitated towards the idea that "courts will not find that Congress has delegated th[is] power to agencies *without a crystal-clear congressional statement*."  Mila Sohoni, *The Power to Privilege*, 163 U. PA. L. REV. 487, 503 (2015) (emphasis added).  This principle makes good sense for several reasons.  First, because "[a]gencies have no inherent powers," *Slater*, 231 F.3d at 9, requiring a clear statement of congressional intent giving such an extraordinary authority to agencies helps ensure delegations are "rooted in . . . grant[s] of [legislative] power by the Congress and subject to limitations which that body imposes," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).  Second, the Supreme Court has made clear that "privileges contravene the fundamental principle that 'the public has a right to every man's evidence,'"  *Trammel v. United States*, 445 U.S. 40, 50 (1980) (cleaned up) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)), and courts must therefore "strictly construe[]" statutes granting privileges "so as 'to avoid a construction that would suppress otherwise competent

---

[20] Because it does not impact the outcome, the Court does not render an opinion here as to the constitutionality of a congressional delegation of the power to privilege to an agency.

[21] To be certain, this argument is bold because of the power inherent to privileges under federal law.  As a leading treatise explains, characterizing a rule as a "privilege" is significant for several reasons:

> First, if the court decides that the statute is one dealing with "privilege" under [Federal Rule of Evidence 501], the court cannot compel disclosure of matters falling within the statute when adjudicating preliminary questions of fact. Second, if the statute is one of "privilege," it applies at all stages of the proceedings and to such proceedings as grand jury hearings. Third, matter that is "privileged" within the exception to Rule 501 is not only inadmissible, but also not discoverable. Finally, if the statutory rule is one of "privilege," it cannot be displaced by another rule adopted by the Supreme Court unless that rule has been affirmatively approved by Congress.

23A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 5437 (rev. 1st ed.) (footnotes omitted).

evidence.'" *Baldrige v. Shapiro*, 455 U.S. 345, 360 (1982) (quoting *St. Regis Paper Co.*, 368 U.S. at 218).  This approach logically translates to situations in which courts examine agency-created privileges.  Third, federal judges are fully aware of their constitutional responsibility to police the boundaries of the separation of powers, and they recognize Congress's authority "to make rules governing the practice and procedure in federal courts."  *In re Adams*, 734 F.2d 1094, 1102 (5th Cir. 1984).  This being the case, requiring a crystal-clear statement of congressional intent to delegate the privilege power to agencies prevents courts from interfering with Congress's exercise of this legislative power.  *See Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (noting the Supreme Court's reluctance "to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself").

To demonstrate this clear-statement rule courts have espoused, take, for example, *Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608 (N.D. Cal. 2004).  There, the enabling statute required the Under Secretary of the Transportation Security Administration ("TSA") to "adopt regulations prohibiting disclosure of information which would be 'detrimental to the security of transportation' if disclosed."  *Id.* at 611–12.  Because the statutory language clearly and specifically expressed Congress's intent to delegate authority to the TSA Under Secretary to determine, by regulation, what information would be detrimental to the security of transportation if disclosed, the district court left the regulations creating the litigation privilege in question undisturbed.  *See id.* at 613–14.  By contrast, in *In re Bankers Trust Co.*, the enabling statutes relied upon were "broad, general grants of authority," resting on language, for example, permitting the Federal Reserve Board "to issue regulations 'as may be necessary to enable the Federal Reserve to administer and carry out the purposes of this chapter and prevent evasions thereof.'"  61 F.3d 465, 470 (6th Cir. 1995) (brackets omitted) (quoting 12 U.S.C. § 1844(b)).  The Sixth Circuit held

45

that the regulation at issue in the case was "plainly inconsistent with Rule 34" of the Federal Rules of Civil Procedure because the general grants of statutory authority on which the Federal Reserve based the regulation were insufficient to demonstrate Congress's intent to delegate the privilege power. *Id.*  As the Sixth Circuit concisely explained, "[A]llowing a federal regulation issued by an agency to effectively override the application of the Federal Rules of Civil Procedure and, in essence, divest a court of jurisdiction over discovery, the enabling statute must be more specific than a general grant of authority as found here." *Id.*; *accord Mktg. Invs. Corp. v. New Millennium Bank*, No. 3:11-CV-1696-D, 2012 WL 1357502, at *5 (N.D. Tex. Apr. 16, 2012), *report and recommendation adopted in part, rejected in part*, 2012 WL 2900606 (N.D. Tex. June 5, 2012).

The statute which Boeing alleges to authorize the NTSB to create the privilege Boeing invokes in this dispute is neither sufficiently clear nor specific to serve as the basis for such a privilege.  The enabling statute here permits the NTSB to "prescribe regulations to carry out this chapter."  49 U.S.C. § 1113(f).  Contrary to Boeing's contention that this statutory grant of authority is sufficiently specific (Dkt. #234 at pp. 6–7), it is nowhere near as specific as the enabling statute in *Chowdury*.  *See Chowdury*, 226 F.R.D. at 611–12.  Realistically, the text of § 1113(f) is fairly general in nature and is closer in character to the statutory language from the *Bankers Trust* case.[22]  *See In re Bankers Tr. Co.*, 61 F.3d at 470.  All things considered, it is evident that even if the Court had determined the statute at issue to be sufficiently ambiguous as to proceed to *Chevron* step two, § 1113(f)'s language is neither specific nor clear enough for the Court to allow the relevant regulations promulgated pursuant to § 1113(f) to override the Federal Rules of Civil Procedure and divest the Court of its jurisdiction over discovery in this case.

---

[22] In fact, § 1113(f) is an even more limited grant of power than the statute in *Bankers Trust*.  *Compare* 49 U.S.C. § 1113(f) ("regulations to carry out this chapter"), *with* 12 U.S.C. § 1844(b) ("regulations and orders . . . as may be necessary to enable [the agency] to administer and carry out the purposes of this chapter and prevent evasions thereof").

### b. The Judiciary and Foreign Affairs

Finally, Boeing emphasizes the international nature of the matter before the Court, characterizing the dispute's foreign-affairs flair as "a very significant element here" and urging judicial deference in this area (Dkt. #269 at pp. 29:20–21, 31:8–12).  Plaintiffs disagree, arguing that the international character of this dispute does not impact the Court's analysis (Dkt. #269 at pp. 8:2–10, 8:23–9:7).

"In foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'"  *Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).  The Constitution explicitly grants the Executive and Legislative Branches sizeable swaths of authority in the foreign-affairs space, *id.* at 33–34 (Thomas, J., concurring in the judgment in part and dissenting in part), and the Supreme Court has previously recognized the President's "plenary and exclusive power" inherent to the office "as the sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936).  Given this structural concentration of foreign-affairs power in the political branches, courts must tread lightly when adjudicating matters involving international relations. *See Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (noting that decisions regarding foreign affairs are the "kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power").  But just because the federal judiciary's "duty will sometimes involve the 'resolution of litigation challenging the constitutional authority of one of the three branches,' . . . courts cannot avoid their responsibility merely 'because the issues have political implications.'"  *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (brackets omitted) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

Though the outcome here may implicate political considerations, the Court cannot abstain on account of subject matter.

Whatever level of deference the Judiciary may owe to the Executive Branch in cases or controversies involving foreign affairs, such deference would be given only to the President or an agency under the President's direct control—not an agency like the NTSB, which is wholly independent from the Executive Branch. Moreover, while the President plays a dynamic role in the formation and execution of foreign policy, "it is still the Legislative Branch, not the Executive Branch, that makes the law"—the President does not singlehandedly "determine the whole content of the Nation's foreign policy." *Zivotofsky*, 576 U.S. at 21. This is particularly so when the enactments in question relate to the regulation of commerce, a power which the Constitution plainly grants to Congress. *See* U.S. CONST. art. I, § 8, cl. 3; *see also* Note, *Nondelegation's Unprincipled Foreign Affairs Exceptionalism*, 134 HARV. L. REV. 1132, 1155–56 (2021) (explaining that the idea the Executive Branch retains authority over a commerce-related matter because of a "statute's relationship to foreign affairs" is incompatible with the constitutional design). From its inception, the NTSB has concerned itself with, among other things, the causes of accidents in civil air navigation so as to promote commerce through transportation safety. Department of Transportation Act of 1966, §§ 2(a), (b)(1), 5(d)(1), 80 Stat. at 931, 935; *see* Air Commerce Act of 1926, Pub. L. No. 69-251, ch. 344, § 2(e), 44 Stat. 568, 569 (listing the NTSB's modern mission, among other aims, as part of Congress's goal "to foster air commerce"); *United States v. Knowles*, 197 F. Supp. 3d 143, 155–56 (D.D.C. 2016). Because Congress not only spoke directly to the precise issue currently before the Court but also acted on a matter over which Article I empowers Congress, the foreign-relations aspect of this discovery dispute does not alter the Court's approach or disposition.

*   *   *

The Court finds that the Annex 13 privilege Boeing invokes does not exist.  Therefore, Boeing must fulfill its disclosure obligations under Federal Rule of Civil Procedure 26, the Local Rules, and the Order Governing Proceedings (Dkt. #30).

**CONCLUSION**

It is therefore **ORDERED** that Plaintiffs' Motion to Compel Boeing to Produce Information Withheld Based on Annex 13 (Dkt. #203) is **GRANTED**.  Boeing shall have twenty-one (21) days to produce to Plaintiffs all discoverable material previously withheld pursuant to Annex 13.

**IT IS SO ORDERED.**

**SIGNED this 27th day of January, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE