**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DAMONIE EARL, LINDA RUGG, ALESA BECK, TIMOTHY BLAKEY, JR., STEPHANIE BLAKEY, MARISA THOMPSON, MUHAMMAD MUDDASIR KHAN, JOHN ROGERS, VALERIE MORTZ-ROGERS, LAKESHA GOGGINS, JAMES LaMORTE, BRETT NOBLE, RUBEN CASTRO, FRITZ RINGLING, LITUAN LEWIS, and LANCE HOGUE, JR., each individually and on behalf of all others similarly situated, | § § § § § § § § § § § § | |
| | § | Civil Action No. 4:19-cv-00507 |
| *Plaintiffs,* | § § | **FILED UNDER SEAL** |
| | § | |
| v. | § § | |
| THE BOEING COMPANY and SOUTHWEST AIRLINES CO., | § § § | |
| *Defendants.* | § § | |

**DEFENDANT SOUTHWEST'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

APPENDIX AND EXHIBIT LIST................................................................................... ix

INTRODUCTION & SUMMARY OF ARGUMENT .................................................... 1

ARGUMENT ....................................................................................................................... 3

I.    Plaintiffs' "Would Have Paid Less" Theory Lacks Article III Standing. ............................ 3

II.   The Identities of Putative Class Members Are Not Ascertainable or, At a Minimum, Require Individualized Inquiries into the "Persons Who Purchased." ................................. 4

III.  Individual Liability and Damages Issues Predominate Over Any Common Questions, Precluding Class Certification under Rule 23(b)(3). ............................................................ 6

   A.   Plaintiffs' class theories of fraud fail as a matter of law and necessitate individualized inquiries that cannot be resolved by common evidence. .................... 7

      1.   The Fifth Circuit has rejected Plaintiffs' sole theory (fraud-on-the-market) in RICO cases, and there is no efficient market to support such a theory. ........ 8

      2.   Plaintiffs are judicially estopped and precluded from seeking certification based on their market-based, fraud-on-the-FAA theory. ................................. 11

      3.   Individual fraud issues and defenses overwhelm any common issues. ........... 12

   B.   Plaintiffs cannot prove the RICO scienter element on a class-wide basis because Southwest's state of knowledge evolved over the class period. ............................... 15

   C.   Plaintiffs cannot prove the RICO injury element on a class-wide basis because multiple issues related to the fact of injury require individual inquiry ..................... 16

      1.   The question of reimbursement is undisputedly individualized. ..................... 17

      2.   Payment of fixed or discounted rates negates any common injury ................. 20

      3.   High variability in fares and consumer preferences following airline safety events show no uniformity in alleged fact of injury. ....................................... 22

   D.   Plaintiffs cannot prove RICO causation through common, class-wide evidence ...... 24

      1.   But-for causation does not present common issues that predominate. ............ 25

      2.   Plaintiffs cannot prove proximate causation with common evidence ............. 25

         a.   RICO proximate causation requires a "direct relationship," not just foreseeability; in any event, foreseeability is not a common issue. ....... 26

         b.   Plaintiffs cannot prove a common, direct chain of causation, and any causal chain would require individualized inquiries into airline pricing and transactions. ....................................................................... 27

3.      Plaintiffs assert reliance by individual "airline customers" and concede that reliance by "someone" is required for RICO causation. ................................... 31

4.      A class-wide inference of causation cannot be applied here because the core conduct—taking a new aircraft to market—is not inherently fraudulent. ...................................................................................... 32

E.      Individual damages issues predominate, and Plaintiffs' "preliminary" survey fails to show that damages are capable of class-wide resolution. ..................................... 35

1.      Plaintiffs' preliminary "trust me" approach fails their Rule 23 burden. .......... 35

2.      The inadmissibility of Plaintiffs' evidence under *Daubert* requires denial of certification. ........................................................................................ 37

3.      Plaintiffs cannot present a reliable, adequate damages model that accounts for the variability in airfare pricing and avoids reliance on averages. ............. 38

a.      Airfares and the alleged overcharges are not susceptible to formulaic calculation but will instead require individual inquiries. ...................... 38

b.      Plaintiffs' reliance on averages and aggregates is insufficient because they mask individual issues related to pricing and injury. .................... 41

F.      The class action waiver defense presents individualized issues. ............................... 43

IV.      Plaintiffs Fail to Satisfy the Rule 23(a)(4) Adequacy Requirement Because They Have No Active Control Over the Litigation and They Agreed to Class-Action Waivers. ......... 45

CONCLUSION .................................................................................................................... 45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)........................................................................................26, 27

*Bacon v. Stiefel Labs., Inc.*,
    275 F.R.D. 681 (S.D. Fla. 2011).............................................................................32

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ........................................................................ *passim*

*Bell v. Ascendant Sols., Inc.*,
    422 F.3d 307 (5th Cir. 2005) ..................................................................................10

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ..................................................................................45

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..................................................................................41

*Bonilla v. Trebol Motors Corp.*,
    150 F.3d 77 (1st Cir. 1998)....................................................................................43

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)........................................................................................30, 32

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...............................................................................7, 35, 38

*Conde v. Sensa*,
    2018 WL 4297056 (S.D. Cal. Sep. 10, 2018)........................................................44

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ...................................................................35, 36, 38

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
    829 F.3d 370 (5th Cir. 2016) ..................................................................................30

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ....................................................................................4

*In re Dig. Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017)..............................................................................41

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   2008 WL 5413105 (D.N.J. Dec. 23, 2008)................................................................9

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)........................................................................................43

*In re EpiPen*,
   2020 WL 1180550 (D. Kan. Mar. 10, 2020) ....................................18, 22, 31, 34

*In re Ford Motor Co.*,
   182 F.R.D. 214 (E.D. La. 1998)..................................................................15, 16

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
   695 F.3d 330 (5th Cir. 2012) ..............................................................................7

*Gene And Gene LLC v. BioPay LLC*,
   541 F.3d 318 (5th Cir. 2008) ............................................................................45

*Haley v. Merial, Ltd.*,
   292 F.R.D. 339 (N.D. Miss. 2013)................................................................9, 40

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)...........................................................................................7

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010)................................................................................24, 26, 27

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992)....................................................................................26, 27

*Ibe v. Jones*,
   836 F.3d 516 (5th Cir. 2016) ...........................................................20, 38, 40, 41

*Jackson v. Nat'l Ass'n for Advancement of Colored People*,
   546 F. App'x 438 (5th Cir. 2013) ......................................................................31

*John v. Nat'l Sec. Fire & Cas. Co.*,
   501 F.3d 443 (5th Cir. 2007) ..............................................................................5

*Korea Week, Inc. v. Got Capital, LLC*,
   2016 WL 3049490 (E.D. Pa. May 27, 2016) ...............................................44, 45

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014).....................................................................45

*Lawrie v. Ginn Dev. Co.*, LLC,
   2013 WL 222258 (M.D. Fla. Jan. 9, 2013)........................................................9

*Lewis v. Casey*,
    518 U.S. 343 (1996)...........................................................................................4

*Madison v. Chalmette*,
    637 F.3d 551 (5th Cir. 2011) ........................................................................36

*Marriott Bros. v. Gage*,
    911 F.2d 1105 (5th Cir. 1990) ......................................................................15

*Mazur v. eBay, Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) .................................................................17

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)..............................................................8, 9, 42

*In re Methionine*,
    204 F.R.D. 161 (N.D. Cal. 2001)..................................................................17

*Morrow v. Washington*,
    277 F.R.D. 172 (E.D. Tex. 2011)...................................................................5

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013)...........................................................................31

*Neuser v. Carrier Corp.*,
    2007 WL 1470855 (W.D. Wisc. May 15, 2007) ..........................................18

*In re Niaspan Antitrust Litig.*,
    464 F. Supp. 3d 678 (E.D. Pa. 2020) ...........................................................43

*Pablo v. ServiceMaster Global Holdings Inc.*,
    2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ...............................................45

*Patterson v. Mobil Oil Corp.*,
    335 F.3d 476 (5th Cir. 2003) ........................................................................17

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)...........................................................................5

*Pfeffer v. HSA Retail, Inc.*,
    2012 WL 1910034 (W.D. Tex. May 24, 2012) .............................................5

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    100 F. App'x 296 (5th Cir. 2004) ..........................................................36, 40

*In re POM Wonderful LLC*,
    2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ..............................................9

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004) ..................................................................28

*Prantil v. Arkema Inc.*,
   2021 WL 222722 (5th Cir. Jan. 22, 2021) ...........................................13, 30, 36, 37

*Price v. Pinnacle Brands, Inc.*,
   138 F.3d 602 (5th Cir. 1998) ..................................................................16

*In re Processed Egg Prod. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015)...............................................................42

*Ranieri v. AdvoCare Int'l, L.P.*,
   336 F. Supp. 3d 701 (N.D. Tex. 2018) ......................................................15

*Ranzy v. Extra Cash of Texas, Inc.*,
   2011 WL 13257274 (S.D. Tex. Oct. 14, 2011).............................................44

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009)...............................................................42

*Rivera v. Wyeth-Ayerst Labs.*,
   283 F.3d 315 (5th Cir. 2002) ....................................................................4

*Robinson v. Texas Auto. Dealers Ass'n*,
   387 F.3d 416 (5th Cir. 2004) ..................................................................22

*RWB Servs., LLC v. Hartford Computer Grp., Inc.*,
   539 F.3d 681 (7th Cir. 2008) ..................................................................25

*Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*,
   319 F.3d 205 (5th Cir. 2003) ..................................................................34

*Sanneman v. Chrysler Corp.*,
   191 F.R.D. 441 (E.D. Pa. 2000)...............................................................15

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   2009 WL 2043604 (D.N.J. July 10, 2009)...............................................8, 9

*Se. Laborers Health & Welfare Fund v. Bayer Corp.*,
   444 F. App'x 401 (11th Cir. 2011) .......................................................9, 12

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015)....................................................................31

*Shivangi v. Dean Witter Reynolds, Inc.*,
   825 F.2d 885 (5th Cir. 1987) ..................................................................15

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    482 F.2d 880 (5th Cir. 1973) ............................................... 12

*Slade v. Progressive Sec. Ins. Co.*,
    856 F.3d 408 (5th Cir. 2017) ............................................... 31

*Spotswood v. Hertz Corp.*,
    2019 WL 498822 (D. Md. Feb. 7, 2019) ................................. 44

*Summit Props. Inc. v. Hoechst Celanese Corp.*,
    214 F.3d 556 (5th Cir. 2000) .......................................... 8, 9, 10

*In re Taxable Mun. Bond Sec. Litig.*,
    51 F.3d 518 (5th Cir. 1995) ................................................. 17

*Ticknor v. Rouse's Enters., L.L.C.*,
    592 F. App'x 276 (5th Cir. 2014) ........................................ 20

*In re Titanium Dioxide Antitrust Litig.*,
    962 F. Supp. 2d 840 (D. Md. 2013) .................................. 44, 45

*Torres v. S.G.E. Mgmt., L.L.C.*,
    838 F.3d 629 (5th Cir. 2016) ...................................... *passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ......................................................... 7

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ................................................ 34

*U1it4Less, Inc. v. FedEx Corp.*,
    2015 WL 3916247 (S.D.N.Y. June 25, 2015) ........................ 44

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010) ..................................... 24, 25, 31

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ............................................... 10

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ................................................. 4

*United Food & Comm'l Workers Unions & Employers Midwest Health Benefits*
    *Fund v. Walgreen Co.*,
    2012 WL 3061859 (N.D. Ill. July 26, 2012), *aff'd*, 719 F.3d 849 (7th Cir.
    2013) ............................................................................... 12

*United States v. Farrar*,
    876 F.3d 702 (5th Cir. 2017) ................................................................12

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ...........................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................7, 14

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019) ...............................................................15

*Warth v. Seldin*,
    422 U.S. 490 (1975).............................................................................17

*Weidenhamer v. Expedia, Inc.*,
    2015 WL 7157282 (W.D. Wash. Nov. 13, 2015) ................................17

## APPENDIX AND EXHIBIT LIST

| Appendix | Title/Description |
|----------|-------------------|
| A | Named Plaintiffs' Alleged Injuries |
| B | Named Plaintiffs' Varying Knowledge of MAX Crashes and Issues |
| C | Named Plaintiffs' Individual Reimbursement and Purchase Experiences |
| D | Factors that Impact Airfares Based on Testimony of Plaintiffs' Expert Jan Brueckner |
| E | Named Plaintiffs' Agreement to Southwest Terms & Conditions |
| F | Named Plaintiffs' Inadequacy |

| Exhibit | Title/Description |
|---------|-------------------|
| 1 | Southwest's Responses and Objections to Plaintiffs' Interrogatories and Verifications |
| 2 | Plaintiffs' Second Updated Rule 30(b)(6) Deposition Notice to Southwest (Topic 30) |
| 3 | Excerpts from Deposition of Matt Louis (08/28/2020) |
| 4 | ███████████████████ document (SWA_Earl_00937747) (Louis Dep. Ex. 3) |
| 5 | ███████████████████ document (SWA_Earl_00938310) (Louis Dep. Ex. 7) |
| 6 | ███████████████████████ document (SWA_Earl_00938189) (Louis Dep. Ex. 8) |
| 7 | ████████████ document (SWA_Earl_00937810) (Louis Dep. Ex. 14) |
| 8 | █████████████████ document (SWA_Earl_00938789) (Louis Dep. Ex. 16) |
| 9 | ███████████████ document (SWA_Earl_00938863) (Louis Dep. Ex. 17) |
| 10 | Excerpts from Deposition of Greg Allenby (11/19/20) |

| Exhibit | Title/Description |
|---|---|
| 11 | Law360 article, "737 Max Flyers Seek Cert In Boeing, Southwest RICO Suit" (01/06/21) |
| 12 | Expert Report of Darin Lee |
| 13 | Excerpts from Deposition of Jan Brueckner (11/12/20) |
| 14 | FAA Emergency Airworthiness Directive (11/07/18) |
| 15 | Los Angeles Time article, "What you need to know about the 737 MAX and the flight control system suspected in the Lion Air crash" (11/16/18) |
| 16 | CNN.com article, "Lion Air: Some are looking where to place the blame, others wonder if their pilot can fly their plane" (11/17/18) |
| 17 | The Wall Street Journal article, "Boeing and Regulators Delay Jetliner Fixes Prompted by Lion Air Crash; Software update, initially expected in January, now likely pushed until April or later" (02/10/19) |
| 18 | Southwest email re: ▮▮▮▮ (11/07/18) (SWA_Earl_00256940) |
| 19 | ▮▮▮▮▮▮▮▮▮▮▮ (11/06/18) (SWA_Earl_00256961) |
| 20 | Boeing-Southwest email re: ▮▮▮▮ (11/08/18) (SWA_Earl_00122327) |
| 21 | Boeing email re: ▮▮▮▮▮▮ (11/10/18) (SWA_Earl_00123074) |
| 22 | Southwest email re: ▮▮▮▮▮▮ (11/28/18) (SWA_Earl_00123360) |
| 23 | Boeing ▮▮▮▮▮ document (03/18/19) (SWA_Earl_00147755) |
| 24 | Top Class Actions Attorney Advertising, "Southwest Airlines Boeing 737 MAX 8 Crash and Defect: Who's Affected?" (DL_004) |
| 25 | Excerpts from Deposition of Robert Mills (01/19/21) |
| 26 | Declaration of Anastasia Whelchel |
| 27 | Declaration of Nickolas Wood, with Ex. 27-A, SWA_Earl_Data_00001812 |

| Exhibit | Title/Description |
|---|---|
| 28 | Excerpts from Deposition of Brett Noble (01/15/21) |
| 29 | B. Noble Flight Summary Chart (SWA_Earl_Data_00003717) |
| 30 | Declaration of Chris Schlatter, with Ex. 30-A, SWA_Earl_01163164, and Ex. 30-B, SWA_Earl_01163255 |
| 31 | Expert Report of Jan K. Brueckner |
| 32 | Expert Report of Lorin M. Hitt |
| 33 | Allenby Pre-Testing Interviews (non-documentary exhibit, filed separately on external hard drive with the clerk's office with a copy to the presiding judge, pursuant to LR CV-5(6)) |
| 34 | Declaration of Geraldine Young, with Ex. 34-A, Excerpts from SWA_EARL_00933391, and Ex. 34-B, Declaration of Maru/Matchbox |
| 35 | Excerpts from Deposition of Litaun Lewis (01/08/21) |
| 36 | Excerpts from Deposition of Marisa Thompson (07/08/20) |
| 37 | A. Beck Flight History Report (SWA_Earl_Data_00000220 to SWA_Earl_Data_00000226) |
| 38 | Excerpts from Deposition of Alesa Beck (09/16/20) |
| 39 | Declaration of Mark Hursh, with Ex. 39-A, Southwest Airlines Terms & Conditions |
| 40 | Excerpts from Deposition of Ruben Castro (01/12/21) |
| 41 | Excerpts from Deposition of Damonie Earl (08/21/20) |
| 42 | Excerpts from Deposition of Lance Hogue (01/20/21) |
| 43 | Excerpts from Deposition of Valerie Mortz-Rogers (08/19/20) |
| 44 | Excerpts from Deposition of Fritz Ringling (01/26/21) |
| 45 | Excerpts from Deposition of John Rogers (01/29/21) |
| 46 | Excerpts from Deposition of Linda Rugg (07/23/20) |
| 47 | Excerpts from Deposition of Darin Lee (12/03/20) |

| Exhibit | Title/Description |
|---------|-------------------|
| **48** | Named Plaintiffs' Flight Summary Charts |
| **49** | Declaration of S. Quillin, with Ex. 49-A, SWA_Earl_01348109, Ex. 49-B, SWA_Earl_01347906, Ex. 49-C, SWA_Earl_01347916, and Ex. 49-D, SWA_Earl_01348092 |
| **50** | Emails between Counsel re: scheduling of Plaintiff James LaMorte's deposition (01/15/21-02/10/21) |

## INTRODUCTION & SUMMARY OF ARGUMENT

Plaintiffs' class certification motion rests entirely on their theory of injury that each putative class member "would have paid less" for their flights absent Defendants' alleged fraud. That theory is foreclosed, however, by the Court's prior orders on Article III standing. Nowhere do Plaintiffs address the conduct that matters under the Court's orders: ***how Southwest or American Airlines actually priced tickets*** during the proposed class period.

The many individualized factors impacting actual Southwest and American flight prices and the alleged overcharges here are also independently fatal to Rule 23(b)(3) certification. Airline pricing is an intricate, multi-step process that, as Plaintiffs' own expert concedes, involves many dynamic factors that are unique to each flight, route, and market and that vary based on when an individual booked a flight. That is, two people sitting next to each other on the same flight may have paid vastly different prices depending on when they booked their flights and the myriad other factors impacting airfares. Moreover, the evidence confirms that: (a) ███████████████████ ███████████████████████; and (b) ██████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. Plaintiffs' complete avoidance of Southwest's and American's pricing practices does not change, and indeed seals, the fate of their class claims.

Ignoring these dispositive issues, Plaintiffs dedicate most of their motion to merits issues unrelated to certification, before asserting highest-level, conclusory arguments about the "common" nature of their class theories. But even cursory scrutiny of Plaintiffs' theories shows predominance-defeating individualized issues as to the injury, causation, fraud, scienter, and damages elements of their claims, and even as to the identity of putative class members:

- Ascertaining putative class members, or those "who purchased," requires individual inquiries. As the named Plaintiffs exemplify, some claim to be the "purchaser" of flights paid for by others at the point of sale or reimbursed later, while others disclaim "purchaser"

status for flights initially paid for or reimbursed later by others.

- The fact of injury—*i.e.*, whether each putative class member suffered an out-of-pocket financial loss—is highly individualized on multiple fronts. For instance, as Plaintiffs admit, if putative class members were reimbursed for their flights, they suffered no injury. The reimbursement question can **only** be answered by asking each individual.

- Plaintiffs have only proffered a "preliminary" class damages model that fails *Daubert* standards and that they cannot just "re-do" at a later time, particularly where they offer no evidence whatsoever that a later model will fix anything. The inherently variable nature of airline pricing—which Plaintiffs ignore—instead shows that the alleged overcharges cannot be reduced to formulaic calculations capable of class-wide resolution.

- Plaintiffs have not stated a coherent theory of RICO causation between the alleged fraud on the FAA, pilots, press, and public—none of whom set airline prices—and each alleged "overcharge." Southwest's actual pricing practices show that innumerable, dynamic factors impact each ticket price at any given time, and that the prices paid by purchasers vary significantly based on those factors even for the exact same flights.

  Nor does the Fifth Circuit's decision in *Torres* save Plaintiffs, as that case rejected a multiple "misrepresentation" theory like Plaintiffs offer here. The Court only affirmed certification based on a uniform "per se illegal" pyramid scheme, which it found, based on lack of evidence from defendants, no reasonable class member would have knowingly joined to lose money. Here, the evidence shows just the opposite—many consumers would still have flown on Southwest MAXs, with no uniform overcharges in the but-for world.

- The Fifth Circuit and others have outright rejected market-based fraud theories, like all of Plaintiffs' theories here, in RICO class actions because no common, efficient market exists for non-securities consumer products.

- The alleged fraud itself spans purported statements made to different audiences in varying contexts over nearly a decade of time, including the proposed class period, negating any common proof of uniform or standardized fraud.

- Defendants' knowledge of the alleged MAX and MCAS issues, relevant to the scienter requirement of the RICO claims, also varied widely over the proposed class period, showing that their alleged conduct "means different things for different class members."

- Putative class members, who flew Southwest and purchased their tickets on Southwest's website or app, agreed to explicit class action waivers, creating yet another individualized issue as to that affirmative defense that cannot be resolved on a class-wide basis.

  For these reasons, and others below, the Court should deny class certification.

## ARGUMENT

**I.      Plaintiffs' "Would Have Paid Less" Theory Lacks Article III Standing.**

Under the Court's prior rulings, only one theory of Article III injury remains viable, while the Court "definitively" and "explicitly *rejected*" two other theories:

| Sole-Remaining Theory | Theories Expressly Rejected by the Court |
|---|---|
| • The theory that "Defendants' fraudulent misrepresentations and omissions ***allowed Defendant Southwest to overcharge*** Plaintiffs for their tickets," an alleged injury that occurred "at the time of their ticket purchase," and not after. Dkt. #56 at 3, 12 (emphasis added).[1] | • Plaintiffs' theory that "if Plaintiffs had known the MAX 8 was fatally defective, Plaintiffs would never have purchased tickets." Dkt. #56 at 3.<br><br>• Plaintiffs' theory "that they could establish an Article III injury by claiming that ***they would have paid less*** if an alleged safety risk had been disclosed." Dkt. #152 at 5 (emphasis added). |

Despite the Court's rulings, Plaintiffs' certification arguments rely on what consumers "would have paid" or been "willing to pay" following the MAX grounding and purported disclosure of the MAX's alleged safety issues. Mot. at 41-42, 45. That is precisely the theory this Court has "already explicitly *rejected*." Dkt. #152 at 5.

By contrast, completely absent from Plaintiffs' motion is any evidence of how the alleged fraud "***allowed Defendant Southwest***" through Southwest's actual pricing practices "to overcharge Plaintiffs for their tickets." Dkt. #56 at 3 (emphasis added). Plaintiffs present no evidence or theory as to how Southwest affirmatively fixed or raised prices through any of its pricing mechanisms, as one would do in, for example, an antitrust case concerning overcharges. Plaintiffs' expert instead purports to rely on ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ Ex. 10, Allenby Dep. 203:11-14; Mot., Ex. A-1 at 19-24.

To be sure, Plaintiffs sought—and Southwest produced—comprehensive information and

---

[1] Southwest continues to respectfully urge that Plaintiffs' remaining "overcharge" theory, in any form, fails to satisfy Article III standing. *See* Dkt. #19, 34, 71, 73.

testimony on how Southwest actually prices its tickets. *E.g.*, Ex. 1, Interrogatory Resp.; Ex. 3, Louis Dep. 144:4-19; Exs. 2, 4-9. Yet Plaintiffs' lengthy "statement of facts" contains **no** evidence regarding Southwest's actual pricing behavior. Nor do they present evidence as to how non-party American prices its flights, or how Southwest, a separate airline, was able to overcharge for American flights. As shown below, the evidence affirmatively establishes the highly individualized nature of airline pricing, negating Rule 23(b)(3) predominance. *Infra* at 27-31.

Plaintiffs themselves testified that they: (a) would never have purchased a ticket at all, or (b) would have paid less based on their later understanding of the alleged MAX risks, ███

████████████████████████████████████████████████████████████████████████

Appendix A; Mot., Ex. M-1, Mills Rep. at 12, 17. Neither alleged injury confers standing.

At class certification, courts "must decide [Article III] standing first." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). Contrary to Plaintiffs' assertion that the Court need only look at their pleadings to determine standing (Mot. at 22), the Article III standing elements "are not mere pleading requirements" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 (1996)). Because the Court already rejected Plaintiffs' sole "would have paid less" injury theory under Article III, neither the named Plaintiffs nor putative class members have standing, and this case should be dismissed.

## II.  The Identities of Putative Class Members Are Not Ascertainable or, At a Minimum, Require Individualized Inquiries into the "Persons Who Purchased."

"[I]n order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012). An "implied prerequisite" of Rule 23, ascertainability requires that the

proposed classes "be clearly defined so that it is administratively feasible for the Court to determine whether a particular individual is a member." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Morrow v. Washington*, 277 F.R.D. 172, 187 (E.D. Tex. 2011). An insufficiently defined class also fails Rule 23(b)(3)'s predominance requirement if identifying putative class members necessitates individualized inquiries. *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017); *Pfeffer v. HSA Retail, Inc.*, 2012 WL 1910034, *3 (W.D. Tex. May 24, 2012).

Plaintiffs define both of their proposed classes as "[a]ll persons **who purchased** a ticket for air travel" on certain Southwest and American flights. Mot. at 20 (emphasis added). Yet neither Plaintiffs nor their experts explain how those "purchasers" will be identified between potentially conflicting groups of possible "purchasers" for the same flight—i.e., the passenger vs. the credit-cardholder vs. the ultimate purchaser/reimburser. Plaintiffs' expert Robert Mills ("Mills") appears to think that ██████████████████████████████████████████████████████████████████ Mot., Mills Decl. ¶ 4. But Mills admitted that ████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ Ex. 25, Mills Dep. 84:15–86:3. In fact, Mills was only able to confirm that the named Plaintiffs were "purchasers" based on "an understanding from counsel." *Id.* at 73:6-18.

The experiences of the named Plaintiffs also confirm the individualized nature of the "purchaser" inquiry. For instance, Plaintiffs Ruben Castro and Alesa Beck seek recovery for a number of flights for which they **were not** the passengers but that they claim they "purchased" for others. Castro Decl. ¶ 5; Beck Decl. ¶ 7; Appendix C. Plaintiff Brett Noble, conversely, does not seek damages for the many flights he initially paid for but were later reimbursed by his employer, as shown below. *Infra* at 19-20. In reimbursement situations, both the existence of a reimbursement

and the identity of the reimburser are unknowable without individual inquiry. *See infra* at 17-20.

Plaintiff Beck's personal situation highlights even more individualized nuances with determining the actual "purchaser": all of her flights during the proposed class period were "initially" paid for with someone else's credit card at the point of sale. Mot. Beck Decl. ¶ 5; Ex. 37 at SWA_Earl_Data_00000221; Ex. 38, Beck Dep. 150:22-151:21. Beck openly acknowledged that she "did not purchase" those tickets. *Id.* at 159:17-24, 161:10-17. Yet Beck asserts that she is due the alleged overcharge because she claims to have, at some later time, "used her own funds" to reimburse the cardholder's credit card account with her own bank account—a one-off transaction not detectable in any Southwest records. *Id.* at 150:22-151:21, 154:12-19; Beck Decl. ¶¶ 6-7. And Beck readily confirmed that, in her personal situation, the "only way" to verify the "purchaser" of her flights would be to "talk" to her. Ex. 38, Beck Dep. 235:1-21. When asked whether she was a member of the putative classes, Beck aptly responded, "I can't answer that." *Id.* at 161:10-17. And neither can the Court or the parties, without making the individual inquiry to each putative class member, like Beck.

Because the "only way" to identify putative-class-member purchasers is by "talking" to each of them, the ascertainability requirement provides yet another independent ground, and set of individualized issues, that require denying class certification under Rule 23(b)(3).

## III.    Individual Liability and Damages Issues Predominate Over Any Common Questions, Precluding Class Certification under Rule 23(b)(3).

Plaintiffs have not proven, and cannot prove, the required predominance under Rule 23(b)(3) because  the fraud, scienter, injury, causation, and damages elements of Plaintiffs' RICO claims, as well as defenses to those claims, are not common issues capable of class-wide resolution.

Because Plaintiffs move to certify under Rule 23(b)(3),[2] Plaintiffs "must actually ***prove***—

---

[2] Plaintiffs abandon certification under Rule 23(b)(2) and 23(c)(4). Dkt. #165 ¶ 294-95, 298, 320, 324.

not simply plead—that their proposed class satisfies" the "demanding" predominance requirement. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). That is, they must actually prove that "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Courts must, in turn, "consider 'how a trial on the merits would be conducted if a class were certified.'" *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). That requires evaluating the elements of plaintiffs' claims and whether each theory presented by plaintiffs is valid and satisfies the predominance requirement. *Funeral Consumers*, 695 F.3d at 348; *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 634 (5th Cir. 2016). Courts must also sufficiently analyze defendants' challenges to class certification and how those would actually be tried. Because Rule 23 cannot "abridge, enlarge or modify any substantive right," in deciding class certification, courts must ensure that defendants maintain the right to litigate all defenses to individual claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

Plaintiffs fail to satisfy Rule 23(b)(3) predominance on multiple grounds.

**A.   Plaintiffs' class theories of fraud fail as a matter of law and necessitate individualized inquiries that cannot be resolved by common evidence.**

As their motion makes plain, Plaintiffs' entire RICO fraud putative class action is premised on "market"-based theories of fraud that the Fifth Circuit and other courts have found invalid as a matter of law outside of the securities context and absent any proof of a common, efficient market, which Plaintiffs have not tried to, and could not, prove here. Plaintiffs' "fraud" allegations also vary so wildly by maker, method, time, context, and audience that it strains credulity even to argue that those fraudulent acts and their impact (e.g., causation and reliance) could somehow be tried

on uniform homogeneous facts across two nationwide classes of airline consumers.

Plaintiffs' fraud theories fail Rule 23(b)(3) on multiple independent fronts.

### 1.   The Fifth Circuit has rejected Plaintiffs' sole theory (fraud-on-the-market) in RICO cases, and there is no efficient market to support such a theory.

In Plaintiffs' own words, their class theories of fraud *all* involve fraud that allegedly impacted the "market." They consistently assert that Defendants' "scheme to defraud regulators, pilots, the media, and the public about the MAX" allegedly "inflated market demand" and "the *market price* for airlines that used a significant number of MAX 8s," thus purportedly inflating the prices that putative class members were willing to pay. Mot. at 37, 40 (emphasis in original), 41. Plaintiffs' theories are, at base, what courts—and Plaintiffs' counsel—have labeled "fraud-on-the-market" theories.[3] But, outside of the securities context, such theories are not cognizable in RICO cases in this Circuit and elsewhere, providing grounds alone to deny class certification.

The Fifth Circuit has rejected the use of "fraud on the market" theories in consumer RICO cases, noting the "critical" requirement for the existence of an "efficient market":

> No court has accepted the use of [the "fraud on the market"] theory outside of the context of securities fraud, and one circuit has expressly rejected its use in the context of a similar civil RICO case. An efficient market is a critical element of a market's role as an intermediary. There is no pretense of such a market here [regarding plumbing systems] and the fraud on the market doctrine is not applicable.

*Summit Props. Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000), *overruled on*

---

[3] *See*, *e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223–24 (2d Cir. 2008) ("Plaintiffs . . . suggest that defendants distorted the body of public information . . . whether or not individual plaintiffs were actually aware of defendants' alleged misrepresentation. Their argument invokes the fraud-on-the-market presumption . . . ."), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *21-22 (D.N.J. July 10, 2009) (classifying price premium and inflation theory as "a classic fraud-on-the-market theory normally pled in securities fraud cases, but one which is not cognizable under RICO.").

Plaintiffs' own counsel openly championed their "fraud on the market" theory after moving for class certification. *See* Ex. 11, *737 Max Flyers Seek Cert In Boeing, Southwest RICO Suit*, Law360.com (Jan. 6, 2021) ("[Yavar] Bathaee said. 'We are optimistic that the court will grant our motion, allowing millions of class members to recover for defendants' *fraud on the market*.'") (emphasis added).

*other grounds*, *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009). Sufficiently efficient markets to support a "fraud on the market" theory are generally restricted to one context: certain publicly traded securities. *See id.* As another court in this Circuit put it: "'[F]raud on the market' theories of recovery . . . are available in the context of securities litigation—not in RICO litigation." *Haley v. Merial, Ltd.*, 292 F.R.D. 339, 357 n.11 (N.D. Miss. 2013).

Numerous other courts have adopted the same rule as the Fifth Circuit—that, outside of the securities context, "fraud on the market" theories are not cognizable in RICO cases, with many also recognizing that consumer products are not sold in efficient markets:

- "[Plaintiff] may not rely on a fraud-on-the-market . . . theory . . . for its RICO claim." *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 410 n.4 (11th Cir. 2011).

- "[T]he market for consumer goods . . . is anything but efficient." *McLaughlin*, 522 F.3d at 223-24.

- "Nor, for that matter, is the court aware of any authority applying a fraud on the market theory to a consumer action. . . . A fraud on the market cannot exist without an efficient market." *In re POM Wonderful LLC*, 2014 WL 1225184, at *4 (C.D. Cal. Mar. 25, 2014).

- "Plaintiffs cannot rely on a fraud-on-the-market theory in this RICO real estate case . . . ." *Lawrie v. Ginn Dev. Co.*, LLC, 2013 WL 222258, at *7 (M.D. Fla. Jan. 9, 2013).

- "Plaintiffs do not expressly plead a fraud on the market theory of RICO injury, presumably because such a theory has been resoundingly rejected outside the context of federal securities fraud litigation. . . . [t]his is, by definition, a fraud-on-the-market theory and one which is not cognizable under RICO." *In re Schering-Plough*, 2009 WL 2043604, at *20, *22.

- "[The fraud-on-the-market] theory is not recognized in the RICO context, and thus, not a viable theory here." *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *9 n.12 (D.N.J. Dec. 23, 2008).

This Court should follow suit and bar Plaintiffs from seeking class certification in this RICO action based on non-cognizable "fraud on the market" theories. Because all of Plaintiffs' theories are fraud-on-the-market theories, class certification should be denied.

This conclusion is supported by Plaintiffs' failure to even attempt to show common evidence of market efficiency. As the Fifth Circuit recognized, if a plaintiff's theory of fraud relies

on the "market's role as an intermediary"—which Plaintiffs' theories all do—then there must be an "efficient market." *Summit Props.*, 214 F.3d at 561. An "efficient market" is one where it can be presumed that public information, including fraudulent information, is directly incorporated into, and thus has a direct impact on, the price of the product at issue. *Id*.

The existence of an efficient market itself, however, cannot be presumed and must be established by evidence. *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 315 (5th Cir. 2005) (faulting the plaintiff for doing "no analysis of any of the market efficiency factors"). Even in the securities context where courts have accepted fraud-on-the-market theories, courts do not presume an efficient market. *See, e.g.*, *id.* (concluding that trading on a major stock exchange alone was "insufficient to show market efficiency and thus predominance"); *Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005) (requiring "an initial demonstration of market efficiency"). Without evidence of an efficient market, "there is no assurance that the available material information . . . translates into an effect on the market price." *Unger*, 401 F.3d at 322. This issue is "decisive for class certification," and courts should "appl[y] rigorous, though preliminary, standards of proof to the market efficiency determination." *Id.*

Plaintiffs have not presented any common evidence, nor even any arguments, that any market for Southwest or American flights—whether by origin-destination route, regionally, nationwide, or otherwise—functioned as an efficient market during the proposed class period.

In fact, just the opposite is true, when considering the "many other factors that could affect the price" and related expert evidence, as this Court must do. *Unger*, 401 F.3d at 324-25. Here, Plaintiffs and Southwest each retained airline economists. Plaintiffs' economist provided no opinions on the efficiency of any commercial airline markets. Instead, he (and Southwest's expert) undisputedly confirmed that: (a) numerous non-safety variables impact consumer preferences and

purchasing of commercial airline flight tickets; and (b) just as many variables impact actual airline pricing, independent of consumer demand. *See infra* at 30; Ex. 12 Lee Rep. at 21-29; Ex. 13, Brueckner Dep. 206:10-214:21. ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ *See infra* at 28-30; Ex. 1, Southwest's Interrogatory Resp. at 3-5; Ex. 3, Louis Dep. 168:15-169:9. Public safety information (to the extent it were even considered) cannot, therefore, be presumed to directly impact consumer demand (or, even more implausibly, airline pricing at all), let alone impact it uniformly or systematically—negating any notion of an efficient market here.

The Court should deny class certification, as Plaintiffs have not asserted any theory of fraud not premised on the "market" as an intermediary.

### 2. Plaintiffs are judicially estopped and precluded from seeking certification based on their market-based, fraud-on-the-FAA theory.

Plaintiffs' market-based, fraud-on-the-FAA theory fails as a matter of law on other grounds as well. Plaintiffs allege throughout their motion that Defendants defrauded regulators, including the FAA, to prop up market demand that then purportedly inflated ticket prices. *See, e.g.*, Mot. at 25, 33, 37, 40, 45. Plaintiffs further argue that Defendants' alleged fraud-on-the-FAA shows commonality under the RICO fraud and causation elements. *See id.* at 30. Not only is Plaintiffs' fraud-on-the-FAA theory invalid as a "fraud-on-the-market" theory, it is also barred from supporting class certification on judicial estoppel and preclusion grounds.

First, in trying to defeat preemption and preclusion arguments at the motion-to-dismiss stage, Plaintiffs asserted that their RICO claims were "for fraud on the public and the Plaintiffs— *not for fraud on the FAA*." Dkt. #56 at 24 n.15 (emphasis added). The Court expressly accepted that position and thus declined to address otherwise-implicated questions of preclusion under the

Federal Aviation Act. *Id.* Leaving no doubt, the Court reiterated "that Plaintiffs ***are not seeking recovery for fraud on the FAA*.*" *Id.* (emphasis added). Because Plaintiffs now seek to certify classes based on that exact theory, all three judicial estoppel elements are met: (1) Plaintiffs' current position is "plainly inconsistent with [their] prior position;" (2) Plaintiffs "convinced '[the] court [to] accept[ ] the prior position;'" and (3) Plaintiffs have not "act[ed] inadvertently" in doing so. *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017).

Second, any fraud-on-the-FAA theory of liability would also be precluded under the Federal Aviation Act ("FAAct"). *See* Dkt. #21 at 21-23; *Se. Laborers*, 444 F. App'x at 410 n.4 (11th Cir. 2011) (rejecting "fraud-on-the-FDA theory" in RICO case); *United Food & Comm'l Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 2012 WL 3061859, at *3-4 (N.D. Ill. July 26, 2012) (rejecting the plaintiff's reliance "on regulatory violations to support its RICO claims"), *aff'd*, 719 F.3d 849 (7th Cir. 2013).

### 3.   Individual fraud issues and defenses overwhelm any common issues.

Even if Plaintiffs' fraud theories were viable, whether each putative class member (or each "market" or segment of the "public") was defrauded is a question riddled with individualized issues, including defenses Southwest is entitled to pursue against each individual's fraud claims.

Courts have rejected, under Rule 23(b)(3), fraud theories based on an "array of alleged misrepresentations," or based on alleged fraud "contain[ing] material variations, emanate[ing] from several sources" and "indicat[ing] no standardized communications." *See*, *e.g.*, *Torres*, 838 F.3d at 634-35; *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 883 (5th Cir. 1973). That is precisely Plaintiffs' fraud theory here, which is far from a matter of uniform alleged fraud. Plaintiffs allege multifarious "fraud" where different individuals at Boeing and Southwest made different statements to different people among the FAA, pilots, "the media," the "public," and even "individual customers" about a host of different subjects, including:

- ██████████████████████████████

- ████████████████████████████████

- ██████████████████████████████

- ██████████████████████████████████

- the Lion Air crash in Indonesia on October 29, 2018;

- the Ethiopian Airlines crash on March 10, 2019;

- ████████████████████████████████████████████

- direct responses to "questions and concerns from [individual] customers" at various unknown and unstated times; and

- "statements to the public [that] would be relied upon by airline customers," including "omitted" information that "would have been material to them if provided."

*See* Mot. at 30-35. Many specific statements allegedly occurred during the 18-month class period, such as alleged statements by: (a) Boeing's CEO on television on November 14, 2018; (b) Southwest that same day; (c) Southwest in the press on November 29, 2018; (d) Southwest at a media dinner on December 4, 2018; (e) Southwest on Twitter on March, 11, 2019; and (f) Boeing the following day. Mot. at 14-15; Am. Compl. ¶ 231-37.

Even in cases involving a "single course of conduct," that alone is not enough for certification; courts must analyze "the evidence the parties may use to prove or defend against liability and its commonality to all class members." *Prantil v. Arkema Inc.*, 2021 WL 222722, at *7 (5th Cir. Jan. 22, 2021). Defendants will be entitled at any trial to defend that no fraud occurred at all—but also that none occurred on particular dates within the proposed class period and as to various individual consumers, audiences, and markets (among others). Such defensive evidence would include information about the MAX that was openly disclosed to segments of the public, media, pilots, and the FAA in the weeks and months after the Lion Air crash. For instance, during the proposed class period, the following information was disclosed to the public:

- On November 7, 2018, the FAA issued an Emergency Airworthiness Directive ("AD") to airlines, the public, and the media. Ex. 14. That AD disclosed that, under certain conditions, flight crews on MAX aircraft could "have difficulty controlling the airplane," resulting in "possible impact with terrain" and that such "unsafe condition . . . is likely to exist or develop in other" MAX aircraft. Ex. 14 at 1.

- On November 16, 2018, the Los Angeles Times quoted the AD and reported that (a) the "MAX aircraft and one of its flight control systems are now in the spotlight" following the death of 189 people in the Lion Air crash; (b) Southwest and American operated 26 and 16 MAX aircraft (respectively); and (c) the Southwest pilot union reported that their FAA-approved manuals from Boeing did not include a description of MCAS. Ex. 15.

- On November 17, 2018, CNN.com reported that (a) "[Boeing] allegedly failed to tell pilots about a new system feature implicated in the crash;" (b) American and Southwest representatives stated that Boeing did not include information in its manuals that "explained the functions of the new feature;" and (c) experts said they "personally would avoid the 737 MAX until there is time for the pilots to be retrained." Ex. 16.

- On February 10, 2019, the Wall Street Journal reported that: (a) "an automated flight-control feature . . . can forcefully push down the nose of MAX aircraft;" (b) the feature "was central" to the high-profile Lion Air crash; (c) "revised software" for the feature had not been finalized; and (d) Southwest and American operated the MAX. Ex. 17.

For those "markets" and segments of the "public" and putative class members that saw or were exposed to these and other public reports, Southwest has powerful individualized defenses against the alleged fraud—including related to truth, materiality, causation, individual awareness, reliance, and individual "willingness to pay" ticket prices—that Defendants are entitled to present at trial against those individual fraud claims. *See Dukes*, 564 U.S. at 367.

Plaintiffs' testimony and expert evidence support the individualized nature of the alleged fraud and defenses to it, making certification improper. Plaintiffs' airline economist expert conceded ███████████████████████████████████████████████████
███████████████████████████████ Ex. 13, Brueckner Dep. 51:6-12, 85:3-14; *see also id.* 50:14-18, 78:23-79:12. Similarly, some named Plaintiffs testified that they read the news about the MAX soon after the Lion Air crash in October 2018 with varying degrees of understanding and knowledge of Southwest's use of the MAX, while other named Plaintiffs were completely

unaware of one or even both of the MAX crashes; one Plaintiff even believed (incorrectly) that Southwest MAX flights had crashed. *See* Appendix B. Whether each putative class member (as well as each "market" and segment of the "public") was defrauded or not, thus, presents highly individualized liability and defense issues that warrant denial of class certification. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 890 (5th Cir. 1987) (affirming denial of class certification where "the critical fact of nondisclosure was not common to the putative class").

> **B.     Plaintiffs cannot prove the RICO scienter element on a class-wide basis because Southwest's state of knowledge evolved over the class period.**

Plaintiffs' RICO fraud claims require proof of "scienter" as to all putative class members—i.e., that both Southwest and Boeing "act[ed] knowingly with the specific intent to deceive." *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 718-19 (N.D. Tex. 2018). The RICO enterprise and conspiracy elements also require knowledge and intent. *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019).

As the Fifth Circuit has recognized, RICO "scienter" is a highly ***time-dependent*** inquiry, and defendants can defeat RICO claims by showing they lacked the required knowledge or intent at the time of the alleged fraud against a particular plaintiff. *Marriott Bros. v. Gage*, 911 F.2d 1105, 1109 (5th Cir. 1990). As one court in this Circuit explained:

> Regarding Ford's knowledge and concealment, there is evidence that Ford's state of knowledge was not uniform over the period in issue and that certain of its alleged "concealing" activities occurred in 1992, which could not have affected plaintiffs' purchasing 1990 model-year vehicles. When defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an aggregated basis is problematic.

*In re Ford Motor Co.*, 182 F.R.D. 214, 220 (E.D. La. 1998); *see also Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 453 (E.D. Pa. 2000) ("Defendant's knowledge would have to be determined for each time period at issue. Clearly, Defendant's knowledge would not be class-wide.").

Here, Southwest's knowledge about the MAX and its alleged issues varied widely during

- 15 -

the proposed class period. As an initial matter, Plaintiffs acknowledge that "Boeing designed the MCAS." Mot. at 8.



In short, Southwest's alleged "conduct means different things for different class members" at different points during the proposed class period. *See In re Ford*, 182 F.R.D. at 220. These individualized issues of liability and defense make trying the scienter element "on an aggregated basis . . . problematic," further supporting denial of class certification. *See id.*

### C.   Plaintiffs cannot prove the RICO injury element on a class-wide basis because multiple issues related to the fact of injury require individual inquiry.

Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement as to the injury element of their RICO claims because, as Plaintiffs' own fact and expert evidence shows, whether putative class members suffered the requisite injury (*i.e.*, the fact of injury) will vary widely, on multiple levels, based on the individualized facts of each member's flight purchase.

In addition to Article III standing, all RICO plaintiffs must establish statutory standing under RICO's civil liability provision, 18 U.S.C. § 1964(c), which requires proof of "two elements—injury and causation." *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998). The RICO injury element, in turn, requires that each Plaintiff, and each putative class

member, suffer a tangible injury to his or her "business or property" that is a "concrete" and "conclusive financial loss." 18 U.S.C. § 1964(c); *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995).

Plaintiffs appear to conflate proof of each putative class member's fact of injury with the distinct element of damages, or the "extent" or amount of the injury. *See* Mot. at 43; *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975) ("[W]hatever injury may have been suffered is peculiar to the individual member concerned, and ***both the fact and extent of injury*** would require individualized proof." (emphasis added)). Plaintiffs thus ask the Court to just assume that all putative class members have, in fact, suffered the requisite RICO injury in the first place—an assumption that is improper under class certification law and negated by Plaintiffs' own evidence.

As shown below, putative class members' fact of injury is a highly individualized question on many fronts, rendering the injury element incapable of class-wide resolution and defeating certification under Rule 23(b)(3).

### 1.  The question of reimbursement is undisputedly individualized.

As Southwest data and various experiences of the named Plaintiffs illustrate, significant numbers of putative class members did not suffer out-of-pocket or "conclusive financial losses" because they were reimbursed by employers or others for their flights—an issue that cannot be determined without individualized inquiries. Indeed, in soliciting potential plaintiffs for this case, Plaintiffs' counsel instructed: "Only personal travel, not business travel, is relevant to this investigation." Ex. 24. Individual Plaintiffs have also made clear they are not seeking reimbursement for flights for which they were reimbursed by their employers. *See* Appendix C.

A number of courts have found reimbursement and similar pass-on issues to be predominance-defeating. *See*, *e.g.*, *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 564 (N.D. Cal. 2009); *In re Methionine*, 204 F.R.D. 161, 165 (N.D. Cal. 2001); *Weidenhamer v. Expedia, Inc.*, 2015 WL

7157282, at *14 (W.D. Wash. Nov. 13, 2015); *Neuser v. Carrier Corp.*, 2007 WL 1470855, at *4 (W.D. Wisc. May 15, 2007). Plaintiffs' cited case law also demonstrates that the question of reimbursement matters. In *In re EpiPen*, the plaintiffs and the court went to great lengths to ensure that "potential 'uninjured class members'" were not included in the classes by excluding groups of putative class members who would have been reimbursed: "Fully insured health plans (i.e., plans that purchased insurance that covered 100% of the plan's reimbursement obligations to its members)" and "Consumers who purchased or received EpiPens or authorized generic equivalents only through a Medicaid program." 2020 WL 1180550, at *8 (D. Kan. Mar. 10, 2020). Similarly, in *Vine v. PLS Financial Services*, this Court modified the class "to include only those who paid some or all of the additional fines and fees," which was "eighty or so" people with "fines and fees" that were "fairly uniform" in fixed amounts of "thirty, fifty, or seventy–five dollars" and were "maintained in a centralized database . . . that lists the precise amount owed . . . to each class member." 331 F.R.D. 325, 332, 338 (E.D. Tex. 2019), *aff'd*, 807 F. App'x 320 (5th Cir. 2020).

By contrast, the issue of reimbursement here is far from uniform or capable of centralized or objective determination. Aside from Plaintiffs' counsel's initial solicitation of potential plaintiffs, Plaintiffs and their experts have made no efforts to ensure that the putative classes do not include reimbursed individuals. *See, e.g.*, Ex. 25, Mills Dep. 92:6-15 █████████████████████████████████████████████████████████████████████ ██████████████████████████████ ). Nor could they. Unlike the ease of categorically identifying health plans that were "fully insured," consumers who were on Medicaid, or those in a centralized database tracking fixed amounts paid, no data exists to resolve the question of employer-funded (or other) reimbursement among the potentially millions of commercial airline passengers at issue in the case. *See id.* at 93:22-94:4, 204:21-206:13; Ex. 26 ¶ 3, A. Whelchel Decl.

Utterly ignored by Plaintiffs, the extent of reimbursement is enormous. During the proposed class period, the percentage of daily Southwest customers who selected "business" as a reason for travel varied between ██████████ Ex 27-A; Ex. 27, N. Wood Decl. ████████

████████████████████████████████████████████████████████████

█████████████████████████████████████. Ex. 27-A; Ex. 12, Lee Rep. at 79-80. The data also does not show which of those self-reported "business" travelers were partially or fully reimbursed, thus requiring an individualized inquiry to determine whether each putative class member actually suffered an alleged injury. As confirmed by Plaintiffs' expert Allenby, ████

████████████████████████████████████████████████████████████

███████████████████████████ Ex. 10, Allenby Dep. 223:8-16. Not to mention, some employers were certainly reimbursed by clients or others, further attenuating the inquiry.

The prevalence and individualized nature of reimbursement is also confirmed by the Plaintiffs' evidence, which shows that reimbursement could not be vetted—as Defendants are entitled to do at trial—without evidence from each Plaintiff. Plaintiffs variously attested that they were reimbursed for some, none, or all of their flights and/or reimbursed others for flights, with 3 of the 11 deposed Plaintiffs experiencing a reimbursement of some sort (some for non-business purposes). Appendix C. Plaintiff Brett Noble exemplifies many of these issues. He disclosed that all of his American Airlines flights "were taken for business purposes and were reimbursed by [his] employer," and so he testified that he was not a member of the proposed American Airlines class, even though one of his American flights was on a MAX aircraft. Mot., Noble. Decl. ¶ 8; Ex. 28, Noble Dep. 60:24-62:6, 75:2-4, 171:10-13, 194:14-195:6, 232:19-24. As for his Southwest flights, Noble flew on ████████ during the proposed class period but only disclosed 12 of them in his declaration. Ex. 29 (Noble Dep. Ex. 8); Mot. Noble. Decl. ¶ 5. When asked about the

discrepancy, Noble explained that it was "a lot of business flights," the reimbursements of which would be impossible to track even in his own records. Ex. 28, Noble Dep. 173:25-176:23, 228:6-229:6. Noble (like Allenby) confirmed that including him as a business traveler in the putative class would result in a windfall as to the alleged overcharge. *Id.* at 218:20-219:22. But he also disclosed a windfall of another type: he earned Southwest Rapid Rewards points for those fully reimbursed flights. *Id.* at 218:20-219:22. That is, reimbursed travelers like Noble not only suffer no out-of-pocket loss, they also walk away with airline points, which are just as good "as cash." *Id.* at 216:7-21.

Thus, the key question of reimbursement, as to the alleged RICO injury, necessitates individualized inquiries and cannot be determined short of asking every putative class member to submit evidence on reimbursement—a process that Plaintiff Noble concedes is impossible and that courts have flatly rejected. *See Ibe v. Jones*, 836 F.3d 516, 531 (5th Cir. 2016) ("[T]his court has made clear that '[a] district court cannot manufacture predominance through the nimble use of' management tools."); *Ticknor v. Rouse's Enters., L.L.C.*, 592 F. App'x 276, 278–79 (5th Cir. 2014) (holding "that class issues do not predominate when 'transaction-by-transaction' determinations are required" and rejecting the "plaintiffs['] conten[tion] that post-trial mechanisms, such as claims forms . . . would eliminate the burdens of a transaction-by-transaction analysis").

### 2.   Payment of fixed or discounted rates negates any common injury.

Separate from any reimbursement issues, and as supported by expert and industry evidence, segments of the putative class purchased their tickets through government-managed, corporate, or other travel programs that offered fixed or discounted rates on both Southwest and American Airlines flights. Many, if not all, of those fixed or discounted rates could not have been overcharged. But dissecting the putative classes for individuals who paid such rates unaffected by any alleged overcharges would, again, necessitate individualized inquiries.

Government-managed travel programs, at the federal and state level, directly contract with

carriers ██████████████████████████████████████████████████████

████████████████████████████████ Ex. 12, Lee Rep. at 18-19 (emphasis in original);

*see also id.* at 133-34. ███████████████████████████████████████

████████████████████████████████████████ *See id.* at 133;

Ex. 30-A at 3. ██████████████████████████████████████████

████████████████████████████████████████████████

██ Ex. 30-B. ███████████████████████████. Ex. 30-A at 2.

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ Ex. 12, Lee

Rep. at 18-19, 133-34. Specifically, for Southwest:



Here, Plaintiffs make no effort to exclude uninjured putative class members who paid fixed

or discounted rates, like government- or corporate-negotiated rates, unaffected by any alleged

fraud.[4] Attempting to do so would require inquiries into (a) the individual negotiations underlying each government, corporate, or other program rate and any influence of the alleged fraud on those negotiations, (b) the price differentials between the fixed or discounted rates and prices paid by others who booked the same flight at the same time, and (c) whether the price differentials resulted from completely unrelated factors. Such inquiries into individual program negotiations "destroy" predominance. *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir. 2004).

### 3. High variability in fares and consumer preferences following airline safety events show no uniformity in alleged fact of injury.

As shown in Defendants' pending Motions to Exclude the Plaintiffs' experts (Dkt. #252, 253), the experts' methodologies are unreliable in measuring class-wide damages for a number of reasons. But the data relied on by Plaintiffs' experts ***all show*** that any impacts on consumer preferences and ultimately flight prices were highly variable across individual putative class members and that many did not suffer the alleged overcharge injury at all.

**Plaintiffs' Expert Brueckner:** Brueckner, the airline economist retained by Plaintiffs,



. *See* Ex. 31, Brueckner Rep. at 7-8, at Ex. 3; Ex. 12, Lee Rep. at 119-20.

---

[4] Again, in *In re EpiPen*, consumers who paid "flat" or "fixed" amounts were excluded from the classes in that case. *See In re EpiPen*, 2020 WL 1180550, at *8 (excluding from proposed classes: "'Single flat co-pay' consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, whether branded or generic (e.g., $20 for all branded and generic devices)").

██████████████████████████████████████████████ Ex. 31, Brueckner

Rep. at 2, 4 n.1, 9-10; Ex. 13, Brueckner Dep. 187:7-188:14. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex.

12, Lee Rep. at 53; *id.* at 45-54. ██████████████████████████████

████████████ Ex. 32, Hitt Rep. ¶¶ 137-38 & Ex. 16. Not surprisingly, Plaintiffs do not cite

Brueckner at all in their motion and now attempt to disclaim any reliance on him. *See* Dkt. #294.

**Plaintiffs' Expert Allenby:** The data proffered by Plaintiffs' other expert Professor Greg

Allenby ("Allenby") likewise shows that █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████▌ ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Mot.,

Ex. A-1, Allenby Rep. Tbls. 10 & 10A; Ex. 10, Allenby Dep. 237:15; Ex. 12, Lee Rep. at 106-08.

**Southwest's Consumer Surveys:** Plaintiffs also cite Southwest's post-grounding

consumer surveys. *See* Mot. at 22. These surveys, like Allenby's survey results, show ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[5] *See* Ex. 33, Allenby Pre-Testing Interviews, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



. Ex. 34-A at 24; Ex. 12, Lee Rep. at 41 n.55-56.

Mot., Ex. 69 at 12-13. Later surveys produced similar results:

. Mot., Ex. 79 at 14; Mot., Ex. 70 at 13.

Mot., Ex. 79 at 14. Plaintiffs' testimony also reflect high variability in consumer preferences. Ex. 12, Lee Rep. at 30-40.

For the many reasons outlined above, the RICO injury element cannot be proven with common evidence but, instead, requires predominant individualized inquiries on multiple fronts.

### D.   Plaintiffs cannot prove RICO causation through common, class-wide evidence.

RICO requires proof of both "but for" and "proximate" causation. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). When a RICO "excess price theory is not susceptible to generalized proof with respect to either but-for or proximate causation, class certification based on this theory [would be] an abuse of discretion." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010). Because putative class members' flight tickets were priced through complex, multi-faceted processes that vary across time, geographic market, passenger, and route (among other factors), any investigation into (and defenses related to) whether the alleged fraud was the but-for and proximate cause of each putative class member's alleged "overcharge" injury will

necessitate individualized inquiries, which will predominate over any common issues.

### 1. But-for causation does not present common issues that predominate.

Regarding but-for causation, Plaintiffs must prove, through class-wide evidence, that each putative class members' alleged overcharge injury would not have occurred "but for" the alleged RICO fraud—that is, they must prove no injury would have occurred in a "but for" or "counterfactual" world where the alleged MAX risks were disclosed at some point prior to or during the proposed class period. *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008). Plaintiffs have not done so. Nor do they even try to analyze the separate RICO requirement of but-for causation, instead addressing only proximate causation. *See* Mot. at 32.

Had they tried, Plaintiffs could not prove but-for causation for the putative classes through common evidence. Plaintiffs and their experts focus solely on the claimed class overcharge and what putative class members "would have paid" based on disclosure of the MAX's alleged issues *after* the two MAX crashes and *after* the aircraft's grounding and the end of the proposed class period. That type of post-hoc analysis shows no predominance, *supra* at 22-24, and it focuses on disclosures in the real world, not events in a counterfactual, "but for" world. Conducting a proper "counterfactual" analysis, as Southwest's expert did, shows that ████████████████████ ████████████████████████████████████████████████, negating any common "but for" causation of any uniform "overcharge" injury. *See* Ex. 12, Lee Rep. at 7-9, 55-75. Plaintiffs do not dispute this result.  And they cannot rely on their market-based theories to show common but-for causation. *Supra* at 8-11; *UFCW*, 620 F.3d at 133 (rejecting fraud-on-the-market theory to prove common RICO causation at class certification, including but-for causation).

### 2. Plaintiffs cannot prove proximate causation with common evidence.

Plaintiffs argue RICO proximate causation in broad strokes, without articulating a precise common chain of causation that is "direct" as to each putative class member. *See* Mot. at 32-35.

Evidence from both sides demonstrates the individualized, dynamic nature of commercial airline pricing, as well as the highly individualized nature of airline-consumer preferences, which, in turn, establish that the alleged fraud could not have uniformly caused, with the required "directness," the alleged "overcharge" injuries of each putative class member.

> ### a.  RICO proximate causation requires a "direct relationship," not just foreseeability; in any event, foreseeability is not a common issue.

Plaintiffs focus their proximate-cause discussion almost exclusively on "foreseeability," arguing that Defendants' alleged fraud "foreseeably inflate[d] the price of airline tickets on carriers that flew the MAX prior to its grounding." Mot. at 32. While relevant, foreseeability is not the test; "directness" or the existence of a "direct causal relationship" is. *See, e.g.*, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010) (plurality op.) ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability."); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim" was to bring about harm at the plaintiff's expense); *Torres*, 838 F.3d at 640 (requiring the alleged injuries to be "both" "a direct and foreseeable consequence" of the alleged fraud, and not merely the latter).

Regardless, foreseeability is not an issue that can be proven through common evidence where putative class members are differently situated (e.g., American Airlines purchasers,[6] people who never purchased tickets on a MAX or Boeing aircraft, people who flew on a so-called "MAX route" on which the MAX had flown once ever, once in a year, once a month, once a week, or

---

[6] Some named Plaintiffs candidly opined that American, not Southwest, would be liable for alleged overcharges on American flights. Ex. 35, Lewis Dep. 108:14-109:4, 156:5-12; Ex. 36, Thompson Dep. 133:19-20. But under Plaintiffs' theory, Southwest's alleged actions foreseeably could have injured passengers of all other MAX airlines (not just American)—further highlighting the theory's absurdity.

once daily); these variations are facially shown by the proposed class definitions and by the evidence, including Southwest's post-grounding consumer surveys (*supra* at 22-24). Contrary to Plaintiffs' argument, foreseeability does not depend only on evidence about Defendants. Mot. at 32. Foreseeability also turns on whether the plaintiffs were "foreseeable victims." *Torres*, 838 F.3d at 640. That is undisputedly a question directed toward each individual plaintiff.

> **b.  Plaintiffs cannot prove a common, direct chain of causation, and any causal chain would require individualized inquiries into airline pricing and transactions.**

Plaintiffs have not shown they can prove RICO proximate causation on a class-wide basis under the test that matters. They have not demonstrated any common ***direct*** causal chain between the various alleged fraud and each putative class member's alleged injury.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation ***led directly*** to the plaintiff's injuries." *Anza*, 547 U.S. at 461 (emphasis added). That directness generally requires a one-step causal chain, where the alleged injury is only one step away from the alleged fraud. *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 261 (1992) (recognizing the "general tendency of the law . . . not to go beyond the first step"); *Hemi Grp.*, 559 U.S. at 10 ("Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.").

Plaintiffs assert the following "chain of causation" that they claim is "incredibly straightforward" (Mot. at 32-33):

| | |
|---|---|
| **Alleged RICO violation:** various alleged frauds on "regulators, pilots, the media, and the public." Mot. at 33. | **Alleged injury:** "an airline ticket overcharge" on the price actually paid by each putative class member. *Id*. at 35. |

But Plaintiffs do not offer a common (or any) explanation as to how alleged "lies" to the

FAA, pilots, the media, or the public—none of whom set prices for flights—directly caused an "overcharge" to all putative class members. As one court explained in denying certification of a RICO fraud class on causation grounds, "misrepresentations standing alone have little legal significance. To connect the dots between the bare allegations and the injury, the class needs something more." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004).

Closer scrutiny of Plaintiffs' theories—as both Rule 23 and RICO demand—shows that Plaintiffs' alleged causal chain is neither "straightforward," direct, common, nor cognizable:

| **Alleged RICO violation:** various alleged frauds on "regulators, pilots, the media, and the public" at various times. Mot. at 33. | "getting" the MAX "approved and launched." *Id.* at 40. | "Keeping the MAX 8 in the air." *Id.* at 34. | The "market": "inflating market demand" and "market prices." *Id.* at 37, 40, 41 | **Alleged injury:** "an airline ticket overcharge" on the price actually paid by each putative class member. *Id.* at 35. |

Plaintiffs do not show that common evidence can bridge the gaps above between the multiple alleged acts of fraud and the asserted injury.

Evidence of Southwest's actual pricing mechanisms shows just the opposite. ▮▮▮▮







Ex. 1. Under the complex processes above, Southwest, like other airlines, ████████

██████████████████████████ *See* Ex. 3, Louis Dep. 226:14-18 ████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████ *See id.*; Ex. 12, Lee Rep. at 4-5, 21, 27-28.

Moreover, as shown above, ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Ex. 1 (emphasis added). Southwest's Rule 30(b)(6) pricing witness added even more color to ███

███████████████████████████████

███████████████████████████



Ex. 3, Louis Dep. 168:15-169:9; *see also id.* at 17:21-19:3. ████████████

██████████████████████████████████████████████████████

████████████████   Ex. 47, Lee Dep. 151:6-152:2.

The complex nature of commercial airline pricing is corroborated by Southwest's ***and Plaintiffs'*** experts. Southwest's expert explained ████████████████████████

██████████████████████████. Ex. 12, Lee Rep. at 4-6, 21-29. Plaintiffs' expert readily conceded that numerous (at least 30) non-safety-related factors impact airfares—many individualized and all independent of the alleged MAX safety issues here. Ex. 13, Brueckner Dep. 206:10-214:21; Appendix D (listing the factors).

Knowledge of the alleged fraud (*supra* at 12-15) would also "constitute an intervening cause breaking the chain of causation between [the alleged] misrepresentations and [the alleged] injury." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008).

Independent variables that could break the chain of causation and that vary between putative class members are fatal to both RICO proximate causation and class certification under Rule 23(b)(3). *See*, *e.g.*, *Prantil*, 2021 WL 222722, at *6 (reversing class certification in part on causation grounds because the district court did not fully assess "whether alternative sources [of the injury] will be a factor at trial"); *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376-77 (5th Cir. 2016) (where "Plaintiffs' own experts acknowledge[d] that not every"

putative class members' properties responded equally to the alleged conduct or that unrelated factors caused some of their damage, "[t]he district court was reasonably concerned that individual questions regarding causation would predominate even if circumstantial proof were used"); *Jackson v. Nat'l Ass'n for Advancement of Colored People*, 546 F. App'x 438, 444 (5th Cir. 2013) (finding no RICO proximate cause where "a combination of independent causal factors led to" the alleged injury).[7] Southwest would be entitled to defend at trial that other independent factors caused each putative class member's alleged overcharge, making class certification improper.

### 3. Plaintiffs assert reliance by individual "airline customers" and concede that reliance by "someone" is required for RICO causation.

Realizing that individual issues of reliance would doom their class certification efforts, Plaintiffs labor mightily to negate reliance's role as to causation. *See Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 415 (5th Cir. 2017) ("This court has held consistently that 'a fraud class action cannot be certified when individual reliance will be an issue.'"). Yet Plaintiffs assert elsewhere in their motion that Defendants made "false and misleading statements" to individual "customers" and that Defendants foresaw and knew "their statements to the public ***would be relied upon by airline customers*** and that information [Defendants] misleadingly omitted would have been material to [customers] if provided." Mot. at 35 (emphasis added). They also argue, in seeking a class-wide inference of causation, that no "member of the class would have paid more for such a

---

[7] Plaintiffs' cited cases do not show otherwise. *See* Mot. at 34-35. In *In re EpiPen*, an antitrust and RICO class action, the defendants Mylan and Pfizer allegedly used their market power, an EpiPen monopoly, fraudulent "pay for delay" settlements, and exclusive contracts to affirmatively raise the price of EpiPens nationwide by concrete dollar amounts, from $100 to over $600, despite its component only costing $1, while allegedly fraudulently marketing the need for two EpiPens versus one. 2020 WL 1180550, at *2, *40-47. Among other distinctions, there is no such alleged common price-related, supply-side conduct here by Southwest—that is, no common evidence that Southwest affirmatively raised its fares by uniform amounts.

Plaintiffs' other case, *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 35 (1st Cir. 2013), decided proximate causation as to ***individual*** RICO claims. Moreover, courts have denied class certification on causation grounds in other similar pharmaceutical RICO cases. *See, e.g., Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71 (2d Cir. 2015); *UFCW*, 620 F.3d 121.

ticket *knowing the truth*." *Id.* at 42 (emphasis added). Plaintiffs cannot have it both ways; they cannot argue no individual reliance but, on the next page, assert that individuals relied.

Plaintiffs also concede that, even if they could sidestep reliance by consumers despite their explicit allegations, *reliance by* "*someone*" *is required* for RICO but-for and proximate causation. Mot. at 37-38; *see also Bridge*, 553 U.S. at 658 ("[T]he plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."). Plaintiffs, however, never specify who that "*someone*" is, nor do they show how any reliance by someone (whether the "market," the FAA, pilots, the media, or the public) *led directly* to the alleged overcharges or is common to the putative classes. *See supra* at 27-31.

### 4. A class-wide inference of causation cannot be applied here because the core conduct—taking a new aircraft to market—is not inherently fraudulent.

Having failed to articulate the required direct causal relationship, Plaintiffs try to hang their hat on the Fifth Circuit's *Torres* opinion to argue for a class-wide inference of causation. Mot. at 38-41. *Torres*, however, actually demonstrates why certification is improper under Rule 23(b)(3).[8]

In *Torres*, the plaintiffs asserted two sets of theories: (1) the defendants made "fraudulent misstatements" about the lucrativeness of their multi-level marketing program or pyramid scheme, which caused the plaintiffs to join as sales associates and lose money; and (2) the pyramid scheme itself was the fraud that defendants engaged in and that caused the plaintiffs to lose money. 838 F.3d at 634. The district court "rejected class certification on the Plaintiffs' [first] theory that depend[ed] on specific misrepresentations," concluding that the reliance and causation issues would require individualized inquiries. *Id.* The district court only certified, and the Fifth Circuit

---

[8] Initially, Plaintiffs cannot invoke a class-wide presumption of causation for their market-based theories (not present in *Torres*) because they have not established an efficient market. *Supra* at 8-11. Applying *Torres* and a class-wide inference here would unquestionably "threaten[] to reduce the certification process into a virtual rubber stamp of approval irrespective of . . . [the] circumstances at issue." *Bacon v. Stiefel Labs., Inc.*, 275 F.R.D. 681, 699 (S.D. Fla. 2011).

only affirmed, a class under the plaintiffs' other theory that "depend[ed] on common proof of a pyramid scheme" *as the fraud*. *Id.* And the certified class was "comprised of only those who *lost money* participating in" the alleged pyramid scheme. *Id.* at 646 (emphasis in original).

This case—where Plaintiffs repeatedly allege that Defendants "disseminated numerous misrepresentations" including "false and misleading statements" to individual "customers"—is akin to the first theory rejected by the district court in *Torres*. Mot. at 33, 35. Plaintiffs' theories here unquestionably "depend[] on specific misrepresentations." *Torres*, 838 F.3d at 634. Unlike the pyramid scheme in *Torres*, which was "*per se*" and "inherently fraudulent" without any misrepresentations, the alleged scheme here—an aircraft-manufacturer and airline-customer (one of many) working independently and together to launch and fly an aircraft—is *only allegedly fraudulent because of the purported misrepresentations*. *Id.* at 638-39. Because the alleged scheme here is not "inherently fraudulent" as in *Torres*, Plaintiffs' reliance on *Torres* falls apart.[9]

Plaintiffs also cannot employ the "common inference of reliance" and causation from *Torres*, even if it were possible under their market-based theories. The Fifth Circuit allowed such inference in *Torres* based on two interrelated grounds: (1) it found it "reasonable to infer that individuals do not knowingly join pyramid schemes" because such schemes are inherently deceptive and participants either lose money or defraud others; and (2) the "record [was] devoid of any evidence that a single putative class member joined" the pyramid scheme with knowledge of the alleged fraud. 838 F.3d at 643. Indeed, the defendants' failure of proof was a consistent theme throughout *Torres*, with the Fifth Circuit remarking that "[h]ad the Defendants presented evidence that could rebut the Plaintiffs' common inference of reliance on an individualized basis,

---

[9] Similarly, in *Vine*, the Court first rejected theories relying on misrepresentations to the plaintiffs, given the individual issues. But the Court allowed the plaintiffs to proceed based on the direct causal relationship between the alleged common fraud on the District Attorney that directly led to the DA's assessment of fines and fees from the plaintiffs. *Vine*, 331 F.R.D. at 339-40. This case is not a one-step, uniform causation case.

we and the district court might have concluded that individual issues of reliance would predominate at trial." *Id.* at 644. The Fifth Circuit contrasted *Torres* with its decision in *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205 (5th Cir. 2003), where the defendants had introduced evidence rebutting common reliance and causation and where the Fifth Circuit reversed certification of a RICO fraud class. 319 F.3d at 644-45.

Neither ground from *Torres* exists here. Defendants have presented substantial evidence showing that: (i) the alleged MAX issues were widely publicized during the proposed class period in mainstream media, *supra* at 12-15; (ii) some named Plaintiffs saw those reports during the proposed class period and still purchased flights, *see* Appendix B; (iii) after the Lion Air MAX crash and its publicity, ███████████████████████████, *supra* at 22-24; (iv) even after the MAX grounding, ██████████████████████████████ ██████████████████████, *id.*; and (v) airlines price, and consumers purchase, seats on flights based on a vast number of dynamic factors that are independent of safety, aircraft type, and the MAX issues alleged here, *supra* at 22-24, 27-31. Based on all of this, there can be no "reasonable" inference that no person "***would have paid*** a full market price for a ticket." *Contra* Mot. at 41 (emphasis added).[10]

---

[10] Plaintiffs' other cited cases are likewise inapposite. *See, e.g.*, *In re EpiPen*, 2020 WL 1180550, at *44–45 ("[i]n the RICO context, class certification is proper when 'causation can be established through an inference of reliance *where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct*.'") (emphasis added); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) ("the defendant here is alleged to have sent the plaintiffs false billing information . . . permitting "the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed"); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (allowing an "inference of class-wide impact" because, in antitrust cases, "price-fixing," by definition, "affects all market participants").

- 34 -

**E.      Individual damages issues predominate, and Plaintiffs' "preliminary" survey fails to show that damages are capable of class-wide resolution.**

Plaintiffs' class damages approach can be summed up as follows: 

*See* Mot. at 45.

*See* Dkt. #253

at 10-11; Allenby Rep. Tbls. 10 & 10A.

Allenby Dep. 237:15. From those conflicting results,

. *See*

Mot. at 46. Allenby later conceded that

.

Ex. 10, Allenby Dep. 170:11-13; Dkt. #296 at 1; Mot. at 47-48.

Plaintiffs' "preliminary" damages model does not fly in the Fifth Circuit for a number of reasons, providing independent grounds under Rule 23(b)(3) for denying class certification.

**1.   Plaintiffs' preliminary "trust me" approach fails their Rule 23 burden.**

The Fifth Circuit has been clear: even if plaintiffs satisfy predominance as to liability issues, "they ***must also present a damages model*** 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 257-58 (5th Cir. 2020) (emphasis added) (quoting *Comcast*, 569 U.S. at 34). Plaintiffs cannot skate by

based on a "preliminary overview of how . . . damages might be calculated." *Id.* at 258 (quoting

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004)).

Specifically, the Fifth Circuit has affirmed denial of certification when faced with such a

"preliminary overview" of damages, where the

> plaintiffs and their expert did not persuade . . . that a reliable formula for damages
> can be devised which will yield statistically significant results, that the data that
> would have to be plugged into such a formula can be assembled, that the relevant
> variables . . . can be quantified, and that all of this can be used to reliably measure
> . . . damages for each of the many thousands of members of the proposed class.

*Piggly Wiggly*, 100 F. App'x at 300. Most recently, in vacating certification in *Prantil*, the Fifth

Circuit again warned against "the 'figure-it-out-as-we-go-along' approach." 2021 WL 222722, at

*5 (quoting *Madison v. Chalmette*, 637 F.3d 551, 557 (5th Cir. 2011)).

Yet that is the exact approach Plaintiffs wish to take. They ask the Court to certify sweeping

nationwide putative classes based on their expert's promise of, in the future, "modifying [his]

survey and collecting additional data." *See* Mot. at 49. The "preliminary" nature of Plaintiffs'

proffered damages approach without proof that they can actually do it, beyond their expert's mere

say-so, provides basis to deny class certification on damages grounds alone. *See* Dkt. #253 at 19-

20. Plaintiffs have not **demonstrated**, and cannot demonstrate (as shown below), how they will

modify Allenby's survey to make it reliable and adequate. Allenby openly admits that ███████

██████████████████████████████████████████████████████████████████

████████████████████████ Ex. 10, Allenby Dep. 237:20-24, 244:23-245:24. Nor have

Plaintiffs specified *any* additional supply-side data to be input, or shown that the relevant variables

can be quantified and included in any formula. *Piggly Wiggly*, 100 F. App'x at 300. Finally, neither

Allenby's conclusory assertions, nor Mill's derivative damages conclusions, show that they can

actually "reliably measure . . . damages for each of the many [millions] of" putative members. *Id.*

### 2. The inadmissibility of Plaintiffs' evidence under *Daubert* requires denial of certification.

Plaintiffs' damages proffer also fails on *Daubert* grounds. Leaving no doubt, the Fifth Circuit recently held that *Daubert*'s "metric of admissibility [is] the same for certification and trial," meaning that the full "*Daubert* hurdle must be cleared" before certifying a class based on expert evidence. *Prantil*, 2021 WL 222722, at *2. As shown in Defendants' pending *Daubert* motions,[11] Plaintiffs have not cleared that hurdle as to any of their three experts.

Allenby's methodology is inadmissible for many reasons. His methodology does not "fit" Plaintiffs' allegations, instead using content that deviates from their theories and failing to measure any alleged overcharge "at the time of purchase." Dkt. #253 at 7-10. The facially inconsistent results of Allenby's methodology also render it unreliable, as many courts have found when faced with similar results, and show the deeply flawed nature of his methodology. *Id.* at 10-15. Allenby also fails to account for the nature and extent of competition and related dynamics on any particular route and other integral supply-side considerations. *Id.* at 15-19. Allenby's methodology does not, and cannot, reliably measure the alleged commercial-airline overcharge damages in this case.

Defendants also moved to exclude on unreliability grounds the opinions of Plaintiffs' expert Brueckner, who also purported to measure the alleged "overcharge" percentage. Dkt. #252. Plaintiffs claim now that they do not rely on Brueckner at all at class certification. Dkt. #294. Yet their other expert Mills testified that ███████████████████████████████████████████ ████████████████████████ Ex. 25, Mills Dep. 119:10-16, 182:12-15, 183:11-17. Regardless, the opinions of both Brueckner and Mills (whose calculations are entirely derivative of Brueckner and Allenby) should be excluded, along with Allenby's opinions. That leaves Plaintiffs with no admissible evidence to support damages at class certification, requiring denial of certification.

---

[11] Those motions (Dkt. #252, 253, 254), any replies and supporting filings, are adopted here by reference.

### 3.   Plaintiffs cannot present a reliable, adequate damages model that accounts for the variability in airfare pricing and avoids reliance on averages.

The Fifth Circuit has long held that "class treatment 'may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate.'" *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003)); *see also Cruson*, 954 F.3d at 257-58 (same). Simply identifying a formula or model is far from sufficient. Similarly, Plaintiffs cannot "show Rule 23(b)(3) predominance" where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34; *see also Ibe*, 836 F.3d at 530 ("[T]his circuit recognizes that individual damages issues can preclude class certification."). Contrary to Plaintiffs' efforts to draw a line between certification and merits damages "matters" (Mot. at 48), the Supreme Court has clearly stated that courts cannot "refus[e] to entertain arguments against [plaintiffs'] damages model [at class certification] . . . simply because those arguments would also be pertinent to the merits determination." *Id.* at 34. Instead, "precedents require[e] precisely that inquiry." *Id.*

Plaintiffs fail on all of these fronts, providing further grounds for denying certification.

### a.   Airfares and the alleged overcharges are not susceptible to formulaic calculation but will instead require individual inquiries.

As demonstrated by the unrefuted evidence of Southwest's actual pricing practices and expert evidence from both sides, ███████████████████████████████████████ ████████████████████████████████████████████████. Ex. 12, Lee Rep. at 24; *supra* at 27-31. Instead, airlines, like Southwest and American, █████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 12, Lee

Rep. at 27-28. That is, seats, even on the same flights, are not singular products or services that have concrete, uniform prices, like an EpiPen for instance; they represent thousands of distinct, non-fungible transportation services to and from different locales servicing different consumers and markets. And, as the evidence clearly shows, prices for airline tickets are highly variable, and those variations are attributable to a number of dynamic factors that cannot be quantified or captured in a singular, or even uniform set of, mathematical formula. *See supra* at 22-24, 27-31.

In fact, Plaintiffs' airline economist expert Brueckner agreed that at least 30 non-safety factors impact airfares—many of which are not reducible to a variable that can just be plugged into a formula. Ex. 13, Brueckner Dep. 206:10-214:21. A prime example is ███████████████

████████████████████████████████████████████████████████

██████████████████████ *Supra* at 27-31; Ex. 12, Lee Rep. at 24 ████████████████

████████████████████████████████████████████████████████

As both sides' experts corroborate, airline risk perceptions are also highly individualized to each person, dependent on individual consumer exposure to various information and consumer preferences, and correlated with variability and non-uniformity in fares. *Supra* at 22-24, 27-31; Ex. 13, Brueckner Dep. 57:3-7, 87:24-88:4, 208:9-15; Ex. 12, Lee Rep. at 30-54. In particular here, putative class members did not encounter the same alleged risks: the vast majority were not scheduled to, nor did they actually, fly on a MAX, and for those scheduled on a "MAX route" at the time of booking, the chances of actually flying on a MAX unquestionably varied widely between each route. *See* Ex. 12, Lee Rep. at 14-15. As the Fifth Circuit found in affirming denial of certification, where the "extent" of damages varies by each putative class member, a model presented by an expert "does not eliminate the need to evaluate the extent of [damages] actually

experienced by individual class members." *Ibe*, 836 F.3d at 531. The alleged overcharges, like the base airfares, cannot be reduced to a formula and instead raise a host of individualized issues.

These individualized pricing and damages issues, which involve "numerous" independent factors inherent with commercial airline pricing, are fatal to class certification, as other courts in this Circuit have found in cases involving far more straightforward products or services. *See*, *e.g.*, *Ibe*, 836 F.3d at 529 (finding no predominance where the inputs and underlying basis for damages calculations as to seats at a single Super Bowl game would be inherently individualized); *Bell Atl.*, 339 F.3d at 304-06 ("Numerous factors" regarding denial of "caller-ID service" necessitated "individualized damages inquiries"); *Piggly Wiggly*, 100 F. App'x at 299-300 (affirming district court's view that "given the numerous independent factors" that impact the pricing of "bread and cake products," there could be no "general formula for calculating damages with precision . . . without requiring some degree of inquiry into the individual facts of 52,000 Plaintiffs and potentially thousands of transactions"); *Haley*, 292 F.R.D. at 360 (denying certification where the pricing of dog heartworm pills "varie[d] over time and is sometimes discounted" and was "likely to vary significantly across geographic markets," among other factors).

Plaintiffs' model entirely ignores key variables, like competitor pricing and other supply-side factors, and the existence of heterogeneity among putative class members, their flights, the fares they paid and allegedly would have paid, and any alleged risk they bore of flying on a MAX. *See* Ex. 12, Lee Rep. at 12-13, 18, 125-32 

Indeed, Allenby

Ex. 10, Allenby Dep. 203:5-204:8, 289:2-290:1. Like other rejected models, Plaintiffs' model

"attempt[s] to project a measure of damages, for all the class members, that in no way accounts for the vast differences among those class members." *Bell Atl.*, 339 F.3d at 304-06; *see also In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 92 (S.D.N.Y. 2017); *Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005).



Allenby's ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████. Ex. 10, Allenby Dep. 270:16-24.

Allenby further concedes, as he must, that ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████ Ex. 10, Allenby Dep. 163:1-5, 185:13-186:14. And neither Allenby nor Plaintiffs articulate how any "modified" merits model could replicate the airlines' actual pricing mechanisms or account for the myriad, non-quantifiable factors inherent to commercial airline pricing.

Untethered to reality, Plaintiffs' damages model is "clearly inadequate." *Ibe*, 836 F.3d at 529. The reality is that neither airfares nor the alleged overcharges are susceptible to formulaic, let alone uniform, calculation—a hurdle Plaintiffs cannot overcome even with a "modified" model.

### b. Plaintiffs' reliance on averages and aggregates is insufficient because they mask individual issues related to pricing and injury.

Allenby's model relies entirely on purported "average" price premiums while failing to grapple with the multitude of independent, individualized variables inherent to airline pricing, as shown above. Mot., Ex. A-1, Allenby Rep. at 26, 32 ██████████████████████ ████████████████████ Ex. 12, Lee Rep. at 14-15, 108-11. And neither Plaintiffs nor Allenby have explained how any "modified" merits model would avoid a similar course.

Like other courts, the Fifth Circuit has flatly rejected the use of averages in calculating class action damages where the averages do not "represent[] an adequate approximation of any single class member's damages, let alone a just and reasonable estimate of the damages of every class member." *Bell Atl.*, 339 F.3d at 304-07; *see also In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 151 (E.D. Pa. 2015) ("The case law . . . allows for averages and aggregations . . . only if the court is convinced that the averages and aggregations are not masking individualized issues that are likely to predominate should the class action move forward."); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 590-91 (N.D. Ill. 2009) (collecting cases). Here, even Allenby

█████████████████████████████████████████████████████████████████

███████████████████████████████████████. Ex. 10, Allenby Dep. 270:16-24.

Plaintiffs' reliance on aggregate figures is also improper. Plaintiffs propose to estimate the "aggregate overcharge" and then, using those aggregate figures, somehow measure "individual overcharge damages"—a calculation they have, of course, not demonstrated at all. *See* Mot. at 47. In any event, courts have rejected such reverse-engineering. As one court explained:

> [S]uch an aggregate determination is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants. . . . Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability.

*McLaughlin*, 522 F.3d at 231-33. Moreover, Plaintiffs' model purports to show ███████████

███████████████████████████████████████████████████████████████████

██████████████████████████ Ex. 12, Lee Rep. at 18.

Finally, because Plaintiffs' model rests on average and aggregate figures that fail to account for variation, Plaintiffs fail to "provide a reasonable and workable method for differentiating between uninjured class members and injured class members so that uninjured class members do

not recover damages." *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020).

Specifically, Plaintiffs' model does not provide any mechanism to distinguish between putative

class members who allegedly paid an overcharge as a result of the alleged RICO fraud and

- those putative class members who did not pay any alleged overcharge, such as the significant segment reimbursed by employers and others (*supra* at 17-20), those who paid fixed or discounted rates (*supra* at 20-22), or those whose flights ███████████ would have been the same or higher price but-for the alleged fraud (*supra* at 22-25, 30); or

- those who may have paid a higher airfare for entirely independent reasons, such as booking date, travel purpose, special event or holiday, to name just a few. *See* Appendix D.

Plaintiffs' model also fails to proffer any way to apply offsets for the rewards points, which

are just as good "as cash," and any other benefits (e.g., credit card points, miles, or "cash-back")

that putative class members earned on purchased and/or reimbursed flights. Allowing individuals,

like Plaintiff Noble for instance, to recover their alleged overcharge and keep all of the points they

earned would undoubtedly result in "an unjustifiable windfall" that a proper damages model must

avoid. *Supra* at 19-20; *Bonilla v. Trebol Motors Corp.*, 150 F.3d 77, 87 (1st Cir. 1998).

Because Plaintiffs have not shown that damages are capable of measurement on a class-

wide basis, among other failures of proof, the Court should deny class certification. The

individualized issues as to damages—along with fraud, scienter, injury, and causation—would turn

any trial into millions of mini-trials on liability and damages, making this case wholly

inappropriate for certification under Rule 23(b)(3)'s predominance and superiority requirements.[12]

### F.   The class action waiver defense presents individualized issues.

Every person who purchased a flight on Southwest's websites and mobile applications

during the proposed class period agreed to Southwest's "Terms & Conditions" ("Terms"). Ex. 39-

A; Ex. 39. And the Terms contain an explicit class action waiver, governed by Texas law:

---

[12] Rule 23(b)(3) superiority "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).

> **These Terms and the relationship between you and Southwest shall be governed by the laws of the State of Texas without regard to any conflict of law provisions. . . . You agree and understand that you will not bring against the Southwest Parties any class action lawsuit related to your access to, dealings with, or use of the Service.**

Ex. 39-A. The Terms, in relevant part, define "Service" as each person's "use of and access to" Southwest's websites and mobile and other applications "and the information, features, content, and services that [Southwest] own[s], control[s], or make[s] available through the Sites." *Id.* "Services," thus, unambiguously include the flight purchase "information, features, content, and services" that Southwest makes available on its website and mobile app.

Under Texas law, courts have found that class action waivers, like Southwest's, are enforceable, are neither procedurally nor substantively unconscionable, and preclude putative class members who made the agreement from pursuing a class action. *See*, *e.g.*, *Ranzy v. Extra Cash of Texas, Inc.*, 2011 WL 13257274, at *4-*8 (S.D. Tex. Oct. 14, 2011). Courts have also enforced such waivers in RICO cases, finding nothing in the RICO statute that would bar them from doing so. *See*, *e.g.*, *Korea Week, Inc. v. Got Capital, LLC*, 2016 WL 3049490, at *10 (E.D. Pa. May 27, 2016); *U1it4Less, Inc. v. FedEx Corp.*, 2015 WL 3916247, at *5 (S.D.N.Y. June 25, 2015).

Here, all of the named Plaintiffs' Southwest flights were purchased on the Southwest website or app, meaning, as most concede, that they agreed to the Terms, including the class action waiver, and waived any right to bring this lawsuit or participate as a class representative. Appendix E. Still, not all putative class members purchased their tickets on the Southwest website or app. Ex. 26 ¶ 4, A. Whelchel Decl. Courts have found, that where some putative class members are foreclosed by contractual provisions from bringing suit, but others are not—precisely the situation here—such individualized issues bar class certification. *See*, *e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861-62 (D. Md. 2013); *Conde v. Sensa*, 2018 WL 4297056, at *11 (S.D. Cal. Sep. 10, 2018); *Spotswood v. Hertz Corp.*, 2019 WL 498822, at *11 (D. Md. Feb. 7,

2019); *Pablo v. ServiceMaster Global Holdings Inc.*, 2011 WL 3476473, at *3 (N.D. Cal. Aug. 9, 2011). And the Fifth Circuit has recognized that "predominance of individual issues necessary to decide an affirmative defense may preclude class certification.'" *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008). The class action waiver issue thus presents yet another individualized issue that cuts against Rule 23(b)(3) class certification.

**IV.      Plaintiffs Fail to Satisfy the Rule 23(a)(4) Adequacy Requirement Because They Have No Active Control Over the Litigation and They Agreed to Class-Action Waivers.**

Because, by their own admissions, none of the named Plaintiffs has taken an active role in controlling or directing, or even been moderately informed about, this putative class action, Plaintiffs fail to satisfy Rule 23(a)(4)'s adequacy requirement, providing independent grounds on which to deny them class certification. *See* Appendix E (compiling Plaintiffs' testimony on lack of knowledge of the litigation); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014). The agreement by the named Plaintiffs, who flew Southwest, to class action waivers also renders each of them inadequate and atypical. *See supra* at 43-45; *In re Titanium Dioxide*, 962 F. Supp. 2d at 861-62; *Korea Week*, 2016 WL 3049490, at *10.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied in its entirety, and no class should be certified. Southwest requests all other relief to which it is entitled.[13]

---

[13] Southwest joins in and adopts by reference the Opposition filed by Defendant The Boeing Company.

Dated: February 15, 2021

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Michael A. Swartzendruber*
Michael A. Swartzendruber (Lead Counsel)
State Bar No. 19557702
Jason K. Fagelman
State Bar No. 00796525
James V. Leito IV
State Bar No. 24054950
Philip A. Tarpley
State Bar No. 24098501
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
michael.swartzendruber@nortonrosefulbright.
com
jason.fagelman@nortonrosefulbright.com
james.leito@nortonrosefulbright.com
philip.tarpley@nortonrosefulbright.com

Geraldine W. Young
State Bar No. 24084134
1301 McKinney St., Suite 5100
Houston, TX 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
geraldine.young@nortonrosefulbright.com

***ATTORNEYS FOR DEFENDANT***
***SOUTHWEST AIRLINES CO.***

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2021, a true and correct copy of the above was served via email through the Eastern District of Texas's CM/ECF system.

*/s/ Philip A. Tarpley*
Philip A. Tarpley

## CERTIFICATE REGARDING SEALING

Pursuant to Local Rule CV-5(a)(7)(B), I hereby certify that the Court already has granted authorization to seal this document. Pursuant to the Protective Order [ECF No. 59], "[t]he Parties are authorized to file under seal any Protected/Controlled Material (including any pleadings, motions, or other papers disclosing Protected/Controlled Material)." This filing and/or its exhibits disclose information that the parties have designated as Protected/Controlled Material and therefore sealing is warranted.

*/s/ James V. Leito IV*
James V. Leito IV