# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| DAMONIE EARL, LINDA RUGG, ALESA BECK, TIMOTHY BLAKEY, JR., STEPHANIE BLAKEY, MARISA THOMPSON, MUHAMMAD MUDDASIR KHAN, JOHN ROGERS, VALERIE MORTZ-ROGERS, JAMES LAMORTE, BRETT NOBLE, RUBEN CASTRO, FRITZ RINGLING, LITAUN LEWIS, and LANCE HOGUE, JR., each individually and on behalf of all others similarly situated, | § § § § § § § § § § § | |
| | § | Civil Action No. 4:19-cv-00507 |
| *Plaintiffs,* | § § | |
| v. | § § | **FILED UNDER SEAL** |
| THE BOEING COMPANY and SOUTHWEST AIRLINES CO., | § § § | |
| *Defendants.* | § § § | |

## DEFENDANT THE BOEING COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 5

I.    The absence of Article III standing bars certification. ................................ 6

II.   Certification should be denied because the proposed classes are not ascertainable. ............................................................................................... 9

III.  Plaintiffs do not satisfy Rule 23(b)(3)'s predominance requirement. ......... 12

    A.    Individualized issues of RICO causation predominate because Plaintiffs offer no viable classwide proof of causation. ..................... 12

        1.    Proof that the public relied on alleged misrepresentations requires individualized inquiries. ........................................... 13

            a.    The public was exposed to different information about the MAX 8 at different times. .............................. 13

            b.    No classwide inference of reliance can be drawn here. ................. 17

        2.    Plaintiffs are barred from relying on a "fraud-on-the-FAA" theory. ....... 21

    B.    Plaintiffs' inability to prove classwide injury and damages defeats predominance. ........................................................................ 23

        1.    Plaintiffs have no admissible evidence of class damages. ....................... 25

        2.    Plaintiffs cannot account for the vast heterogeneity in the markets for airline tickets, and do not even try. ...................... 26

            a.    Airline pricing decisions are individualized by route, time, and ticket. ........................................................... 26

            b.    Determining the amount of an overcharge, if any, would require individual inquiry. ................................. 29

        3.    Dr. Allenby's model ignores price heterogeneity in the air travel industry. ......................................................................... 32

            a.    Dr. Allenby presumes price homogeneity. ....................... 32

            b.    Plaintiffs cannot justify using average price premiums that conceal heterogeneity. .......................................... 34

            c.    Dr. Allenby's sensitivity analysis did not and cannot account for price heterogeneity. ................................... 36

        4.    The proposed classes consist of many members who are uninjured even under Plaintiffs' capacious theory of injury. ............... 37

            a.    Class members who would have paid the same price are uninjured even under Plaintiffs' theory. ................. 38

|   | b. | Reimbursed class members are uninjured. | 40 |

| | 5. | Dr. Allenby's promise to provide reliable classwide proof after class certification confirms that Plaintiffs have not met their burden. | 41 |

IV.   Plaintiffs are improper representatives for the proposed classes. ................................... 43

CONCLUSION ................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Agricultural Chems. Antitrust Litig.*,
  1995 WL 787538 (N.D. Fla. Oct. 23, 1995) ........................................................31

*Allstate Ins. Co. v. Plambeck*,
  802 F.3d 665 (5th Cir. 2015) .........................................................................13, 17

*Am. Seed Co. v. Monsanto Co.*,
  238 F.R.D. 394 (D. Del. 2006) ............................................................................31

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)...............................................................................12, 15–17

*Arruda v. Curves Int'l, Inc.*,
  2020 WL 4289380 (W.D. Tex. July 27, 2020) ....................................................18

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)...........................................................................38, 41

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) .............................................3, 23–24, 26, 31, 34–35

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) .........................................................................43–44

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) .......................................................................5, 33–34

*Booth v. Galveston Cty.*,
  2019 WL 1129492 (S.D. Tex. Mar. 12, 2019)...............................................43–44

*Bridge v. Phoenix Bond & Indemnity Co.*,
  553 U.S. 639 (2008)........................................................................................13, 16

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001)...............................................................................................23

*Cole v. General Motors Corp.*,
  484 F.3d 717 (5th Cir. 2007) ............................................................................7–8

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...........................................................................................23, 25

*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020) ......................................................23–24, 34, 42

*DeBremaecker v. Short,*
    433 F.2d 733 (5th Cir. 1970) .............................................................................5

*In re Deepwater Horizon,*
    732 F.3d 326 (5th Cir. 2013) ...........................................................................5, 7

*In re Deepwater Horizon,*
    739 F.3d 790 (5th Cir. 2014) ..........................................................................9, 24

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006).............................................................................6–7

*In re Dig. Music Antitrust Litig.,*
    321 F.R.D. 64 (S.D.N.Y. 2017) ..........................................................................32

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.,*
    2020 WL 1180550 (D. Kan. Mar. 10, 2020) .......................................................18

*Espenscheid v. DirectSat USA, LLC,*
    705 F.3d 770 (7th Cir. 2013) .........................................................................31–32

*Freeland v. AT&T Corp.,*
    238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................35

*Gen. Tel. Co. of the Sw. v. Falcon,*
    457 U.S. 147 (1982).............................................................................................5

*Haley v. Merial, Ltd.,*
    292 F.R.D. 339 (N.D. Miss. 2013)............................................................20, 30–31

*Holmes v. SIPC,*
    503 U.S. 258 (1992)............................................................................................12

*John v. Nat'l Sec. Fire & Cas. Co.,*
    501 F.3d 443 (5th Cir. 2007) ...............................................................................9

*Kohen v. Pac. Inv. Mgmt. Co.,*
    571 F.3d 672 (7th Cir. 2009) ...............................................................................9

*In re Kosmos Energy Ltd. Sec. Litig.,*
    299 F.R.D. 133 (N.D. Tex. 2014) ...................................................................44–45

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)..................................................................25

*Love v. Tyson Foods, Inc.,*
    677 F.3d 258 (5th Cir. 2012) .........................................................................21–23

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) .................................................................................24

*MacDougall v. Am. Honda Motor Co.*,
   2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) .................................................34–35

*Madison v. Chalmette Ref., L.L.C.*,
   637 F.3d 551 (5th Cir. 2011) ...........................................................................5, 12

*Mazur v. eBay, Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009)...........................................................................40

*In re Methionine Antitrust Litig.*,
   204 F.R.D. 161 (N.D. Cal. 2001).....................................................................40–41

*Morrow v. Washington*,
   277 F.R.D. 172 (E.D. Tex. 2011).............................................................2, 9, 11–12

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013).....................................................................................17

*Neuser v. Carrier Corp.*,
   2007 WL 1470855 (W.D. Wisc. May 15, 2007) ....................................................40

*In re Niaspan Antitrust Litig.*,
   464 F. Supp. 3d 678 (E.D. Pa. 2020) .....................................................................38

*O'Sullivan v. Countrywide Home Loans, Inc.*,
   319 F.3d 732 (5th Cir. 2003) ...................................................................................5

*In re Oparaji*,
   698 F.3d 231 (5th Cir. 2012) .................................................................................21

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) ...................................................................................5

*Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) .................................................................................39

*Pfeffer v. HSA Retail, Inc.*,
   2012 WL 1910034 (W.D. Tex. May 24, 2012) ........................................................9

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 F. App'x 296 (5th Cir. 2004)......................................................................42–43

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   215 F.R.D. 523 (E.D. Tex. 2003).............................................................................31

*Pioneer Valley Casket Co. v. Serv. Corp. Int'l*,
  2008 WL 11395528 (S.D. Tex. Nov. 24, 2008) ......................................................35

*Prantil v. Arkema Inc.*,
  — F.3d —, 2021 WL 222722 (5th Cir. Jan. 22, 2021)............................................4, 25–26, 41

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015) ......................................................35

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017)......................................................38

*Ranieri v. AdvoCare Int'l, L.P.*,
  336 F. Supp. 3d 701 (N.D. Tex. 2018) ......................................................18

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)......................................................35

*Regents of Univ. of Calif. v. Credit Suisse First Boston*,
  482 F.3d 372 (5th Cir. 2007) ......................................................6

*Rivera v. Wyeth-Ayerst Labs.*,
  283 F.3d 315 (5th Cir. 2002) ......................................................7

*Se. Laborers Health & Welfare Fund v. Bayer Corp.*,
  444 F. App'x 401 (11th Cir. 2011) ......................................................23

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
  2015 WL 5604763 (E.D. Tex. Sept. 23, 2015)......................................................14, 18–20

*Steering Comm. v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ......................................................12

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
  2018 WL 3586182 (N.D. Ill. July 26, 2018)......................................................20–21

*Ticknor v. Rouse's Enters., L.L.C.*,
  592 F. App'x 276 (5th Cir. 2014) ......................................................10

*Torres v. S.G.E. Mgmt., LLC*,
  838 F.3d 629 (5th Cir. 2016) ......................................................2, 17–19

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)......................................................37–38

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)......................................................18

*Umsted v. Intelect Commc'ns, Inc.*,
   2003 WL 79750 (N.D. Tex. Jan. 7, 2003) .............................................................44

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ...............................................................................41

*United Food & Com. Workers Unions & Employers Midwest Health Benefits
   Fund v. Walgreen Co.*,
   2012 WL 3061859 (N.D. Ill. July 26, 2012)........................................................22

*Vine v. PLS Fin. Servs., Inc.*,
   807 F. App'x 320 (5th Cir. 2020) .........................................................................18

*Weiner v. Snapple Bev. Corp.*,
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010).........................................................35

*Windham v. Am. Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) ............................................................................31, 42

**Statutes**

18 U.S.C.

   § 1962..................................................................................................................2, 12

   § 1964(c) ...........................................................................................................12, 24

49 U.S.C.

   § 46106....................................................................................................................23

   § 46301....................................................................................................................23

   § 46320....................................................................................................................23

**Rules and Regulations**

14 C.F.R. § 121.9 ...........................................................................................................23

Fed. R. Civ. P. 23(a)(4) ....................................................................................................6

Fed. R. Civ. P. 23(b)(3)....................................................................................................6

**Other Authorities**

Airlines for Am., *Air Travelers in America: Annual Survey*,
   https://www.airlines.org/dataset/air-travelers-in-america-annual-survey...............10

Dominic Gates, "*U.S. pilots flying 737 MAX weren't told about new automatic
   systems change linked to Lion Air crash*," Seattle Times (Nov. 12, 2018),
   http://perma.cc/DE9F-3Z8N ..................................................................................15

## EXHIBIT LIST

Exhibit 1:       Deposition of Greg M. Allenby (Nov. 19, 2020) ("Allenby Dep.)

Exhibit 2:       Expert Report of Robert Mills (Sept. 10, 2020) ("Mills Rep.")

Exhibit 3:       Flight History of Damonie Earl

Exhibit 4:       Flight History of Litaun Lewis

Exhibit 5:       Flight History of Brett Noble

Exhibit 6:       Flight History of Ruben Castro

Exhibit 7:       Deposition of Robert Mills (Jan. 19, 2021) ("Mills Dep.")

Exhibit 8:       Deposition of Brett Noble (Jan. 15, 2021) ("Noble Dep.")

Exhibit 9:       TopClassActions.com, "Boeing 737 MAX 8 Class Action Lawsuit Investigation"

Exhibit 10:     Southwest Airlines Passenger Information of Plaintiff Alesa Beck
                 ("Beck Passenger Information")

Exhibit 11:     Deposition of Alesa Beck (Sept. 16, 2020) ("Beck Dep.")

Exhibit 12:     Deposition of Ruben Castro (Jan. 12, 2021) ("Castro Dep.")

Exhibit 13:     Expert Report of Lorin M. Hitt, Ph.D. (Oct. 15, 2020) ("Hitt Rep.")

Exhibit 14:     Deposition of Jan K. Brueckner (Nov. 12, 2020) ("Brueckner Dep.")

Exhibit 15:     Deposition of Fritz W. Ringling (Jan. 26, 2021) ("Ringling Dep.")

Exhibit 16:     Recordings and Notes Regarding Allenby Survey Participants
                 ("Allenby Survey Materials")

Exhibit 17:     Expert Report of Greg M. Allenby (Sept. 10, 2020) ("Allenby Rep.")

Exhibit 18:     Southwest Airlines, Revenue Management 101 ("RM 101")

Exhibit 19:     Expert Report of Jan K. Brueckner (Sept. 10, 2020) ("Brueckner Rep.")

Exhibit 20:     Expert Report of Peter E. Rossi, Ph.D. (Oct. 15, 2020) ("Rossi Rep.")

Exhibit 21:     Expert Report of Darin N. Lee, Ph.D. (Oct. 15, 2020) ("Lee Rep.")

Exhibit 22:     Deposition of Peter E. Rossi, Ph.D. (Jan. 7, 2021) ("Rossi Dep.")

Exhibit 23:     Supplemental Expert Report of Greg M. Allenby (Nov. 11, 2020) ("Allenby Suppl. Rep.")

Exhibit 24:     Deposition of John Rogers (Jan. 29, 2021) ("Rogers Dep.")

Exhibit 25:     Deposition of Marisa Thompson (July 8, 2020) ("Thompson Dep.")

Exhibit 26:     Deposition of Valerie Mortz-Rogers (Aug. 19, 2020) ("Mortz-Rogers Dep.")

Exhibit 27:     Deposition of Litaun Lewis (Jan. 8, 2021) ("Lewis Dep.")

Exhibit 28:     Deposition of Linda Rugg (July 23, 2020) ("Rugg Dep.")

Exhibit 29:     Deposition of Damonie Earl  (Aug. 21, 2020) ("Earl Dep.")

Exhibit 30:     Deposition of Lance Hogue (Jan. 21, 2021) ("Hogue Dep.")

Exhibit 31:     Named Plaintiffs' Collected Testimony Regarding Instructions to Counsel

Exhibit 32:     Named Plaintiffs' Collected Testimony Regarding Lawsuit Knowledge

Exhibit 33:     Named Plaintiffs' Collected Testimony Regarding Lawsuit Involvement

## **INTRODUCTION**

This putative class action seeks a ten-figure windfall for airplane ticket purchasers whose flights, mostly on airplanes *other* than the 737 MAX 8, proceeded successfully and safely to their destinations.  Plaintiffs allege that Defendants—The Boeing Company and Southwest Airlines— conspired to conceal defects in the MAX 8 from the Federal Aviation Administration ("FAA"), pilots, and the flying public, and that through this conspiracy, Defendant Southwest and non-party American Airlines were able to charge Plaintiffs a supposed "price premium" on their airline tickets.  Based on this sprawling and nebulous theory of recovery, Plaintiffs seek to certify classes of millions of purchasers of airplane tickets—without regard to whether individual members of the putative classes ever flew on a MAX 8, what they knew about the MAX 8 aircraft at the time of purchase, whether they knew or cared about what model aircraft they were flying, or whether knowledge of the information Defendants allegedly concealed would have affected their purchasing decision.  As one would expect, these purported classes cannot be certified under Fed. R. Civ. P. 23 as a matter of law for multiple, independently sufficient reasons under well-established precedent.

To begin with, the vast majority of proposed class members were not scheduled to fly, and did not fly, on a 737 MAX 8, which is the airplane at the heart of Plaintiffs' alleged conspiracy. These putative class members, ███████████████████████████████████████ ██████ plainly could have suffered no injury from the MAX 8 and lack Article III standing under this Court's rulings and settled Fifth Circuit law.  For that reason alone, the proposed classes cannot be certified.

Certification should also be denied because Plaintiffs cannot meet either the prerequisite of ascertainability under Rule 23 or the requirement of Rule 23(b)(3) that common questions predominate over individual inquiries.

1

*The Classes Are Not Ascertainable.*  As a threshold issue, a class can be certified only if it is ascertainable, meaning that a court must be able to determine a particular individual's membership without intensive, individualized factual inquiry.  *Morrow v. Washington*, 277 F.R.D. 172, 187 (E.D. Tex. 2011).  Plaintiffs' proposed classes here fail to satisfy that standard.  As Plaintiffs themselves acknowledge, the "purchaser" in their proposed class definitions is the bearer of the ultimate economic burden for a ticket, not necessarily the person who paid for the ticket at the point of sale.  There is no way to identify these true "purchasers"—for example, businesses reimbursing their employees—without inquiring into the individual circumstances of each of millions of ticket sales.  Accordingly, class membership is not ascertainable without the need for burdensome individualized inquiry.

*Plaintiffs Cannot Show Common Questions Predominate.*  Certification also should be denied because Plaintiffs fail Rule 23(b)(3)'s predominance requirement—on two different scores.  First, Plaintiffs seek to establish liability under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962, but they cannot prove RICO causation on a classwide basis.  Plaintiffs allege a scheme to defraud that involves many different purported misrepresentations to different audiences at different times over an 18-month class period.  Plaintiffs admit their case requires proof that the alleged fraud "caused someone to rely on the false statements."  Mot. Class Cert. 38.  But establishing that reliance will require purchaser-by-purchaser inquiries into *who* knew *what* about the allegedly concealed feature of the MAX 8, *when* they knew it, and whether they relied upon it.  Accordingly, the key element of reliance is not subject to classwide proof.

Plaintiffs seek to avoid this burden by analogizing their allegations to the pyramid scheme discussed in *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629 (5th Cir. 2016) (en banc).  Mot. Class

Cert. 41.   But the analogy is inapt.   The multifarious fraud that Plaintiffs allege—involving complex chains of causation across time and encompassing numerous actors in the global aviation system—bears no resemblance whatsoever to a pyramid scheme.   In any event, the record contains ample evidence, from Plaintiffs themselves, showing that many class members purchased their tickets *despite* knowing the information Defendants allegedly concealed, which breaks any alleged causal chain for substantial portions of the putative classes.   Finally, Plaintiffs' attempt to avoid individual causation inquiries by asserting fraud on the FAA runs headlong into their explicit disclaimer of that allegation at the motion to dismiss stage.   This Court accepted that representation in denying Defendants' motions to dismiss in part, and Plaintiffs are estopped from reviving that theory now.   The RICO claims predicated on it would, in any event, be precluded as a matter of law by the Federal Aviation Act.

Second, Plaintiffs fail to meet the predominance requirement because they cannot prove damages on a classwide basis, and have not even tried.   As the Fifth Circuit has held, "where the issue of damages does not lend itself to mechanical calculation, but requires separate mini-trials of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance."   *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306–307 (5th Cir. 2003).   Here, the scope of the proposed classes, ████████████████████████████ ████████████████████████████████████████, would result in an "overwhelmingly large number" of individual damages mini-trials, foreclosing certification.

████████████████████████████████████████

████████████████████████████████████████

████████████████████   But this model is inadequate because it does not calculate each class member's purported damages consistently with the realities of ticket pricing in the air travel

industry.  Calculating overcharge amounts for each class member would require *route-by-route* consideration, because different routes are subject to different competitive pressures from different numbers of competing airlines of different strengths.  Accordingly, that calculation would require consideration of pricing at the flight level—and even the seat level—because airlines employ sophisticated revenue management systems that adjust prices in real time to ensure that every seat on a flight is sold for the highest possible price.  As a result, different passengers on the same route or *even on the same airplane* pay significantly different prices based on the particular circumstances of their ticket purchases, including the market dynamics existing at the time.

Plaintiffs' only response to those unique complexities of the airplane ticket market is to ignore them.  Their proffered price-premium expert, Dr. Greg Allenby,



This, by itself, defeats Plaintiffs' motion to certify.  *See Prantil v. Arkema Inc.*, — F.3d —, 2021 WL 222722, at *2–3 (5th Cir. Jan. 22, 2021) (expert analysis must be "admissible at trial under the *Daubert* standard" before "pav[ing] the way for certifying a proposed class.").[1]

In any event, Dr. Allenby's analysis does not meet Plaintiffs' burden to establish predominance.

Allenby Dep. 289:2–290:1,                                        . A

---

[1] Plaintiffs do not dispute that Dr. Allenby's present analysis would be inadmissible at trial, *see* Pls.' Opp'n to Allenby Daubert 8 (Dkt. 296), and his promise that somehow he will fix his deficient analysis later cannot satisfy the requirement that *Daubert*'s standard for rigorous analysis must be met before any class is certified.

reliable classwide damages model, however, must account for that heterogeneity.  *See, e.g.*, *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005).  Because the analysis offered by Plaintiffs' sole price-premium damages expert cannot meet the predominance standard, the motion for class certification cannot satisfy Rule 23(b)(3).

For these and the reasons below, Plaintiffs' motion for class certification should be denied.

## ARGUMENT

The class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982).  The court must conduct a "rigorous analysis" of the "claims, defenses, relevant facts, and applicable substantive law" to prevent certification where trying the claims of a putative class would "degenerate[e] into a series of individual trials." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003).  The Fifth Circuit has repeatedly "stress[ed] that it is the party seeking certification who bears the burden of establishing that the requirements of Rule 23 have been met." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554–55 (5th Cir. 2011).  "[T]he plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007).  And this obligation "is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.* at 268.

In order to even proceed to the Rule 23 analysis, the named Plaintiffs and the classes as a whole—or at least a critical mass thereof—must have Article III standing.  *See In re Deepwater Horizon*, 732 F.3d 326, 342 (5th Cir. 2013) (opinion of Clement, J.).  And once Article III standing is established, the Rule 23 inquiry then starts with the requirement that Plaintiffs demonstrate an "adequately defined and clearly ascertainable" class. *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).  Next, Plaintiffs must satisfy the Rule 23(a) criteria, including the

requirement that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Once the rule 23(a) requirements are satisfied," Plaintiffs bear the burden of establishing that the "predominance" requirement is met, *i.e.*, "'that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'" *Regents of Univ. of Calif. v. Credit Suisse First Boston*, 482 F.3d 372, 382 (5th Cir. 2007) (quoting Fed. R. Civ. P. 23(b)(3)).

Plaintiffs' Motion fails on at least four independently sufficient grounds. First, many named Plaintiffs and the classes as a whole lack Article III standing, even under the analysis that this Court applied in allowing Plaintiffs' claims to proceed past the motion to dismiss stage. Second, Plaintiffs fail the Fifth Circuit's requirement that they identify an ascertainable class, because they cannot show—as courts in this district have required—that it is administratively feasible to identify individual class members. Third, Plaintiffs cannot satisfy the Rule 23(b)(3) requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members," because highly individual questions of both liability and damages will dominate this litigation. And last, the named Plaintiffs are inadequate representatives under Rule 23(a)(4) because—as they admit—it is their attorneys who are actually driving this litigation.[2]

## I.   The absence of Article III standing bars certification.

As Plaintiffs recognize, Article III standing is a prerequisite for class certification. Mot. Class Cert. 21. To certify a class, "the court must be able to find that both the class and the representatives have suffered some injury . . . . The class must therefore be defined in such a way

---

[2] Plaintiffs' Motion includes a self-styled 20-page "Statement of Facts" that is in fact littered with mischaracterizations and rampant speculation that are irrelevant to the certification issue. *See* Mot. Class Cert. 1–20. This opposition will focus on those facts relevant to certification.

that *anyone* within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (emphasis added); *accord In re Deepwater Horizon*, 732 F.3d 326, 342 (5th Cir. 2013) (opinion of Clement, J.) (same).

For the reasons stated in support of Boeing's motion to dismiss, Boeing's consistent position has been that none of the named Plaintiffs or proposed class members has Article III standing. Although the Court did not accept the whole of Boeing's argument in its decision on Boeing's motion to dismiss,[3] that decision makes clear that the vast majority of the members of the proposed classes lack Article III standing. The classes therefore cannot be certified.

In ruling on Article III standing, this Court allowed Plaintiffs to pursue a "claim of economic injury via an overcharge" that is "similar to the economic injury suffered by the plaintiffs in *Cole* [*v. General Motors Corp.*, 484 F.3d 717 (5th Cir. 2007)]." MTD Order 13. The Complaint before the Court when it issued this ruling alleged that "all Plaintiffs . . . paid for flights that met ordinary and reasonable consumer expectations regarding safe airplane design and operation but instead received flights of lesser or no value on planes that did not meet ordinary and reasonable consumer expectations of safe airplane design and operation." Compl. ¶ 54. But in fact, the proposed classes are *not* limited to those who flew on planes alleged to "not meet ordinary and reasonable consumer expectations of safe airplane design and operation"—*i.e.*, the 737 MAX 8. *Id*. Rather, the proposed classes include purchasers of tickets for *any* flight on *any* aircraft on any Southwest or American route, if a MAX 8 had *ever* been used on that route. *See* Mot. Class Cert. 47 (calculating damages from ████████████████████████████████

████████████████████  Mills Rep. 9–10 ████████████████

---

[3] Boeing respectfully reserves the right to challenge subject matter jurisdiction under *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002), as it did at the outset of this case. *See* Dkt. 21.



*Cole* provides no support for recognizing the standing of purchasers who did not even purchase the allegedly defective product.  Instead, the Fifth Circuit in that case specified that the class included only "persons and legal entities who *have acquired* . . . 1998 or 1999 Cadillac DeVilles," which were the allegedly defective cars.  484 F.3d at 719 (emphasis added).  The *Cole* plaintiffs' injury asserted "a difference between what they contracted for and what they actually received": they "contracted to purchase DeVilles with side impact air bags that would deploy only under certain circumstances involving a side impact but . . . they received DeVilles with air bags that could deploy unexpectedly, without a crash."  *Id.* at 722.  Nothing in *Cole* suggests that purchasers of *other* vehicles would have Article III standing, merely because they could have purchased a DeVille (but did not).  Likewise, nothing in this Court's prior rulings suggests that someone who purchased a ticket for a flight that was scheduled and flown on a Boeing 737 NG or an Airbus A320, for example, has standing to assert the injury Plaintiffs allege, merely because a 737 MAX 8 theoretically could have flown the same route.  Because the vast majority of the

proposed class members lack standing, these classes cannot be certified.[5]

## II.   Certification should be denied because the proposed classes are not ascertainable.

"The existence of an ascertainable class of persons to be represented by the proposed class representatives is an implied prerequisite of [Rule 23]." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).   Courts in this Circuit thus hold that "[t]he proposed class must be clearly defined so that it is administratively feasible for the Court to determine whether a particular individual is a member," *Morrow*, 277 F.R.D. at 187, "without resorting to intensive, individualized factual inquiries," *Pfeffer v. HSA Retail, Inc.*, 2012 WL 1910034, *3 (W.D. Tex. May 24, 2012).   Here, the proposed classes—which include certain "persons who purchased a ticket for air travel," Mot. Class Cert. 20, are not adequately defined because ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████   Mills Dep. 85:24–86:3.

The ascertainability problems here are fundamental, and derive from Plaintiffs' distinction between the person who pays for a ticket at the point of sale, and the ultimate ticket "purchaser," as that term is used in the proposed class definitions.   According to Plaintiffs, the "purchaser" of a ticket is the person who bore the ultimate economic burden for a ticket,—not necessarily the person who bought the ticket at the point of sale.   For example, Plaintiffs do not include business passengers as putative class members when they were later reimbursed by employers.   *See, e.g.*, Mot. Class Cert. 26 n.11 (Plaintiff Brett Noble is not a putative American Airlines class member

---

[5] The Fifth Circuit has recognized[5] a circuit split on whether each class member must have Article III standing.   *In re Deepwater Horizon*, 739 F.3d 790, 801–02 (5th Cir. 2014).   Nevertheless, the classes proposed here involving a majority of non-MAX 8 purchasers could not be certified even under the minority view, which holds that "a class should not be certified if it . . . contains a *great many persons* who have suffered no injury at the hands of the defendant."   *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (emphasis added).

because he was reimbursed by his employer); Noble Decl. ¶¶ 7–8.  Excluding such passengers

from the class is necessary because ██████████████████████████████████████

████████████████████████████████████████                    Allenby Dep. 222:12–17;

Noble Dep. 171:10–13 █████████████████████████████

████████████████████████████████████████████████  Even

though the advertisement counsel used to recruit Plaintiffs declared that "[o]nly personal travel,

not business travel" was relevant to the lawsuit, TopClassActions.com, "Boeing 737 MAX 8 Class

Action Lawsuit Investigation" at DL_004, identifying and excluding such travel from the class

will be difficult without individual inquiry, as business travelers account for roughly 30% of airline

passengers in the U.S.  *See* Airlines for Am., *Air Travelers in America: Annual Survey*,

https://www.airlines.org/dataset/air-travelers-in-america-annual-survey.    As courts have

recognized, determining the business passengers who should be excluded because they were

reimbursed for their tickets will require exactly the type of intensive, individualized factual

inquiries that defeat ascertainability.  *See, e.g.*, *Ticknor v. Rouse's Enters., L.L.C.*, 592 F. App'x

276, 278–79 (5th Cir. 2014) (denying certification because "determining whether a purchase was

for consumer or business purposes" would require "transaction-by-transaction" analysis).

The same problem exists even outside the employer-reimbursement context.  Plaintiff

Alesa Beck, for example, ██████████████████████████████████████

████████  ████  ████  ████████  ████  ████    Beck    Passenger    Information    at

SWA_Earl_Data_00000221.  Still, Plaintiffs insist that Beck is a member of the Southwest class

because ██████████████████████████████████  Beck Dep. 151:14–

19; *accord* Castro Dep. 93:4–7 ██████████████████████████████

████████████████████████████████████████████  These

examples only highlight the obvious need for individualized inquiry to ascertain class membership.

That Southwest and American Airlines ███████████████████████████

██████████████████ Mot. Class Cert. 23, does not solve the problem of

ascertainability.  As Plaintiffs' own damages expert, Robert Mills, admitted, ████████████

███████████████████████ Mills Dep. 85:24–86:3 ███████████████

██████████████████████████████████████████████

████████████████████████████ As Mr. Mills explained,

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████ Id. at 84:15–85:1.  Additional individualized

factual inquiry would be required because ██████████████████████████

███████████████████████████████████████████ Id. at

85:2–12. ████████████████████████████████████████

██ the need for separate inquiries on who purchased each ticket defeats ascertainability.

As Mr. Mills admits, ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ Mills Decl. ¶ 5. █████████████

██████████████████████████████████████████████

███████████████████ Mills Dep. 73:6–18.  That approach—

insufficient as it is for even the named Plaintiffs—shows that Plaintiffs have not provided an

"administratively feasible [method] for the Court to determine whether a particular individual is a

member" of either class.  *Morrow*, 277 F.R.D. at 187.

### III.   Plaintiffs do not satisfy Rule 23(b)(3)'s predominance requirement.

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  *Madison*, 637 F.3d at 554–55.  This prerequisite is "far more demanding" than Rule 23(a)'s commonality test because it assesses "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601–02 (5th Cir. 2006).  If a "close look" at plaintiffs' proposal, *Madison*, 637 F.3d at 554, and a "consideration of defendant's weightiest arguments," *Prantil*, 2020 WL 222722, at *6, show common issues do not predominate, class certification must be denied.

#### A.   Individualized issues of RICO causation predominate because Plaintiffs offer no viable classwide proof of causation.

Individualized proof is necessary to establish the causation element of Plaintiffs' RICO claim, *i.e.*, that each putative class member paid an overcharge "by reason of a violation of section 1962,"[6] 18 U.S.C. § 1964(c), and that the violation was a proximate cause of their injury.  Establishing causation under RICO requires "some direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. SIPC*, 503 U.S. 258, 268 (1992), and the link between the injury and conduct must not be "too remote."  *Id.* at 271.  The "central question" for RICO causation is "whether the alleged violation led *directly* to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).

As Plaintiffs concede, proving causation for the fraud-based RICO claims here requires proof that the fraud caused "someone to rely on the false statements."  Mot. Class Cert. 38.  And

---

[6] Section 1962 prohibits patterns of racketeering; section 1964 provides civil remedies for injuries caused by violations of section 1962.

that reliance—by Plaintiffs or some third party—must have caused Plaintiffs' alleged injury.  The

need to prove reliance here flows from the fact that "if no one relied on the misrepresentation,"

then Plaintiffs "will not be able to establish even but-for causation," let alone the proximate

causation also required by RICO.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 658–

59 (2008).  The inquiry is further complicated by the Supreme Court's holding that a purchaser's

knowledge of the alleged fraud "would constitute an intervening cause breaking the chain of

causation between [a defendant's] misrepresentations and [a plaintiff's] injury." *Id.* at 659.[7]

Plaintiffs propose to meet their burden of proving RICO causation by showing fraud on the

public or on the FAA.  Both theories fail.  As shown below, the former would require

individualized proof that would defeat predominance.  The latter theory fails for two reasons.  First,

Plaintiffs disclaimed it at the pleading stage to avoid Boeing's argument that the Federal Aviation

Act precludes such a private right of action, and thus, they cannot raise it here.  Second, even if

they could, Boeing's preclusion argument is correct, and the Court should reject an attempted class

certification based on a theory of causation that fails as a matter of law.

1.   **Proof that the public relied on alleged misrepresentations requires individualized inquiries.**

a.   **The public was exposed to different information about the MAX 8 at different times.**

Plaintiffs propose to prove RICO causation by showing that Defendants' "statements to the

public would be relied upon by airline customers and that information they misleadingly omitted

would have been material to them if provided."  Mot. Class Cert. 35; *see also id.* at 24 (asserting

that "false and misleading statements to the press and the public" are a "common issue").  But as

---

[7] Plaintiffs cherry-pick the isolated statement from *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015), discussing *Bridge*, that "reliance is not necessary" in a RICO claim.  Mot. Class Cert 36.  But the Fifth Circuit made clear that under *Bridge* "an injured party must show that the violation was the but-for and proximate cause of the injury."  *Allstate*, 802 F.3d at 676.  *Bridge* held only that *first-party* reliance is unnecessary.  553 U.S. at 661.

Plaintiffs' own allegations and the undisputed evidence make clear, proof of reliance would require highly individualized inquiries here.  The proposed class period covers 18 months, including 14 months preceding most of the alleged common misrepresentations, and 4 months after the Lion Air accident, during which time there was significant media attention to the MAX 8's alleged defects.  The putative class members were exposed to different information—and different levels of information—at different times, which affected purchasing decisions differently.  *See* Mot. Class Cert. 12–14.  Establishing reliance over such an extended period of time, and for such a large group of ticket purchasers—with different access to information, different levels of awareness about the MAX, and different ticket-buying preferences—is not subject to common proof.  *See St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, 2015 WL 5604763, at *5 (E.D. Tex. Sept. 23, 2015) (holding RICO reliance not subject to common proof given the need to "establish[] what each network member knew [and] when they knew it").

For the portion of the class period that predated the Lion Air accident on October 29, 2018, Plaintiffs offer hardly *any* alleged misstatements to the public that class members (or anyone else) could have possibly relied on.[8]  The motion includes a single reference to a "marketing video" released in 2016, Mot. Class Cert. 11, but does not anywhere allege that any class member actually saw or relied on that video, and Plaintiffs do not contend that this video is common evidence of any predicate RICO act, *id.* at 30–31; association-in-fact enterprise, *id.* at 31; or RICO causation, *id.* at 32–35.[9]  Plaintiffs cannot begin to show causation for pre-October, 2018 purchasers, and this, alone, dooms certification of a class that includes these purported members.

---

[8] Plaintiffs have long recognized that pre-October 29, 2018 purchasers are differently situated, because they initially proposed alternative classes that excluded them. *See, e.g.*, Compl. ¶ 295 n.12; Am. Compl. ¶ 295 n.14 (same).

[9] Even if that marketing video could be considered common evidence, individualized issues of ascertainability, causation, and damages predominate for pre-October 29, 2018 purchasers.

A different issue arises for those class members who purchased tickets after the Lion Air accident.  They did so at a time when a significant amount of information about the functioning of MCAS on the MAX was frequently discussed in national media.  *See* Hitt Rep. 43–44 ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  Determining which alleged misrepresentations a particular plaintiff was aware of, and whether that individual credited the alleged misrepresentation, would involve a necessarily individualized inquiry.  And even for class members who were actually exposed to Defendants' alleged misrepresentations, the statements Plaintiffs target were often presented in news reports alongside countervailing information.  *See, e.g.*, Dominic Gates, "*U.S. pilots flying 737 MAX weren't told about new automatic systems change linked to Lion Air crash*," Seattle Times (Nov. 12, 2018), http://perma.cc/DE9F-3Z8N (featuring Boeing's statement expressing confidence in the safety of the MAX, while noting the FAA's reference to the possibility that MCAS "may not be performing as it should").  Plaintiffs have failed to explain how determining ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  Hitt Rep. 44.

Individual inquiry would also be required to determine whether an alleged misrepresentation "led directly" to a particular class member being overcharged for a particular ticket.  *Anza*, 547 U.S. at 461.  Air travelers choose which ticket to purchase based on a host of factors—e.g., price, flight duration, departure time, baggage fees, and loyalty status—most of which have nothing to do with the perceived safety of a particular aircraft.  Brueckner Dep. 206:10–214:21 ███████████████████████████  If a

15

putative class member would have purchased the same flight for the same price notwithstanding knowledge of the MAX's alleged safety defect, then such class member did not suffer any injury as a "direct result of a RICO violation." *Anza*, 547 U.S. at 459; *see also Bridge*, 553 U.S. at 659 (explaining that knowledge of the falsity of a representation "would constitute an intervening cause breaking the chain of causation between [defendant's] misrepresentations and [plaintiff's] injury").

Plaintiffs themselves show that knowledge of the alleged defect need not have affected an individual's flight choice.  Plaintiff Fritz Ringling, for example, ████████████████████████ ████████████████████████████████████████ Ringling Dep. 105:16–19; ████████ ████████████████████████ *id.* at 107:6–12; ████████████████████ ██████████████████ *id.* at 111:2–4; ████████████████████████████████ ██████ *id.* at 110:15–22; ████████████████████████████████████████ *id.* at 110:23–111:1. █████████████████████████████████████████████ ███████████████████████████████████████████████████. *See, e.g.*, Allenby Survey Materials, Participant 3 at 13:01–13:20 ████████████████████████████████ ██████████████████████████████████████████████████████ Participant 2 at 20:19 ████████████████████████████████████████ Indeed, ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ Ex. 16, Allenby Survey Materials.  Plaintiffs' own evidence, therefore, shows there are many reasons why a putative class member would purchase a flight on Southwest or American Airlines without regard to the alleged fraud, severing any direct relationship to Plaintiffs' claimed injury, and at a minimum, requiring a highly individualized inquiry to determine RICO causation.

Plaintiffs also propose to prove RICO causation by showing that "pilots" and "crew

16

members" were deceived.  *See, e.g.*, Mot. Class Cert. 40.  But Plaintiffs do not articulate any causal

link between alleged misrepresentations to pilots and any overcharges paid by class members, let

alone show that the purported fraud on pilots "led directly" to overcharges.  *Anza*, 547 U.S. at 461.

In any event, any causal chain between the two would require the same individualized proof as

Plaintiffs' proposal to prove fraud on "ticket buyers."  Mot. Class Cert. 40.  Pilots do not set "price

levels" for tickets, nor are they relevant to the market for "ticket demand."  *Id.* at 34.  So

determining what (if any) overcharges would result from alleged fraud on pilots would still require

the same individualized inquiries into what ticket purchasers knew, at what times, and how they

responded to that information.  *See supra* at 13–16.

### b.   No classwide inference of reliance can be drawn here.

Plaintiffs try to circumvent the glaring need for individualized proof of causation for their

claim by citing *Torres*, which permitted an inference of classwide causation because of the peculiar

nature of the claim there involving a pyramid scheme.  838 F.3d at 643.  But *Torres* is inapplicable

here because a pyramid scheme is an entirely distinct type of fraud that bears no similarity to what

Plaintiffs are alleging.  Mot. Class Cert. 38–40.[10]  The *Torres* plaintiffs alleged that defendants

defrauded them through a classic pyramid scheme in which the perpetrators concealed that they

were "robbing Peter to pay Paul" to keep the fraud going.  838 F.3d at 639.  The court permitted

Plaintiffs to prove causation on a classwide basis by establishing the existence of the pyramid

scheme and their investment in it.  It ruled that, under those circumstances, it could draw an

inference of classwide reliance because "individuals do not knowingly join pyramid schemes,"

noting that the record was "devoid of any evidence that a single putative class member joined [the

---

[10] Plaintiffs' citations to *individual* RICO cases that did not implicate class certification do not
support certification.  *See Allstate*, 802 F.3d 665 (addressing individual RICO claim); *In re
Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013) (same).

pyramid scheme] despite having knowledge of the fraud." *Id.* at 643.  As another court in this district has explained in distinguishing the district court's opinion in *Torres*, "[t]his inference of reliance can be applied in *select* cases where the facts clearly demonstrate that because of the economics of the transaction, no rational actor would enter into the transaction but for the misrepresentation." *St. Gregory*, 2015 WL 5604763, at *4 (emphasis added).[11]

The rationale underlying those cases does not apply here.  Plaintiffs do not allege that Defendants operated a pyramid scheme, or anything close to a pyramid scheme.  Indeed, several courts have found that the absence of a pyramid scheme alone renders the *Torres* inference of classwide causation inapplicable.  *See, e.g. Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 718 (N.D. Tex. 2018) (rejecting plaintiffs' reliance on *Torres* because of "one fatal issue . . . defendants did not operate [a] pyramid scheme"); *Arruda v. Curves Int'l, Inc.*, 2020 WL 4289380, at *7 (W.D. Tex. July 27, 2020) ("[T]his case is distinguishable from *Torres* as there was no allegation of a pyramid scheme[.]").

---

[11] The other cases cited by Plaintiffs that follow *Torres*'s reasoning likewise emphasize that the *exclusive* potential source of the alleged losses at issue was Defendants' actions.  In *Vine v. PLS Fin. Servs., Inc.*, for example, payday loan borrowers alleged that their lender had submitted affidavits to the district attorney "fraudulently representing that the Borrowers had committed theft by check."  807 F. App'x 320, 330 (5th Cir. 2020).  And defendant's fraudulent representations prompted the district attorney to send letters to class members "threatening prosecution if the recipient did not pay" certain fines.  *Id.* at 325.  On those facts, the Fifth Circuit upheld an "inference of reliance" because there was no plausible reason why borrowers "would have paid the [district attorney's] office" had it not been for "the very misrepresentation [defendant] made in its affidavits."  *Id.* at 330.  *See also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) ("In cases involving fraudulent overbilling" there is a "reasonable inference that customers who pay the amount specified . . . would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,  2020 WL 1180550, at *45 (D. Kan. Mar. 10, 2020) (permitting "an inference of reliance" in RICO cases "where the behavior of . . . the members of the class cannot be explained in any way *other than* reliance upon the defendant's conduct" (emphasis added)).

Nor are the facts alleged here remotely "similar" to *Torres,* as Plaintiffs contend.  Mot. 40.[12]  As the *St. Gregory* court ruled, *Torres's* holding applies only to "select cases where . . . because of the economics of the transaction, no rational actor would enter into the transaction but for the misrepresentation."  2015 WL 5604763, at *4.  But as Plaintiffs' own evidence shows, people buy airline tickets all the time, for all sorts of reasons, at all sorts of prices, based on factors entirely distinct from the alleged misrepresentations.  *See supra* at 15–16.  And unlike in *Torres* and Plaintiffs' other cases, the record here is *not* "devoid of evidence that a single putative class member" would have purchased their ticket had they known about the alleged defect.  *Id.* ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  *See* Hitt Rep. ¶¶ 81–82.  So information about such allegations was widely available when *many* putative class members bought tickets.[13]

This case much more closely resembles *St. Gregory*, a putative RICO class action in which LG allegedly concealed defects in its HVAC units.  2015 WL 5604763, at *2.  That court rejected plaintiffs' attempt to invoke the "inference of reliance," finding that there were "numerous possibilities that would explain why a consumer might elect to purchase an LG HVAC unit[] rather than some other brand," such as the fact that that the LG units "were less expensive and had a

---

[12] In a pyramid scheme, there is a unique identity—not extant here—between the existence of the scheme and each of its ultimate investors' losses, because no one invests but for the scheme and, after that investment, the scheme's nature "requires the individual to choose to become either a victim or a fraudster."  *Torres*, 838 F.3d at 643.

[13] As noted above, *see supra* at 15–16, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮  *See* Ringling Dep. 114:17–115:14 ▮▮▮▮
▮▮▮▮▮▮▮▮  Allenby Survey Materials,
Participant 3 at 13:01–13:20
▮▮▮▮▮▮

longer warranty than other options." *Id.* at *5.  Expressly distinguishing *Torres* on its facts, *St. Gregory* held that because it could not be "taken as given that every class member necessarily relied on LG's alleged misrepresentations" in choosing to purchase LG products, the "inference of reliance" did not apply.  *Id.*  The same logic applies here.

Without the *Torres* inference of causation, the individualized inquiries needed to prove RICO causation defeat predominance, as they frequently do in fraud-based RICO cases involving consumer goods and services.  In *Haley v. Merial, Ltd.*, 292 F.R.D. 339, 343–44 (N.D. Miss. 2013), for example, plaintiffs sought to certify a class of dog owners who bought canine medication allegedly mismarketed as 100% effective.  While acknowledging that plaintiffs need not show first-party reliance, the court still denied certification because proof that the defendant "caused injury . . . to *all putative class members* would [have] require[d] the fact finder to examine the prices paid by each individual putative class member . . . and to examine other individualized factors to determine if [defendant's conduct] *directly led* to any overpayment of the drug." *Id.* at 359.  These "individualized factors" included the actual ways that individual sellers (*i.e.*, veterinarians) "set[] the retail price" of the medications, as well as "considerations concerning the medical judgment of the veterinarians who prescribed [the medications] over other [alternatives]." *Id.*  In other words, it was not enough for plaintiffs to allege that the defendant's deceptive conduct "inflated [the] market price" for the medications, *id.* at 354; plaintiffs had to show that for each class member such deception "*directly led* to any overpayment [for] the drug," *id.* at 359.

The same reasoning applies here.  Given the individualized factors bearing on each ticket purchase—*i.e.*, the specific misrepresentation, who relied on it, and how this reliance led directly to an increased ticket price—RICO causation cannot be established on a classwide basis.  *Id.*; *see also In re Testosterone Replacement Therapy Prods. Liab. Litg.*, 2018 WL 3586182, at *19 (N.D.

Ill. July 26, 2018) (finding reliance an individualized issue in a putative RICO class action because "even assuming all [third-party payors for prescription drugs] received the same alleged misrepresentations, the question whether all TPPs based their formulary or utilization management decisions on the misrepresentations cannot be answered with common evidence").  *Torres* thus does not support Plaintiffs' effort to evade the need for individualized proof of causation in order to establish the type of fraud they have alleged.

### 2.    Plaintiffs are barred from relying on a "fraud-on-the-FAA" theory.

Plaintiffs also now contend that Boeing made "false and misleading statements to regulators," Mot. Class Cert. 25, but they expressly disclaimed that theory at the motion to dismiss stage in response to Boeing's argument that the Federal Aviation Act precludes a private right of action for that theory under civil RICO.  Thus, judicial estoppel bars Plaintiffs from asserting that previously disclaimed theory now.  "[A] party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position."  *In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012).  The doctrine applies when: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."  *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261–62 (5th Cir. 2012).

Plaintiffs' invocation now of the theory that Boeing defrauded the FAA satisfies all three elements for judicial estoppel.  First, Plaintiffs avoided responding to Boeing's argument in its motion to dismiss that the Federal Aviation Act precluded their claim by insisting they did not "rel[y] on 'fraud-on-the-FAA allegations'" and that such a claim is "not . . . actually in the complaint."  Pls.' Opp'n Mot. Dismiss 43 (Dkt. 28).  Plaintiffs reiterated that position in their surreply.  *See* Pls.' Surreply Mot. Dismiss 15 (Dkt. 39) (labeling the fraud-on-the-FAA theory a "straw man" concocted by Boeing and claiming that its theory concerned fraud to "the public"

only).  But in their motion for class certification, the assertion that Boeing defrauded the FAA is a central and recurrent element of their effort to establish their common proof of RICO liability. *See, e.g.*, Mot. Class Cert. 25 (asserting that Defendants' "false or misleading statements to regulators" are a "common issue"); *id.* at 30 (claiming that Plaintiffs will offer "common evidence that" Defendants "made false and misleading statements to U.S. and international regulators"); *see also* Allenby Rep. 9 ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ This inconsistent legal position plainly satisfies the first element for judicial estoppel.

Second, the Court accepted and relied on Plaintiffs' position in its opinion denying in part the motion to dismiss. Mot. Dismiss Order 24 n.15 (Dkt. 56).  Boeing previously sought dismissal of any claim of fraud on the FAA because it was precluded by the regulatory structure of the Federal Aviation Act.  *See* Boeing Mot. Dismiss 21–23 (Dkt. 21); *see also United Food & Com. Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 2012 WL 3061859, at *3–4 (N.D. Ill. July 26, 2012) (dismissing RICO claim based on "regulatory violations").  Based on Plaintiffs' "agreement" that their claims "are for fraud on the public and the Plaintiffs—not for fraud on the FAA," the Court bypassed this argument.  Mot. Dismiss Order 24 n.15 (Dkt. 56).

As for the third element, Plaintiffs did not act inadvertently in asserting inconsistent positions.  Plaintiffs themselves stated that they were not seeking recovery for fraud on the FAA. *See* Pls.' Opp'n Mot. Dismiss 51. ██████████████████████████████████████

████████████████████████████████ Allenby Dep. 125:13–16; *id.* at 123:18–20 ██████████

██████████████████████████████████████████ *See Love*, 677 F.3d at 262 (rejecting argument that changed position was "inadvertent" when Plaintiff

"acknowledged" he knew and understood prior position).  The Court should therefore give no credence to Plaintiffs' position that their fraud-on-the-FAA theory achieves predominance when Plaintiffs "expressly and strenuously argued" against that theory to defeat dismissal on the pleadings.  *Leet*, 2017 WL 3782780, at *9 (M.D. La. Aug. 31, 2017) (refusing to consider plaintiff's changed position on preemption).

Finally, even if Plaintiffs could revoke their disclaimer, Boeing's preclusion argument was correct, and the Federal Aviation Act bars fraud on the FAA as a basis for class certification.  As Boeing explained in its motion to dismiss, Plaintiffs cannot use civil RICO as a basis for a cause of action where Congress left enforcement decisions to "punish and deter fraud against" an agency to that agency.  *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001); *see also* Boeing Mot. Dismiss 21–23; *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 410 n.4 (11th Cir. 2011) (rejecting "fraud-on-the-FDA theory" under RICO).  That is exactly the circumstance with the FAA, which has been granted full authority to police fraud against the agency.  *See, e.g.*, 49 U.S.C. §§ 46106, 46301, 46320; *see also* 14 C.F.R. § 121.9 (prohibiting false statements to FAA and providing for civil penalties for violations).

### B.   Plaintiffs' inability to prove classwide injury and damages defeats predominance.

"[P]laintiffs seeking class certification . . . must . . . present a damages model 'establishing that damages are capable of measurement on a classwide basis.'"  *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  The Fifth Circuit forbids certification "where the calculation of damages is not susceptible to a mathematical or formulaic calculation." *Bell Atl.*, 339 F.3d at 306–07; *see also id.* at 307 ("[W]here the issue of damages does not lend itself to mechanical calculation, but requires separate mini-trials of an overwhelmingly large number of individual claims, the need to calculate

23

individual damages will defeat predominance.").  Plaintiffs cannot meet this standard.

Plaintiffs wrongly claim that "it is not necessary to show that damages are susceptible to classwide proof."  Mot. Class Cert. at 43 (citing *In re Deepwater Horizon*, 739 F.3d 790, 815–17 (5th Cir. 2014)).  As the Fifth Circuit recently confirmed, "[e]ven where plaintiffs seeking class certification show that common issues predominate on questions of liability, *they must also* present a damages model establishing that damages are capable of measurement on a classwide basis." *Cruson*, 954 F.3d at 258 (emphasis added).  Therefore, Plaintiffs' failure to meet this burden constitutes an independently sufficient ground to deny certification.  *See id.*[14]

Plaintiffs' "sole theory of injury in this case" is that "the price of airline tickets on carriers that operated the MAX was higher than it would have been, but for Defendants' [allegedly] fraudulent scheme."  Mot. Class Cert. 33.  To prove each class member's damages (and RICO injury), therefore, Plaintiffs must present a model that can mechanically calculate how much less each class member would have paid for his or her ticket in the so-called "but-for" world where Defendants' alleged conduct never occurred.  But Plaintiffs fail to meet this burden for five reasons.  First, as explained in the Motion to Exclude Dr. Greg Allenby, Dr. Allenby has presented no reliable method for calculating damages here.  Second, the nature of the air travel industry creates huge obstacles to calculating prices using a single model for flights nationwide, and therefore necessitates individualized inquiry into the price changes affecting different ticket

---

[14] Plaintiffs' contrary argument misreads *Deepwater Horizon*.  As the Fifth Circuit held in rejecting this same argument, *Deepwater Horizon* does not apply to Rule 23(b)(3) classes where predominance is based on "liability *and damages*, where we ask whether in operation the commonality is undone by the damages theory."  *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 n.36 (5th Cir. 2015) (emphasis added); *see* Mot. Class Cert. 43 ("Plaintiffs will prove the existence and amount of this overcharge for each class member on a classwide basis, using exclusively common evidence.").  In any event, the same reasons that prevent classwide proof of damages also prevent classwide proof of *liability* because Plaintiffs have no classwide proof of RICO injury to business or property due to "inflated prices."  Mot. Class Cert. 38; *see also* 18 U.S.C. § 1964(c).

purchasers.  Third, Dr. Allenby ignores the heterogeneity within the airline ticket market, and so offers no way to address it.  Fourth, leaving aside whether class members flew on the MAX 8, the proposed class definitions improperly pull in many class members who are uninjured, even under Plaintiffs' overcharge theory; the inability to exclude these uninjured members without individualized inquiry makes certification inappropriate.  And fifth, Dr. Allenby's unsubstantiated promise to fix these problems in the future cannot meet Plaintiffs' burden of proving at the class certification stage, with admissible evidence, that individualized inquiries will not predominate.

### 1.    Plaintiffs have no admissible evidence of class damages.

To begin, Plaintiffs offer no reliable method of calculating class damages.  The Fifth Circuit recently confirmed that "the *Daubert* hurdle must be cleared when [expert] evidence is relevant to the decision to certify."  *Prantil*, 2021 WL 222722, at *2.  Having abandoned reliance on Dr. Brueckner's analysis, Pls.' Opp'n Mot. Exclude Brueckner 1 (Dkt. 294), Plaintiffs now depend entirely on Dr. Allenby's model.  If his analysis "would not be admissible at trial, it should not pave the way for certifying a proposed class."  *Prantil*, 2021 WL 222722, at *3.

*Prantil*'s requirement means that for all the reasons Dr. Allenby's analysis should be excluded under *Daubert*, class certification should be barred too.  First, he does not even try to measure Plaintiffs' actual theory of damages.  Allenby *Daubert* 7–10 (Dkt. 253); *Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").  ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  Allenby *Daubert* 10–11; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 477–78 (S.D.N.Y. 2018) (denying certification because an expert's "internally inconsistent results . . . seriously undermine[d]" the reliability of his analysis).  ███████████████████████████████████████████████████

████████████   Allenby *Daubert* 11–18.  And fourth, he relies on alternative methodologies that purport to calculate market prices without even accounting for supply-side considerations.  *Id.* at 18–19.  Because "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot . . . establish through evidentiary proof that Rule 23(b) is satisfied," *Prantil*, 2021 WL 222722, at *3, Plaintiffs cannot show that they will be able to prove damages on a classwide basis.

## 2.   Plaintiffs cannot account for the vast heterogeneity in the markets for airline tickets, and do not even try.

Even if Dr. Allenby's analysis could survive *Daubert*, his analysis would not meet Plaintiffs' burden under Rule 23.  To establish predominance, Plaintiffs must provide a reliable, classwide method for determining what price *each class member* would have paid for their ticket in the but-for world.  This model must account for how prices are set in the airline market, because a model that "makes no effort to adjust for the variegated nature" of a market "cannot reasonably approximate the actual damages suffered by class members."  *Bell Atl.*, 339 F.3d at 307.  Here, the heterogeneous nature of airline ticket markets makes the alleged overcharge not "susceptible to a mathematical or formulaic calculation."  *Id.* ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████   Hitt Rep. ¶ 67.  But Dr. Allenby does not account for any of this significant real-world heterogeneity in his model, and does not even attempt to do so.

### a.   Airline pricing decisions are individualized by route, time, and ticket.

As anyone who has shopped for an airline ticket well knows, ticket prices are not uniform.

████████████████████████████████████████

██████████████   Hitt Rep. ¶ 59. █████████████████████



*Id.* ¶ 67.

RM 101 at SWA_Earl_00937782.

These prices are also affected by different competitive factors across routes and departure times.

Hitt Rep. ¶ 26(a).

*Id.* ¶ 62; *see also* Brueckner Dep. 214:4–7

This competitive makeup varies considerably over time.

Hitt Rep. ¶ 64.

*Id.* ¶ 72.

*Id.* ¶ 71.

RM 101 at SWA_Earl_00937806.

*Id.* at SWA_Earl_00937803.

27

Application of these complex pricing models causes substantial (and largely unpredictable) price variation for every ticket on every flight. ██████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████ Hitt Rep. ¶ 67.  Price variability is also evident among all flights along a specific route. ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶ 79 & Ex. 11.  The average price paid for tickets on a particular flight also varies over time, not only in absolute terms, but also relative to other flights on the same route. ██████████████████████████████

███████████████████████████████████████████████████ *Id.* ¶ 79. ████████

███████████████████████████████████████████████████ *Id.* ¶ 71. ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* ¶ 24(d).  As a result, the price an airline charges for a particular ticket on a particular flight at a particular time ████████

█████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ *Id.*

¶ 137.  The coverage of this accident in major U.S. publications—*e.g.*, *USA Today*, the *New York Times*, the *Washington Post*, and the *Wall Street Journal*—addressed many of the same purported developments as this case alleges, including these statements:

- The Lion Air accident resulted from an erroneous flight data sensor, which led an automated flight-control feature to forcefully push down the nose of the MAX aircraft;

- The FAA was evaluating whether to require a fix to the MAX's automated flight software;

- The lack of information about the new system on the MAX likely confused the pilots flying the Lion Air aircraft;

- Southwest Airlines and American Airlines were the only U.S. airlines currently operating the MAX 8; and

- Unions representing pilots at Southwest and American Airlines expressed concern that they were not properly informed about changes to the MAX software.

*Id.* ¶ 82 (collecting media coverage). ████████████████████████████████



████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*See id.* ¶ 137. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ *Id.* ¶ 137 & Ex. 16. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *Id.* ¶

138-40 & Ex. 18 ██████████████████████████████████████████████

████████████████████████████████████████████████ ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Brueckner Rep. 10.

In short, airline prices are highly heterogeneous across routes, within routes, on the same flight, and over time.  And market data confirm that, even after the Lion Air crash, there was no common effect on market prices.

> **b.    Determining the amount of an overcharge, if any, would require individual inquiry.**

████████████████████████████████████████████████████████████████



██████████████████████████████████████████████████ Hitt
Rep. ¶ 69. ██████████████████████████████████████
████████████ *Id.* ¶ 59. ███████████████████████████
██████████████████████████████ RM 101 at SWA_Earl_00937809.
As a result, ███████████████████████████████████████
████████████████████████████████████████████████████
Hitt Rep. ¶ 65. Plaintiffs' own experts █████████████████████
██████████████████ *See* Allenby Dep. 289:2–9████████████████
████████████████████████████████████████████████████
████████████████████████ Brueckner Dep. 160:18–161:10████████
███████████████████████████████████████

Courts have found that individualized damages inquiries were necessary to ascertain but-for pricing in far simpler markets than this one. In *Haley*—the putative RICO class action on pet medication overcharges, *see supra* at 20—plaintiffs sought damages for "their overpayment for a product worth less than its inflated price." 292 F.R.D. at 360. In addition to individualized causation problems, the court also found "that determining the amount of [overcharge] damages for each putative class member would require individualized determinations with respect to each Plaintiff." *Id.* The court noted that "th[e] wholesale price [of the medications] varies over time and is sometimes discounted"; "[e]ach veterinarian clinic apparently sets the retail price of [the medications]"; and "[t]he purchase price of the drugs [was] likely to vary significantly across geographic markets and the Internet." *Id.* at 359. These factors "illustrate[d] the many underlying

individual circumstances that would need to be considered" in calculating damages, causing the court to conclude that certification was inappropriate.  *Id.* at 360.

*Haley* aligns with other courts that denied class certification because the markets involved were too heterogeneous to allow for classwide, formulaic proof of damages.  In *Bell Atlantic*, the Fifth Circuit denied certification of a class of businesses who purchased blocked caller ID services because "any adequate estimation of actual damages suffered would require consideration of the variegated nature of the businesses included in . . . the proposed classes."  339 F.3d at 304; *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523, 531 (E.D. Tex. 2003) (refusing to certify a class of bread and cake product purchasers because "[t]he court does not believe, given the numerous independent factors that go into both the price that should have been paid and the price that was actually paid, that there could be any general formula for calculating damages with precision.").[15]

The difficulties in those cases pale by comparison to the complexity of airfare pricing.  *Haley*, for example, dealt with two forms of the same medication, whose prices simply "varie[d] over time." 292 F.R.D. 359.  Yet certification was denied. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Hitt

Rep. ¶ 73.  While courts have found that the need for even a few thousand "separate evidentiary

---

[15] *See also, e.g.*, *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 62–65 (4th Cir. 1977) (en banc) (affirming denial of certification given the complexity of calculating damages in the market for flue-cured tobacco); *Am. Seed Co. v. Monsanto Co.*, 238 F.R.D. 394, 400 (D. Del. 2006) (denying certification because "[t]he market for seeds is highly individualized depending on geographic location, growing conditions, consumer preference and other factors"); *In re Agricultural Chems. Antitrust Litig.*, 1995 WL 787538, at *7 (N.D. Fla. Oct. 23, 1995) ("[T]he reality of the market for agricultural chemicals makes it virtually impossible that the 'but for price' . . . could be determined on a class-wide basis.").

hearings" on damages defeats predominance, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013), this case would require *millions* of hearings to evaluate the effect of a but-for disclosure on the price each putative class member would have paid, given the unique supply and demand conditions prevailing for their specific ticket on their specific flight at the time of purchase.

### 3. Dr. Allenby's model ignores price heterogeneity in the air travel industry.

#### a. Dr. Allenby presumes price homogeneity.



Allenby Dep. 203:25–204:3 ████████████████████████████████████████

████████████████████████████ This flaw is fatal to class certification. *See In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 93 (S.D.N.Y. 2017) (denying certification because plaintiffs' damages model "fail[ed] to account for price variability in the but-for world"). Dr. Allenby ████████████████████████████████████████████████

███████████████████████ Hitt Rep. ¶ 30 n.27, ████████████████████████

Instead, Dr. Allenby ████████████████████████████████████

███████████████████████████████ In other words, Dr. Allenby ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ Instead, ████████████████████████████████████

████████████████████████████████████████

Dr. Allenby acknowledges that this model does not account for the price heterogeneity observed in the real world. For example, while Dr. Allenby's ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████  Allenby Dep. 203:5–204:8.  But because he did not analyze this issue,

Dr. Allenby ████████████████████████████████████████████████████

*id.* at 289:2–290:1 (emphasis added).  In their motion for class certification, Plaintiffs themselves

acknowledge the limited utility of Dr. Allenby's ███████████████████████  *See* Mot.

Class Cert. 49.  ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████  *Id.* (emphases added).  But this is a clear admission that Dr. Allenby's *current* survey

fails to make this necessary determination.  The reason Plaintiffs cannot ████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████  *See* Rossi Rep. 43  ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████[16]  As discussed above, a flight's route is just one of many

variables that impact the price paid for a ticket, and customers pay vastly different prices even for

tickets on the same flight.  So Dr. Allenby's ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████  Hitt Rep. ¶ 114.

In *Blades v. Monsanto Co.,* 400 F.3d 562, 570 (8th Cir. 2005), the Eighth Circuit rejected

---

[16] Dr. Allenby's analysis, by his own admission, has other flaws.  He admits that ██████████████

██████████████████████████████████████████████  Allenby Dep. 185:13–

186:14.  ████████████████████  *Id.* at 163:1–5. ██████████████████████

██████████████████████████████████

a similar unwarranted presumption of homogeneity.  There, the district court denied certification because "plaintiffs *presume[d]* class-wide impact without any consideration of whether the markets . . . at issue [] actually operated in such a manner so as to justify that presumption." *Id.* The Eighth Circuit affirmed because "the evidence . . . showed that supply-and-demand conditions for seed sales var[ied] to such a great extent that the 'but-for' prices could be determined only through individualized inquiries for each potential class member." *Id.* ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ Allenby Dep.

203:5–204:8; *see also id.* at 289:2–290:1 ████████████████████████████████

In short, Dr. Allenby acknowledges that ████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ Mot. Class Cert. 49.  Plaintiffs thus fail to "present a damages model establishing that damages are capable of measurement on a classwide basis," and their motion should be denied.  *Cruson*, 954 F.3d at 258.

### b.   Plaintiffs cannot justify using average price premiums that conceal heterogeneity.

Plaintiffs admit that Dr. Allenby's model ████████████████████████████████████

████████████████████████████████████ Instead, that model only ████████████

████████████████████████████████ But this approach fails as well, because "where the injury alleged is measured in terms of an average . . . , it is the plaintiff who must demonstrate the reasonable similarity" of the values being averaged.  *Bell Atl.*, 339 F.3d at 306. Plaintiffs do not attempt to meet this burden and thus, the failure of Dr. Allenby's model to account for price heterogeneity dooms this approach as well.  *See MacDougall v. Am. Honda Motor Co.*, 2020 WL 5583534, at \*8 (C.D. Cal. Sept. 11, 2020) (explaining that the reliability of an average

depends on the similarity of the averaged values, and where there is significant heterogeneity in the data an average "w[ill] not reflect reality").

Courts denying certification in similar cases describe the "reliance on averages" to prove individual damages as a "fundamental flaw." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 590–91 (N.D. Ill. 2009) (collecting cases). This is because "averages can hide substantial variation across individual cases." *Id.* at 591. So an average price impact "cannot establish injury to each individual class member." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 152 (S.D.N.Y. 2006). And because averages can "mask significant price variations" paid by individual class members, *Weiner v. Snapple Bev. Corp.*, 2010 WL 3119452, at *9 (S.D.N.Y. Aug. 5, 2010), the use of averages "is not a methodology common to the class that can determine impact with respect to each class member," *Reed*, 268 F.R.D. at 591.

 "[A] proposed class seek[ing] to calculate damages by use of an average . . . bear[s] the burden of demonstrating the similarity" of each class member's damages. *Pioneer Valley Casket Co. v. Serv. Corp. Int'l*, 2008 WL 11395528, at *13 (S.D. Tex. Nov. 24, 2008). Plaintiffs must establish that "averages and aggregations are not masking individualized issues that are likely to predominate should the class action move forward." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015).

Plaintiffs do not even try to meet their burden of "demonstrat[ing] the reasonable similarity" of damages incurred by individual class members. *Bell Atl.,* 339 F.3d at 306. Dr. Allenby ██████████████████████████████████████████████████████████ ████████████████████████████ *See Reed*, 268 F.R.D. at 594 (denying certification where expert "d[id] not explain in any detail how he would actually calculate damages for each member of the putative class"). ████████████████████████████████████████████████████

████████████████████████████████████████████

████ .[17]   Allenby Dep. 203:5–204:8.  Plaintiffs admit that until Dr. Allenby ████████

████████████████████████████████████████████

████████████████████████████████████████████

Mot. Class Cert. 49. ████████████████████████████

████████████████████████████████████████████

████████  Allenby Dep. 238:12–15, ██████████████████████

████████████████████  *id.* at 289:2–290:1.[18]  This will not suffice.

        **c.**      **Dr. Allenby's sensitivity analysis did not and cannot account for price heterogeneity.**

In an attempt to ameliorate Dr. Allenby's ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████  *See* Mot. Class Cert. 46. ████████████████

---

[17] Plaintiffs' reliance on impermissible averages is especially egregious as to purchasers of tickets on non-MAX 8 flights, whose only exposure was the (unrealized) possibility of reassignment from a non-MAX 8 to a MAX 8.  The odds of that reassignment were heterogeneous and ████████  Hitt Rep. ¶ 44.  But Plaintiffs ████████ ████████████████████████████  Lee Rep. ¶ 114.

[18] Dr. Allenby ██████████ ████████████████████████████  Allenby Decl. ¶ 6. ████████████████████████  *See* Rossi Dep. 263:9–15 ██████████ ████████████████████  Indeed, Plaintiffs concede that there may be ████████ ████████████████████████████████  Mot. Class Cert. 49 (emphases added). ████████████████ ████████  Dr. Allenby ████████ ████████████████  Rossi Dep. 263:16–25.



*Id.* This argument fails because

First, *See* Rossi Dep. 263:19–25.

Rossi Rep. 37.

In short, Dr. Allenby's

Allenby Dep. 270:16–24.

### 4.    The proposed classes consist of many members who are uninjured even under Plaintiffs' capacious theory of injury.

The proposed classes also cannot be certified because they contain many members who have not suffered the overcharge injury Plaintiffs allege, either because they would have paid the same price in the but-for world or were reimbursed for any alleged overcharge.  Plaintiffs simply ignore the proposed members in these categories, apparently hoping they will be swept along into a class.  But "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016)

(Roberts, C.J., concurring).  Plaintiffs, therefore, "must provide a reasonable and workable method for differentiating between uninjured class members and injured class members so that uninjured class members do not recover damages."  *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 135 (D.D.C. 2017) (Rule 23(b)(3) requires "that injury to 'all or virtually all' putative class members can be proved through common evidence and that plaintiffs have a reliable way to ensure that all class members suffered some injury").  Where, as here, "there are apparently thousands who in fact suffered no injury," the "need to identify those individuals will predominate and render an adjudication unmanageable absent . . . some other mechanism that can manageably remove uninjured persons from the class."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018).

By ignoring the issue of uninjured class members, Plaintiffs have not met their burden of "provid[ing] a reasonable and workable method" for removing the uninjured members from the class.  *In re Niaspan*, 464 F. Supp. 3d at 715.  Nor can they show that all putative class members suffered *any* "overcharge" RICO injury, Mot. Class Cert. 43, without burdensome individualized inquiries to exclude members who were not overcharged.

### a.   Class members who would have paid the same price are uninjured even under Plaintiffs' theory.

Class members who would have paid the same price for their tickets regardless of Defendants' conduct were not injured by that conduct.  And there are many reasons why many of the proposed class members would have paid the same price for their tickets in the so-called "but-for world" without the alleged fraud.  As explained above, *see supra* at 26–32, ███████████

████████████████████████████████████████████████████ Hitt Report

¶ 67.  In setting prices, ████████████████████████████████████████████

████████████████████████████████████████████████████████



*Id.* ¶ 121.

RM 101 at SWA_Earl_00937782.

Dr. Allenby's report

Allenby Rep. 9.

*See, e.g.*, Allenby Survey Materials, Participant 2 at 12:44–13:06

Participant 4 Interviewer Notes

And Plaintiff Fritz Ringling's real-world purchase

Ringling Dep. 114:17–115:14.  More generally, a disclosure may not have affected demand at all from certain customers, such as brand loyalists

Hitt Rep. ¶ 86; *see also* Allenby Survey Materials, Participant 3 at 13:01–13:20

Thus, for many class members, a but-for disclosure about the alleged defects would not have influenced their purchasing decisions, which defeats Plaintiffs' attempted class certification. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510 (7th Cir. 2006) (denying certification because "Coke's marketing may have been only a minor factor in the purchasing decisions of [some] class members," and others "may have known about the [alleged misrepresentation] and bought fountain Diet Coke anyway").  For these class members,

████████████████████████████████████████████

████████████████████████████████████████████

████ Hitt Rep. ¶ 121.  As a result, class members whose willingness to pay was unaffected by derogatory information about the MAX 8—████████████████████████—would not have paid less in the "but-for" world, and therefore have sustained no cognizable injury.

### b.      Reimbursed class members are uninjured.

The putative classes also contain many who were reimbursed for tickets and so suffered no harm from any overcharge.  As discussed in Section II, Plaintiffs' inability to identify these reimbursed individuals renders the class unascertainable.  But reimbursed individuals would be ineligible in any event because they would have suffered no injury, and Plaintiffs would still have to offer a method for identifying them, which they cannot do.  *See supra* Section II.

Courts have denied certification where individualized inquiry is needed to determine whether a class member passed on any damages.  For example, where plaintiffs accused eBay of operating a fake bidding system that artificially inflated auction prices, the court denied certification because an individualized inquiry would have been needed to determine whether each class member passed on any damages by "re[selling] the item for what she paid for it."  *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 564, 572 (N.D. Cal. 2009).  Similarly, in a case alleging furnace defects, the court denied certification because "those class members who sold [their] homes prior to furnace failure . . . clearly sustained no damages."  *Neuser v. Carrier Corp.*, 2007 WL 1470855, at *4 (W.D. Wisc. May 15, 2007).  The "possible alternatives in dealing with the inevitable inclusion of these class members" were either "inappropriate overpayment of damages" or "an unmanageably cumbersome process of eliminating these members from the class."  *Id.*; *accord In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001) (denying certification because

plaintiff offered no reasonable method for determining "whether an individual class member passed on the full amount of the overcharge").

Here, the reimbursed purchasers (and those who would have paid the same price anyway) make this "a case in which any class member may be uninjured, and there are apparently [millions] who in fact suffered no injury.  The need to identify those individuals will predominate and render an adjudication unmanageable." *Asacol*, 907 F.3d at 53–54.  Thus, certification should be denied.

> ### 5. Dr. Allenby's promise to provide reliable classwide proof after class certification confirms that Plaintiffs have not met their burden.

Plaintiffs do not say that Dr. Allenby has addressed all of these problems, or that he has reliably calculated classwide damages at this stage.  Even Dr. Allenby ███████████████ ████████████████ Allenby Dep. 170:11–13, ████████████████████████████ ██████████████████ Allenby Suppl. Rep. 1.  ███████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ Mot. Class Cert. 49.  But Rule 23 does not allow Plaintiffs that leeway.  Rather, Plaintiffs "bear[] the burden of establishing that *all* requirements of Rule 23 *have* been satisfied," not that they *might* be satisfied with a reinvented damages model.  *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (second emphasis added).  Plaintiffs can only meet their burden through "adequate admissible evidence to justify class certification," not speculation about what evidence Plaintiffs might be able to produce in the future.  *Id.* at 319.  And particularly where an expert's opinion is at issue, the Fifth Circuit recently clarified that Plaintiffs must show it would be "admissible at trial" *before* the opinion  can "pave the way for certifying a proposed class." *Prantil*, 2021 WL 222722, at *3.  All that Plaintiffs have offered to support certification here is speculation that a future, as-yet-undesigned survey will reach rational, statistically significant results while accounting for the airline industry's complexity

41

and excluding uninjured class members.  That speculation is not evidence, nor would it be admissible at trial, and Plaintiffs thus have not met their burden under Rule 23.

In *Cruson,* the Fifth Circuit vacated the grant of class certification where an expert took a similar approach to damages.  Without offering a formula for calculating certain damages related to variable annuities, the plaintiffs' expert asserted he would provide "[t]he precise details of how the calculation of these additional damages will be performed" later.  954 F.3d at 258.  The Fifth Circuit held that insufficient, ruling that for class certification, it is not enough to provide merely a "preliminary overview of how [these] damages might be calculated."  *Id.*; *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp*., 100 F. App'x 296, 299 (5th Cir. 2004) (insufficient to "merely opine[]" that a valid damages formula "could be found").

Here, as in *Cruson*, it is not enough for Dr. Allenby to provide a "preliminary overview" of how he might try to establish the actual overcharge paid by each class member, assuming he has even done that.  As Plaintiffs concede, Dr. Allenby's current model ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████ Mot. Class Cert. 49 (emphases added), ████████████████████████████████ Instead, Dr. Allenby offers ██████████████████████████████████ ████████████████████████████████████████████ ████████████ Allenby Dep. 238:12–15.  Given these "serious problems" with Plaintiffs' damages model, the court "should not certify the class merely on the assurance of counsel that some solution will be found." *Windham*, 565 F.2d at 70.

In any event, there is no reason to think that Plaintiffs' proposed modifications could

salvage Dr. Allenby's model.  As Dr. Rossi has explained, ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ Rossi Dep.

262:20–23.  To start, one key defect in Dr. Allenby' model is ███████████████

██████████████████████████████████████████████████████████

████████████████████████ *See* Brueckner Dep. 228:24–229:2 ██████████████

██████████████████████████████████████████████████████████

███████ But Plaintiffs offer no method for accounting for ██████████████████

████████████████████████████ Instead, Plaintiffs propose a modified survey

that would ████████████████████████████████████████████████████

████████ Mot. Class Cert. 49.  But these ██████████████████████████████

██████████████████████████████████████████████████████████

█████ And Dr. Allenby has not shown how he would fix most of his model's defects. ███████

██████████████████████████████████████████████████ Allenby

Dep. 237:20–24; *see also Piggly Wiggly*, 100 F. App'x at 300 (affirming denial of certification

because "plaintiffs and their expert did not persuade [us] that a reliable formula for damages can

be devised which will yield statistically significant results . . . and that all of this can be used to

reliably measure . . . damages for each of the many thousands of members of the proposed class.").

## IV.    Plaintiffs are improper representatives for the proposed classes.

Finally, the named Plaintiffs are inadequate class representatives for this lawyer-dominated

case, as they have proven unwilling "to take an active role in and control the litigation to protect

the interests of absentees."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001).

"[T]he party seeking to certify the class must affirmatively prove that he is an adequate

class representative." *Booth v. Galveston Cty.*, 2019 WL 1129492, at *5 (S.D. Tex. Mar. 12, 2019).

The court must "inquir[e] into the willingness and ability of the representatives to take an active

role in and control the litigation." *Berger*, 257 F.3d at 482.  "[P]laintiffs seeking certification must

produce actual, credible evidence that the proposed class representatives are informed, able

individuals, who are themselves—not the lawyers—actually directing the litigation."  *In re*

*Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014)  But these Plaintiffs agree

that ███████████████████████████████████ Rogers Dep. 78:24–

79:4.[19]

Like other representatives that have been found inadequate, these named Plaintiffs have

"taken little or no supervisory role over lead counsel." *Umsted v. Intelect Commc'ns, Inc.*, 2003

WL 79750, at *3 (N.D. Tex. Jan. 7, 2003); *e.g.*, Lewis Dep. 57:22–58:3 ███████████

████████████████████████████████████████████████

████████████████████████████████████████ *see also*

Exs. 31, 32, 33 (collected testimony).  Nor have named Plaintiffs "participate[d] in litigation

decisions." *Umsted*, 2003 WL 79750, at *3; *e.g.*, Castro Dep. 54:16–19 ████████████

███████████████████ Indeed, some have forsworn any intention to supervise

class counsel.  Mortz-Rogers Dep. 87:25–88:8 ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ Others have refused to say ███████████████

███████████████████████████ Lewis Dep. 73:9–17.

---

[19] Defendants have deposed all named Plaintiffs other than James LaMorte.  Plaintiffs cancelled
LaMorte's depositions that had been confirmed for January 19, January 21, and February 5, 2021.

Plaintiffs try to overcome this evidence of their inability to direct this litigation with attorney-drafted declarations purportedly ██████████████████████

████████████████████████████████████████████████████████████

██████████ Mot. Class Cert. 27.  These declarations show just the opposite.  *See* Rogers Dep. 61:14–17 ████████████████████████████████████████

██████████████████ Several named Plaintiffs contradicted these declarations just a few days after signing them. *Compare, e.g.*, Castro Decl. ¶ 4 (Dec. 30, 2020) ████████████████

██████████████████████████████ *with* Castro Dep. 107:15–17 (Jan. 12, 2021) ████

████████████████████████████████████████████████████████

████████ In fact, the named Plaintiffs lack even a basic familiarity with their own lawsuit. *E.g.*, Rogers Dep. 63:16–18 ████████████████████████████████████

██████████████████ *see also* Ex. 32 (collected testimony).  Where, as here, the record shows that counsel alone is "actually direct[ing] this litigation," Plaintiffs have not proved adequacy.  *Kosmos*, 299 F.R.D. at 145.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs' motion for class certification should be denied.[20]

---

[20] Boeing agrees with the arguments in Southwest' Opposition, which are consistent with those in this Opposition.

Date:   February 15, 2021   Respectfully submitted,

**McGUIREWOODS LLP**

*/s/ Thomas M. Farrell*
Clyde M. Siebman
TX Bar No. 18341600
Elizabeth S. Forrest
TX Bar No. 24086207
Jeffrey J. Burley
TX Bar No. 03425250
Siebman Forrest Burg & Smith LLP
300 N Travis St
Sherman, TX 75090
Tel: 903-870-0070
Fax: 903-870-0066
Email: clydesiebman@siebman.com
Email: elizabethforrest@siebman.com
Email: jeffburley@siebman.com

Thomas M. Farrell
TX Bar No. 06839250
McGuireWoods LLP
JPMorgan Chase Tower
600 Travis Street
Suite 7500
Houston, TX 77002-2906
Tel: 713-353-6677
Fax: 832-214-9933
Email: tfarrell@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
Jeremy S. Byrum (*pro hac vice*)
Gregory J. DuBoff (*pro hac vice*)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3406
Tel:  804-775-4746
Fax:  804-698-2304
Email: bschmalzbach@mcguirewoods.com
Email: jbyrum@mcguirewoods.com

Benjamin L. Hatch (*pro hac vice*)
McGuireWoods LLP
2001 K Street N.W.

Suite 400
Washington, DC 20006-1040
Tel:  757-640-3727
Fax:  757-640-3947
Email:   bhatch@mcguirewoods.com

***Attorneys for The Boeing Company***

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2021, a true and correct copy of the above was served to counsel through the Eastern District of Texas's CM/ECF system.

*/s/ Thomas M. Farrell*
Thomas M. Farrell

## CERTIFICATE REGARDING SEALING

Pursuant to Local Rule CV-5(a)(7)(B), I hereby certify that the Court has already granted authorization to seal this document.  Pursuant to the Protective Order (ECF No. 59), "[t]he Parties are authorized to file under seal any Protected/Controlled Material (including any pleadings, motions, or other papers disclosing Protected/Controlled Material)."  This filing and/or its exhibits disclose information that the parties have designated as Protected/Controlled Material and therefore sealing is warranted.

*/s/ Thomas M. Farrell*
Thomas M. Farrell