# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| DAMONIE EARL, ET AL., § | |
| § | |
| *Plaintiffs*, § | Civil Action No. 4:19-cv-507 |
| § | Judge Mazzant |
| v. § | |
| § | |
| THE BOEING COMPANY, ET AL., § | |
| § | |
| *Defendants*. § | |
| § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Exclude the Expert Report and Testimony of Dr. Greg M. Allenby (Dkt. #253). After considering the Motion and the relevant pleadings, the Court concludes that the Motion should be denied.

### BACKGROUND

This case arises out of allegations made by Plaintiffs that Defendants The Boeing Company ("Boeing") and Southwest Airlines Co. ("Southwest") colluded to cover up fatal defects in Boeing's 737 MAX 8 aircraft and encourage public confidence to fly aboard these aircrafts while aware of the defects (Dkt. #165). Defendants deny these allegations (Dkts. #191–92). On December 3, 2020, Defendants jointly filed their Motion to Exclude the Expert Report and Testimony of Dr. Greg M. Allenby (Dkt. #253), currently before the Court. On January 29, 2021, Plaintiffs filed their response (Dkt. #296). On February 26, 2021, Defendants filed their reply (Dkt. #314). And on March 26, 2021, Plaintiffs filed their sur-reply (Dkt. #370).

### LEGAL STANDARD

The Federal Rules of Evidence permit the introduction of expert testimony when the offering expert demonstrates "genuine 'scientific, technical, or other specialized knowledge that

will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (brackets omitted) (quoting FED. R. EVID. 702(a)). But "prior to admitting expert testimony, 'district courts must be assured that the proffered witness is qualified to testify.'" *Taylor Pipeline Constr., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 705 (E.D. Tex. 2006) (brackets omitted) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)); *see United States v. Herman*, 997 F.3d 251, 269 (5th Cir. 2021) ("[D]istrict courts act as gatekeepers to determine the relevance and reliability of expert testimony."). This gatekeeping function guarantees that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) ("[An] expert's self-proclaimed accuracy is insufficient.").

Courts review the admissibility of expert opinions under the framework the Supreme Court set out in *Daubert*. *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 807 (5th Cir. 2018). "The party offering an expert's testimony must prove '(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable.'" *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-227, 2021 WL 1725564, at *1 (E.D. Tex. Apr. 30, 2021) (quoting *Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018)). "A proffered expert witness is qualified to testify by virtue of his or her 'knowledge, skill, experience, training, or education.'" *Little v. Tech. Specialty Prods., LLC*, 940 F. Supp. 2d 460, 467 (E.D. Tex. 2013) (quoting FED. R. EVID. 702). "[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002); *see Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("It goes without saying that *Daubert* clarified a district court's gate-keeping

function: the court must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case."). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Kuhmo*, 526 U.S. at 147. And, as the Fifth Circuit recently clarified in *Prantil v. Arkema Inc.*, a full-scale *Daubert* analysis must be conducted here because an expert opinion inadmissible at trial "should not pave the way for certifying a proposed class." 986 F.3d 570, 576 (5th Cir. 2021)

"Critically, the party offering expert testimony 'must prove by a preponderance of the evidence that the testimony is reliable,' not that it is correct." *Swanston v. City of Plano, Tex.*, No. 4:19-CV-412, 2021 WL 327588, at *2 (E.D. Tex. Feb. 1, 2021) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). At this point in the proceedings, district courts must simply ensure "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability"—"the accuracy of the actual evidence is to be tested before the jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) (explaining the district courts' role under *Daubert* is deciding "whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers"). It is imperative for district courts to bear in mind that the *Daubert* regime does not conscript judges into service as the adversary system. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996); *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) ("[C]ourts must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial."). In fact, "*Daubert* itself stressed the importance of the 'conventional devices' of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' (rather than wholesale exclusion by the trial judge) as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *In re Lipitor*

*(Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (brackets omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).  Nevertheless, "[e]xpert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021).

Courts consider the factors put forward by the *Daubert* Court to help assess the reliability of expert testimony, which include:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 775 n.4 (5th Cir. 2017).  These factors are "non-exclusive and 'do not constitute a definitive checklist or test.'" *United States v. Norris*, 217 F.3d 262, 269 (5th Cir. 2000) (quoting *Kumho*, 526 U.S. at 150).  Importantly, when courts evaluate challenges to expert testimony, the analysis is "limited to 'principles and methodology, not on the conclusions they generate.'" *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 595).

The immediate inquiry is a "flexible one," allowing district courts "to identify the most germane considerations." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012); *see Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 475 (E.D. Tex. 2020) ("The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue."). Nevertheless, "caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment.  Whether to allow or exclude expert testimony is committed to the sound discretion of district courts, *Weiser-*

*Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015), and such decisions will be overturned only if a district court abuses its discretion, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). *See United States v. Pon*, 963 F.3d 1207, 1219 (11th Cir. 2020) (explaining that this level of deference is "especially pronounced in the *Daubert* context, where the abuse of discretion standard places a 'heavy thumb'—'really a thumb and a finger or two'— 'on the district court's side of the scale'" (citation omitted)).

## ANALYSIS

I. **Admissibility vs. Certifiability**

Before evaluating Allenby's expert testimony in earnest, the Court addresses the conflicting views on the intersection of the Supreme Court's decisions in *Daubert* and *Comcast*. The parties present diverging views on these cases (*see, e.g.*, Dkt. #296 at pp. 9–13; Dkt. #314 at pp. 6–10), and the Court takes this opportunity to briefly clarify how *Daubert* and *Comcast* determine the analytical rubric for class-action litigation.

In *Daubert*, the Supreme Court held that courts must ensure the admissibility of expert testimony by confirming that it "rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. That is, courts must evaluate the "evidentiary reliability" of expert testimony. *Id.* at 590 n.9; *see United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021) (Sutton, J.) ("The key handholds of Rule 702 . . . bear repeating: To be admissible, any relevant scientific or technical evidence must be the 'product of reliable principles and methods' and must have been 'reliably applied' in the case."). By contrast, in *Comcast*, the Supreme Court held that courts must ensure damages are "susceptible of measurement" across a putative 23(b)(3) class by confirming that the proposed damages model "measure[s] only those damages attributable" to plaintiffs'

5

theory of liability.[1]  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  Phrased differently, "*Comcast* demands [a] fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory."  *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 411 (5th Cir. 2017). Juxtaposing these holdings demonstrates that, while potentially related or overlapping in certain instances, the inquiries under *Daubert* and *Comcast* are fundamentally distinct from one another. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) ("[W]hether [an expert]'s proposed conjoint analysis is sufficiently reliable from a methodological standpoint— and therefore admissible under *Daubert*—is a different issue from whether the conjoint analysis satisfies *Comcast*."); *see also, e.g.*, *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 575 n.18 (N.D. Cal. 2020); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1073–74 (C.D. Cal. 2015); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17CV2335-GPC(MDD), 2018 WL 6300479, at *14 (S.D. Cal. Nov. 29, 2018); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 31, 2017); *Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2017 WL 3704206, at *8–9 (S.D. Ill. Aug. 28, 2017); *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 510 (D.N.J. 2016); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 130 (S.D.N.Y. 2014).

In other words, all expert opinions satisfying *Comcast* also satisfy *Daubert*, but not all expert opinions satisfying *Daubert* satisfy *Comcast*.  *See Comcast*, 569 U.S. at 32 n.4; *see also, e.g.*, *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule

---

[1] The Court makes no determination at this time as to whether the putative classes could be certified even if Allenby's damages model does not pass muster under *Comcast*.  *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("[N]othing in *Comcast* mandates a formula for classwide measurement of damages in all cases.").

23(b) is satisfied."). Considering this slight (yet critical) distinction, the Court sets aside any contention offered by either party pertaining to the inquiry under *Comcast* since such analysis would be inappropriate at this juncture. These arguments will be properly examined and thoroughly addressed in the Court's forthcoming memorandum opinion and order on Plaintiffs' Motion for Class Certification—for now, the Court's focus remains with those contentions pertinent to the *Daubert* inquiry. *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 417 (E.D. Pa. 2015) (describing how to adjudicate a "*Daubert* motion without deciding the issues tied in with class certification"); *see also, e.g.*, *Dzielak v. Whirlpool Corp.*, No. CV2120089KMJBC, 2017 WL 1034197, at *13–15 (D.N.J. Mar. 17, 2017). As such, the applicable threshold here is admissibility under *Daubert*, which is decidedly "low: it is 'principally a matter of relevance. Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful.'" *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013) (en banc) (ellipsis omitted) (quoting *Roman*, 691 F.3d at 692); *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 91 (D.D.C. 2017) ("[R]eliability under Rule 23 is a higher standard than reliability under *Daubert*."), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

## II. Allenby's Expert Report

The Court now turns to Allenby's expert report. For context, the Court provides brief background on "conjoint analysis"—the generic technique on which Allenby bases his opinions. Then, as Fifth Circuit precedent requires, the Court conducts a full *Daubert* inquiry of Allenby's report. *Prantil*, 986 F.3d at 576.

### a. Background

Conjoint analysis is "a statistical technique capable of using survey data to determine how consumers value a product's individual attributes." *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-

9366-SVW, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014). *See generally* Greg M. Allenby et al., *Economic Foundations of Conjoint Analysis*, in HANDBOOK OF THE ECONOMICS OF MARKETING, VOLUME 1, at 151, 152–161, 188 (Jean-Pierre H. Dubé & Peter E. Rossi eds., 2019). It does so by "ask[ing] questions that force survey respondents—actual or potential consumers—to make trade-offs among features, determin[ing] the value placed on each feature based on the trade-offs made by respondents, and permit[ting] simulations as to how the market will react to the various feature trade-offs being considered." Stephen F. Ross & Wayne S. DeSarbo, *A Rapid Reaction to* O'Bannon*: The Need for Analytics in Applying the Sherman Act to Overly Restrictive Joint Venture Schemes*, 119 PENN ST. L. REV. PENN STATIM 43, 53 (2015); *see* BRYAN K. ORME, GETTING STARTED WITH CONJOINT ANALYSIS 29 (4th ed. 2020) ("Essentially, [conjoint analysis] is a back-door, decompositional approach to estimating people's preferences for features rather than an explicit, compositional approach of simply asking respondents to rate the various features."). Conjoint analysis "has been used for decades as a way of estimating the market's willing[n]ess to pay for various product features." *Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *5 (C.D. Cal. July 24, 2014); *see In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 334 (D.N.H. 2017). If "properly designed, pretested, and applied to representative samples," conjoint surveys are useful in "estimat[ing] industry demand." Greg M. Allenby et. al., *Valuation of Patented Product Features*, 57 J.L. & ECON. 629, 645 (2014).

In his survey, Allenby used the "choice-based" variation of conjoint analysis, which prompts respondents "to make selections from among a set of choice alternatives . . . described in terms of features," which are then "used to infer, or estimate, the value" respondents ascribe to the surveyed features (Dkt. #253, Exhibit 1 at p. 7). *See* VITHALA R. RAO, APPLIED CONJOINT ANALYSIS 6 (2014); *see also, e.g.*, *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010,

8

1020 (C.D. Cal. 2018). Allenby thoroughly describes the design and administration of the survey at issue in his expert report (*see* Dkt. #253, Exhibit 1 at pp. 11–35). As such, the Court does not restate these details here.

One final point worth reemphasizing before proceeding—the applicable standards for the inquiry that follows are reliability and relevance. *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007); *see Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-227, 2021 WL 1691136, at *3 (E.D. Tex. Apr. 29, 2021) ("As with other expert evidence, surveys are subject to *Daubert* scrutiny."). Precedent instructs courts to engage this inquiry with "proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Accordingly, so long as Allenby "used 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field,'" *Roman*, 691 F.3d at 693 (quoting *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (per curiam)), and the evidence he offers "assists the trier of fact to understand the evidence or to determine a fact in issue," *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012), the Court will not exclude Allenby's report. Any objections to Allenby's expert report unrelated to reliability or relevance go to "the weight" of his opinions "rather than [their] admissibility." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).

    **b. *Daubert* Inquiry**

Defendants' criticisms of Allenby's report break down into four general concerns: (1) the results produced are internally inconsistent; (2) the survey departs from reliable methods and practices; (3) Allenby's "Equilibrium Price and Share Premium" ("EPSP") measurement is

unreliable; and (4) the other measurements Allenby utilizes[2] do not consider supply-side factors. The Court addresses each category of critiques in turn.

### i. Internally Inconsistent Results

Defendants begin their challenge to Allenby's expert testimony by pointing to the "irrational results regarding the key element of Plaintiffs' damages theory" that Allenby offers (Dkt. #253 at p. 6). Specifically, Defendants argue that his results "illogically imply" that survey respondents would pay a premium to both (1) fly on a 737 MAX 8 ("MAX 8") "after being presented with derogatory messages about the" aircraft and (2) remove the MAX 8 from the "airline's replacement fleet" (Dkt. #314 at p. 12). Defendants maintain that these "irrational, self-contradictory" outcomes make Allenby's results unreliable (Dkt. #314 at p. 12). Plaintiffs disagree, arguing that the results produced by Allenby are not facially inconsistent (Dkt. #296 at p. 18; Dkt. #370 at pp. 9–12), and any perceived inconsistency is the product of a "design artifact" that Allenby can remedy in his merits-stage report if the Court certifies the class (Dkt. #296 at pp. 18–20; *see* Dkt. #235, Exhibit 7 at pp. 10–11).

The Court finds these grounds insufficient to warrant exclusion. To start, Allenby asserts that this anomalous result is "not due to any inconsistent preferences"—which are the core metrics of his analysis—and he has articulated a viable plan to fix the underlying issue so it "will not be present in [the] merits analysis"[3] (Dkt. #296 at pp. 18–20; *see* Dkt. #424, Exhibit 2 at pp. 21–24). But in addition (and more importantly), Defendants are asking the Court to exclude Allenby's

---

[2] These measures are "pseudo Willingness to Pay" ("p-WTP"), "Willingness to Pay" ("WTP"), and "Willingness to Buy" ("WTB") (*see* Dkt. #253, Exhibit 1 at pp. 21–22). *See generally* Allenby et al., *Valuation of Patented Product Features*, *supra*, at 647–52.

[3] The specific design artifact Allenby identified is the manner in which he structured the "outside-good" option within the survey (Dkt. #296 at p. 19; Dkt. #370 at pp. 10–11). *See generally* Jeff D. Brazell et al., *The No-Choice Option and Dual Response Choice Designs*, 17 MKTG. LETTERS 255 (2006). Determining how to incorporate the outside-good option, let alone whether to include one at all, is the subject of debate in the field of conjoint analysis. *See* Greg M. Allenby et al., *Economic Valuation of Product Features*, 12 QUANTITATIVE MKTG. & ECON. 421, 434–35 (2014).

testimony based on the conclusions he draws.[4] This position contravenes *Daubert*'s command to focus "solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595; *see Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) ("Although [Rule 702] places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion . . . ."). As such, the inconsistencies Defendants perceive in Allenby's report go to its weight, not its admissibility.[5] *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 196 (5th Cir. 2018); *see Valencia*, 600 F.3d at 429 ("[I]f the expert has used reliable methods to assess the data, isolated computational or arithmetic discrepancies affect the weight of the testimony, not its admissibility.").

### ii. Unreliable Survey Methods and Practices

Next, Defendants claim that Allenby's survey design departs from reliable methods and practices, identifying three specific problems: (1) Allenby primed the survey respondents; (2) the survey failed to present a realistic purchasing scenario; and (3) research does not support the use

---

[4] At times, the line between conclusions and methodology can be fuzzy. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017); *see Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data."). But given the "reasonable and scientifically valid" connection between Allenby's data and opinions, the challenge Defendants bring here concern conclusions drawn by Allenby. *Moore*, 151 F.3d at 279.

[5] Time and again, Defendants call for the exclusion of Allenby's opinions based on the belief that Allenby's report must be beyond reproach at this stage of the litigation (*see, e.g.*, Dkt. #253 at pp. 24–25; Dkt. #314 at pp. 10, 12). Defendants are correct that, at this point, "the *Daubert* hurdle must be cleared." *Prantil*, 986 F.3d at 575. But satisfying *Daubert* here and subsequently amending Allenby's report are not mutually exclusive. Of course, Allenby's report would need to survive another *Daubert* examination if modified—but as long as Allenby "present[s] conclusions 'grounded in the methods and procedures of science,'" the Court cannot exclude his testimony. *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) (original alterations omitted) (quoting *Daubert*, 509 U.S. at 590); *see Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 624 (5th Cir. 2018) ("The Supreme Court in *Daubert* emphasized the 'capabilities of the jury and of the adversary system generally' as the appropriate antidotes to 'absurd and irrational pseudoscientific assertions.' Chiefly, the 'conventional devices' of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (citations and brackets omitted)).

of conjoint surveys to test product defects (Dkt. #253 at pp. 16–20). The Court addresses each concern individually.

First, Defendants take issue with Allenby "artificially prim[ing]"[6] survey respondents, which Defendants claim is "inconsistent with accepted conjoint survey methods" (Dkt. #253 at p. 17). Defendants offer that Allenby admitted as much in his deposition, stating that he was "unaware of any conjoint survey that has ever employed" priming (Dkt. #253 at p. 18). Further, Defendants argue that priming the survey respondents led them "to consider the aircraft type or fleet composition as a purchase factor when they would not have otherwise" (Dkt. #253 at p. 18 (internal quotation marks omitted)). Plaintiffs disagree, maintaining that priming the survey respondents is a well-accepted and reliable practice in this context (*see* Dkt. #296 at pp. 20–21).

Defendants' methodological critique is unpersuasive. Contrary to Defendants' contention, Plaintiffs proffer a technique known as "information acceleration," which can prime respondents mid-survey and potentially yield viable results (Dkt. #296 at p. 20). Plaintiffs even produced an example of a conjoint survey that implements a variation of this approach (*see* Dkt. #296, Exhibit 3 at pp. 7–8). So this concern ultimately falls flat. And as for their other priming-related criticism, Defendants are effectively arguing that Allenby's survey is tainted by focalism bias. *See Schechner v. Whirlpool Corp.*, No. 2:16-CV-12409, 2018 WL 6843305, at *5 (E.D. Mich. Oct. 30, 2018) ("Focalism bias is a condition that exists when a survey fails to contain distracting factors to such an extent that the factor being targeted—the purpose of the survey itself—is easily discovered by the survey taker, leading to unreliable results."); *Hadley*, 324 F. Supp. 3d at 1109 ("[A] conjoint survey suffers from focalism bias if it 'telegraphs to respondents that they are only

---

[6] In this context, "priming" refers to the practice of exposing survey respondents to a stimulus to measure that stimulus's effect on the respondents' subsequent responses. *See, e.g.*, *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 930–31 (S.D. Tex. 2014).

being tested about a particular attribute' or set of attributes." (original alterations and internal quotation marks omitted)); *see also, e.g.*, *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 232–33 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).  Even if Defendants are correct and focalism bias is present in Allenby's survey, "alleged focalism bias goes to the weight of [an] expert's opinion, not its admissibility." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 372 (N.D. Cal. 2018); *see id.* (collecting cases).  Therefore, Defendants' concern over Allenby priming survey respondents does not weigh in favor of excluding his report.

Second, Defendants argue that Allenby's survey did not offer respondents "a realistic purchasing scenario" (Dkt. #253 at p. 18).  Specifically, they state that Allenby's report "does not identify any research he did to ensure that he included in his survey the relevant attributes customers consider when booking a flight" (Dkt. #253 at p. 19).  As such, Defendants claim that Allenby substituted "unfamiliar features for key real-world features," which "risks a biased survey" (Dkt. #253 at p. 19; *see* Dkt. #314 at p. 13).  Plaintiffs see things differently, arguing that the purchasing scenario used to test respondents was adequately designed to elicit stable, meaningful results (Dkt. #296 at pp. 21–22).  Overall, Plaintiffs maintain that the quantity of features included in the survey and the identity of the features Allenby selected permit "conjoint to collect information on attributes of interest without overwhelming respondents with numerous other attributes that are not being studied" (Dkt. #296 at p. 22).

Defendants' criticism here is unhelpful to their position.  For one thing, at no point do Defendants articulate *why* the features Allenby included (or did not include) in the survey are contextually inadequate to produce reliable results through conjoint analysis—their *ipse dixit* is flimsy support at best.  *Cf. A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013).  While true that the applicable burden remains with Plaintiffs throughout the *Daubert* inquiry,

critiquing an expert's opinion simply by suggesting an alternative and allegedly superior methodological approach is, without more, insufficient to push back on Plaintiffs' relevant arguments.  Moreover, like the argument as to priming, the concern Defendants express regarding the quantity of features included in the survey and the identity of those selected features goes to the weight of Allenby's testimony, not its admissibility.  *See, e.g.*, *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017); *see also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., joined by all other members of the Court, concurring in part) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").  Defendants' point pertaining to Allenby's "realistic purchasing scenario" is unconvincing.

Third, Defendants challenge the underlying scholarly basis for Allenby's survey, insisting that Plaintiffs "cannot point to any research supporting the use of conjoint surveys to test defects (much less safety defects) in products" (Dkt. #253 at p. 19).  Applying conjoint analysis to value safety defects, Defendants claim, "has not been established as a reliable methodology" (Dkt. #314 at p. 14).  But this argument is a nonstarter—because Allenby's survey "relies on sound scientific methodology, 'lack of textual support may go to the weight, not the admissibility of [Allenby]'s testimony.'"  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (citation omitted); *see Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) ("A contrary requirement 'would effectively resurrect a *Frye*-like bright-line standard, not by requiring that a methodology be generally accepted, but by excluding expert testimony not backed by published (and presumably peer-reviewed) studies.'" (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999))).  As such, this argument does not weigh in favor of exclusion.

Ultimately, Defendants' tripartite attack on Allenby's survey design and methodology does not persuade the Court to exclude Allenby's opinions at the class-certification stage.  Without a

doubt, serious issues with a survey's methodology can make "reliance on that survey unreasonable." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). But here, as is usual with questions of survey methodology, the matters raised by Defendants go to the weight of Allenby's testimony, not its admissibility. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392 (5th Cir. 2002); *see Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("[T]he district court properly admitted the survey evidence in this case, leaving the format of the questions and the manner of conducting the survey for consideration as to the weight of this evidence."). Therefore, the concerns Defendants express as to the methodology of Allenby's survey do not convince the Court that exclusion of Allenby's report is warranted.

### iii. EPSP Measurement's Lack of Reliability

Defendants next challenge Allenby's EPSP metric, which tracks "competitive price reaction" to a product's "new feature introduction" and gauges how "demand and supply sides of the market" affect the product's market value (Dkt. #253, Exhibit 1 at p. 25). *See generally* Allenby et. al., *Valuation of Patented Product Features*, *supra*, at 645–47. The theme of Defendants' critique is that Allenby's analysis is not reliable in this setting—they allege that the "EPSP measurement cannot reliably measure the air travel market prices required" because the assumptions underlying Allenby's report are faulty (Dkt. #253 at p. 20; *see* Dkt. #253 at pp. 20–23). Plaintiffs wholeheartedly disagree (*see* Dkt. #296 at pp. 23–26).

As with most of their arguments in the Motion and their reply, Defendants advance concerns that go to the weight, not the admissibility, of Allenby's testimony. Undoubtedly, an expert report should be excluded if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell*

15

*Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)). But otherwise, as is the case here, the assumptions Allenby drew and subsequently integrated into his report do not render his opinions excludable. *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, 507 F. Supp. 3d 774, 779 (W.D. Tex. 2020). And "[e]ven if [Allenby] made factual errors or incorrect assumptions, these go only to the weight, not admissibility, of [his] testimony." *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 113 (D.D.C. 2018). As such, Defendants' protestations as to the EPSP measurement do not warrant the exclusion of Allenby's report.[7]

### iv. Measurements Lack Supply-Side Considerations

Finally, Defendants argue that Allenby's "other price premium measurements"—p-WTP, WTP, and WTB—cannot reliably calculate price premia because "they do not account for supply-side considerations in any way" (Dkt. #253 at p. 23; *see* Dkt. #314 at pp. 14–15). *See generally* Allenby et. al., *Valuation of Patented Product Features*, *supra*, at 647–52. Because these measurements "do not account for the supply side," Defendants reason, p-WTP, WTP, and WTB are unreliable determinants of price premia (Dkt. #253 at p. 24).

Defendants correctly assert that district courts nationwide have overwhelmingly found conjoint analyses insufficient when they measure "only consumers' subjective valuation or willingness to pay"—*i.e.*, demand factors. *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F.

---

[7] The Court additionally notes that some of Defendants' contentions regarding Allenby's views on the EPSP measurement are incomplete at best, and misleading at worst. Take just one example: Defendants offer that calculating EPSP requires assuming that the firms in the marketplace are single-product firms—that is, they only sell one product (Dkt. #253 at p. 22). Defendants argue that the absence of this assumption in Allenby's report renders his EPSP calculation unreliable and, accordingly, warrants exclusion of the report (Dkt. #253 at p. 22). Defendants' contention is problematic for a couple of reasons. For one thing, Defendants attempt to make it appear as though Allenby has said that the single-product-firm assumption is always required for this type of calculation (Dkt. #253 at p. 22; *see* Dkt. #253, Exhibit 7 at p. 18). But read in completeness, Allenby's previous statement to this effect is clearly case-specific: "The single-product firm assumption is reasonable *in this case* . . . " (Dkt. #253, Exhibit 7 at p. 18 (emphasis added)). Furthermore, as Plaintiffs indicate in their response, Defendants' assertion contradicts what Allenby has otherwise published academically and what *Defendants' own expert* stated when deposed (Dkt. #296 at p. 25; *see* Dkt. #296, Exhibit 1 at pp. 6–7). *See* Allenby et al., *Economic Valuation of Product Features*, *supra*, at 425.

Supp. 3d 212, 237 (S.D.N.Y. 2019); *see MacDougall v. Am. Honda Motor Co., Inc.*, No. SACV171079JGBDFMX, 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (collecting cases). Yet this argument is ill-conceived for several reasons. To start, Allenby acknowledges that certain aspects of the supply side are intentionally absent in various ways with these measurements (Dkt. #253, Exhibit 1 at p. 29). And Allenby never asserts that the price premia are best determined by p-WTP, WTP, or WTB—in fact, he explicitly states that because EPSP "allows for competitive reaction," *i.e.*, supply-side considerations, EPSP is "the most accurate for product feature valuation" (Dkt. #253, Exhibit 1 at p. 29; see Dkt. #370 at p. 14). *See In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 971 n.25 (N.D. Cal. 2018) (finding exclusion unnecessary when an expert offering a conjoint analysis "considers the supply curve"); *see also Unwired Planet, LLC v. Apple Inc.*, No. 13-CV-04134-VC, 2017 WL 589195, at *2 (N.D. Cal. Feb. 14, 2017) ("[G]ame-theoretic models have longstanding and widespread acceptance in economics and other disciplines."). Just as well, Plaintiffs do not rely on p-WTP, WTP, or WTB "as measures of the overcharge damages in this case" (Dkt. #296 at p. 26). Moreover, Plaintiffs advance an unrefuted, benign explanation for the inclusion of these measurements in Allenby's report—doing so is standard in a conjoint analysis (Dkt. #296 at p. 26). Defendants' argument regarding supply-side factors is, therefore, unconvincing in the exclusion analysis.[8]

### v. Conclusion: Allenby's Report Cannot Be Excluded

All in all, "conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia, and the concerns that [Defendants] raise[] are nowhere near severe enough to turn

---

[8] The Court emphasizes the words ending this sentence: "in the exclusion analysis." As the Court noted above, *supra* pp. 5–7, the *Daubert* and *Comcast* inquiries are distinct—simply because Allenby's report survived *Daubert* scrutiny does not mean it will automatically survive *Comcast*'s. *See, e.g.*, *In re NJOY*, 120 F. Supp. 3d at 1069–75, 1117–22 (permitting plaintiffs' expert's conjoint analysis under *Daubert* but subsequently finding it "deficient under *Comcast*").

[Allenby]'s conjoint analysis into unreliable 'junk science.'" *Hadley*, 324 F. Supp. 3d at 1110. Defendants certainly levy valid criticisms of Allenby's opinions, but none rise to the level of affecting the report's admissibility—just its weight. *See Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138–39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."). Accordingly, after conducting a full-scale *Daubert* analysis as *Prantil* requires, the Court finds no concerns warranting the exclusion of Allenby's opinions and leaves any judgment as to the weight of his report to the jury.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Exclude the Expert Report and Testimony of Dr. Greg M. Allenby (Dkt. #253) is **DENIED**.

**SIGNED this 26th day of July, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE