# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DAMONIE EARL, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action No.  4:19-cv-507 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| THE BOEING COMPANY, ET AL., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiffs' Motion for Class Certification (Dkt. #276).  Having considered the Motion, the relevant pleadings, and the arguments of counsel, the Court concludes that the Motion should be granted as set forth herein.

## BACKGROUND

It all began in the nineties with a handshake.  The then-chairmen of The Boeing Company ("Boeing") and Southwest Airlines ("Southwest") shook hands to seal a significant deal between their companies.  Boeing, a leading manufacturer of commercial airplanes, promised Southwest, a prominent commercial airline, that no airline would pay a lower price for Boeing's 737-series aircrafts than Southwest (Dkt. #165 at p. 6).  In exchange, Southwest promised Boeing that Southwest's fleet would be made up exclusively of Boeing 737s (Dkt. #165 at p. 6).  This symbiotic relationship between Boeing and Southwest has been integral to their businesses since the deal was struck (Dkt. #276 at pp. 8–9).

With Southwest's fleet due for a large-scale replacement at the end of the 2010s, Boeing and Southwest made a joint announcement in 2011:  Boeing would release a new, more

fuel-efficient 737 aircraft—the 737 MAX 8—and Southwest would place an initial order for 300 MAX 8s (Dkt. #276 at p. 10).

Southwest was involved in Boeing's development of the MAX 8.  Early in the process, Southwest communicated its hope to Boeing that the MAX 8 would require, at most, "Level B" pilot training (Dkt. #276 at p. 10).  Were the required training set at Level B or lower, MAX 8 pilots would only need to train on a digital device like a computer or tablet; training for a higher level would be more expensive and likely require use of a full-scale flight simulator (Dkt. #276 at p. 10 & n.5).  In May 2013, Southwest and Boeing entered into an agreement that Boeing would ensure the Federal Aviation Administration ("FAA") would approve a MAX 8 "pilot training differences program comprised of Training at no levels beyond Level B" (Dkt. #276 at p. 11). With this program in place, Southwest would be able to integrate the operation of the MAX 8 seamlessly into its existing fleet (Dkt. #276 at p. 11; *see* Dkt. #431 at pp. 23:10–24:3).  Under this agreement, if Boeing failed to secure FAA approval for the desired training requirement, Boeing would have to pay Southwest significant sums of money and cover the cost to train Southwest's pilots to operate the MAX 8 (Dkt. #276 at pp. 11–12).

When assessing the ramifications of failing to meet this contractual condition, Mark Forkner ("Forkner"), then a technical pilot for Boeing, concluded that Boeing's loss would be "so big, and the non-financial impacts so bad, that to try and determine a number [wa]s a waste of time" (Dkt. #276, Exhibit 48 at p. 2).  The consequences of failure were clear—Boeing needed to secure the Level B pilot-training requirement (Dkt. #276 at pp. 12–13).  The drive to do so intensified in 2015 when the FAA informed Boeing that the company's pilots would be unable to operate all three versions of the 737 interchangeably (Dkt. #276 at p. 13).  With Southwest's entire business model potentially in jeopardy, Southwest decided to fly MAX 8s and 737 NGs

exclusively, predicating this strategy on ensuring the Level B training requirement as between the two aircrafts (Dkt. #276 at p. 14).

At this point, Boeing and Southwest worked closely with each other to identify differences between the MAX 8 and the NG as a means to secure the Level B requirement (Dkt. #276 at p. 14; *see* Dkt. #276, Exhibit 32).  The companies communicated frequently about the MAX 8 in the wake of the FAA's announcement regarding the interchangeability of Boeing's fleet.  During this time period, Southwest first encountered a new system Boeing included on the MAX 8: the Maneuvering Characteristic Augmentation System ("MCAS") (Dkt. #276 at p. 14).

In an effort to make the MAX 8 more fuel-efficient, Boeing included larger, more powerful engines to the plane's chassis and positioned the engines closer to the aircraft's nose (Dkt. #165 at p. 7; Dkt. #276 at p. 14).  The effects of this design change became apparent during testing.  The shift in the aircraft's weight and weight distribution caused the MAX 8's nose to tilt upward during certain aerial maneuvers (Dkt. #276 at p. 15).  Boeing developed and installed the MCAS to address the MAX 8's tendency to tilt upward due to weight distribution of the engines.  If unaddressed, the difference between the MAX 8 and the NG would be significant enough to warrant a pilot-training requirement more strenuous than Level B (Dkt. #276 at p. 15).

MCAS is a computer-controlled system that corrected this upward tilt by, among other things, "automatically pitching the nose of the airplane down as necessary" (Dkt. #165 at p. 7).  It worked as follows: the MCAS system received information from an angle-of-attack ("AoA") sensor located on the side of the aircraft's nose (Dkt. #165 at p. 8).  The AoA is a critical metric during flight because it helps ensure the proper amount of air flows over and under the wings to provide sufficient lift, *i.e.*, one of the four forces of flight that keeps aircraft airborne (Dkt. #165 at p. 8).  When the AoA sensor detected an upward tilt in the airplane's nose that caused the AoA

to climb too high, MCAS would activate and automatically adjust the nose downward to return the

MAX 8 to aerodynamic equilibrium (Dkt. #165 at p. 8; *see* Dkt. #276 at p. 15 & n.6).



(Dkt. #165 at p. 8 illus.).

Despite including this new feature in the MAX 8, Boeing did not list the addition of MCAS

on the pilot checklists distributed to its customers, acting upon a recommendation Southwest made

(Dkt. #276 at p. 15; *see* Dkt. #276, Exhibit 55 at p. 4).  In other words, Boeing gave "detailed

manuals to MAX 8 pilots" without including information about this "new automated system"

onboard (Dkt. #276 at p. 15; *see* Dkt. #165 at pp. 9–10).

Boeing and Southwest's joint process to identify and eliminate differences between the

MAX 8 and the NG continued for some time, culminating with Southwest's meeting with the FAA

regarding the pilot-training requirement (Dkt. #276 at p. 16).  Plaintiffs allege that, at the meeting,

Southwest emphasized "the lack of differences between the NG model and the MAX" and failed to mention at least one pertinent distinction between the aircrafts (Dkt. #276 at p. 16).   Three months later, Southwest received word from the FAA that the MAX 8 had been validated at Level B—the same type rating as the NG, meaning that "Southwest pilots already trained on the 737 NG model would need only to complete a simple iPad course 'running under 3 hours,' with 'no special currency issues or formal checks of any sort identified by the regulators,' to be able to also fly the MAX" (Dkt. #276 at p. 17 (brackets and ellipsis omitted)).   Following this validation, Boeing, through Forkner, began traversing the globe to achieve comparable approvals from aviation regulators in other countries, including Indonesia (Dkt. #276 at p. 17).

A few months after FAA validation, Forkner and his Boeing colleague Patrik Gustavsson ("Gustavsson") noticed an issue with MCAS (*see* Dkt. #276, Exhibit 45 at pp. 2–3).   As it turned out, during the time in which Boeing and Southwest were identifying and eliminating differences between the MAX 8 and the NG, Boeing had made changes to the MCAS system (Dkt. #276 at p. 18).   Despite coming across this information post-FAA-validation in the flight simulator and observing that MCAS was unexpectedly adjusting the MAX 8's nose downward, neither Forkner nor Gustavsson "told the FAA or any other regulators about the change to the MCAS and the dangers it posed" (Dkt. #276 at p. 18).

Around this same time, Boeing began delivering MAX 8s to Southwest.[1]   Notably, in October 2016, Defendants released a marketing video stating, *inter alia*, that Defendants "had 'simulated the kind of real-life conditions the [MAX 8] will encounter on any given day,' and that because of their joint testing, there would be 'no surprises' and 'no secrets'" (Dkt. #276 at p. 18 (original alterations omitted); *see* Dkt. #165 at pp. 10–11).

---

[1] According to the operative complaint, "[b]y February 2019, Southwest had 31 MAX 8s in its fleet" "with another 249 ordered for delivery" (Dkt. #165 at p. 11).

Then tragedy struck.  On October 29, 2018, the passengers and crew of Lion Air Flight 610 boarded a MAX 8 in Jakarta, Indonesia.  Shortly after takeoff, an AoA sensor failed, which sent erroneous information to the plane's flight-control computer that indicated a stall was imminent (Dkt. #165 at p. 11; Dkt. #276 at p. 19).  The perceived stall warning activated the aircraft's MCAS system, which began automatically adjusting the plane's nose downward to prevent the "imminent stall."  The flight crew attempted to regain operational control of the MAX 8, but ultimately for naught.  Lion Air Flight 610 fell from the sky into the Java Sea.  No one aboard survived the crash.

One week after the Lion Air crash, Forkner, now a technical pilot for Southwest, learned from his former colleagues at Boeing that the FAA would be publishing an advisory regarding the failure of the AoA sensor aboard Lion Air Flight 610's MAX 8 (Dkt. #276 at p. 19).  After discussion among Southwest management about the potential of preemptively grounding their MAX 8s, Southwest Chief Operating Officer Mike Van de Ven ("Van de Ven") decided that Southwest would continue to operate the MAX 8s in their fleet (Dkt. #276 at pp. 19–20).  Van de Ven made it clear that Southwest was to follow Boeing's instruction to the letter, no matter the instruction (Dkt. #276 at p. 20; Dkt. #276, Exhibit 66 at p. 2).  As a result, Southwest's internal risk assessment of the MCAS system did not recommend grounding the MAX 8s because "its pilots were now informed about the MCAS and could manually override the system if necessary" (Dkt. #276 at p. 20).  This idea became the "central premise" of Defendants' response to the Lion Air crash—the MAX 8s' "existing procedures" adequately addressed the problem that led to the crash (Dkt. #165 at p. 14; Dkt. #276 at p. 20).

In the weeks and months following the Lion Air crash, Boeing and Southwest began a joint campaign to ensure regulators, the media, and members of the public that, despite the crash, the

MAX 8 was safe to operate[2] (*see* Dkt. #165 at pp. 11–12; Dkt. #276 at pp. 21–24; Dkt. #357 at p. 25 & n.6).  This effort included top-level corporate officials (*see, e.g.*, Dkt. #357, Exhibits 8–9).  For example, on November 14, 2018, Boeing CEO Dennis Muilenburg ("Muilenburg") gave a televised interview to Fox Business, during which he publicly stated, among other things, that "'all of the information that is needed to safely fly our airplanes' had been provided to pilots and that Boeing merely needed to 'point them back to existing flight procedures to handle this kind of situation'" (Dkt. #276 at p. 21).  Muilenburg also repeatedly claimed "that 'existing flight procedures' were adequate to address the Lion Air crash and that information the pilots need was 'part of the training manual'" (Dkt. #276 at p. 21).  And though Southwest's MCAS risk assessment indicated the existence of a potential problem in the system, Southwest began internally disseminating information and talking points that bolstered what Muilenburg was representing publicly (*see* Dkt. #276, Exhibit 71 at pp. 4–8).

In a specific instance of Defendants' coordinated response to the Lion Air crash, on November 29, 2018, a Wall Street Journal reporter emailed Southwest regarding a story the outlet planned to run about the MAX 8 (Dkt. #276 at p. 22; *see* Dkt. #276, Exhibit 73 at p. 2; Dkt. #357 at pp. 26–28).  The email indicated the article "would say that Southwest had worked with Boeing to avoid 'simulator training for pilots'" (Dkt. #276 at p. 22).  Within three hours of receiving this correspondence, Southwest reached out to Boeing to collaborate on a response to the reporter's email (Dkt. #276 at p. 22; *see* Dkt. #276, Exhibit 72 at pp. 2–5).  Several of Defendants' "communications employees and executives," including vice presidents at both companies, "spoke

---

[2] Plaintiffs still seek further discovery at this stage in light of discovery material Defendants produced after the Motion was filed (*see* Dkt. #357 at p. 8; *see also* Dkt. #357 at p. 18 n.5, 25 n.6).  Evidentiary disputes have been vigorous and frequent throughout this action.  *See, e.g.*, *Earl v. Boeing Co.*, 515 F. Supp. 3d 590 (E.D. Tex. 2021).

by phone" the next morning to do so (Dkt. #276 at p. 22).  After consulting Boeing, Southwest eventually responded to the Wall Street Journal reporter's email[3] (*see* Dkt. #276, Exhibits 73–74).

Then tragedy struck yet again.  On March 10, 2019, the passengers and crew of Ethiopian Airlines Flight 302 boarded a MAX 8 in Addis Ababa, Ethiopia.  Almost immediately after takeoff, the pilot indicated he was having problems controlling the aircraft (Dkt. #165 at p. 15).  The onboard MCAS system began pitching the plane's nose up and down, which prevented the pilot from regaining control of the aircraft despite knowledge of MCAS's existence (Dkt. #165 at p. 15; Dkt. #276 at p. 24).  Ethiopian Airlines Flight 302 ultimately fell from the sky into the earth below.  No one aboard survived the crash.

In the days after the Ethiopian Airlines crash, Defendants continued to communicate with one another to coordinate public response (*see* Dkt. #165 at p. 15; Dkt. #276, Exhibits 76–77).  On March 13, 2019, the FAA indefinitely grounded all MAX 8 aircraft (Dkt. #276, Exhibit 78 at pp. 3–5).

## PROCEDURAL HISTORY

On July 11, 2019, roughly four months after the FAA's grounding of the MAX 8, the initial complaint in this action was filed (Dkt. #1).  On October 9, 2020, the Court granted leave for Plaintiffs to file the now-operative complaint.  *Earl v. Boeing Co.*, No. 4:19-CV-507, 2020 WL 5993785, at *3 (E.D. Tex. Oct. 9, 2020).  Plaintiffs plead two causes of action, both arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Dkt. #165 at pp. 87, 93).  *See* 18 U.S.C. § 1961 *et seq.*  They generally allege that, "[b]y reason of and as a result of the conduct of Boeing and Southwest, and the pattern of racketeering activity engaged in on behalf of the Boeing-Southwest RICO enterprise, Plaintiffs and class members have been injured in their

---

[3] This series of events is just one example of how Boeing and Southwest coordinated their public response regarding the Lion Air crash (*see, e.g.*, Dkt. #276, Exhibit 75).

business and/or property" (Dkt. #165 at p. 92).  Throughout their pleadings, Plaintiffs allege two theories of injury: (1) if Plaintiffs had known the MAX 8 was fatally defective, Plaintiffs would never have purchased tickets, so Plaintiffs want their money back; and (2) Defendants' fraudulent misrepresentations and omissions allowed Defendant Southwest to overcharge Plaintiffs for their tickets (Dkt. #1 ¶¶ 8, 52–53, 364–65; Dkt. #48 at pp. 42–43).  Consequently, Plaintiffs bring this suit on behalf of two putative classes, one consisting of Southwest ticket purchasers, the other consisting of American Airlines ticket purchasers (Dkt. #165 at pp. 80–81).

On January 4, 2021, Plaintiffs filed their Motion for Class Certification (Dkt. #276), currently before the Court.  On February 15, 2021, Southwest and Boeing filed their respective responses in opposition (Dkts. #302–03).  On March 23, 2021, Plaintiffs filed their reply (Dkt. #357).  On April 6, 2021, Southwest and Boeing filed their respective sur-replies (Dkts. #388–89).  And on April 26, 2021, the Court held a hearing on class certification (Dkt. #431).

## LEGAL STANDARD

It is fundamental in the American legal system that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940).  Several exceptions apply to this foundational principle, however—one of which is "properly conducted class action[]." *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008); *see Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 302 (1853).  "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  To ensure a class action is "properly conducted," the party seeking certification must comply with "multiple

conditions" set out in Federal Rule of Civil Procedure 23 "before a district court may certify a class." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 764 (5th Cir. 2020).

Any putative class, irrespective of its type, must satisfy the four prerequisites of Rule 23(a): "numerosity, commonality, typicality, and adequacy of representation." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016); *see* RICHARD A. NAGAREDA ET AL., THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 91 (2d ed. 2013) ("[T]he purpose of subsection 23(a) is to set out the minimum requirements for any class action: that joinder is impracticable, a homogenous enough class exists (commonality and typicality), and the representational nexus is sufficient to satisfy due process."). An "implied prerequisite" also exists in the Fifth Circuit that the proposed class definition must make the members of the class readily ascertainable. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). Additionally, a putative class must meet the requirements of at least one of Rule 23(b)'s subsections. *Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017). Because Plaintiffs specifically seek monetary damages on a classwide basis, the class must satisfy Rule 23(b)(3)'s predominance and superiority elements.[4] *Unger*, 401 F.3d at 320; *see* FED. R. CIV. P. 23(b)(3).

Each of these inquiries involves "highly fact-based, complex, and difficult matters," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997) (Breyer, J., concurring in part and dissenting in part)—as such, the decision to certify a class falls within the considerable discretion of the district court. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018); *cf. United States v. McCoy*, 517 F.2d 41, 44 (7th Cir. 1975) (Stevens, J.) ("[T]he choice of alternatives is left to the trial judge, not because the decision is of little importance, but rather because the factors

---

[4] In the operative complaint, Plaintiffs state that they "bring this action and seek to certify and maintain it as a class action under Rules 23 . . . (b)(2); and/or (b)(3)" (Dkt. #165 at p. 80). Yet in their class-certification briefing, Plaintiffs do not mention 23(b)(2) certification (*see* Dkt. #276) Therefore, the Court analyzes the putative classes as 23(b)(3) classes. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

which may properly influence his decision are so numerous, variable and subtle that the fashioning of rigid rules would be more likely to impair his ability to deal fairly with a particular problem than to lead to a just result.").

Nevertheless, it is vital that Rule 23's requirements are vigorously enforced. *Flecha*, 946 F.3d at 766. Accordingly, courts have "an obligation before certifying a class to 'determine that Rule 23 is satisfied, even when that requires inquiry into the merits.'" *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960–61 (2021) (brackets omitted) (quoting *Comcast*, 569 U.S. at 35); *see Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Courts "often have 'to probe behind the pleadings' because 'the class determination generally involves considerations that are enmeshed in the factual and legal issues' of the case." *Chavez v. Plan Benefit Servs.*, 957 F.3d 542, 546 (5th Cir. 2020) (citation and brackets omitted) (first quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); and then quoting *Dukes*, 564 U.S. at 351). But this requirement does not grant courts "license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021) (describing the parameters of the class-certification analysis). This degree of scrutiny is critical for class-action proceedings to protect what due process promises—an individual's day in court. *See E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977); *see also Chavez*, 957 F.3d at 547 ("This 'rigorous analysis' mandate is not some pointless exercise that we foist on this circuit's hardworking and conscientious district judges . . . . It matters. . . . No less than due process is implicated, so a careful look is necessary.").

## ANALYSIS[5]

### I.   Standing

The Constitution empowers the federal courts to resolve "Cases" or "Controversies," U.S. CONST. art. III, § 2, cl. 1, "a cradle-to-grave requirement that must be met in order to file a claim in federal court and that must be met in order to keep it there." *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011).   "[O]riginating in the case-or-controversy requirement," *Trump v. New York*, 141 S. Ct. 530, 535 (2020), the standing doctrine "rations the exercise of judicial power by determining who is entitled to invoke the power of the federal courts to decide cases," RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 101 (7th ed. 2015) (emphasis omitted).   "The requisite elements of this 'core component derived directly from the Constitution' are familiar: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).   The Supreme Court recently reiterated that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

The Court begins by addressing a pair of questions regarding the standing analysis conducted in this procedural posture.  Then the Court's attention turns to two elements of standing, injury-in-fact and causation.[6]

---

[5] Unless otherwise specified, the Court's analysis herein applies to both the Southwest and American Airlines classes.

[6] None of the parties contest redressability, and the Court has no reason to doubt that "a favorable decision w[ould] relieve" "discrete injur[ies]" to Plaintiffs.  *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982); *see Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800–01 (2021).

### a. Preliminary Matters

In their briefs, the parties quarrel over several issues related to standing.  And under Fifth Circuit law, the Court must ensure the presence of standing "as a threshold matter of jurisdiction" when considering class certification.  *In re Deepwater Horizon (Deepwater Horizon II)*, 739 F.3d 790, 799 (5th Cir. 2014); *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).  The aggregate nature of this action does not alter the constitutional-standing analysis.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016); *see O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").  But before engaging the parties' arguments, the Court takes up two precursory matters to determine the necessary scope of the standing inquiry: (1) which evidentiary burden Plaintiffs bear at this stage; and (2) to what extent, if at all, the absent class members' standing must be considered.

### i. Evidentiary Burden at Class Certification

"[F]ederal courts lack jurisdiction if no named plaintiff has standing."  *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (per curiam).  At "successive stages of the litigation," a named plaintiff bears an escalating burden to demonstrate standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  For instance, "'at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice' to show standing, but when challenged by a motion for summary judgment, more evidence is required, including 'affidavits and other facts.'"  *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561).  The standard at class certification, however, inhabits a twilight zone because the Supreme Court has not made clear whether anything additional is needed to demonstrate standing at this stage.  *Deepwater Horizon*

13

*II*, 739 F.3d at 800.  Courts are split on the applicable evidentiary burden at the class-certification stage.  *Compare, e.g.*, *Gomez v. Trump*, No. 20-CV-1419, 2020 WL 3429786, at *6 n.7 (D.D.C. June 23, 2020) (heightened standard), *with, e.g.*, *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 414 (S.D.N.Y. 2012) (pleading standard).  Here, Defendants insist upon a heightened standard (*e.g.*, Dkt. #302 at p. 17), while Plaintiffs argue for a pleading-like standard (Dkt. #276 at p. 29; Dkt. #431 at p. 25:18–21).

The Court finds Plaintiffs' position more compelling.  When a plaintiff utilizes the class-action device, the fundamental requirements of Article III standing do not change.  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976).  For standing purposes, three general phases of litigation exist: pleading, summary judgment, and trial.  *See Lujan*, 504 U.S. at 561; *accord Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).  Rule 23 does not—and cannot— add an additional step to the litigatory life cycle.  *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 360 (3d Cir. 2015); *see also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) ("A federal rule cannot alter a constitutional requirement.").

At class certification, a named plaintiff remains several "successive stages" away from resolving a given dispute.  Accordingly, there is no shift from the pleading-stage burden until summary judgment—a named plaintiff may continue to demonstrate standing through allegations of a cognizable injury suffered as a result of the defendant's conduct.  *Cole v. Gen. Motors Corp.*, 484 U.S. 717, 723 (5th Cir. 2007); *see Deepwater Horizon II*, 739 F.3d at 803 ("At the Rule 23 stage, *Cole* provides that 'a federal court must assume *arguendo* the merits of each named plaintiff's legal claim.'" (brackets and citation omitted)); *see also Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018).  Defendants cite no authority to the contrary.  *See Verde Mins., LLC v. 1893 Oil & Gas, Ltd.*, No. 2:16-CV-463, 2020 WL 3546879, at *3 (S.D. Tex.

14

Apr. 1, 2020); *see also Dukes*, 564 U.S. at 351 (explaining that the requirements of *Rule 23* must be rigorously analyzed at the class-certification stage). As such, the standard to evaluate standing of named plaintiffs does not escalate at class certification.

### ii. Standing of Absent Class Members

The Court is obligated to evaluate whether Plaintiffs have offered general factual allegations of injury resulting from Defendants' conduct. Defendants additionally contend that the standing of absent class members must be scrutinized (*e.g.*, Dkt. #302 at p. 17; Dkt. #303 at pp. 16–19; Dkt. #431 at pp. 24:20–26:7, 28:15–29:16). *See Flecha*, 946 F.3d at 768 ("[The Fifth Circuit] has not yet decided whether standing must be proven for unnamed class members, in addition to the class representative."). But as the Court explains below, this argument misses the mark for three reasons.

First, Defendants' contention "conflates standing and class certification." *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015); *see Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("The standing determination is quite separate from certification of the class."); *see also, e.g.*, *Dragoslavic v. Ace Hardware Corp.*, 274 F. Supp. 3d 578, 585–86 (E.D. Tex. 2017). The confusion is understandable—even the Supreme Court has highlighted the inconsistency in this area. *See Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003). At base though, "standing doctrine is primarily concerned with ensuring that a real case or controversy exists," while Rule 23 is "designed precisely to address concerns about the relationship between the class representative and the class," making Rule 23 the "more appropriate tool" to assess standing issues related to absent class members at class certification. 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:3 (5th ed.); *see Lewis*, 518 U.S. at 395 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (stating that "standing doctrine has no further part to play"

in class certification once a named plaintiff has established standing).  So "[r]ather than 'shoehorn questions into an Article III analysis,' the standing inquiry must be limited to a consideration of the class representatives themselves, after which" Rule 23 ensures the class's procedural propriety. *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 (3d Cir. 2018) (ellipsis omitted) (quoting *Neale*, 794 F.3d at 368); *see Flecha*, 946 F.3d at 769 ("[I]f there is no class action under Rule 23, then there are no unnamed class members in the suit—and thus no attendant class standing concerns.").

Defendants' argument here really goes to Plaintiffs' proposed class definitions, which is a component of class certification under Rule 23 at this stage of the litigation and not, as Defendants argue, an aspect of Article III standing.[7]  *See Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir. Unit A July 1981), *superseded on other grounds as stated in Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 234 (S.D.N.Y. 1996); *see also Cooper v. Univ. of Tex. at Dall.*, 482 F. Supp. 187, 191 (N.D. Tex. 1979) (Higginbotham, J.) (finding that once a named plaintiff in a class action passes the "threshold constitutional test" of standing, "then the next question whether she may represent the class members is not in the first instance one of standing" but of Rule 23), *aff'd*, 648 F.2d 1039 (5th Cir. 1981).  If a class definition is "so broad that it sweeps within it persons who could not have been injured by the defendant's conduct," then "it is too broad"—but such a

---

[7] Defendants call upon *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), to support their contention that absent class members' standing must be considered at this juncture (*see, e.g.*, Dkt. #303 at pp. 16–17; Dkt. #389 at pp. 15–19).  The case is inapposite for a few reasons.  To start, *Denney*, unlike here, concerned a settlement class (*see* Dkt. #431 at p. 24:20–25:2).  *See also In re Deepwater Horizon (Deepwater Horizon I)*, 732 F.3d 326, 344 n.12 (5th Cir. 2013) (opinion of Clement, J.).   This distinction is critical because "a pre-trial litigation class certification . . . presupposes that there will be a further stage where the Article III standing requirements will be proven up," whereas a "settlement class certification . . . will [have] no additional stages for substantiating standing." *Deepwater Horizon II*, 739 F.3d at 826 (Garza, J., dissenting).  As well, the sentence in *Denney* that Defendants reference is somewhat out of context—while *Denney* does hold that a class must be defined "in such a way that anyone within it would have standing," just a few sentences before that, the panel also stated that the standing inquiry concerns the named plaintiff, not the absent class members.  *See* 443 F.3d at 264; *see also* 1 NEWBERG, *supra*, § 2:3. Nevertheless, it is certainly not lost on the Court that the analytical paths taken here and in *Denney* will likely "produce the same substantive result."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 532 n.98 (S.D.N.Y. 2018).

problem does not concern Article III standing.  *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).  An overbroad class definition "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012); *see* FED. R. CIV. P. 23(d)(1)(D).

Second, a putative class is not a standalone juridical entity.  *See Vuyanich v. Republic Nat. Bank of Dall.*, 82 F.R.D. 420, 426–29 (N.D. Tex. 1979) (Higginbotham, J.).  Prior to and at the class-certification stage, at least one named plaintiff must have standing because "no one else has a legally protected interest in maintaining the suit."  *Kohen*, 571 F.3d at 676; *see Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (rejecting the notion that "a nonnamed class member is a party to the class-action litigation before the class is certified" (internal quotation marks omitted) (quoting *Devlin v. Scardelletti*, 536 U.S. 1, 16 (2002) (Scalia, J., dissenting)).  Once certified, however, "that class 'acquire[s] a legal status separate from the interest asserted by' the named plaintiff," *Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)), at which point the "certified class becomes an independent juridical entity capable of satisfying the standing requirements of Article III," *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138 (10th Cir. 2009).  *See Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 250 (5th Cir. 2020) ("What brings putative class members before the court is certification: 'Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power.'" (quoting *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015))).  Of course, this certification-induced transformation does not permit a class to become "a free floating entity entitled to conduct new and separate lawsuits against new defendants," *Zimmermann v. Epstein Becker & Green, P.C.*, 657 F.3d 80, 85 (1st Cir.

2011), nor does it "bestow standing on individuals or a class who lacked the requisite personal stake at the outset," *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985).  Instead, as Judge Wood has explained,

> [O]nce a class is properly certified, . . . Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs. The certification of a class changes the standing aspects of a suit, because "a properly certified class has a legal status separate from and independent of the interest asserted by the named plaintiff."

*Payton v. Cnty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (original alterations omitted) (quoting *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998)).  Phrased differently, the absent class members are truly absent for Article III purposes prior to certification, but once a class is certified, the standing of its class members is ripe for analysis.  *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1045 (5th Cir. Unit A July 1981); *see Vuyanich*, 82 F.R.D. at 427 ("Requiring injury to the class is a direct by-product of the class' jural independence.").

Third, and more practically, it is "almost inevitable" that key aspects of a class's makeup, such as the members' identities and the facts bearing on their claims, will be unknown at the case's outset.  *Kohen*, 571 F.3d at 677.  Were the standing of absent class members considered before conducting adequate discovery, courts might lack sufficient evidence to properly evaluate whether class treatment is appropriate.  *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008); *see also* 3 NEWBERG, *supra*, § 9:11 ("Subjecting absent class members to discovery also threatens to undermine the efficiency of representative litigation.").

Taken together, these considerations demonstrate that the standing of the named plaintiffs, and not that of the absent class members, is implicated at class certification.  As such, the Court does not consider Defendants' concerns regarding the absent class members' standing at this juncture.  *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322,

333 (S.D.N.Y. 2012) ("It is . . . important not to collapse the standing inquiry into the class certification inquiry.").

Nevertheless, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant," *Kohen*, 571 F.3d at 677, which the Court perceives to be Defendants' actual concern. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019) ("[T]here is a meaningful difference between a class with a few members who might not have suffered an injury traceable to the defendants and a class with potentially many more, even a majority, who do not have Article III standing."); *see also, e.g.*, *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp.*, 431 F. Supp. 3d 1003, 1019–20 (N.D. Ill. 2020). This worry is both legitimate and weighty, since "class certification creates insurmountable pressure on defendants to settle." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996); *see Blair v. Equifax Check Servs.*, 181 F.3d 832, 834–35 (7th Cir. 1999). This consideration implicates Rule 23, not Article III standing, but does not resolve which Rule 23 element a court should use to determine substantial overbreadth of a class.

The Supreme Court appeared to provide the answer in *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*: Rule 23(b)(3)'s predominance requirement. *See* 573 U.S. 258, 275–76 (2014). *Halliburton II* held that so long as a court can find no reason individualized questions will "overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)," then individualized questions will not rule out certification. *Id.* at 276. Chief Justice Roberts, writing for the Court, explained that "individual questions" will not predominate even if a defendant attempts "to pick off the occasional class member here or there." *Id.* Applying this

logic here, when a class contains members who lack Article III standing, that class may still be certified if "the presence of a de minimis number" of class members without standing does not "overwhelm the common issues for the class."  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 24 (1st Cir. 2015); *see Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009) ("Class certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct.").  Moreover, using Rule 23's predominance requirement to evaluate a putative class for overbreadth on the issue of standing makes sense from a functional perspective, since making this "de minimis" determination is nothing more than examining whether proving absent class members' standing would be an individualized question that outweighs issues common to the class.  *See, e.g.*, *Ibe*, 836 F.3d at 531; *see also Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 375 (5th Cir. 2016) ("[A] district court's expertise in case management and overseeing trials is particularly useful in making the predominance and superiority inquiries of Rule 23(b)(3), which require envisioning what a class trial would look like.").

Accordingly, the Court examines Defendants' concerns regarding the standing of absent class members within the predominance analysis.  Briefly though, the Court addresses one argument in particular that recurs throughout the briefing.  Defendants repeatedly assert that the vast majority of putative class members lack standing due to the absence of a MAX 8's direct involvement with each ticket purchase (*see, e.g.*, Dkt. #303 at pp. 17–18).  This understanding misconstrues Plaintiffs' injury theory.  The alleged overcharge "occurred at the time of ticket purchase," and Plaintiffs purport that "the presence of the MAX in the fleet would have diminished the demand (and price) for those tickets" (Dkt. #357 at p. 15).  The *ex post* variations Defendants urge do not impact Plaintiffs' theory of Article III injury.  Therefore, Defendants' continued

attempts to distinguish class members in this manner falls flat and is perhaps more appropriate for a later stage of the litigation.

### b.   Injury-in-Fact

In their briefing and at the certification hearing, Defendants argue at length about injury-in-fact.  However, because the Court previously addressed this element of standing, *see Earl v. Boeing Co.*, No. 4:19-CV-507, 2020 WL 759385, at *4–10 (E.D. Tex. Feb. 14, 2020), and the arguments Defendants make are better addressed under the predominance requirement since they relate to the absent class members, the Court does not restate its injury-in-fact findings.

### c.   Causation

While practically all aspects of the Court's analysis are the same at this stage as relates to the Southwest and American Airlines classes, the Court recognizes a difference between the Article III traceability of the Southwest and American Airlines' named Plaintiffs.  Even Plaintiffs admit that the "causal nexus is not as tightly coupled between injury and the fraudulent scheme" for the American Airlines class (Dkt. #453 at p. 10).  Accordingly, the Court ordered the parties to file supplemental briefing on Article III causation (Dkt. # 449) to ensure the Court has an Article III case or controversy before it.  Fed. R. Civ. P. 12(h)(3); *see, e.g.*, *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 (4th Cir. 2021).  The parties filed briefs per the Court's order (*see* Dkts. # 453, 455, 458–59).  After considering the issue, the Court finds that the American Airlines class has established Article III causation at this stage of the proceedings.

To demonstrate Article III causation, "a plaintiff must allege that his injury is 'connected with the conduct about which he complains."  *Glen v. Am. Airlines, Inc.*, ___ F.4th ___, ___, No. 20-10903, 2021 WL 3285307, at *3 (5th Cir. Aug. 2, 2021) (brackets omitted) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)).  In the context of constitutional standing, causation "is not

the same as proximate causation from tort law, and the Supreme Court has cautioned against 'wrongly equating injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (brackets and ellipsis omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)); *see K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010).  As such, "Article III 'requires no more than *de facto* causality.'"[8] *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); *see, e.g.*, *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021).  "In examining the causation element of standing, the question to be asked is whether the line of causation between [the plaintiff]'s injury and the [defendant]'s [challenged conduct] is 'too attenuated.'" *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) (quoting *Allen*, 468 U.S. at 752).

Standing extends only to the extent that an injury can be fairly "traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41–42.  Indirect injuries can satisfy Article III causation provided that they are fairly traceable to the defendant's alleged conduct. *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 285 (3d Cir. 2021); *see Simon*, 426 U.S. at 44–45 (explaining that "indirectness of injury, while not necessarily fatal to standing, 'may make it substantially more

---

[8] Since the Framers ratified the Constitution well over two centuries ago, "the concept of 'Art. III standing' has not been defined with complete consistency." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982).  Standing's causation requirement has long been "subject to uncertainty and manipulation.  Fine conceptual lines may be drawn, and questions of degree and remoteness often seem intractable." 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.5 (3d ed.).  Unsurprisingly, causation is "something of a term of art" in the constitutional context, "taking into account not merely an estimate of effects but also considerations related to the constitutional separation of powers as that concept defines the proper role of courts in the American governmental structure." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987) (en banc).  Accordingly, courts must carefully examine this element, finding traceability only when the proof alleged amounts to "something more than conjecture . . . but less than certainty." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 368 (5th Cir. 2020); *see Simon*, 426 U.S. at 44 ("[U]nadorned speculation will not suffice to invoke the federal judicial power.").

difficult to meet the minimum requirement of Art. III'" (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).  When causation "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," facts must be adduced "showing that those choices have been or will be made in such manner as to produce causation."  *Lujan*, 504 U.S. at 562 (internal quotation marks omitted in first quotation) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (plurality opinion)); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (noting the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").  To make this showing, the party invoking jurisdiction must demonstrate "at the least 'that third parties will likely react in predictable ways.'"  *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Dep't of Comm.*, 139 S. Ct. at 2566).

Proving causation for standing purposes requires a showing that "the defendant's conduct did in fact cause the plaintiff's injury."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013).  Such "action 'is not regarded as a cause of an event if the particular event would have occurred without it.'"  *Id.* at 347 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON LAW OF TORTS 265 (5th ed. 1984)); *Cuddy v. Carmen*, 694 F.2d 853, 858 n.23 (D.C. Cir. 1982) (describing but-for causation as "no more than the traditional factual inquiry into whether consideration of the impermissible criterion made a difference toward causing the adverse action to occur").

As such, the Court finds that, at this stage, the named American Airlines Plaintiffs have sufficiently alleged a fairly traceable causal chain between the injuries they suffered and the challenged conduct of Boeing and Southwest.  These Plaintiffs have plausibly alleged that Boeing and Southwest perpetrated a "fraudulent conspiracy" regarding the MAX 8 that "predictably

resulted in the price and demand inflation experienced for tickets on American Airlines routes" that flew the MAX 8 during the class period (Dkt. #453 at p. 7).  Further, as part of his conjoint survey for this case, Plaintiffs' expert Dr. Greg Allenby ("Dr. Allenby") found statistically significant effects on both market-adjusted demand and pricing for American Airlines when relevant information regarding the MAX 8 was disclosed to respondents (Dkt. #453 at pp. 9–10). *See, e.g.*, *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1055 (C.D. Cal. 2014); *see also In re Whole Foods Mkt. Grp. Overcharging Litig.*, 397 F. Supp. 3d 406, 421 (S.D.N.Y. 2019).  At this point in the litigation, Plaintiffs have satisfied their burden to show that "the causal relation" between Defendants' conduct and the injuries Plaintiffs allegedly suffered is "probable." *BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011).[9]

Defendants' primary argument in opposition to traceability concerns the role played by a third party—here, American Airlines.  They maintain that "any alleged overpayment for inflated ticket prices on American Airlines results from the independent pricing decisions of non-party American Airlines," which is "not traceable to Defendants' alleged conduct" (Dkt. #455 at p. 9). While the causal nexus between the injury pleaded and the alleged fraudulent scheme is less direct as to the named American Airlines Plaintiffs (Dkt. #453 at p. 10), the Court finds that American Airlines' presence does not make the causal chain overly attenuated.  To start, Plaintiffs seek to certify the American Airlines class based on something more than American Airlines' status as a commercial airline.  According to the operative complaint, American Airlines had twenty-eight MAX 8s in its fleet during the class period (Dkt. #165 at p. 80).  As such, the allegations that

---

[9] While sufficient at this phase, the evidence Plaintiffs put forward regarding traceability will be subjected to a higher threshold at summary judgment.  *See California*, 141 S. Ct. at 2117 ("'[A]t the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth specific facts' that adequately support their contention." (ellipsis omitted) (quoting *Clapper*, 568 U.S. at 412)).

Boeing and Southwest's fraudulent scheme affected ticket pricing is not unrealistic, especially given the results of Dr. Allenby's survey.

An injury may still be fairly traceable to a defendant's conduct, despite a third-party presence, if "produced by determinative . . . effect upon the action of someone else." *Bennett*, 520 U.S. at 169.  Such is plausibly alleged here.  Industry competitors constantly evaluate market conditions, and the nature of economic competition necessarily involves reacting to other industry actors, *e.g.*, through competitive pricing.  *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("In a highly competitive industry . . . intensely dependent on marketing strategy, it makes common sense to obtain as much information as possible of the pricing policies and marketing strategy of one's competitors.").  As Dr. Allenby explained in his expert report:

> Each [airline], one at a time, determines the optimal prices of their flight given the prices of other offerings and the cost assumptions.  This optimization is repeated for each airline until an equilibrium is reached where it is not in anyone's interest to change prices any further.  The equilibrium is referred to as a Nash equilibrium because none of the airlines have an incentive to move away from their profit maximizing price, given the prices of the other airlines

(Dkt. #276, Exhibit 7 at p. 26).

Given Plaintiffs' allegations regarding Boeing and Southwest's scheme to inflate prices and the notable swath of MAX 8s in American Airlines' fleet, it is fair for Plaintiffs to assert a causal link. *See New York v. Dep't of Comm.*, 351 F. Supp. 3d 502, 623 (S.D.N.Y.) (stating that the "presence of third parties in the causal chain does not necessarily undermine" traceability's but-for requirement), *aff'd in part, rev'd in part on other grounds, and remanded*, 139 S. Ct. 2551 (2019).  The named American Airlines Plaintiffs allegedly suffered injury in the form of an overcharge for tickets on American Airlines flights, and these Plaintiffs were overcharged because Defendants' alleged conduct "likely" caused American Airlines to "react in [a] predictable way[]"

and adjust its ticket pricing scheme.[10]  *Dep't of Comm.*, 139 S. Ct. at 2566; *see Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 521 (5th Cir. 2014) (finding Article III causation despite attenuation in the causal chain by "market forces").

For these reasons, the Court finds that the named American Airlines Plaintiffs satisfy Article III's causation element at this stage.[11]

## II.  Prerequisites for Class Treatment

The Federal Rules of Civil Procedure and relevant caselaw enumerate five preliminary requirements that every class must satisfy to be eligible for certification: numerosity, commonality, typicality, adequacy of representation, and ascertainability. *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019).  The Court addresses each in turn.

### a.  Numerosity

Under Rule 23(a)(1), a class may be certified only when it is "so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).  While this requirement sounds quantitative, the Fifth Circuit "has repeatedly noted that 'the number of members in a proposed class is not determinative of whether joinder is impracticable.'"  *Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013)); *see Phillips v. Joint Legis. Comm.*, 637 F.2d

---

[10] Defendants argue that Plaintiffs needed to allege more to demonstrate the alleged effect Defendants' scheme had on American Airlines's ticket pricing (Dkt. #455 at pp. 14–16).  Demanding anything further from Plaintiffs at this point would elevate traceability's threshold to a more limiting standing than the existing but-for requirement, which would contravene binding precedent.  *See Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 74–78 (1978).  An Article III causal link may be less than "direct and perceptible" at this stage so long as the allegations forming the connection are "true and capable of proof at trial."  *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688–89 (1973); *see Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) ("[T]he causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury.").  While not a certainty, it is "far from speculative" for the Court to conclude as it did at this juncture.  *Legacy Cmty. Health Servs. v. Smith*, 881 F.3d 358, 367–68 (5th Cir. 2018).

[11] Defendants take issue in their traceability briefing as relates to the American Airlines class definition (*see* Dkt. #455 at pp. 17–19; Dkt. #459 at p. 9).  Since these arguments concern absent class members, Defendants' arguments are better addressed under the predominance requirement.

1014, 1022 (5th Cir. Unit A Feb. 1981) ("Ample case law can be cited to show that smaller classes have been certified and larger ones denied certification for lack of numerosity.").   "Rather, assessing numerosity also entails consideration of 'the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.'"   *In re TWL Corp.*, 712 F.3d at 894 (quoting *Zeidman*, 651 F.2d at 1038).

Here, Plaintiffs have made the requisite showing for numerosity.[12]   *Zeidman*, 651 F.2d at 1038 ("[A] plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.").   Even if the Court considered only those flight segments for which a MAX 8 was scheduled to fly and was actually flown, the proposed classes would each contain thousands of members (Dkt. #276, Exhibit 10 at pp. 16, 21).   This number easily satisfies the numerosity requirement.   *See Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th Cir. 1976). "In addition to the sheer size of the class, members are 'geographically dispersed, decreasing the practicability of joinder into one action.'"   *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on April 20, 2010*, 910 F. Supp. 2d 891, 915 (E.D. La. 2012) (quoting *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 324 (N.D. Tex. 2011)).   Therefore, Plaintiffs have satisfied the numerosity requirement.

### b.   Commonality

Under Rule 23(a)(2), a class may be certified only where "questions of law or fact common to the class" exist.   FED. R. CIV. P. 23(a)(2).   But "commonality requires more than a shared cause of action or common allegation of fact."   *Flecha*, 946 F.3d at 767.   "[W]hat matters . . . 'is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding

---

[12] Boeing and Southwest did not argue in opposition to Plaintiffs' numerosity position (*see* Dkts. #302–03).   The Court examined numerosity with the rigor required at this stage.   *Dukes*, 564 U.S. at 351; *see Ward v. Hellerstedt*, 753 F. App'x 236, 244 n.16 (5th Cir. 2018) (per curiam) (finding that "lengthy discussion" of a Rule 23(a) element is "likely not necessary" given a defendant's "apparent concession").

to generate common answers apt to drive the resolution of the litigation.'" *Yates*, 868 F.3d at 361

(quoting *Dukes*, 564 U.S. at 350).  In other words, the class members' claims "must depend on a

common contention" whose "truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  A single common question suffices

for commonality purposes. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014).

Plaintiffs have made the requisite showing for commonality.[13]  RICO claims often satisfy

commonality's minimal threshold because the schemes that allegedly violate the RICO statute tend

to be the central, unifying source of injury for class members. *Williams v. Mohawk Indus., Inc.*,

568 F.3d 1350, 1356 (11th Cir. 2009); *see, e.g.*, *Melby v. Am.'s MHT, Inc.*, No. 3:17-CV-155, 2018

WL 10399004, at *4 (N.D. Tex. June 22, 2018) ("Here, Plaintiffs allege that the class members

are victims of MHT's fraudulent scheme perpetrated through a common pattern of

misrepresentations.  Class members share many issues, such as the common misrepresentations

made by MHT to all participating physicians, and the scope of the other Defendants' involvement

in MHT's scheme.").  Because Plaintiffs maintain they suffered injuries stemming from a

centralized pattern of racketeering activity that functioned as the core of Defendants' allegedly

fraudulent scheme (Dkt. #276 at pp. 31–32), commonality is satisfied here. *Corley v. Entergy

Corp.*, 220 F.R.D. 478, 482 (E.D. Tex. 2004).

### c.  Typicality

Under Rule 23(a)(3), a class may be certified only when its claims or defenses "are typical

of" "the claims or defenses of the representative parties."  FED. R. CIV. P. 23(a)(3).  The typicality

requirement focuses on "whether the named plaintiff[s are] threatened with the harm plaintiffs

---

[13] Boeing and Southwest did not argue in opposition to Plaintiffs' commonality position (*see* Dkts. #302–03).  The Court examined commonality with the rigor required at this stage. *Dukes*, 564 U.S. at 351; *see Ward*, 753 F. App'x at 244 n.16 (finding that "lengthy discussion" of a Rule 23(a) element is "likely not necessary" given a defendant's "apparent concession").

impute to the class as a whole." *Doe v. Obama*, 631 F.3d 157, 161 (4th Cir. 2011). The inquiry into typicality "rests 'less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims.'" *Ibe*, 836 F.3d at 529 (quoting *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). The Fifth Circuit's standard for typicality "is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).

Plaintiffs have made the requisite showing for typicality.[14] Though commonality and typicality are separate requirements under Rule 23, the potential for considerable overlap between them is evident here. *Dukes*, 564 U.S. at 350 n.5; *see M. D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013) ("Often, once commonality is shown typicality will follow as a matter of course."). As with commonality's low bar, typicality's threshold is usually cleared in RICO cases because the central scheme at the heart of a RICO violation similarly injures the named plaintiffs and unnamed class members. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1117–18 (9th Cir. 2017); *see, e.g.*, *In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-MD-02878, 2021 WL 1947982, at *6 (D. Mass. May 14, 2021). Here, Plaintiffs and the unnamed class members share in the same, fundamental aspects of the action, *i.e.*, Defendants' alleged course of conduct and the underlying remedial theory (Dkt. #276 at pp. 32–33). Therefore, the typicality requirement is satisfied.

### d. Adequacy of Representation

Under Rule 23(a)(4), a class may be certified only when its interests will be "fairly and adequately" protected by the "representative parties." FED. R. CIV. P. 23(a)(4). The adequate-representation requirement "mandates an inquiry into . . . the willingness and ability of

---

[14] Boeing and Southwest did not argue in opposition to Plaintiffs' typicality position (*see* Dkts. #302–03). The Court examined typicality with the rigor required at this stage. *Dukes*, 564 U.S. at 351; *see Ward*, 753 F. App'x at 244 n.16 (finding that "lengthy discussion" of a Rule 23(a) element is "likely not necessary" given a defendant's "apparent concession").

the representative to take an active role in and control the litigation and to protect the interests of absentees."[15]  *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982); *see Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080–81 (7th Cir. 2013) (detailing the role of a class representative).  Additionally, to satisfy this element, "class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort."  *Unger*, 401 F.3d at 321.

The inquiry into adequacy of representation ultimately "serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625; *see E. Tex. Motor Freight Sys.*, 431 U.S. at 403 ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974))).  "[I]ntraclass conflicts may" very well "negate adequacy under Rule 23(a)(4)."  *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007).  As such, "[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 480 (5th Cir. 2001).  And "[w]hile Rule 23(a)(4) does not require that the case be prosecuted by the 'best' plaintiff in the putative class, it does require the representative to be one who will 'adequately protect the interests of the class.'"  *McGowan v.*

---

[15] Traditionally, this requirement entailed jointly evaluating the adequacy of the class representatives *and* class counsel.  *See Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 294 (5th Cir. 2017).  But in 2003, Congress, "respond[ing] to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action," amended Rule 23 by adding subsection (g) as a guide for courts "in assessing proposed class counsel as part of the certification decision."  FED. R. CIV. P. 23 advisory committee's note to 2003 amendment.  Accordingly, the Court addresses the adequacy of class representatives separately here because "the plain language of the rule" instructs district courts to rule on certification before broaching the issue of class counsel's adequacy.  *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010); *see* 1 NEWBERG, *supra*, § 3:80 (explaining that the approach intended by the "rule makers" is "to move the entire analysis of counsel's adequacy out of Rule 23(a)(4) and into Rule 23(g)").

*Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir. Unit A Oct. 1981) (footnote and citation omitted).

Plaintiffs have made the requisite showing for adequacy of representation.  This element primarily evaluates whether intraclass conflicts exist between the class representatives and the putative class members.  *In re Deepwater Horizon ("Deepwater Horizon III")*, 785 F.3d 1003, 1015 (5th Cir. 2015).  A class representative must "possess the same interest and suffer the same injury as the class members."  *E. Tex. Motor Freight Sys.*, 431 U.S. at 403.  The class representatives have the same interests, and assert the same type of injury, as the members they seek to represent—they claim economic overcharge on their respective airline tickets and seek to recoup the injury inflicted by the overcharge.  Moreover, neither Defendant calls attention to any intraclass conflict, and the record before the Court reveals none.

Defendants do not explicitly disagree, but they do contest a separate facet of Rule 23(a)(4), arguing that Plaintiffs are not adequate class representatives because they lack sufficient knowledge of the case and do not exercise control over the litigation (Dkt. #302 at p. 58; Dkt. #303 at pp. 54–55; Dkt. #388 at p. 53; Dkt. #389 at pp. 54–55).  This requirement, however, has not been extended to negative-value consumer class actions, such as the immediate suit.  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012); *see In re TWL Corp.*, 712 F.3d at 903 (Graves, J., concurring in the judgment) (describing negative-value suits as those in which "the cost to each [class member] to litigate his or her own . . . proof of claim would almost certainly outweigh the value of the claim"); *Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the

class-action device.").  Here, "the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011).  "Given the minimal individual stakes," Defendants' fervent "denial of wrongdoing," and the complexities of pursuing class-litigation of this size and scale, "individual class members cannot plausibly be expected to have significant involvement." *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1057; *see Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373–74 (1966).

Nevertheless, were the Court to assume (without deciding) that Defendants' purported requirement applied in this situation, Plaintiffs would still satisfy this standard.  Plaintiffs have demonstrated both sufficient involvement in this action and adequate knowledge of the case to serve and protect the interests of the class members (Dkt. #357 at p. 76–80; *see* Dkt. #276, Exhibits 11–15, 17–22; Dkt. #290, Exhibits 1, 3).  Plaintiffs have "some rudimentary knowledge of [their] role[s]" as class representatives and are "committed to serving in that role in the litigation."  1 NEWBERG, *supra*, § 3:67; (Dkt. #357 at pp. 77–80).  Such is the extent of Rule 23(a)(4)'s requirement, and Plaintiffs have demonstrated as much.[16]  *See Vine v. PLS Fin. Servs.*, 331 F.R.D. 325, 335 (E.D. Tex. 2019), *aff'd*, 807 F. App'x 320 (5th Cir. 2020).  Accordingly, adequacy of representation is satisfied here.

---

[16] Southwest offers an additional argument, purporting that because the named Plaintiffs for the Southwest class allegedly agreed to class-action waivers, "each of them" are "inadequate and atypical" representatives for the Southwest class (Dkt. #302 at p. 58).  While the Court pays slightly more attention to this argument as relates to predominance, this contention does not bear on the adequacy of the named Southwest Plaintiffs as class representatives.  According to Southwest's own argument, these named Plaintiffs and all putative members of the Southwest class agreed to class-action waivers (Dkt. #388 at p. 53).  Because the Southwest named Plaintiffs and class members allegedly agreed to these waivers, Southwest's argument here actually works against its intended point.  *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861–62 (D. Md. 2013).

### e.  Ascertainability

In the Fifth Circuit, there is an additional, "implied prerequisite" under Rule 23 that the "class of persons to be represented by the class representative" is "ascertainable." *John*, 501 F.3d at 445.  Since "ascertainability" is "intensely fact-specific and the origins of the requirement murky, a precise definition of th[is] judicially-created requirement . . . is elusive." *Shelton v. Bledsoe*, 775 F.3d 554, 559–60 (3d Cir. 2015).  Generally speaking, the ascertainability requirement mandates that the putative class be "adequately defined." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).  Defining a class with precision is "necessary to identify properly 'those entitled to relief, those bound by the judgment, and those entitled to notice.'" *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) (citation omitted)); *see City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (delineating "three principal rationales" for the ascertainability requirement).  To prove ascertainability, "a party need only demonstrate—'*at some stage of the proceeding*'—that the class is 'adequately defined and clearly ascertainable.'" *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (emphasis added) (first quoting *Frey v. First Nat. Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015); and then quoting *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012)).  Ultimately, "the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (citation omitted).

Plaintiffs assert that the classes are ascertainable because the airlines in question have databases that document passenger flight records and fares paid for those flights (Dkt. #276 at pp. 30–31).  They plan to use this information, along with claims forms submitted by class members,

to disburse damages to class members should Plaintiffs prevail at trial (Dkt. #357 at pp. 16–17). In response, Defendants offer a veritable assortment of ascertainability concerns that come in two flavors. First, Defendants express concern that Plaintiffs' class definition requires identifying the "purchaser," which in the context of purchasing airline flights is unworkable (Dkt. #302 at pp. 18–19; Dkt. #303 at pp. 19–22; Dkt. # 388 at p. 14; Dkt. #389 at pp. 20–25). Second, Defendants argue that the logistics of the claims-administration process is unworkable (Dkt. #388 at p. 15; Dkt. #389 at p. 24).

The Court finds Defendants' arguments unavailing. To start, Defendants' initial critique is an attempt to heighten the level of scrutiny that the ascertainability requirement imposes. The ascertainability standard is less burdensome in this circuit than in others. *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 52–53 (1st Cir. 2018); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). In the Fifth Circuit, "a party need only demonstrate—'at some stage of the proceeding'—that the class is 'adequately defined and clearly ascertainable.'" *Seeligson*, 761 F. App'x at 334 (footnote omitted) (first quoting *Frey*, 602 F. App'x at 168; and then quoting *Union Asset Mgmt. Holding*, 669 F.3d at 639). Several of the criticisms Defendants offer are certainly valid, but none demonstrate that the classes Plaintiffs propose will be clearly unascertainable at some stage of these proceedings.[17] *C.C. v. Baylor Scott & White Health*, 502 F. Supp. 3d 1146, 1160 (E.D. Tex. 2020); *see In re Monumental Life Ins.*, 365 F.3d at 414 (instructing that courts to not be "overly formalistic" when assessing ascertainability at the certification stage). The data from Southwest and American's databases as well as claimant-generated information constitutes

---

[17] Defendants argue that *Ticknor v. Rouse's Enterprises, L.L.C.* demonstrates that individualized inquiries into the relevant transactions are necessary for each class member, which precludes certification due to lack of ascertainability (Dkt. #302 at p. 33; Dkt. #303 at p. 20). *See* 592 F. App'x 276, 278–79 (5th Cir. 2014) (per curiam). *Ticknor* is inapposite though—the panel made this finding as to the predominance element, not ascertainability. 592 F. App'x at 278–79; *see also Mims*, 590 F.3d at 306–07. A claims-administration process is well suited to determine to whom a defendant owes damages after liability has been established at trial (Dkt. #357 at p. 17).

objective criteria from which membership in the class can be determined.[18]   And even if an

ascertainability issue eventually becomes "truly insoluble, the [C]ourt may decertify the class at a

later stage of the litigation."  *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 664 (7th Cir. 2015).

Additionally, Defendants' concern regarding the workability of Plaintiffs' proposed

claims-administration process is overblown.  For one thing, Defendants do not cite—and the Court

cannot find—Fifth Circuit law prescribing the level of demonstrable workability Defendants urge.

Some circuits do require such a showing.  *See, e.g.*, *City Select Auto Sales Inc. v. BMW Bank of N.*

*Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017); *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 946

(11th Cir. 2015).  But several circuits outright reject this approach.  *See, e.g.*, *In re Petrobras Sec.*,

862 F.3d 250, 265 (2d Cir. 2017); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir.

2015).  Moreover, Defendants' concerns appear to be about the scope of the work involved in the

claims-administration process.  Even if ultimately tedious and laborious, the proposed process

would not cause the putative classes to fail for lack of ascertainability.  *Cleven v. Mid-Am.*

*Apartment Comms.*, 328 F.R.D. 452, 467 (W.D. Tex. 2018) ("Even if manual review were

necessary to ascertain every member of the class, Plaintiffs have still shown that the class is

identifiable by objective criteria. Manual review does not preclude ascertainability.").

The Court concludes that Plaintiffs satisfy the ascertainability requirement.  Of course,

Plaintiffs are not finished with this element—as the litigation progresses, the Court will scrutinize

this ascertainability.  Additionally, if necessary, class definitions may be limited or modified "to

---

[18] In its sur-reply, Boeing argues that the criteria with which Plaintiffs plan to identify the ultimate ticket purchasers
are subjective (Dkt. #389 at pp. 20–21).  But not so.  The criteria Plaintiffs articulate are objective and make class
membership readily discernible in this situation (*see* Dkt. #431 at pp. 175:19–176:2).  Subjective criteria that fail
ascertainability usually involve a class definition that considers a class member's state of mind.  *See, e.g.*, *J.D. v. Azar*,
925 F.3d 1291, 1319 (D.C. Cir. 2019).  Furthermore, the Fifth Circuit makes clear that "'the possibility that some
claimants may fail to prevail on their individual claims will not defeat class membership' on the basis of the
ascertainability requirement."  *Deepwater Horizon II*, 739 F.3d at 821 (majority opinion) (quoting *In re Rodriguez*,
695 F.3d 360, 370 (5th Cir. 2012)).

provide the necessary precision" on this element.  *In re Monumental Life Ins.*, 365 F.3d at 414; *see* Fed. R. Civ. P. 23 (c)(1)(C).

## III.    23(b)(3) Class Requirements

Rule 23(b)(3) is "designed for situations 'in which class-action treatment is not as clearly called for,'" *Comcast*, 569 U.S. at 34 (quoting *Dukes*, 564 U.S. at 362), *i.e.*, when putative classes seek monetary damages.  *See* Nagareda et al., *supra*, at 92 ("Rule 23(b)(3) . . . extends preclusive effects to cases for monetary relief . . . to reap the judicial economy gains from litigating common issues of fact and law in one proceeding, and to reap the deterrence gains from facilitating private enforcement of the substantive law.").  As such, certifying a (b)(3) class requires the named plaintiffs to clear the additional hurdles of predominance and superiority.  "Since claims aggregated under Rule 23(b)(3) can be resolved without the class mechanism, these requirements ensure that a class action is only used when it makes sense."  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019); *see Dukes*, 564 U.S. at 362–63 (explaining the utility of these requirements as procedural safeguards).  The Court addresses predominance and superiority in turn, analyzing each element separately as to the proposed classes.

### a.  Predominance

Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Though similar to Rule 23(a)(2) commonality, Rule 23(b)(3)'s predominance requirement is "'more demanding,' testing 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 702 (5th Cir. 2012) (quoting *Wilborn v. Wells Fargo Bank, N.A.*, 609 F.3d 748, 755 (5th Cir. 2010)).  The predominance inquiry "calls upon courts to give careful scrutiny to the relation between

common and individual questions in a case." *Bouaphakeo*, 577 U.S. at 453 (majority opinion); *see id.* ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'") (brackets and citation omitted)).   If adding or subtracting members to a putative class has "a substantial effect on the substance or quantity of evidence offered," there is little possibility of satisfying the predominance requirement. *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978); *see Robinson v. Union Carbide Corp.*, 544 F.2d 1258, 1261 (5th Cir. 1977) (explaining that the "clear thrust" of Rule 23(b)(3) is "to minimize the requirement of active intervention by numerous members of an affected class"), *modifying on reh'g*, 538 F.2d 652 (5th Cir. 1976).

"Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider 'how a trial on the merits would be conducted if a class were certified,'" *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)), which, "in turn, 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials,'" *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)).   This inquiry is conducted "on a claim-by-claim basis," *Prantil*, 986 F.3d at 577, and "no mathematical or mechanical test" exists to evaluate predominance, *Messner*, 669 F.3d at 814.   *See Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).   Pragmatism is the lodestar of predominance.

The Court breaks down the following analysis into two parts—liability and damages. Unless otherwise indicated, the analysis the Court conducts and the conclusions the Court draws are applicable to all classes.

### i. Liability

Of the aspects presented at class certification, the parties spar most intensely over the predominance of liability.  The Court analyzes predominance of liability as follows.  First, since determining "whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action," the Court provides brief background on the RICO causes of action Plaintiffs plead.  *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 809 (2011).  Then the Court examines the substantive RICO violations for predominance.  Next, the Court evaluates the twin pillars of RICO standing under the predominance standard, beginning with injury and ending with causation.  Finally, the Court looks to the affirmative defenses pleaded by Defendants.

### 1. RICO Primer

Congress enacted RICO primarily "to combat organized crime."  *United States v. Uni Oil, Inc.*, 646 F.2d 946, 953 (5th Cir. May 1981); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481–83, 497–99 (1985).  Nonetheless, the statute "imposes criminal and civil liability upon those who engage in certain 'prohibited activities.'"  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989).  Specifically, a RICO plaintiff may bring "a private civil action to recover treble damages for injury 'by reason of a violation of' [RICO's] substantive provisions."  *Sedima*, 473 U.S. at 481 (quoting 18 U.S.C. § 1964(c)).  Succeeding on a RICO cause of action requires a plaintiff to prove two separate aspects: (1) substantive violation of the statute, and (2) statutory standing.  *See Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 929 (5th Cir. 2002).

On the substantive-violation front, § 1962 of RICO "sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2097 (2016) (brackets omitted). Here, Plaintiffs allege two violations of prohibitions (*see* Dkt. #165 at pp. 87–93). Under § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Under § 1962(d), it is unlawful for "any person to conspire to violate" any of § 1962's first three subsections. *Id.* § 1962(d). Though each § 1962 subsection varies, all RICO plaintiffs "must establish three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'"[19] *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 523–24 (5th Cir. 2016) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)).

A RICO person "includes any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3), while a RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," *id.* § 1961(4). "'Racketeering activity' means any of the predicate acts specified in § 1961(1)." *Zastrow v. Hous. Auto Imports Greenway Ltd.*, 789 F.3d 553, 559 (5th Cir. 2015). Two or more of these predicate acts form a "pattern of racketeering

---

[19] Section 1962 requires a RICO enterprise to affect interstate commerce. *United States v. Martino*, 648 F.2d 367, 394 (5th Cir. 1981), *aff'd sub nom. Russello v. United States*, 464 U.S. 16 (1983); *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 153–54 (1987). Because Defendants do not contest this element and given the inherently interstate nature of the commercial-airline industry, the Court does not address this element.

activity" when they are "(1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009); *see* 18 U.S.C § 1961(5).

A substantive RICO violation does not, however, permit just anyone to bring suit. Only those who suffer injury to their "business or property by reason of a violation of section 1962" have statutory standing.  18 U.S.C. § 1964(c).  RICO standing has two elements:  injury and causation. *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) (per curiam).  A RICO injury must affect the plaintiff's "business or property," which ordinarily means that there must be "concrete financial loss." *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003).  When an injury is "speculative and does not show a conclusive financial loss," it does not constitute an injury under RICO. *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995).  "A RICO plaintiff must also plausibly allege that the RICO violation proximately caused the plaintiff's injuries." *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020).  The Fifth Circuit has generally found RICO causation present where the injury was "either a direct result or a reasonably probable consequence" of the defendant's conduct. *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015).  "If some other conduct directly caused the harm, the plaintiff cannot sustain a RICO claim." *Molina-Aranda*, 983 F.3d at 784.  Evaluating RICO's statutory-standing elements is a fact-intensive inquiry that necessitates case-specific considerations. *See Nat'l Enters. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254–55 (5th Cir. 1988); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 223 (E.D.N.Y. 1999).

### 2.  Substantive RICO Violations

The Court finds that, as to the substantive RICO violations Plaintiffs allege, common questions predominate.  Plaintiffs spend little time on this aspect of predominance, and, with one

exception, Defendants do not challenge that common questions predominate here.  Nevertheless, the Court briefly examines the substantive RICO violation for predominance to ensure the requisite, rigorous analysis.[20]  *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) ("[T]he fact that an issue is conceded or otherwise resolved does not mean that it ceases to be an 'issue' for the purposes of predominance analysis.").

Addressing the uncontested elements first, Plaintiffs can demonstrate the following at trial through common evidence:

- Boeing and Southwest are RICO "persons," *see Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995);
- Boeing and Southwest committed a sufficient number of predicate RICO acts as to constitute a "pattern," (Dkt. #276 at pp. 37–38), *see Malvino v. Delluniversita*, 840 F.3d 223, 231–33 (5th Cir. 2016);
- Boeing and Southwest are a RICO "enterprise" in the form of an association-in-fact (Dkt. #276 at p. 38), *see Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019); *see also Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 583 (5th Cir. 1992); *Z-Tel Commc'ns v. SBC Commc'ns*, 331 F. Supp. 2d 513, 560 (E.D. Tex. 2004); and
- The predicate RICO acts Boeing and Southwest committed were connected to the conduct of the enterprise, *see United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998).[21]

Plaintiffs have put forward substantial evidence that yield answers to these common, class-wide questions.  For example, consider the series of events Plaintiffs pleaded regarding Boeing and

---

[20] Though distinct substantive violations of the RICO statute, § 1962(c) and § 1962(d) almost entirely overlap.  *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 643 (S.D. Tex. 2016).  Because the Motion is for class certification and Plaintiffs rely on the same evidence for both § 1962 claims, the Court conducts a unified predominance inquiry of the substantive RICO violations.  *See, e.g.*, *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 262 (3d Cir. 1995).

[21] To prove their § 1962(d) claim, Plaintiffs need only demonstrate that Defendants "conspired to violate § 1962(c), and no more."  *United States v. Nieto*, 721 F.3d 357, 368 (5th Cir. 2013).  Even though this § 1962(d) element differs from the core of § 1962(c)'s prohibition, they are similar enough for instant purposes that separate analyses would be extraneous.

Southwest's reaction and response to inquiries from the Wall Street Journal (*see* Dkt. #276 at pp. 21–24).   Just within these pages of the Motion, Plaintiffs proffer evidence going to the substantive-violation elements that would be the same were each Plaintiff and putative class member to put on an individualized trial.  When the reporter reached out to Southwest for comment on a story about the MAX 8, Southwest almost immediately connected with Boeing to confer on a response (Dkt. #276, Exhibit 72 at p. 5).  Several of Defendants' employees and executives spoke by phone to discuss the planned response (Dkt. #276 at p. 22).  Such evidence bears on the class members' common question of whether Boeing and Southwest constitute an association-in-fact, which may, in turn, constitute a RICO enterprise (*see also, e.g.*, Dkt. #357 at Exhibits 86–90). Similarly, Southwest corresponded with the Wall Street Journal reporter via email (*see* Dkt. #276, Exhibit 74).  These emails can serve each and every class member as trial evidence to prove wire fraud, which would bear on the class members' ability to show one or more predicate RICO acts, which may even constitute a pattern of racketeering activity.  *See, e.g.*, *United States v. Hoffman*, 901 F.3d 523, 546–49 (5th Cir. 2018).  Defendants' interactions with one another and the Wall Street Journal reporter demonstrate the aptness of the class-wide evidence to engage common questions regarding the alleged substantive RICO violations.

The only (somewhat) disputed element here is the scienter requirement present in the acts Boeing and Southwest allegedly committed that constitute "racketeering activity"—mail fraud, 18 U.S.C. § 1341, and wire fraud, *id.* § 1343.  *See id.* § 1961(1)(B) (listing RICO predicate acts originating in Title 18 of the U.S. Code).  Both mail and wire fraud require "the specific intent to defraud." *Hoffman*, 901 F.3d at 545.  The analysis is the same under these statutes.  *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

Advocating solely for itself, Southwest maintains that individual questions regarding scienter will predominate since Southwest's "required knowledge or intent" to defraud vacillated over time as to particular Plaintiffs (Dkt. #302 at p. 28).  This argument is unsuccessful for two reasons.  First, Southwest's position appears to assume that the fraudulent-intent element involves some sort of reliance by Plaintiffs (*see, e.g.*, Dkt. #388 at p. 27).  Such is not the case.  *In re MasterCard Int'l Inc.*, 313 F.3d 257, 263 (5th Cir. 2002) ("[R]eliance is not an element of statutory mail or wire fraud.").  Second, common questions of fact regarding scienter will certainly predominate since Defendants have allegedly "acted in the 'same basic manner' towards" the entirety of both classes.  *Billitteri v. Sec. Am., Inc.*, No. 3:09-CV-1568, 2011 WL 3586217, at *7 (N.D. Tex. Aug. 4, 2011) (quoting *Eatmon v. Palisades Collection, LLC*, No. 2:08-CV-306, 2010 WL 1189571, at *8 (E.D. Tex. Mar. 5, 2010)).  "Southwest's scienter when it engaged in a fraudulent scheme directed to the classes is plainly a common question" (Dkt. #357 at p. 51).

The considerable predominance of common questions to the classes on the substantive-RICO-violation element is straightforward and clear, unsurprisingly so given the centralized course of conduct in which Defendants allegedly partook (*see, e.g.*, Dkt. #276 at pp. 19–24).  The Court agrees with Plaintiffs that "[e]stablishing the necessary facts for these legal issues will establish them as to the entire class" (Dkt. #276 at p. 37 n.15).  As such, questions common to the putative class members regarding §§ 1962(c) and (d) clearly predominate.

### 3.  RICO Standing

Now to the most heavily contested predominance issue: RICO standing.  To have standing under the statute, a plaintiff must (1) suffer injury to business or property (2) caused by a substantive RICO violation.[22]  *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992); *see* 18

---

[22] While both constitutional and statutory standing are necessary for federal courts to exercise judicial power, *see In re Estate of Goudreau*, No. 4:20-CV-970, 2021 WL 1518114, at *2 (E.D. Tex. Apr. 16, 2021), they are considerably

U.S.C. § 1964(c).  The Court takes these statutory-standing elements in turn, beginning with injury

and then proceeding to causation.

### a.  Injury

As previously stated, RICO injury occurs when a person's "business or property" is injured.

18 U.S.C. § 1964(c).  An injury "must be 'conclusive' and cannot be 'speculative.'"  *Gil Ramirez*

*Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 409 (5th Cir. 2015) (quoting *In re Taxable*

*Mun. Bond Sec. Litig.*, 51 F.3d at 523).  "Injury to mere expectancy interests or to an 'intangible

property interest'" is also insufficient to qualify as an injury for RICO purposes.  *Pinnacle Brands*,

138 F.3d at 607; *see id.* at n.21 (delineating that purchasing chattel based on a defendant's

misrepresentation of the chattel's value is not a RICO injury, while purchasing chattel at a price

set by the defendant that is greater than the chattel's fair market value may be a RICO injury); *see*

*also Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, ___ F.4th ___, ___, No. 20-20338,

2021 WL 3521659, at *4 (5th Cir. Aug. 11, 2021).  Simply, a plaintiff must demonstrate RICO

injury through a "concrete financial loss."  *Patterson*, 335 F.3d at 492 n.16; *see United States v.*

*Hager*, 879 F.3d 550, 554 (5th Cir. 2018).  "[W]hether a given party has suffered a RICO injury

is a fact-heavy question."  *Nat'l Enters.*, 847 F.2d at 254.

In the Motion, Plaintiffs state that they will demonstrate RICO injury through Dr. Allenby's

conjoint analysis (Dkt. #276 at pp. 50–54).  The survey set out to determine "whether, as a result

of the FAA and the public having incomplete and false information about the safety of the MAX

---

different in nature.  Article III standing is jurisdictional, and statutory standing is not.  *Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 409 (5th Cir. 2008); *see, e.g.*, *Simmons v. UBS Fin. Servs.*, 972 F.3d 664, 666 (5th Cir. 2020) ("[Statutory standing] asks the 'merits question' of 'whether or not a particular cause of action authorizes an injured plaintiff to sue.'" (citation omitted)), *cert. denied*, 141 S. Ct. 1382 (2021) (mem.); *HCB Fin. Corp. v. McPherson*, ___ F.4th ___, ___, No. 20-50718, 2021 WL 3394995, at *3 (5th Cir. Aug. 4, 2021) ("[A] motion to dismiss for lack of statutory standing is analyzed under Rule 12(b)(6), not Rule 12(b)(1)."); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–37 & n.4 (2014).  This distinction accounts for the Court's differing treatment of these concepts in the class-action setting.  *Compare Rivera*, 283 F.3d at 319, *with Chavez*, 957 F.3d at 546 n.3.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974).

8, Southwest Airlines and American Airlines enjoyed a price premium on the sale of tickets on flights that were either flown on a MAX 8 or could have been flown on a MAX 8" (Dkt. #276, Exhibit 7 at p. 4).  The data captured by the survey indicated that "the market price for flights on airlines using the MAX 8 would have been lower had the truth about the MAX 8 been known during the class period" (Dkt. #276 at pp. 52–53).  Plaintiffs plan to offer Dr. Allenby's conjoint as "common evidence" to demonstrate the "existence . . . of [an] overcharge for each class member on a classwide basis" (Dkt. #276 at p. 50).

Defendants challenge Plaintiffs' position on the predominance of RICO injury in two general ways.  First, Defendants claim that Dr. Allenby's model cannot demonstrate RICO injury on account of market and industry complexity.  Second, they contend that determining which class members have RICO standing under the class definitions will lead individualized questions to predominate.[23]  The Court takes each in turn.

Defendants primary challenge to the predominance of RICO injury concerns the "vast heterogeneity in the markets for airline tickets" (Dkt. #303 at p. 36).  They argue that there is "no uniformity in the fact of injury or the existence of an alleged overcharge across the putative classes" (Dkt. #388 at p. 30).  Upon close review, a fundamental flaw with this general contention comes to the surface—Defendants base their position on the extent, rather than the existence, of injury (*see* Dkt. #302 at p. 36; Dkt. #303 at pp. 36–42; Dkt. #388 at pp. 30–32).

Though conjoined at the metaphorical hip, the fact of injury and the magnitude of that injury are not the same thing.  *See Yucaipa Am. All. Fund I, LP v. Ehrlich*, 716 F. App'x 73, 78 (3d Cir. 2017).  For instance, when an individual's car is stolen, that individual is injured.  But the

---

[23] Given that the alleged injury here is concrete financial loss, the Court addresses this argument as to Article III and RICO standing simultaneously.  *Compare Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For [Article III] purposes, a loss of even a small amount of money is ordinarily an 'injury.'"), *with Patterson*, 335 F.3d at 492 n.16. (*See also* Dkt. #431 at p. 17:2–24).

extent of that injury depends on the stolen car.  An individual's damages would be greater if the stolen car were a luxury vehicle than if it were a jalopy.  *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 318–19 (E.D. Mich. 2001); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 489 (3d Cir. 2000).

Such is the case with RICO injuries.  Section 1964(c) requires that a RICO plaintiff suffer injury in their business or property, irrespective of the injury's magnitude.  *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001); *see Ass'n of Commonwealth Claimants v. Moylan*, 71 F.3d 1398, 1404 (8th Cir. 1995) ("In regard to injury, all that is required to start the running of the clock on a RICO claim is knowledge of the fact of injury, not knowledge of the precise quantum of damages.").  These claim-specific aspects must receive separate treatment.  *See Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) ("[While] variations in the amount of damages do not preclude certification, this conclusion does not obviate the need for plaintiffs to establish the fact of damages when class-wide injury cannot be presumed and forms an essential element of their case." (emphases omitted)).

Heeding this distinction, the Court concludes that Defendants' critiques of Dr. Allenby's survey relating to fact of injury fall short for two reasons.  First, the difficulties in measuring the fact of injury in the manner Plaintiffs must is incidental to the cause of action they allege.  Neither side disputes that the statistical analysis of injury (and damages) here is complex (Dkt. #357 at p. 68).  But where the fact of injury depends on answering what would have happened had something in the past never occurred, demonstrating injury becomes impracticable outside of a "but-for" world.  *See Mathiowetz Const. Co. v. Minn. Dep't of Transp.*, No. 01-cv-548, 2002 WL 334394, at *4 (D. Minn. Feb. 27, 2002) ("The correct analysis is to measure injury in comparison to a world in which the offending conduct did not occur . . . ."); *see also Hall v. Arthur*, 141 F.3d 844, 848

46

(8th Cir. 1998) ("Certain proof of a counterfactual situation is, of course, extraordinarily difficult to produce.").  Defendants are essentially arguing that due to the market's nature and the myriad variables involved, determining the existence of the alleged overcharge is impossible.  This contention cannot be correct—this train of "logic would have the effect of immunizing . . . any fraudulent . . . conduct concerning . . . air travel" from class treatment (Dkt. #357 at p. 67).  It would be untenable to find that the counterfactual nature of the injury Defendants allegedly caused makes proving the fact of injury impossible.  *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

Second, demonstrating RICO injury through Dr. Allenby's conjoint survey indicates that questions common to the classes predominate.  Using an established, survey-research technique, Dr. Allenby tested a sizable sample of respondents to gauge the impact of "the FAA and the public having incomplete and false information about the safety of the MAX 8" on ticket pricing during the class period (Dkt. #276, Exhibit 7 at p. 4).  He ran the respondents through a conjoint survey crafted according to current standards of practice in the field (*see* Dkt. #276, Exhibit 7 at pp. 10–21).  Dr. Allenby then applied conventional statistical analysis to the survey results to refine the data and interpret the results (*see* Dkt. #276, Exhibit 7 at pp. 21–31).  Ultimately, he found "that as a result of the public having incomplete and false information about the safety of the MAX 8, Southwest Airlines and American Airlines enjoyed a price premium on the sale of tickets on flights that were either flown on a MAX 8 or could have been flown on a MAX 8" (Dkt. #276, Exhibit 7 at p. 31).  The measured and carefully designed approach Dr. Allenby implemented to capture the fact of injury in this (necessarily) counterfactual world demonstrates that his model is capable of serving Plaintiffs and class members alike to prove fact of injury in individualized trials.  *See Bouaphakeo*, 577 U.S. at 455 ("One way . . . to show . . . that the sample relied upon here is a

permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action.").

Moreover, Defendants have not show that individualized proof of RICO injury affects, let alone outweighs, the ability of Dr. Allenby's conjoint to show the proposed classes' injuries through class-wide proof.   Further, to the extent Defendants' critcisms are relevant, these arguments are for the factfinder's consideration.  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 157 (S.D.N.Y. 2008); *see Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 396 n.5 (5th Cir. 2007) (Dennis, J., concurring in the judgment) (noting that any "factual findings made by the district court at the class certification stage are not binding on the trier of fact at trial").  The Court's role at this stage is to determine whether class treatment is appropriate under the circumstances, not whether Plaintiffs will succeed on the merits.  *Bouaphakeo*, 577 U.S. at 457 ("When . . . 'the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.'" (brackets omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 107 (2009))); *see also Amgen*, 568 U.S. at 466.  For the foregoing reasons, the Court finds Plaintiffs have shown that common questions regarding the class members' RICO injuries predominate over questions affecting individual members.

As to which individuals suffered a RICO injury, Defendants contend that the proposed class definitions would lead to individualized questions regarding various class members' fact of injury.  Defendants maintain that these questions would predominate over common questions (*see* Dkt. #303 at pp. 50–51; Dkt. #389 at pp. 50–52).  For instance, Defendants focus on purported class members whose airline tickets were reimbursed, arguing that individually identifying these

uninjured class members outweighs the common questions on the class member's RICO injuries (Dkt. #303 at p. 51).

The Court cannot agree.  Contrary to Defendants' contention, the class definitions do not include individuals who were reimbursed (Dkt. #357 at p. 74; Dkt. #431 at p. 170:6–13).  A class member "must be 'the bearer of the ultimate economic burden for a ticket, not . . . the person who paid for the ticket at the point of sale'" (Dkt. #357 at p. 74).  Therefore, as opposed to those who received reimbursements, individuals who paid out the reimbursements are pertinent to the predominance inquiry and would become class members upon certification.  *See, e.g.*,  *E. B. Elliott Adv. Co. v. Metro. Dade Cnty.*, 425 F.2d 1141, 1148 (5th Cir. 1970); *see also Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 768 (8th Cir. 2020).

While Defendants offer other criticisms that nominally concern the predominance of class members' RICO injuries, they are better addressed as part of RICO causation.  As such, the Court finds that the questions common to the proposed classes regarding RICO injury predominate over those affecting individual members.

### b.  Causation

Suffering injury to one's business or property is only half of the RICO-standing equation. That injury must also occur "by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  This statutory language signifies that a defendant's substantive RICO violation must be "a 'but for' . . . [and] proximate cause" of the alleged injury.  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see McCampbell v. KPMG Peat Marwick*, No. 3:96-CV-3136, 1997 WL 311521, at *2 (N.D. Tex. May 30, 1997) ("Whether the predicate acts proximately caused the alleged injuries is the 'crux of the analysis' for civil RICO standing." (quoting *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989))).  "Proximate cause should be

49

evaluated in light of its common-law foundations and requires some direct relation between the injury asserted and the injurious conduct alleged." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 965 (5th Cir. 2019) (brackets, ellipsis, and internal quotation marks omitted) (quoting *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016) (en banc)). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "If some other conduct directly caused the harm, the plaintiff cannot sustain a RICO claim." *Molina-Aranda*, 983 F.3d at 784. At trial, Plaintiffs would need to prove that "their damages 'were a foreseeable and natural consequence' of Defendants' action." *Waste Mgmt.*, 920 F.3d at 965 (brackets omitted) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008)).

The Court analyzes Plaintiffs' case for RICO causation under the predominance requirement in two parts, beginning with but-for causation and ending with proximate causation.

### i.  But-For Causation

As detailed above in the Article III context, *supra* pp. 21–26, but-for causation "requires the plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for— the defendant's conduct." *Nassar*, 570 U.S. at 346–47. In this setting, Plaintiffs must "show that . . . but for the RICO violation, [they] would not have been injured." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010); *see RWB Servs., LLC v. Hartford Comput. Grp.*, 539 F.3d 681, 686 (7th Cir. 2008). The but-for threshold is "not difficult to meet because it 'asks simply whether the outcome would have occurred in the absence of the action.'" *United States v. Thompson*, 945 F.3d 340, 344 (5th Cir. 2019) (quoting *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019)). An injury may "have 'many but-for causes.'" *Salinas*, 918 F.3d at 466 (citation

omitted); *see, e.g.*, *United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014) ("For example, if in the present case defendants' actions had merely sprained a passenger's hand, making him go to the hospital, and the hospital exploded from a gas leak, the defendants' actions would still have been a but-for cause of death.  But for his sprained hand the passenger would not have gone to the hospital.").

Southwest contests that Plaintiffs have made the requisite predominance showing on but-for causation.  Southwest offers three arguments and an out-of-circuit, district-court case supporting its position.  The Court finds no merit in these contentions.  First, Southwest insists that the Court cannot certify the proposed classes because Plaintiffs have not even attempted to affirmatively prove but-for causation's compliance with Rule 23(b)(3) predominance (Dkt. #302 at p. 38; Dkt. #388 at p. 33).  This contention is off-base for two reasons.  To start, Plaintiffs have addressed case-specific concerns regarding but-for causation in the standing analysis, *supra* pp. 21–26, which shares the same causal standard.  *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 377–78 (5th Cir. 2020) (Oldham, J., concurring in part, dissenting in part, and concurring in the judgment).  As well, the Court understands Plaintiffs' predominance arguments as to RICO causation as incorporating but-for causation since proximate causation would be demonstrated at trial by the exact same class-wide evidence (*see* Dkt. #276 at pp. 39–49).  *See also Paroline v. United States*, 572 U.S. 434, 444 (2014); *accord Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982) ("Implicit in [proximate causation] is the notion of causation in fact, or 'but for' cause: a defendant's conduct is not the legal cause of an event unless, without that conduct, the event would not have occurred." (ellipsis omitted)).

Next, Southwest argues that Plaintiffs "focus solely on the claimed class overcharge and what putative class members 'would have paid' based on disclosure of the MAX's alleged issues,"

which cannot show common questions to predominate on this element given Plaintiffs' focus "on disclosures in the real world, not events in a counterfactual, 'but for' world" (Dkt. #302 at p. 38). The Court finds this point unpersuasive. Any viable evidence must necessarily incorporate critical aspects of the real-world conduct at issue, lest the complained-of conduct bear any resemblance in the hypothetical universe to the case's factual allegations. *See Hardy v. Johns-Manville Sales Corp.*, 851 F.2d 742, 745 (5th Cir. 1988). Southwest also does not help its position by offering this point and then citing to one of its own expert reports that uses real-world considerations to analyze the counterfactual world at issue (Dkt. #302 at p. 38; *see* Dkt. #302, Exhibit 18 at pp. 61–81).

Southwest continues by arguing that Plaintiffs have not demonstrated but-for causation's predominance with the affirmative rigor required of movants seeking class certification (*see* Dkt. #388 at pp. 32–33). The Court cannot agree. First, as previously mentioned, the Court understands Plaintiffs' predominance arguments on RICO causation to incorporate but-for causation since proximate causation would necessarily be shown at trial by the same class-wide evidence. But second, Plaintiffs have affirmatively demonstrated but-for causation can be shown by class-wide evidence—Dr. Allenby's conjoint survey (*see* Dkt. #276, Exhibit 7 at p. 31 ("[I] find that *as a result of* the public having incomplete and false information about the safety of the MAX 8, Southwest Airlines and American Airlines enjoyed a price premium on the sale of tickets on flights that were either flown on a MAX 8 or could have been flown on a MAX 8." (emphasis added)). *See also Beaty v. Ford Motor Co.*, No. 17-cv-5201, 2021 WL 3109661, at *5 (W.D. Wash. July 22, 2021) (explaining that conjoint surveys attempt "to measure market value or consumer demand in the 'but-for world'").

Finally, Southwest offers a case from the District of Massachusetts supposedly supporting the notion that class certification should be denied if "plaintiffs fail[] to establish 23(b)(3) predominance as to RICO but-for causation, even though predominance was satisfied as to RICO proximate causation" (Dkt. #388 at p. 33).  *See In re Celexa & Lexapro Mktg. & Sales Prac. Litig.*, 325 F.R.D. 529 (D. Mass. 2017).  But this case is inapposite.  "[I]ndividual issues as to but-for causation persist[ed]," thereby precluding the satisfaction of the predominance requirement, because the causes of action involved different state statutes with different reliance requirements. *See id.* at 542.

Additionally, Defendants jointly raise a pair of concerns regarding predominance of Article III's but-for causation standard.  Defendants first argue that the American Airlines class definition does not capture the appropriate fit between Defendants' allegedly fraudulent conduct and the injury its class members allegedly suffered as a result (Dkt. #455 at pp. 17–18).  Defendants contend that the uniformity of Southwest's Boeing-based fleet—a cornerstone of Plaintiffs' claims and underlying theory of liability—is absent in American Airlines's fleet, thereby rendering any uniform overcharge for American Airlines class members deficient (Dkt. #455 at pp. 18–19).  Consequently, Defendants maintain that individual questions necessary to prove that American Airlines class members satisfy Article III's traceability requirement will predominate over common questions at trial.

The Court cannot agree for two reasons.  First, Defendants' arguments attempt to swap out Article III's but-for causality standard with RICO's proximate-cause requirement.  *See Lexmark*, 572 U.S. at 134 n.6.  Both contentions Defendants advance implicate the directness of the causal chain linking Defendants' allegedly fraudulent conduct at the one end and the injury American Airlines class members incurred at the other.  The chain of causation's directness does not bear on

whether common questions of traceability will predominate as to members of the American Airlines class at trial. *Inclusive Comms. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) ("Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" (quoting *Bennett*, 520 U.S. at 169)); *see Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).

Second, Defendants' contentions effectively ask the Court to traverse further into the merits than is needed to "determin[e] whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. Rephrased as interrogatives, Defendants' arguments plainly become questions common to the American Airlines class members: (1) but for Defendants' allegedly fraudulent conduct, would American Airlines class members have suffered injury-in-fact?; and (2) does the absence of Boeing-based fleet uniformity break the chain of but-for causation between Defendants' allegedly fraudulent conduct and the class members' alleged injuries? These questions are common to all members of the American Airlines class and adjust the 23(b)(3) calculus of traceability further in favor of predominance.

Because Defendants' arguments regarding but-for-causation's predominance fall flat, the Court proceeds to the issue of proximate causation. Given Plaintiffs' single strand of causation-related arguments, whether common questions of proximate cause predominate as to the putative class members will also determine the predominance inquiry on but-for causation.

### ii.  Proximate Causation

Proximate cause is the legal system's label for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. Though "def[ying] easy summary," proximate cause "is 'a flexible concept' that generally 'refers to the basic requirement that there

must be some direct relation between the injury asserted and the injurious conduct alleged.'" *Paroline v. United States*, 572 U.S. at 444 (cleaned up) (first quoting *Bridge*, 553 U.S. at 654; and then quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 707 (2011) (Roberts, C.J., dissenting)). "Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp.*, 564 U.S. at 692 (majority opinion). "[I]t is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). "[I]n the RICO context," proximate causation's analytical locus is "the directness of the relationship between the conduct and the harm." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010); *see Aetna Ins. Co. v. Boon*, 95 U.S. (5 Otto) 117, 130 (1877) ("The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation."). At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268 (citation omitted); *see Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 223 (2012) (Scalia, J., concurring in part and concurring in the judgment) ("Life is too short to pursue every event to its most remote, 'but-for,' consequences, and the doctrine of proximate cause provides a rough guide for courts in cutting off otherwise endless chains of cause and effect.").

The Fifth Circuit has not settled on a definitive test for proximate causation under RICO, and other circuits differ in their approaches. *See Plambeck*, 802 F.3d at 676. This notwithstanding, analytical guideposts exist. First, plaintiffs alleging proximate cause under RICO cannot be "unforeseeable victims or otherwise wronged by the caprice of chance" as to a predicate RICO act. *Id.* RICO plaintiffs are better suited to show the requisite causation if the injury to business or property is "not just incidental" to the "objective of the enterprise" but is, instead, "the object of the collaboration." *Id.* As well, RICO proximate cause can be found when the plaintiffs' injury is "either a direct result or a reasonably probable consequence" of a predicate RICO act. *Id.*

(internal quotation marks omitted).  These considerations make clear that proximate causation is intensely fact-dependent.  *Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. (4 Otto) 469, 474 (1876) ("[W]hat is the proximate cause of an injury is ordinarily a question for the jury.  It is not a question of science or of legal knowledge.  It is to be determined as a fact, in view of the circumstances of fact attending it."); *see* Leon Green, Rationale of Proximate Cause 132 (1927) ("Causal relation is one of fact.").

### 1.  Splitting the Classes

Before proceeding further, the Court takes a step back to assess a potential issue regarding RICO causation and the predominance requirement in this action.  As will become evident in the predominance analysis below, the Court concludes that the interests of judicial economy and aggregate litigation generally will be better served by subdividing the putative classes in two; the Court takes such action pursuant to the rules governing class-action procedure.  *See* Fed. R. Civ. P. 23(c)(5), (d)(1)(A), (E); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997); 3 Newberg, *supra*, § 7:29 ("Subclassing is not necessary but is permitted to assist a court in managing complex litigation in a variety of circumstances in which subclasses would promote efficiency.").

As the Court's recounting of Fifth Circuit doctrine on RICO causation evinces, proximate causation is a "legal term of art."  *Eagle Suspensions, Inc. v. Hellmann Worldwide Logistics, Inc.*, 571 F. App'x 281, 291 (5th Cir. 2014).  At its core, proximate cause concerns the chain of events leading from the alleged conduct in question to the injury that conduct allegedly caused.  As long as this relationship is sufficiently direct, a plaintiff can succeed in proving RICO causation.  *See Hemi*, 559 U.S. at 12.  Thus, were this action to be tried before a jury, Plaintiffs would first need to demonstrate a non-attenuated causal chain between Defendants' alleged violation of § 1962 and

the overcharge injury Plaintiffs plead.  Of course, Defendants would almost certainly attempt to demonstrate that the causal link Plaintiffs set out to prove is so attenuated as to render the alleged injury too indirect or that an intervening event ruptures the causal chain Plaintiffs allege.  As such, the case facts will play a critical role at trial when determining the character of the relevant causal chain.

Herein lies the problem.  While the Court finds Defendants' characterization of the causal chain at issue to be inaccurate, their arguments offer insight regarding RICO causation's predominance in this case.  Many of the class members acquired and paid for the tickets as to which they were allegedly overcharged.  But as Defendants point out, some class members acquired the tickets and were later reimbursed by another (*see* Dkt. #302 at pp. 30–33; Dkt. #303 at pp. 50–51).  While Plaintiffs disagree on this argument, the Court finds this distinction critical to two questions that would likely be of consequence on this issue at trial.

This distinction complicates two pivotal points that Plaintiffs allege apply to all class members and will attempt to prove based on class-wide evidence at trial: (1) which events constitute the causal chain between Defendants' alleged RICO violation and Plaintiffs' alleged injury, and (2) whether this causal chain is sufficiently direct to hold Defendants liable as a matter of law for causing the injury Plaintiffs allege.  Were the causal chain as simple as the two steps Plaintiffs allege it to be (*see* Dkt. #276 at pp. 39–42), this pair of questions would be common to Plaintiffs and class member.  The Court, however, characterizes the chain of causation differently—a step exists in between the two that Plaintiffs plead.  Defendants' allegedly fraudulent conduct brought about reliance by third parties, *i.e.*, regulators and the media, regarding the safety of the MAX 8 (*see, e.g.*, Dkt. #357 at p. 42).  In turn, it was then this third-party reliance that caused the putative class members to purchase plane tickets at a fraud-induced price premium.

This additional link in the causal chain may not seem to matter that much, but it very much does when determining whether a class member who acquired a ticket also bore the ultimate economic burden.  If a class member ended up not paying for the ticket themselves, they did not suffer injury—the individual *paying out the reimbursement* did.  Therefore, for those putative class members who can claim membership in a class on the basis of reimbursement, another link must be added to their causal chain.

As a result, the causal chain for those who acquired and bore the ultimate economic burden of a ticket at issue contains three links, but the chain of causation for those who bore the ultimate economic burden but did not acquire the ticket themselves contains four links.  Assessing this standalone fact demonstrates a natural divide on the predominance of causation.  At trial, demonstrating what events constitute the causal chain between Defendants' alleged RICO violation and Plaintiffs' alleged injury would differ between these two sets of class members. Moreover, given the additional link in the causal chain for those who bore the ultimate economic burden for the plane ticket but did not acquire it themselves, proving whether this further attenuation in the chain of causation renders the relevant sequence of events insufficiently direct would differ between these groups of class members.

Retaining the Southwest and American Airlines classes as currently constituted could cause individualized issues of causation to predominate over those common to the classes.  Nevertheless, the Court possesses the authority to form subclasses from the classes Plaintiffs propose for certification.  *See Reyes v. Netdeposit*, LLC, 802 F.3d 469, 494 (3d Cir. 2015).  Accordingly, the Court divides each proposed class in two, based on whether the class member acquired the plane ticket themselves.  The Court refers to the subclasses containing those who acquired and bore the ultimate economic burden of a plane ticket as the "purchasing" classes, and the subclasses

containing those who bore the ultimate economic burden but did not acquire the ticket themselves as the "reimbursing" classes.  Subclassing in this manner results in four putative classes: the Southwest purchasing class, the Southwest reimbursing class, the American Airlines purchasing class, and the American Airlines reimbursing class.

With this issue addressed, the Court proceeds to examine the predominance of Plaintiffs' class-wide RICO-causation theories.

## 2.   Theories

Regardless of the parties' characterizations, Plaintiffs propose two possible paths to demonstrate that proving RICO causation through questions common to the classes predominates.[24]   First, Plaintiffs plan to use class-wide evidence to show that Defendants' allegedly fraudulent scheme directly and foreseeably led to the injury Plaintiffs allege (Dkt. #276 at p. 39).  The Court refers to this as the *Bridge* theory.  Second, Plaintiffs maintain that a reasonable jury could infer RICO causation on a class-wide basis because "no one would have paid a full market price for a ticket that could not have been sold without the existence of a fraudulent scheme" (Dkt. #276 at p. 48).  The Court refers to this as the inference-based theory. The Court addresses each theory in turn.[25]

### a.   *Bridge* Theory

Plaintiffs first propose that questions common to the class members on proximate causation predominate under the *Bridge* theory.  Through common evidence of "the scheme's nature and

---

[24] Plaintiffs proposed a third class-wide theory of RICO causation in its reply brief (*see* Dkt. #357 at pp. 44–47).  But as Boeing correctly points out (*see* Dkt. #389 at p. 34), arguments raised in a reply brief are deemed waived.  *Dugger v. Stephen F. Austin State Univ.*, 232 F. Supp. 3d 938, 957 (E.D. Tex. 2017).  Therefore, the Court does not consider the aggregate-evidence theory Plaintiffs advance.  And even if it did, the Court is skeptical that survey evidence alone is sufficient to demonstrate proximate causation on a class-wide basis in a fraud-based RICO action.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 697–98 (E.D. Mich. 2019) (discussing the results of a conjoint analysis as demonstrating but-for causation).

[25] The Court borrows the labels for these theories from *Torres*.  *See* 838 F.3d at 638–46.

purpose; the circumstances of its execution; and most critically, the specific actions, communications, and knowledge of the Defendants during the life of the scheme and the class period," Plaintiffs contend that, at trial, they will be able to prove that the overcharge injury class members suffered was a direct and foreseeable consequence of Defendants' fraudulent scheme (Dkt. #276 at p. 39).

### b.  Law

Under *Bridge*, a person can be injured by reason of a pattern of racketeering activity "even if he has not relied on any misrepresentations."  553 U.S. at 649.  This principle is not applicable to all § 1961(1) predicate acts—relevant here, "no reliance requirement exists for civil causes of action under RICO for victims of mail" or wire fraud.  *St. Germain*, 556 F.3d at 263.  As a result, the "the most straightforward way of demonstrating reliance in a classwide manner" under the *Bridge* theory is by "showing that the [p]laintiffs' losses were caused 'by reason of' the [d]efendants' operation of a fraudulent scheme."  *Torres*, 838 F.3d at 638.

In *Torres*, the *en banc* Fifth Circuit outlined the approach to make this determination.  *See id.* at 638–41.  To render first-party reliance "not determinative of whether the [p]laintiffs can prove proximate causation under *Bridge*," the plaintiffs must prove that (1) the defendants operated a fraudulent scheme that caused RICO injury; (2) the plaintiffs are "both the direct and foreseeable victims of the alleged fraud"; and (3) the plaintiffs are "necessary to the scheme."  *Id.* at 640.  Once the plaintiffs make these showings, it is not necessary to demonstrate the class members themselves relied on a representation made by the defendants.  *Id.*

The *Torres* court noted two further considerations relevant to this theory.  First, as with proximate causation generally, an intervening cause, such as "a class member's knowledge" of the fraudulent scheme, could "break the chain of causation."  *Id.*; *see Fisher v. Lufkin Indus.*, 847 F.3d

752, 758 (5th Cir. 2017) ("[T]he decis[i]onmaker's judgment should only be considered a superseding cause if it is 'a cause of independent origin that was not foreseeable.'" (quoting *Staub*, 562 U.S. at 420)).   Second, if concerns exist that the case involves "attenuated injuries," the directness of the causal chain to the RICO injury can obviate these concerns when (1) "there are no independent factors that account for the [p]laintiffs' injury"; (2) "there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation"; and (3) "no more immediate victim is better situated to sue."   *Torres*, 838 F.3d at 640 (original alterations and internal quotation marks omitted) (quoting *Bridge*, 553 U.S. at 658).

### c.   Analysis

Applying this framework to the instant case, the Court concludes that questions common to the class members will predominate over those concerning individual members.   The Court considers each of these five considerations as follows.

As the Court has previously discussed, the glue binding this putative class action is Defendants' alleged fraudulent scheme.   This scheme "requir[ed] years of near-constant communication between high-level principals at both Defendants on issues ranging from system design; to regulatory submissions, flight crew documentation, and training requirements; to statements to regulators, pilots, the media, and the public" (Dkt. #276 at p. 40).   Defendants' actions allegedly constituting the fraudulent scheme are common to all class members and would be the same for all at individual trials (Dkt. #276 at p. 41).   Therefore, the Court finds that proving Plaintiffs' alleged injury by reason of Defendants' alleged fraudulent scheme can be accomplished through common evidence.

Next, Plaintiffs will be able to demonstrate that the class members were both the direct and foreseeable victims of Defendants' alleged scheme through common evidence.   Contrary to

Defendants' position (*see, e.g.*, Dkt. #302 at p. 40), this consideration inherently relies on the structure and "objective of the enterprise." *Plambeck*, 802 F.3d at 676.  Out of context, a direct and foreseeable victim appears to depend on a class member's identity.  But this characterization cannot stand because it lacks the necessary referent—direct and foreseeable *as a result of what*?  So as with the previous prong, this showing would be established at trial "through common evidence focused on Defendants and the foreseeable impact of their conduct, not through proof that varies from class member to class member" (Dkt. #276 at p. 39).

As with the direct-and-foreseeable prong, a class-wide demonstration that the putative class members were necessary to Defendants' alleged fraudulent scheme is possible through common evidence.  This consideration also depends on the structure and objective of the scheme.  At trial, evidence common to the classes could be used to show that the formation and maintenance of Defendants' alleged fraudulent scheme necessarily required the class members.

Unlike the three main considerations above, whether an intervening cause snaps the chain of causation between Defendants' alleged fraudulent scheme and the class members' resulting injury would most likely involve individualized questions.  For instance, in *Torres*, whether a class member knew of the scheme's fraudulent nature could have broken the necessary causal link.  838 F.3d at 640.  Despite the more individualized nature of this consideration, the Court is unconvinced that questions affecting individuals will predominate over common questions for two reasons.

First, the Supreme Court has made clear that even where Defendants "attempt to pick off the occasional class member here or there through individualized rebuttal," individual questions do not automatically become predominate.  *Halliburton II*, 573 U.S. at 276.  So long as this number of class members is "de minimis," questions common to all class members may still predominate.  *In re Nexium*, 777 F.3d at 24.  In the immediate case, there is no indication that Defendants plan

to challenge more than this de minimis number of class members through *individualized* rebuttal at trial on the issue of proximate causation.  Second, Defendants have not shown that any of the class members had knowledge *of Defendants' alleged fraudulent scheme*.  The knowledge the class member must possess is that the scheme at issue was fraudulent, not that information incidental to the scheme may not have been true.  *See, e.g.*, *Torres*, 838 F.3d at 640 ("[T]he Defendants . . . have offered no evidence that any putative class member knew Ignite was an illegal pyramid scheme before joining.").  While Defendants here attempt to show that at least one class member was aware of potential problems with the MAX 8 when purchasing a ticket (*see, e.g.*, Dkt. #303 at p. 49), Defendants have not shown that a class member was aware of Defendants' fraudulent scheme.  For these reasons, even though questions of class-member knowledge as an intervening cause may generate some individual questions, the Court finds that these questions would be few and far from the quantity necessary for individualized questions to predominate.

Finally, as for the trio of factors relating to causal attenuation, the Court finds that questions common to the class members will predominate.  Starting with the independent factors that may account for Plaintiffs' injuries, this consideration could swing either way at trial.  If Defendants planned to demonstrate that class members were aware of Defendants' allegedly fraudulent scheme and purchased an airline ticket nevertheless, this factor might very well lead to individualized questions.  However, Defendants have made no indication that they plan to do so.  The closest Defendants come to arguing that an independent factor accounts for Plaintiffs' alleged injury is that ticket purchasers make other considerations that may be determinative in completing a transaction (*see, e.g.*, Dkt. #302 at pp. 40–44).  Without more, these hypothetical concerns regarding independent factors of causation cannot demonstrate the absence of predominance.  *See, e.g.*, *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 556–57 (W.D. Tex. 2020) (finding that the

absence of concrete evidence regarding potential intervening causes cannot show lack of predominance). As such, the Court cannot find that this issue will generate individual questions that predominate as to the putative class members.

Regarding the duplicative-recovery factor, the Court determines that the way the classes have been structured will prevent this possibility. Subclassing the purchasers and reimbursers into their own classes isolates this factor's key variable: who paid for the ticket? Or, phrased another way, who suffered a RICO injury? The identity of the members in each class is directly tied to the link in the chain of causation at which the alleged injury occurred. As such, the Court is confident that, if Defendants were found liable at trial, evidence common to the respective purchasing and reimbursing classes would show that the damages to be paid out would not involve duplicative recovery.

Finally, as to whom is best situated to bring suit, this factor generates common questions in much the same manner as the duplicative-recovery factor. Because the identity of the class members turns on their respective position in the causal chain, determining whether others are better situated to bring the immediate action will be accomplished through common, class-wide evidence. Defendants argue it is already evident that members of the putative classes are not the most immediate victims and, therefore, are not best situated to prosecute this suit (*see, e.g.*, Dkt. #388 at pp. 39–40). Oddly enough, this contention proves why questions common to the classes predominate over individual ones. Their argument is that other similarly situated *groups* are best situated to litigate this case, not the putative classes.[26]

Based on the foregoing analysis, the Court concludes that the evidence each class member would likely put on at individual trials to prove proximate causation would be the same.

---

[26] The Court does not address the merits of this argument at the class-certification stage. *See Messner*, 669 F.3d at 811 ("[C]ourt[s] should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.").

Accordingly, the Court finds that questions common to the class members regarding under the *Bridge* theory will predominate over those that relate only to individual class members.

### d.  Defendants' Opposing Arguments

Defendants offer a variety of arguments in opposition to Plaintiffs' invocation of *Bridge* theory, but only two merit discussion.  *See Prantil*, 986 F.3d at 579 ("A certification order ought to reflect the district court's consideration of a defendant's *weightiest* arguments against certification." (emphasis added)).  First, Defendants argue that Plaintiffs' attempt to recover, at least in part, on an allegation of fraud on the public, would result in individualized inquiries predominating (*see, e.g.*, Dkt. #303 at pp. 23–26).  Second, Defendants maintain that Plaintiffs cannot use any representations Defendants made to the FAA as part of the immediate RICO action (*see, e.g.*, Dkt. #302 at pp. 24–25; Dkt. #303 at pp 31–33).  The Court finds neither cuts against the conclusion that common questions of RICO causation predominate.

Defendants' first argument is unavailing for a simple reason—under the *Bridge* theory of causation, it is immaterial whether class members relied on Defendants' alleged misrepresentations.  *Torres*, 838 F.3d at 640 ("Whether the Plaintiffs relied on a misrepresentation about the scheme is thus not determinative of whether the Plaintiffs can prove proximate causation under *Bridge*.").  Yet just as Defendants cannot invoke individualized questions of first-party reliance in opposition to the predominance requirement here, Plaintiffs will not be able to use common evidence of first-party reliance to support the *Bridge* theory of causation once the merits may be considered.

Defendants' second argument has two parts, both of which are without merit.  First, Defendants assert that Plaintiffs are judicially estopped from arguing that alleged misrepresentations made by Defendants to the FAA support Plaintiffs' RICO-causation theory

(Dkt. #302 at pp. 24–25; Dkt. #303 at pp. 31–33).  *See Zedner v. United States*, 547 U.S. 489, 504 (2006).  This contention is incorrect as a matter of law.  The first element of judicial estoppel that courts consider is whether "the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position."  *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc).  At no point during this action have Plaintiffs claimed that they seek to recover for Defendants' fraudulent acts against the FAA (*see, e.g.*, Dkt. #39 at p. 19).  *See also United States v. Boeing Co.*, No. 4:21-cr-005 (N.D. Tex.).  Plaintiffs simply seek to argue that Defendants' alleged misrepresentations to the FAA bear on the third-party-reliance aspect of the *Bridge* theory.  This distinction is critically important and demonstrates why Defendants' judicial-estoppel argument is misplaced.

Second, Defendants argue that the Federal Aviation Act (the "FAAct") "bars fraud on the FAA as a basis for class certification" (Dkt. #303 at p. 33).  This contention entirely misunderstands how preemption functions.  The doctrine of preemption is relevant only when "federal and state laws conflict."  *Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 465 (E.D. Tex. 2020).  The problem with this argument is clear: Plaintiffs are not pursuing *any* state-law claims.  As such, Defendants' assertion is irrelevant here, and the cases they cite are inapposite.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) ("state-law fraud-on-the-FDA"); *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 409 (11th Cir. 2011) (state-law consumer fraud); *Timaero Ir. Ltd. v. Boeing Co.*, No. 19-C-8234, 2021 WL 963815, at *7 (N.D. Ill. Mar. 15, 2021) (state-law fraudulent inducement).  Furthermore, Defendants neither argue nor cite legal authority to the effect that the FAAct either explicitly or implicitly repealed RICO.  *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (explaining the implied-repeal canon of construction); *see also, e.g.*, *Ray v. Spirit Airlines,*

*Inc.*, 767 F.3d 1220, 1223–28 (11th Cir. 2014).  For these reasons, Defendants' preemption-based argument is unavailing.

### e.  Inference-Based Theory

The Court looks now to Plaintiffs' inference-based theory of RICO causation.  This theory is an exception to the general rule that fraud actions predicated on first-party reliance cannot be certified as Rule 23(b)(3) classes because individual issues will predominate over common ones. *See Sandwich Chef*, 319 F.3d at 211.   But where "common evidence of fraudulent misrepresentation 'gives rise to a reasonable inference that that misrepresentation induced the class members' actions and caused their losses,'" then "common issues can still predominate" via a class-wide inference of reliance.  *Vine v. PLS Fin. Servs.*, 807 F. App'x 320, 329 (5th Cir. 2020) (per curiam) (quoting *Torres*, 838 F.3d at 641); *see Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015) ("Such an inference may be available if, for example, the class members all faced 'the same more-or-less one-dimensional decisionmaking process,' such that the alleged misrepresentation would have been 'essentially determinative' for each plaintiff." (quoting Nagareda, *supra*, at 121)).

Plaintiffs assert that, under the inference-based theory, they are entitled to a common, class-wide inference of reliance because a jury could reasonably infer "that no one would have paid a full market price for a ticket that could not have been sold without the existence of a fraudulent scheme" (Dkt. #276 at p. 48).  Defendants disagree, arguing that the Court cannot grant such an inference to the classes on these facts (*see* Dkt. #302 at pp. 45–47; Dkt. #303 at 27–31; Dkt. #388 at pp. 43–44; Dkt. #389 at pp. 31–34).  After carefully considering *Torres* and subsequently squaring the immediate facts with applicable law, the Court concludes that the proposed classes cannot be granted the inference Plaintiffs seek.

### i.  Law

In *Torres*, the Fifth Circuit certified a class on two separate theories of causation, the latter of which was the inference-based theory.  Judges Wiener and Costa, writing on behalf of the *en banc* court, framed the inquiry as follows.  First, a named plaintiff must allege that a RICO defendant made a "representation of legitimacy" that was actually fraudulent in nature.  *Torres*, 838 F.3d at 641, 646.  Once the alleged misrepresentation is identified, the plaintiff must demonstrate that the question of whether the representation was legitimate or fraudulent is "subject to common proof."  *Id.* at 641.  If this showing is made, the question then becomes whether the plaintiff "may employ a common inference of reliance based on that alleged misrepresentation." *Id.*  The inference may be used when (1) the inference of reliance "follow[s] logically from the nature of the scheme,"[27] and (2) there is "common, circumstantial evidence that class members relied on the fraud."  *Id.*  A common inference of reliance logically follows from the nature of the scheme when (1) "it may be rationally assumed that a precondition" to engaging the scheme was its legitimacy, and (2) the defendants offer "no evidence of any putative class member who" engaged or would have engaged the scheme if aware of its fraudulent nature.  *Id.*

The facts of *Torres* are a prime example of how to conduct this analysis.  In the case, the plaintiffs sought class certification on behalf of victims to an alleged pyramid scheme perpetrated by the defendants.  *See id.* at 633–34.  The Fifth Circuit affirmed certification on the plaintiffs' inference-based theory.  *Id.* at 641.  At the first analytical step, the plaintiffs offered that the defendants had represented the allegedly fraudulent pyramid scheme to be "a legal multi-level marketing program," and the question of whether the defendants' representation was legitimate or

---

[27] Contrary to Defendants' repeated contention (*see, e.g.*, Dkt. #303 at p. 28), finding that "no rational actor would [engage a] scheme had he or she known of the fraud" is a sufficient, as opposed to necessary, condition "to infer reliance" class-wide.  *Torres*, 838 F.3d at 642.

fraudulent was "subject to common proof." *Id.* The *Torres* court then concluded that the plaintiffs could use "a common inference of reliance to prove proximate causation under RICO" if they proved that the scheme at issue was indeed fraudulent. *Id.* at 643. Two points specifically supported this finding. First, it was "reasonable to infer" that the putative class members "would not have knowingly joined a fraudulent pyramid scheme." *Id.* Second, the record was "devoid of evidence that a single putative class member [engaged the scheme] despite having knowledge of the fraud." *Id.* Hypotheticals and "sheer speculation" that a class member could have engaged the scheme while aware of its fraudulent nature were insufficient. *Id.* at 644. The *en banc* court clarified that had the defendants "presented evidence that could rebut the [p]laintiffs' common inference of reliance on an individualized basis," individualized issues of reliance might have predominated over common ones at trial. But absent this evidentiary basis, no other conclusion could be drawn. *See id.*

### ii. Analysis

Applying this framework to the instant action, the Court is unable to make out a basis for granting the common inference of reliance Plaintiffs seek. Starting at the first step, Plaintiffs maintain that Boeing and Southwest made implicit representations of legitimacy in the course of their alleged scheme regarding the MAX 8's safety and operational capacities that were actually fraudulent (Dkt. #276 at pp. 49–50). As the Court previously addressed, *supra* pp. 68–69, whether these representations were legitimate or fraudulent are subject to common proof.

But this is where Plaintiffs' case for the inference-based theory runs into trouble. At the next step, to demonstrate that a common inference of reliance follows logically from the nature of Defendants' scheme, Plaintiffs needed to show that it may be rationally assumed that a precondition to purchasing a plane ticket from Southwest or American Airlines during the class

period was that the MAX 8's design and operation complied with federal aviation laws and regulations.  Plaintiffs cannot and do not do so.

While their *ipse dixit* certainly possesses intuitive appeal, Plaintiffs' argument in favor of the rational, preconditional assumption falls short.  The instant facts are distinguishable from those in *Torres* in a meaningful way:  the alleged misrepresentation there was a precondition to a "financial transaction," whereas the alleged misrepresentations here are preconditions to "consumer purchases."  *Id.* at 643 n.62.  This distinction matters because "a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008); (*see* Dkt. #303 at p. 29); *see also, e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665–66 (9th Cir. 2004) ("[G]ambling is not a context in which we can assume that potential class members are always similarly situated. Gamblers do not share a common universe of knowledge and expectations—one motivation does not 'fit all.' . . . Thus, to prove proximate causation *in this case*, an individualized showing of reliance is required.").  None of the cases Plaintiffs cite support the position they attempt to prove (Dkt. #303 at p. 28 n.11).

Even supposing the assumption were warranted and Defendants had not offered any evidence to rebut the proposition that putative class members did not purchase or would not have purchased a plane ticket while keen to Defendants' allegedly fraudulent scheme, Plaintiffs would still need to demonstrate the existence of common, circumstantial evidence that class members relied on the fraudulent representation.  Plaintiffs have pleaded and discussed several theories of causation throughout this litigation, but none involve first-party reliance.  And for good reason— a putative fraud-based class action seeking money damages will all but certainly fail to satisfy Rule

23(b)(3)'s predominance requirement.  *See McManus v. Fleetwood Enters.*, 320 F.3d 545, 549–50 (5th Cir. 2003); (*see also* Dkt. #431 at p. 72:13–18).

Based on the foregoing, the Court determines that a common inference of reliance cannot be conferred to the proposed classes as Plaintiffs request.  Therefore, the Court will not certify the inference-based theory of RICO causation.

### 4.  Affirmative Defenses

Though practically unaddressed by the parties, the Court briefly examines the predominance of Defendants' affirmative defenses.  Southwest pleads forty defenses in its operative answer (Dkt. #192 at pp. 43–47), and Boeing pleads twenty-five (Dkt. #191 at pp. 54–58).  Other than the sole exception the Court addresses below, neither Plaintiffs nor Defendants said one word regarding affirmative defenses in their briefing and arguments on class certification.

"[L]ike other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate."  *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 438 (4th Cir. 2003).  Affirmative defense are "not *per se* irrelevant to the predominance inquiry."  *Gene & Gene*, 541 F.3d at 327.  In fact, "[t]he predominance of individual issues necessary to decide an affirmative defense may preclude class certification."  *In re Monumental*, 365 F.3d at 420; *see Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1241 (11th Cir. 2016).  Nevertheless, even when "some affirmative defenses peculiar to some individual class members" must be tried separately, the proposed class may still meet the predominance requirement.  *Bouaphakeo*, 577 U.S. at 453.

Defendants plead a few defenses that may involve individual questions[28] (*see, e.g.*, Dkt. #191 at p. 56; Dkt. #192 at p. 45).  But even so, "an affirmative defense, standing alone, does not

---

[28] It is difficult to know for sure, though, since the parties offer almost no discussion on the topic.  Furthermore, it is unclear which side bears the burden of proof.  *See Gene & Gene*, 541 F.3d at 329 (assigning the burden of proof to the party seeking certification but not clearly delineating whether this rule applied to an affirmative defense).  The burden of proof for class certification, of course, rests with the movant.  *Mitchell*, 954 F.3d at 709.  At the same time,

compel a finding that common liability issues do not predominate." *In re HCA Holdings, Inc.*, 14-0511, 2015 WL 10575861, at *2 (6th Cir. Feb. 26, 2015).  Most of the defenses Defendants plead are, in fact, not affirmative defenses, and nearly all pled-defenses are susceptible to proof via class-wide evidence.

The only argument offered on affirmative defenses pertains to class-action waiver. Southwest contends that those ticket purchasers who transacted on Southwest's website or app agreed to class-action waivers, while those who completed their transactions by other means did not (Dkt. #302 at p. 57).  As such, Southwest alleges that this distinction will cause individualized issues to predominate (Dkt. #388 at p. 53).  Plaintiffs respond to the merits of Southwest's argument (*see* Dkt. #357 at pp. 80–87), but the Court finds it unnecessary to wade into this discussion.  Assuming without deciding that class-action waiver has been properly raised as an affirmative defense, determining the waiver's effect and enforceability is a question common to many in the class and would be resolved with class-wide evidence.  *See, e.g.*, *Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d 682, 691–92 (S.D. Tex. 2013) (Costa, J.).

In sum, to the degree that any affirmative defenses Defendants plead require individualized resolution, the common questions related to the affirmative defenses certainly predominate.

### ii.  Damages

Having concluded that issues of liability satisfy Rule 23(b)(3)'s predominance element, the Court considers Plaintiffs' damages case under the same requirement.  Plaintiffs plan to use Dr. Allenby's conjoint model to demonstrate the amount of overcharge as a percentage, which, when applied to the ticket price paid, would yield the amount of overcharge in dollars, *i.e.*, produce the

---

the default rule is that "a defendant bears the burden of proving affirmative defenses." *Rosemond v. United States*, 572 U.S. 65, 91 (2014) (Alito, J., concurring in part and dissenting in part); *see Martin v. Ohio*, 480 U.S. 228, 235 (1987) ("[T]he common-law rule was that affirmative defenses . . . were matters for the defendant to prove."). Nevertheless, the Court arrives at the same conclusion here under either approach.

individualized quantum of damages for each class member.  Defendants forcefully challenge Plaintiffs' proposed approach to damages on several fronts.

The predominance element applies to damages as it would to any other aspect of a case. "The issue of damages may defeat predominance 'where the calculation of damages is not susceptible to a mathematical or formulaic calculation.'"  *Cruson*, 954 F.3d at 258 (quoting *Bell Atl.*, 339 F.3d at 307).  Under the Supreme Court's *Comcast* rubric, "when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto plaintiffs' liability theory."[29]  *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410–11 (5th Cir. 2017).  For common questions of damages to predominate over questions only affecting individual members of the classes proposed here, the "damages methodology" Plaintiffs produce "must be 'sound' and must 'produce commonality of damages.'"  *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (brackets omitted) (quoting *Comcast*, 569 U.S. at 37); *see id.* at n.36 (holding that where, as here, predominance is based on the commonality of "liability and damages," the predominance inquiry asks whether "th[is] commonality is undone by the damages theory").

### 1.  Plaintiffs' Damages Model

After comparing Plaintiffs' damages model to the liability theory underlying the case, *i.e.*, "an airline ticket overcharge due to Defendants' fraudulent scheme" (Dkt. #276 at p. 40), the Court finds Dr. Allenby's conjoint survey to be consistent with "what *Comcast* demands":  "fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory."  *Slade*, 856 F.3d

---

[29] Parties opposing class certification tend to characterize *Comcast*'s holding as either imposing new requirements for damages to predominate or having raised the level of scrutiny with which courts must evaluate damages.  This is not the case.  *See Deepwater Horizon II*, 739 F.3d at 815 & n.104; *see also Neale*, 794 F.3d at 374–75 & n.10.  As Justice Scalia stated in *Comcast*, "This case . . . turns on the straightforward application of class-certification principles."  569 U.S. at 34.

at 411.  In his survey, Dr. Allenby set out "to determine whether, as a result of the FAA and the public having incomplete and false information about the safety of the MAX 8, Southwest Airlines and American Airlines enjoyed a price premium on the sale of tickets on flights that were either flown on a MAX 8 or could have been flown on a MAX 8" (Dkt. #276, Exhibit 7 at p. 4).  This research objective is consistent with Plaintiffs' theory of liability in the case.  *See Earl*, 2020 WL 759385, at *7–9.

As recounted above, *supra* pp. 24–25, Dr. Allenby's carefully drawn survey detected the fact of injury "as a result of the public having incomplete and false information about the safety of the MAX 8" (Dkt. #276, Exhibit 7 at p. 31).  After finding the fact of injury, Dr. Allenby applied statistical methodologies accepted within the field of price-equilibrium analysis to elucidate the quantum of the ticket overcharge.  Through a series of three, interlocking metrics derived from the conjoint's results, *see Earl v. Boeing Co.*, No. 4:19-CV-507, 2021 WL 3140545, at *7 (E.D. Tex. July 26, 2021), Dr. Allenby derived the Equilibrium Price and Share Premium ("EPSP"), which measures the fair market value attributable to a product's feature that accounts for "demand and supply sides of the market" (Dkt. #276, Exhibit 7 at p. 25).  Calculated as a percentage, the EPSP measurements for both Southwest and American Airlines demonstrated the damages model's ability to "reliably estimate the amount of the price premium" these airlines enjoyed during the class period, "as well as the impact on market shares and revenues" (Dkt. #276, Exhibit 7 at p. 31; *see* Dkt. #276, Exhibit 7 at pp. 27–28 tbl. 10, 34 tbl. 10A).  Dr. Allenby affirmed the soundness of the results by conducting a sensitivity analysis, which indicated that "the model estimates are unrelated to the demographic and behavioral variables investigated," meaning that the "preference estimates and price effects . . . are unaffected by variation between the sample and the target population" (Dkt. #276, Exhibit 7 at p. 30).

The Court concludes that this damages model satisfies *Comcast* and demonstrates the predominance of common questions.  The design and execution of the conjoint survey show that the damages Plaintiffs allege "arise from a course of conduct that impacted the class." *Just Film*, 847 F.3d at 1120.  The approach Dr. Allenby took in building, conducting, and analyzing the survey aligns with accepted principles of conjoint and price-equilibrium analysis.  By isolating the effect that the absence of knowledge had on ticket purchasers, Dr. Allenby was able to determine the price difference between what ticket purchasers actually paid versus would have paid but for Defendants' allegedly fraudulent scheme.  *See Slade*, 856 F.3d at 411.  Because Dr. Allenby calculated the overcharge amount as a percentage, class members will be able to use this class-wide theory of damages to calculate their own individual damages by locating the receipt of purchase, identifying the price paid for a ticket, and multiplying that price by the overcharge percentage.  The damages methodology advanced by Plaintiffs through Dr. Allenby is sound and produces commonality of damages, thereby demonstrating that damages predominate as to the proposed class members.  *See Ludlow*, 800 F.3d at 683; *see also, e.g.*, *Cohen v. Trump*, 303 F.R.D. 376, 389 (S.D. Cal. 2014).

### 2.  Defendants' Opposing Arguments

Turning now to Defendants' arguments regarding predominance of damages, the Court begins by noting the multitude of arguments Defendants offer in their class-certification briefing regarding the admissibility of Dr. Allenby's expert testimony (*see* Dkt. #302 at p. 50; Dkt. #303 at pp. 35–36; Dkt. #388 at pp. 47–48; Dkt. #389 at pp. 39–41).  Last month, the Court denied Defendants' Motion to Exclude the Expert Report and Testimony of Dr. Allenby.  *Earl*, 2021 WL 3140545, at *1–9.  To the extent that any of Defendants' class-certification arguments repeat and

re-urge those from their *Daubert* motion, the Court finds such arguments unpersuasive and incorporates its opinion on the *Daubert* motion here.  *See id.*

Defendants offer criticisms on damages-predominance that boil down to two general positions: (1) Plaintiffs cannot use averages or other aggregated measures to calculate individual damages, and (2) because Plaintiffs' damages case can neither (i) account for the complexity and heterogeneity of the commercial-airline marketplace nor (ii) replicate the revenue management systems airlines use to price tickets, Plaintiffs' damages model is unusable.  Neither argument is persuasive.

Beginning with the concern over averages and aggregates, Defendants' worries are misplaced.  First, as Plaintiffs reiterate in their reply, the overcharge measures Dr. Allenby elicited from the conjoint survey are not averages—they are "estimates of the market-wide price premium applicable to each ticket purchaser in the classes" (Dkt. #276, Exhibit 6 at p. 3; *see also* Dkt. #276, Exhibit 6 at p. 3 n.1).  And second, the supposed aggregate measure of damages which, according to Southwest, Plaintiffs will use is not what Southwest purports the metric to be (*see* Dkt. #302 at p. 55).  The proper characterization of Plaintiffs' "aggregate" intent is to use Dr. Allenby's survey as class-wide proof to answer the overarching, common question that predominates here: what quantum of damages did each class member suffer when they purchased plane tickets during the class period?  By integrating "Dr. Allenby's results, data in fare databases, and a basic algebraic calculation," Plaintiffs seek to enable all class members to calculate the extent to which Defendants' allegedly fraudulent course of conduct caused any pocketbook injury (Dkt. #276 at p. 54).  *Cf. In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) ("Antitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages

attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members.").

Defendants' second argument also comes up short.  Southwest and Boeing spend a significant amount of time isolating and differentiating as many variables as they can spot in the ticket-pricing mechanisms of the airlines, with the hope of demonstrating that individualized questions regarding damages predominate over questions common to the classes (*see* Dkt. #302 at pp. 36–37, 51–54; Dkt. #303 at pp. 36–42; Dkt. #388 at pp. 30–32, 48–49; Dkt. #389 at pp. 44–48).  But to no avail.  If what Defendants seek is a determination that including or excluding one or more of these considerations causes Plaintiffs' damages model to fail as a matter of law, the Court cannot find as much.  For one thing, conjoints already account for supply-side forces—"a reliable conjoint analysis does not require a replication of the supply side at a granular level" (Dkt. #276, Exhibit 8 at p. 7).  Furthermore, the various threads of argumentation Defendants urge on this point relate more readily to the task of the factfinder at trial.  Because the Court concludes that Plaintiffs' damages model is viable under *Comcast* and involves predominantly common questions, the Court cannot venture any further without intruding upon the jury's domain.  *See Amgen*, 568 U.S. at 460 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'method' best suited to adjudication of the controversy 'fairly and efficiently.'" (brackets omitted)).

From a macro-level perspective, the Court discerns a common theme to Defendants' arguments on the predominance of damages: Plaintiffs' damages model cannot determine the extent of the class members' alleged injury with pinpoint precision.  While by no means a frivolous contention, this implicit notion in Defendants' damages arguments does not hold water for two reasons.  First, along the same lines the Court addressed regarding predominance of RICO injury,

*supra* pp. 50–65, it is incredibly difficult to calculate damages resulting from Defendants' allegedly fraudulent conduct because the only way to take this measurement is in a counterfactual, but-for universe.[30]  *See, e.g.*, *Ludlow*, 800 F.3d at 685; *cf. In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 32 (E.D.N.Y. 2020) ("Courts recognize that, 'given the inherent difficulty of identifying a "but-for world,"' antitrust damages need not 'be measured with certainty.'" (brackets and citation omitted)).

Second, it is black-letter law that "when uncertainty in proving damages is caused by the defendant's own wrongful act, 'justice and sound public policy alike require' that the defendant 'bear the risk of the uncertainty thus produced.'"  *State v. United Parcel Serv.*, 253 F. Supp. 3d 583, 687 (S.D.N.Y. 2017) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931)), *aff'd*, 942 F.3d 554 (2d Cir. 2019).  "In most any damage class action, each class member is likely to be entitled to a specific amount of damage pertinent to the harm she suffered."  2 Newberg, *supra*, § 4:54.  And in a considerable number of cases, "damages will not be uniform across the class," thereby requiring individualized calculation.  *In re Nexium*, 777 F.3d at 21.  Nonetheless, it is "well nigh universal" that "individual damages calculations do not preclude class certification under Rule 23(b)(3)."  *Comcast*, 569 U.S. at 42 (Ginsburg and Breyer, JJ., dissenting); *see Bell Atl.*, 339 F.3d at 306 ("[R]elatively few motions to certify a class fail because of disparities in the damages suffered by the class members.").  In fact, "[i]t would drive a stake through the heart of the class action device, in cases in which damages were sought . . . , to require that every member of the class have identical damages."  *Butler v. Sears, Roebuck &*

---

[30] It is not unreasonable for Plaintiffs to characterize aspects of Defendants' position as completely ungrounded (*see* Dkt. #357 at p. 67).  As far as either Defendant actually contends that Plaintiffs' inability to replicate the airlines' revenue pricing mechanisms should render the damages model deficient for predominance purposes, the Court wholly rejects such a  bizarre claim.  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946); *see also, e.g.*, *Allens Mfg. Co. v. Napco, Inc.*, 3 F.3d 502, 505–06 (1st Cir. 1993) (Breyer, J.).

*Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  Courts must be vigilant in recognizing that "[t]he question of whether there is a right to recovery is not to be confused with the difficulty in ascertaining the scope or extent of the injury."  *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987).

RICO regime guarantees damages in some form upon a finding of liability.  "For RICO claims, '[w]here injury is established, damages need not be demonstrated with precision.'"  *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 371 (D. Mass. 2008) (quoting *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 578 (E.D.N.Y. 2007)).  Accordingly, and assuming that Plaintiffs are able to demonstrate Defendants' RICO liability at trial based on class-wide evidence, Plaintiffs would have "broad latitude . . . in quantifying damages, especially when the defendant's own conduct impedes quantification."  *Comex Int'l v. Norfolk S. Ry. Co.*, No. 04-cv-3637, 2006 WL 355230, at *5 (S.D. Tex. Feb. 14, 2006) (internal quotation marks omitted) (quoting *Haslund v. Simon Prop. Grp.*, 378 F.3d 653, 658 (7th Cir. 2004)); *see Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698 (5th Cir. 1975).  For these reasons, Defendants' overarching position regarding Plaintiffs' supposed inability to produce a damages model with exacting precision is unpersuasive.

In sum, the Court finds common questions of damages to predominate.  To the extent that any individualized questions are present, the overwhelming majority of questions relating to predominance of the classes' liability and damages are common to the putative members.  *See Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) ("Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue.").  And, on balance, the Court finds that while individualized questions may be present in certain aspects of the class proceedings, questions common to putative

class members regarding liability and damages will predominate.  Accordingly, the Court finds that the classes satisfy Rule 23(b)(3)'s predominance requirement.

### b. Superiority

The second 23(b)(3) element is superiority, which requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  This "requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'"  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3d Cir. 2016) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004)).  From a general level, two questions comprise the superiority inquiry: "First, would a class action create more manageability problems than its alternatives?  And second, how do the manageability concerns compare with the other advantages or disadvantages of a class action?"  *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304–05 (11th Cir. 2021) (citation omitted).  Courts consider four main factors when analyzing superiority: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  FED. R. CIV. P. 23(b)(3)(A)–(D).  And when "considering the superiority requirement, a district court must possess 'an understanding of the relevant claims, defenses, facts, and substantive law presented in the case' . . . [and] consider 'how a trial on the alleged causes of action would be tried.'"  *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 425 (5th Cir. 2004) (first quoting *Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 419 (5th Cir. 1998); and then quoting *Castano*, 84 F.3d at 752).

The class-action device is far superior for the instant litigation than "other available methods for fairly and efficiently adjudicating the controversy."[31]  First and foremost, the action Plaintiffs bring is a quintessential negative-value suit (Dkt. #276 at pp. 56–57).  Considering that the "most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit," *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996), Plaintiffs have already made a strong showing for superiority.  *Flecha*, 946 F.3d at 769–70 ("[P]roof that a particular action is a negative value suit may satisfy the requirement of superiority under Rule 23(b)(3)."); *see Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see also* 2 NEWBERG, *supra*, § 4:87 ("In . . . cases [involving small claims], there will either be a class action or there will be no litigation. A class action is not only superior to other forms of litigation; it is the only form of litigation.").

As for the other superiority considerations, each strengthens Plaintiffs' position on this element.  For instance, there are no indications that litigation related to this suit exists and is currently pending elsewhere.  *See, e.g.*, *Robertson v. Monsanto Co.*, 287 F. App'x 354, 361–62 (5th Cir. 2008) (per curiam).  Additionally, the value of concentrating litigation in the Eastern District of Texas is clear given that this Court has already ruled on a number of matters in this case.  *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 510–11 (S.D. Tex. 2004); *see also* 2 NEWBERG, *supra*, § 4:71 ("In a nationwide class action, there may be no forum that is convenient for all participants, and it may only be possible for a forum to be no worse than the alternatives.").  And as for manageability, though the potential size of the putative classes might engender some concern as to the claims-administration process, class size is "rarely itself a reason for finding litigation . . . unmanageable."  2 NEWBERG, *supra* § 4:72; *see In re Visa Check/MasterMoney*

---

[31] Neither Defendant contests this element (*see* Dkts. #302–03).

*Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'" (citation omitted)).

Here, the superiority factors weigh overwhelmingly in favor of class-action treatment in comparison to all other available methods of adjudication. The Court therefore finds that Plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement.

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Motion for Class Certification (Dkt. #276) is **GRANTED** in accordance with this opinion. Accordingly, the Court proceeds to "define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." FED. R. CIV. P. 23(c)(1)(B).

The Court certifies four separate classes under Federal Rule of Civil Procedure 23(a) and 23(b)(3). They are defined as follows:

### (1) Southwest Airlines purchasing class

All persons who conducted the transaction to purchase and bore the economic burden for a ticket for air travel within, to, or from the United States on a Southwest Airlines aircraft, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (*i.e.*, routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

### (2) Southwest Airlines reimbursing class

All persons who did not conduct a transaction to purchase, but bore the economic burden for, a ticket for air travel within, to, or from the United States on a Southwest Airlines aircraft, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (*i.e.*, routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

### (3) American Airlines purchasing class

All persons who conducted the transaction to purchase and bore the economic burden for a ticket for air travel within, to, or from the United States on an American Airlines aircraft, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (*i.e.*, routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

### (4) American Airlines reimbursing class

All persons who did not conduct a transaction to purchase, but bore the economic burden for, a ticket for air travel within, to, or from the United States on an American Airlines aircraft, except for such persons whose tickets were solely for flight segments (a) for which the MAX 8 aircraft was not scheduled for use as of the reservation date nor actually used or (b) that were not on MAX 8 routes as of the reservation date (*i.e.*, routes that had not as of the time of the reservation included the use of a MAX 8 aircraft).

The following are excluded from the class definitions: Boeing and Southwest, their employees, officers, directors, legal representatives, successors, and wholly or partly owned subsidiaries or affiliates of Boeing and Southwest; class counsel and their employees and experts; and the judicial officers and their immediate family members and associated court staff formerly or currently assigned to this case.

The class period is defined as August 29, 2017, through March 13, 2019, inclusive. These dates represent the time period from when Southwest first took delivery of the MAX 8 until the date that the FAA grounded all MAX series aircraft.

The two class claims are for (1) a RICO violation under 18 U.S.C. § 1962(c), and (2) a RICO violation under 18 U.S.C. § 1962(d).

The Court "must appoint class counsel" at this stage. Fed. R. Civ. P. 23(g)(1). "[T]he language of Rule 23(g) 'recognizes the importance of judicial evaluation of the proposed lawyer for the class' and entrusts courts with ensuring fair and adequate representation of the class

interests." *In re Toyota Hybrid Brake Litig.*, No. 4:20-CV-127, 2020 WL 6161495, at *14 n.18 (E.D. Tex. Oct. 21, 2020) (original alterations omitted) (quoting FED. R. CIV. P. 23 advisory committee's note to 1998 amendment).  Where, as here, "one applicant seeks appointment as class counsel," the Court may appoint the applicant only if "adequate under Rule 23(g)(1) and (4)." FED. R. CIV. P. 23(g)(2).  Under Rule 23(g)(1), the criteria that the Court must consider as to the applicant are:  (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A)(i)–(iv).  Under Rule 23(g)(4), the Court must consider whether the applicant, as class counsel, will "fairly and adequately represent the interests of the class."

After considering the criteria of Rule 23(g)(1) and (g)(4), the Court appoints Bathaee Dunne LLP and Dovel & Luner, LLP as Co-Lead Class Counsel.  The Court also appoints Capshaw Derieux LLP as Class Counsel.

If Defendants elect not to appeal under Rule 23(f), once the time period in which Defendants may appeal the Court's decision expires, Plaintiffs shall have thirty (30) days to propose to the Court a method and form of individual notice for class members.  *See* FED. R. CIV. P. 23(c)(2)(B).

The Court also recognizes that Plaintiffs, seeking two certify only two classes, have not had an opportunity to name class representatives for the Southwest Airlines purchasing class or the American Airlines purchasing class.  If Defendants elect not to appeal under Rule 23(f), once the time period in which Defendants may appeal the Court's decision expires, Plaintiffs shall

amend their Motion for Class Certification (Dkt. #276) to include named representatives for the

Southwest and American Airlines purchasing classes within thirty (30) days.

**IT IS SO ORDERED.**

**SIGNED this 3rd day of September, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE